Appeal No. 13-35290

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

_____

LESTER R. SHINAULT,
*Appellant*,

*v.*

DICK HAWKS; TAMI DOHRMAN; MARTHA MCDANIEL;
OREGON DEPT. OF CORRECTIONS GENERAL SERVICE DIVISION,
*Appellees*.

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON
THE HONORABLE ANNA J. BROWN, JUDGE
CASE NO. 3:11-CV-00436-PK

_____

**APPELLANT'S OPENING BRIEF**

_____

O'MELVENY & MYERS LLP
DANIEL H. BOOKIN
ANNA-ROSE MATHIESON
TWO EMBARCADERO CENTER, 28TH FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3823
TELEPHONE: (415) 984-8700
FACSIMILE: (415) 984-8701

*Pro Bono Attorneys for Appellant Lester R. Shinault*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ....................................................................................1

STATEMENT OF JURISDICTION.........................................................3

ISSUES PRESENTED FOR REVIEW ....................................................4

STATEMENT OF THE CASE..................................................................4

      A.    Defendants Issued an Ability to Pay Order and Seized Mr. Shinault's Funds Without a Hearing...................................6

      B.    Mr. Shinault Was Denied Access to Counsel at the ALJ Hearing.......................................................................................10

      C.    Mr. Shinault Filed This Suit.......................................................15

SUMMARY OF ARGUMENT ...............................................................17

STANDARD OF REVIEW .....................................................................21

ARGUMENT ..........................................................................................22

    I.    DEFENDANTS SEIZED MR. SHINAULT'S FUNDS WHILE DENYING HIM SUFFICIENT PROCESS AND ACCESS TO THE COURTS ..............................................................................22

      A.    Defendants Denied Mr. Shinault Pre-Deprivation Process ......23

      B.    Mr. Shinault Was Denied the Right to Have an Attorney Present to Protect His Property Interest...................................28

      C.    Mr. Shinault Was Denied a Meaningful Opportunity to Be Heard ...................................................................................35

    II.    DEFENDANTS ACTED WITH DELIBERATE INDIFFERENCE TO MR. SHINAULT'S SERIOUS MEDICAL NEEDS....................................................................38

      A.    Diabetes Is an Objectively Serious Medical Need ..................40

      B.    Defendants Acted with Deliberate Indifference by Intentionally Interfering with the Known Purpose of Mr. Shinault's Medical Settlement Funds ...............................41

CONCLUSION .......................................................................................49

# TABLE OF AUTHORITIES

**Page**

## <u>CASES</u>

*Allen v. Sakai,*
    48 F.3d 1082 (9th Cir. 1994) ...........................................................................35

*Armstrong v. Manzo,*
    380 U.S. 545 (1965)........................................................................................29

*Barnes v. Indep. Auto. Dealers Ass'n of Cal. Health & Benefit Plan,*
    64 F.3d 1389 (9th Cir. 1995) .............................................................................5

*Brady v. Gebbie,*
    859 F.2d 1543 (9th Cir. 1988) ........................................................................24

*Campbell v. Beto,*
    460 F.2d 765 (5th Cir. 1972) ..........................................................................46

*Carey v. Piphus,*
    435 U.S. 247 (1978)........................................................................................29

*Clement v. Gomez,*
    298 F.3d 898 (9th Cir. 2002) .................................................................... 20, 39

*Estelle v. Gamble,*
    429 U.S. 97 (1976)............................................................................. 40, 42, 43

*Farmer v. Brennan,*
    511 U.S. 825 (1994).................................................................................. 38, 39

*Fuentes v. Shevin,*
    407 U.S. 67 (1972).................................................................................. passim

*Gideon v. Wainwright,*
    372 U.S. 335 (1963)........................................................................................25

*Goldberg v. Kelly,*
    397 U.S. 254 (1970)................................................................... 24, 25, 29, 30

*Hamilton v. Endell,*
    981 F.2d 1062 (9th Cir. 1992) ........................................................................42

## TABLE OF AUTHORITIES
### (continued)

Page

*Helling v. McKinney*,
    509 U.S. 25, 33 (1993)........................................................................46

*Hernandez-Gil v. Gonzales*,
    476 F.3d 803 (9th Cir. 2007) ..........................................................30

*Houston v. Lack*,
    487 U.S. 266 (1988)..........................................................................4

*Hudson v. Palmer*,
    468 U.S. 517 (1984)........................................................................27

*Hunt v. Uphoff*,
    199 F.3d 1220 (10th Cir. 1999) ......................................................41

*Hutchinson v. United States*,
    838 F.2d 390 (9th Cir. 1988) ..........................................................38

*Jackson v. McIntosh*,
    90 F.3d 330 (9th Cir. 1996) .................................................... 42, 45

*Jett v. Penner*,
    439 F.3d 1091 (9th Cir. 2006) ........................................................39

*Johnson v. Meltzer*,
    134 F.3d 1393 (9th Cir. 1998) ........................................................21

*Jones v. Blanas*,
    393 F.3d 918 (9th Cir. 2004) .................................................... 4, 21

*Kaley v. United States*,
    134 S. Ct. 1090 (2014)....................................................................31

*Lolli v. Cnty. of Orange*,
    351 F.3d 410 (9th Cir. 2003) ................................................. passim

*Lopez v. Smith*,
    203 F.3d 1122 (9th Cir. 2000) ................................... 21, 45, 46, 47

# TABLE OF AUTHORITIES
## (continued)

Page

*Matthews v. Eldridge*,
424 U.S. 319 (1976)...................................................................... passim

*McGuckin v. Smith*,
974 F.2d 1050 (9th Cir. 1992) ........................................ 39, 40, 42, 46

*Peralta v. Dillard*,
744 F.3d 1076 (9th Cir. 2014) ..............................................................48

*Powell v. Alabama*,
287 U.S. 45 (1932)........................................................... 25, 30, 35

*Quick v. Jones*,
754 F.2d 1521 (9th Cir. 1984) .................................................. passim

*Roberson v. Bradshaw*,
198 F.3d 645 (8th Cir. 1999) ..............................................................41

*Schroeder v. McDonald*,
55 F.3d 454 (9th Cir. 1995) ......................................................... 4, 21

*Sniadach v. Family Fin. Corp.*,
395 U.S. 337 (1969)......................................................... 24, 26

*United States v. Howard*,
381 F.3d 873 (9th Cir. 2004) .................................................................5

*United States v. Monsanto*,
491 U.S. 600 (1989)...................................................................31

*W. Coach Corp. v. Shreve*,
475 F.2d 754 (9th Cir. 1973) ................................................. 24, 25

*Wakefield v. Thompson*,
177 F.3d 1160 (9th Cir. 1999) ................................................... passim

*White v. Napoleon*,
897 F.2d 103 (3d Cir. 1990) .............................................................45

**TABLE OF AUTHORITIES**
(continued)

Page

**STATUTES**

28 U.S.C. § 1291 .................................................................4

28 U.S.C. § 1331 .................................................................3

28 U.S.C. § 1343 .................................................................3

42 U.S.C. § 1983 ...............................................................15

42 U.S.C. § 1985 ...............................................................15

42 U.S.C. § 1986 ...............................................................15

O.R.S. § 179.460 ..............................................................29

O.R.S. § 179.620 ................................................................7

O.R.S. § 179.640 ........................................................... 8, 45

O.R.S. § 179.701 ................................................................9

O.R.S. § 179.731 ....................................................... 2, 13, 37

O.R.S. § 183.417 ...................................................... 12, 25, 29

**RULES & REGULATIONS**

Fed. R. App. P. 4 ................................................................4

O.A.R. 291-203-0010 .........................................................7

O.A.R. 291-203-0020 .........................................................7

O.A.R. 291-203-0040 ................................................. passim

O.A.R. 291-203-0050 ..................................................... 9, 14

O.A.R. 291-203-0080 ................................................. passim

**TABLE OF AUTHORITIES**
**(continued)**

Page

## CONSTITUTIONAL PROVISIONS

U.S. Const. amend. XIV ........................................................................22


## OTHER AUTHORITIES

Diabetes in America (Maureen I. Harris, 2d ed. 1995), *available at*
http://diabetes.niddk.nih.gov................................................... 5, 41, 47

National Diabetes Statistics 2011, *available at*
http://diabetes.niddk.nih.gov/ ............................................................5

Oregon Legislative Fiscal Office, *Correctional Spending Trends*,
*available at*
http://www.oregon.gov/CJC/docs/2011_report_correctional_
spending_trends_updated.pdf ..........................................................27

Snapshot of Diabetes, *available at* http://diabetes.niddk.nih.gov/ ................... 5, 41

**INTRODUCTION**

Lester Shinault developed diabetes as a side effect of medication prescribed to treat his mental health issues. He sued the manufacturer of the medication, and recovered over $107,000 in a medical liability settlement. This settlement was designed to pay for the diabetes treatment he will need for the rest of his life; Mr. Shinault must take prescription medication every day or he risks falling into a potentially fatal coma.

Because Mr. Shinault was incarcerated when the settlement was finalized, all the funds were placed in his prison trust account. Defendants—various prison officials and the Oregon Department of Corrections—stated that the funds would be "safe" in this trust account, yet soon after the funds were deposited they seized the majority of the settlement money under a provision of Oregon law that allows inmates to be charged for the full cost of their incarceration. Defendants took the funds from the trust account without any judicial oversight and without allowing Mr. Shinault to contest the seizure before it occurred, in violation of the due process protections of the Fourteenth Amendment. *See Quick v. Jones*, 754 F.2d 1521, 1523-24 (9th Cir. 1984) (due process requires pre-deprivation hearing before prison officials can seize money in inmate trust account).

Mr. Shinault promptly requested review of this deprivation, and a telephonic hearing was scheduled for several months after the seizure. Mr. Shinault had

1

strong grounds to challenge the deprivation because Oregon law mandates

consideration of "the inmate's need for funds for personal support after release" in

assessing ability to pay for the costs of incarceration (O.A.R. 291-203-0040(5)),

and allows waiver of the charges when collection would be detrimental to the

interests of the inmate (O.R.S. § 179.731; O.A.R. 291-203-0080). Although

Mr. Shinault had the right to hire counsel to represent him at the post-deprivation

hearing, Defendants refused to allow Mr. Shinault to withdraw any of his seized

funds to retain an attorney. The harm from this deprivation of counsel was

particularly acute because Mr. Shinault was forced to represent himself even

though he had not completed high school, suffered from serious mental health

issues, and was heavily medicated. On this record the district court erred in

granting summary judgment because there was a significant dispute over whether

Defendants violated Mr. Shinault's due process rights.

In addition to these due process violations, the district court erred in granting

summary judgment to Defendants on Mr. Shinault's claim of deliberate

indifference in violation of the Eighth Amendment. This Court has recognized the

serious medical nature of diabetes, and has upheld a deliberate indifference claim

based on the failure of prison officials to provide for the medical needs of a

diabetic. *Lolli v. Cnty. of Orange*, 351 F.3d 410, 418-20 (9th Cir. 2003).

Mr. Shinault submitted sufficient evidence to support a finding that Defendants

were aware that Mr. Shinault suffered from diabetes, knew that the funds in

Mr. Shinault's trust account were earmarked for his future medical treatment, and

yet seized the funds in callous disregard of the fact that their actions would leave

Mr. Shinault unable to pay for the medication he needs to survive. Because this

record is more than sufficient to create a material dispute over whether

Defendants' actions constituted deliberate indifference, the district court's grant of

summary judgment to Defendants was improper. *See Wakefield v. Thompson*, 177

F.3d 1160, 1165 (9th Cir. 1999) (deliberate indifference when prison officials do

not give petitioner the prescribed medication he needs after his release from

incarceration).

Because the evidence before the district court supporting a finding that

Defendants' actions deprived Mr. Shinault of procedural due process and

constituted deliberate indifference to his medical needs, the district court's order

should be reversed.

## STATEMENT OF JURISDICTION

The United States District Court for the District of Oregon had jurisdiction

over Mr. Shinault's complaint pursuant to 28 U.S.C. §§ 1331 and 1343. The

district court entered final judgment in favor of Defendants on March 5, 2013.

ER1. Mr. Shinault timely appealed by placing his notice of appeal in the prison

mail system on April 3, 2013.  ER29; Fed. R. App. P. 4(a)(1)(A); *Houston v. Lack*,

487 U.S. 266, 276 (1988).  This Court has jurisdiction under 28 U.S.C. § 1291.

## ISSUES PRESENTED FOR REVIEW

1.      Did Defendants deny Mr. Shinault due process when they seized

funds in his inmate trust account without a pre-deprivation hearing, and then

refused to release sufficient funds for him to obtain legal representation for the

post-deprivation hearing?

2.      Did Defendants act with deliberate indifference when they seized

funds Mr. Shinault received from a medical liability settlement, and used those

funds to pay for the costs of Mr. Shinault's incarceration, despite their knowledge

that Mr. Shinault needed the settlement funds to treat his serious medical needs?

## STATEMENT OF THE CASE

Lester Shinault is 46 years old and has long suffered from mental health

issues, including bipolar disorder and depressive disorder.  ER49-51; ER59-63.[1]  In

an attempt to medicate his mental health issues, his doctors prescribed him

---

[1] Mr. Shinault submitted his complaint and several declarations under penalty of perjury.  These documents contain facts "based on personal knowledge" and "admissible in evidence," so should be considered as relevant evidence at the summary judgment stage.  *Jones v. Blanas*, 393 F.3d 918, 923-35 (9th Cir. 2004) (considering facts in sworn pro se declaration at summary judgment); *Schroeder v. McDonald*, 55 F.3d 454, 460 (9th Cir. 1995) (considering facts in verified complaint at summary judgment).

4

Zyprexa. ER44. This medication had a serious side effect—it caused Mr. Shinault to develop diabetes. ER107; ER94; ER44.

Diabetes affects over 25 million people in the United States. *See* National Diabetes Statistics 2011, *available at* http://diabetes.niddk.nih.gov/.[2] If left untreated even for a short time, diabetes can produce severe consequences, including kidney disease, heart disease, psychological problems, motor disabilities, and even death. Snapshot of Diabetes ("Diabetes is the seventh leading cause of death listed on U.S. death certificates."), *available at* http://diabetes.niddk.nih.gov/ (visited May 30, 2014); *see also* Diabetes in America 1 (Maureen I. Harris, 2d ed. 1995) (noting that complications of diabetes include comas, blindness, neuropathy, inability to work, kidney disease, vascular disease, lower extremity ulcers and amputations, heart disease, stroke, digestive diseases, infections, oral complications, and psychological problems), *available at* http://diabetes.niddk.nih.gov (visited May 30, 2014). Mr. Shinault must take two

---

[2] This Court may take judicial notice of well-known medical facts, such as these regarding diabetes. *Lolli*, 351 F.3d at 419 (taking judicial notice of facts about diabetes on the http://diabetes.niddk.nih.gov website); *see also Barnes v. Indep. Auto. Dealers Ass'n of Cal. Health & Benefit Plan*, 64 F.3d 1389, 1395 n.2 (9th Cir. 1995) ("Well-known medical facts are the types of matters of which judicial notice may be taken."); *United States v. Howard*, 381 F.3d 873, 880 n.7 (9th Cir. 2004) ("We take judicial notice of these medical facts regarding [medications], which [defendant] raised in his memorandum on appeal.").

different medications every day to treat his Zyprexa-related diabetes, or he risks falling into a potentially fatal diabetic coma. ER44; ER55; ER107.

When the link between Zyprexa and diabetes was uncovered, attorneys at the Watts Law Firm represented Mr. Shinault in a suit against the manufacturer of Zyprexa. ER36; ER225.[3] Mr. Shinault received a settlement award from this suit to cover his future medical costs for diabetes, including medication and potential hospitalizations. ER36; ER225-26. The settlement provided Mr. Shinault with approximately $107,000 for his future medical expenses. ER36, ER49.

### A. Defendants Issued an Ability to Pay Order and Seized Mr. Shinault's Funds Without a Hearing

Defendant Dick Hawks is the central trust manager for the Oregon Department of Corrections ("ODOC"). Trust accounts are set up for each inmate, and function "very much like a bank account." ER155. Mr. Hawks communicated with representatives from the Watts Law Firm to receive the settlement funds on Mr. Shinault's behalf, and stated that the funds would be "safe" in the trust account. ER36; ER105.[4] The entire lump sum settlement was deposited into Mr. Shinault's trust account on April 3, 2009. ER105.

---

[3] Pages 132-247 of the Excerpts of Record contain the certified transcript of the ability to pay hearing. Mr. Shinault filed an Unopposed Motion to Supplement the Record with this transcript on May 6, 2014. Dkt. 19. This motion was referred to the panel assigned to decide the merits of the appeal. Dkt. 20.

[4] When asked about this exchange, Mr. Hawks stated that he did not recall the specific conversation, but did not deny that it occurred. ER199.

Rather than keep the funds safe, ODOC seized more than $60,000 of

Mr. Shinault's medical liability settlement to reimburse itself for the purported cost

of housing and feeding Mr. Shinault during his incarceration.  ER70; ER73.

Oregon law allows ODOC to charge inmates for the entire "cost of care" while

incarcerated, including "medical care, room, board, administrative costs, and other

costs not otherwise excluded by law."  O.A.R. 291-203-0020(6); *see also*

O.A.R. 291-203-0010; O.R.S. § 179.620.[5]  Defendants may "collect charges in

advance for inmates with determinate sentences."  O.A.R. 291-203-0040(1).  The

statute makes every inmate "liable for the full cost of care," but provides that "the

maximum amount a person is required to pay toward the full cost of care shall be

determined according to the person[']s ability to pay."  O.R.S. § 179.620(1)-(2).

Under the implementing regulations, prison officials may issue an "Ability

to Pay" Order only when they become "aware" that an inmate has assets in excess

of $55,000 or the current biennial cost of care, whichever is greater.  O.A.R. 291-

203-0040(3).  ODOC does not require inmates to pay anything toward their cost of

care if they have less than this threshold amount, but if the inmate has over the

threshold, ODOC can charge him for the full cost of care down to the last cent he

---

[5] All statutes are cited as of October 23, 2009, the date of the hearing; there do not
appear to be any changes material to this case from the version in effect on June 2,
2009, the date Defendants seized Mr. Shinault's funds.  All regulations are cited as
effective on both June 2 and October 23, 2009.

is able to pay.  Thus, if a prisoner has $54,999 in assets, he can keep all of it; if he

has $55,001 in assets, ODOC can seize his funds.[6]  Prison officials are not

obligated to issue an Ability to Pay Order even if an inmate has over $55,000 in

assets, and officials may waive the costs of care "based on the best interest of the

inmate or the department."  O.A.R. 291-203-0080.

On May 29, 2009, shortly after Defendant Hawks learned of Mr. Shinault's

medical liability settlement, Mr. Hawks issued an Ability to Pay Order.  ER76-83.

He assessed Mr. Shinault for the full cost of his "medical care, room, board,

administrative costs and other costs" for each day of his current incarceration at

Deer Ridge Correctional Institute.  *Id.*  Mr. Hawks also assessed Mr. Shinault the

full cost of care for his *previous* incarceration at a different facility—a sentence

which ended two years earlier—by invoking a statutory provision that allows

ODOC to retroactively charge an inmate for any term of incarceration that ended

within the last 36 months.  ER82; ER187; O.R.S. § 179.640(5).

---

[6] The arbitrariness of this provision is even more stark because, although the biennial cost of care was just over the $55,000 threshold at the time Defendants issued the Ability to Pay Order, by the time of the hearing it was approximately $61,600—slightly *more* than the total assets left from Mr. Shinault's settlement. ER152; ER190.  That is, had Defendants begun the ability to pay process on the date of the hearing, rather than four months earlier, they would not have been allowed to seize *any* of Mr. Shinault's funds.  As it was, they kept *all* of his remaining funds.

The cost of care figures are calculated generically for all inmates on a statewide basis. Defendant Martha McDaniel, who manages the ODOC budget, explained that in calculating the cost of care figures she simply takes the entire relevant portion of the ODOC budget and averages it out by the number of inmates. ER204-05; *see* O.R.S. § 179.701. The costs of care were approximately $68 a day for Mr. Shinault's earlier term of incarceration, and approximately $78 a day for the later term, so the total amount originally assessed was $65,353.94. ER15; ER83.

Although the regulations require ODOC to consider "the inmate's need for funds for personal support after release" in assessing ability to pay (O.A.R. 291-203-0040(5)), Defendant Hawks determined that Mr. Shinault only needed $5,000 after release, using a standardized figure for three months of housing and all other "miscellaneous expenses." ER81; O.A.R. 291-203-0050(6)(b). This figure was a generalized estimate that did not take into consideration any individualized costs for Mr. Shinault, such as the cost of Mr. Shinault's medication and diabetes-related expenses. ER183; ER76-83; ER176. ODOC also allowed Mr. Shinault to keep about $1 a day for the last three months of incarceration for basic hygiene items and snacks. ER81.

On June 2, 2009—one business day after the Defendants sent the Ability to Pay Order to Mr. Shinault—they deducted the full $65,353.94 cost of care and

9

$5,000 for post-release support from Mr. Shinault's trust account and moved it to a "reserve" account. ER16-17 n.3; ER73. Mr. Shinault promptly filed a request for a contested hearing, explaining that the money ODOC attached was intended to cover the future costs of his diabetes, which would entail "continuous" costs for the rest of his life. ER90. He described how he had obtained the funds through a medical liability settlement from a product that caused his diabetes, and he asked that ODOC waive the assessed costs "because of the future medical costs I will be required to pay." *Id*.

Pursuant to the administrative guidelines, ODOC referred the matter to the Office of Administrative Hearings, and a telephonic hearing was scheduled for August 10, 2009 before an Administrative Law Judge ("ALJ"). ER92.

### B. Mr. Shinault Was Denied Access to Counsel at the ALJ Hearing

Mr. Shinault hired a lawyer, Kevin Carolan, to represent him at the ability to pay hearing (the "hearing"). ER73; ER172. Mr. Shinault withdrew $11,000 from his trust account to pay Mr. Carolan, nearly draining the remaining funds in his trust account. *See* ER73; ER94; ER172.[7] Mr. Carolan requested a continuance to prepare, so the telephonic hearing was rescheduled for October 23, 2009. ER92. But Mr. Carolan withdrew on September 25, 2009, leaving Mr. Shinault without

---

[7] In addition to the funds the state withdrew for cost of care and post-release support, the state used the money in the trust account to satisfy multiple garnishment orders. ER73; ER190.

representation.  ER227-28; ER142; ER38; ER92.  Mr. Shinault asked Defendant

Hawks if he could use some of the money that Defendants had seized in order to

retain another lawyer, but Mr. Hawks refused to release any funds, leaving

Mr. Shinault without the financial capacity to obtain legal assistance.  ER47;

ER179-81.

   The hearing was conducted over the phone on October 23, 2009.  Because

Mr. Shinault had been re-incarcerated shortly before the hearing, he had no access

to his paperwork on the case.  Mr. Shinault stated no fewer than five times during

the hearing that he did not understand what was happening and needed an attorney

to assist him.  ER146, ER159, ER179-81; ER38.  From the very beginning of the

hearing, Mr. Shinault told the ALJ that he did not understand the process,

explaining, for example, "Your Honor, I don't know what I'm doing here.  Okay.

I'm in left field here."  ER159; *see also* ER146 ("I'm not very good on my spelling

and reading and stuff.  That's why I needed a lawyer."); *see also* ER38, ER46,

ER52.  The ALJ responded that Mr. Shinault should "do the best you can, I guess

is all I can tell you at this point."  ER159.  As Mr. Shinault explained, "I never

been to a hearing like this here and I think it jeopardize $65,000 and I'm

incarcerated and I don't feel comfortable doing this, you know.  I could lose my

money and I don't even know what I'm doing here."  ER179-80.

11

Mr. Shinault repeatedly asked that he be allowed to hire an attorney, explaining that he had been diligent in seeking counsel, but his first attorney had withdrawn and he had not been able to hire another one because he had been incarcerated and Defendants refused to release his funds. ER179-81. Even though Oregon law gives inmates the right "elect to be represented by counsel" at this hearing (O.R.S. § 183.417(1)), the ALJ refused delay the hearing to allow Mr. Shinault to obtain legal representation. ER47; ER52; ER141; ER179-81.

Forced to represent himself, Mr. Shinault tried to explain why the confiscation of his funds would be detrimental to his medical interests. He explained that he developed diabetes in 2004 as a side effect of a prescription medication. ER94; ER90; ER225. He explained that he had been prescribed two separate medications to control his diabetes, and would be required to take these medications for the rest of his life. ER36; ER97. He did not have copies of his specific medical records or information on the costs of those medications, at least in part because he had been incarcerated shortly before the hearing and had no access to any of his files. ER135-36. He did, however, explain that Defendants— who bore the burden of proof at the hearing—should be able to access the information about his medications from the prison records. ER39; ER51; ER224. Mr. Shinault stressed the urgency of his need for funds to cover the cost of these medications and his future medical needs, stating that ODOC effectively would be

12

"murdering" him if it deprives him of these funds because diabetes can cause fatal comas and related complications. ER108; ER39, ER46; ER94. He thus asked that he be allowed to keep his settlement funds because of his medical need. ER90.

Although Oregon law requires consideration of "the inmate's need for funds for personal support after release" in assessing ability to pay (O.A.R. 291-203-0040(5)), and provides for waivers from collection of the costs of care whenever collection "would be detrimental to the best interests of the person or the agency" (O.R.S. § 179.731; O.A.R. 291-203-0080), Defendants took the position that the case did not present a situation where that "escape valve" could apply. ER241. The ALJ appeared to believe that a separate proceeding would be needed to assess a waiver request, suggesting that even in a case where a paraplegic provided credible evidence that he would need hundreds of thousands of dollars of care for the rest of his life, any consideration of those facts would need to be made in a separate proceeding. ER241 ("I guess the process would be . . . you'd be entitled to make a request for waiver and then the Department would make a decision and then would that be subject to a separate appeal, I wonder? Do you know [asking Defendants]?"). Even though Mr. Shinault had repeatedly requested that the costs be "waive[d]" (ER242), Defendants did nothing to correct the ALJ's misunderstanding but rather told the ALJ that to their knowledge no prisoner had ever requested a waiver. *Id*.

13

Notwithstanding Mr. Shinault's testimony and his written request for a waiver, the ALJ found that ODOC met its burden of establishing that Mr. Shinault had the ability to pay every cent remaining from his medical liability settlement.[8] ER94, ER97. The ALJ wrongly concluded that Mr. Shinault did not need more than the standard figure of $5,000 to care for himself for three months after his release.[9] ER96. The ALJ reasoned that Mr. Shinault would not actually need his medical settlement funds for personal support because (1) Mr. Shinault did not demonstrate that he would be unable to work and obtain medical insurance through an employer; (2) the Oregon Health Plan might cover his medication costs; and (3) if Mr. Shinault ended up back in jail, the institution holding him would pay for his medication. ER97. The ALJ incorrectly stated that Mr. Shinault presented no evidence that the waiver statute should apply—even though Mr. Shinault had presented evidence that he suffered from a serious illness and would have a lifelong need for treatment and medication. *Id*.

Ultimately, Mr. Shinault was released from prison with only $5,000 for housing and a temporary prescription of medication. ER40; ER42. The seizure of

---

[8] This total was $61,352.39. While the initial Ability to Pay Order had sought a charge of $65,353.94 for cost of care, by the time of the hearing the available funds had been reduced because the state had deducted funds to pay several garnishment orders. ER152; ER94; ER97.

[9] Less than a month after the hearing, and before the ALJ issued his final order (ER92), the regulations were changed to allow six months of post-release support. O.A.R. 291-203-0050(6)(b) (11/11/2009).

his funds left Mr. Shinault without sufficient money to cover future hospitalization and medication bills.  ER40.  As a result of this deprivation, Mr. Shinault experienced the typical harmful complications of untreated diabetes after his release: mental and physical distress that worsened his existing mental health issues, an inability to obtain employment, and, ultimately, homelessness.  ER35; ER48; ER50-53; ER138 ("I don't have no place to stay because I don't got no assess to my money … I didn't have no money to pay my rents and stuff like that and I don't got no medication and none of that stuff because I don't have no money.").  Because he could not obtain employment and because he was without his settlement funds, Mr. Shinault was unable to pay for private medical insurance.  ER50-52.  In an effort to address this ongoing harm, Mr. Shinault filed suit in federal court.

### C.    Mr. Shinault Filed This Suit

In April 2011, Mr. Shinault filed this action alleging that Defendants violated his right to meaningful access to the courts under the First and Fourteenth Amendments; denied or interfered with his right to counsel in violation of the Sixth Amendment; denied his serious medical needs under the Eighth Amendment; conspired to violate his rights under the First, Sixth, Eighth, and Fourteenth Amendments; and violated his right to due process under the Fourteenth Amendment.  ER103-21 (bringing claims under 42 U.S.C. §§ 1983, 1985, 1986).

15

After filing this suit, Mr. Shinault filed multiple motions for appointment of counsel, explaining that he lacked a G.E.D. or any legal training, had mental health issues that interfered with his ability to litigate the case, and his incarceration prevented him from getting timely access to the legal library area. ER59; D. Ct. Dkt. 4, 8, 16, 38.[10] The court denied all these motions. D. Ct. Dkt. 6, 22, 46, 78.

Defendants filed a motion for summary judgment, seeking dismissal of all claims. D. Ct. Dkt. 27. The same day, they filed a motion to stay all discovery, arguing that "[b]ecause the arguments in defendants' motion are purely legal and based on undisputed facts (most of which are derived from accepting the allegations in plaintiff's complaint), plaintiff should not need additional discovery in order to respond." D. Ct. Dkt. 31 at 2. The district court granted the motion to stay, cutting off all outstanding discovery requests. D. Ct. Dkt. 40.

On June 11, 2012, the magistrate issued his first Findings and Recommendations, holding that Defendants were entitled to summary judgment on all claims. ER12-28. Mr. Shinault filed objections to the magistrate's report. ER34-63. The district court considered Mr. Shinault's objections but adopted the magistrate's findings in their entirety, and dismissed Mr. Shinault's First, Sixth,

---

[10] For instance, Mr. Shinault submitted evidence that when he sought access to the law library to work on the case, the facility repeatedly rejected his request because the "Law library is for criminal law." ER60; ER58. Similarly, the prison rejected his requests for legal copies because "Your Attorney . . . should be making Copies for you." ER62.

and Eighth Amendment claims with prejudice.  ER9-11.  The court noted,

however, that the magistrate had neglected to address the due process claim, and

remanded for consideration of this issue.  On December 10, 2012, the magistrate

recommended dismissal of Mr. Shinault's final claim for a procedural due process

violation.  ER4-8.  On March 5, 2013, the district court adopted the magistrate's

order on that claim as well, and dismissed it with prejudice (ER2-3).

The district court entered final judgment in Defendants' favor on March 5,

2013.  ER1.  Mr. Shinault timely appealed on April 3, 2013.  ER29.  On

October 25, 2013, this Court ordered that pro bono counsel be appointed for

Mr. Shinault.  Dkt. 13.

## SUMMARY OF ARGUMENT

The evidence before the district court supported a finding that Defendants

violated Mr. Shinault's due process rights in at least three ways.  First, Defendants

seized Mr. Shinault's funds long before he was afforded a hearing on the merits of

that deprivation.  Undisputed evidence before the district court showed that

Defendants seized the entire amount they assessed for the cost of incarceration

more than two months before the earliest date Mr. Shinault had any opportunity to

contest the seizure, and more than four months before any hearing actually

occurred.  ER73; ER38.  Mr. Shinault had a protected property interest in the funds

in his inmate trust account, and those funds were necessary to pay for his future

17

medical expenses. Due process thus required a hearing before the deprivation, not after it. *See Matthews v. Eldridge*, 424 U.S. 319, 335 (1976); *Quick*, 754 F.2d at 1523-24.

Second, because Defendants seized the vast majority of Mr. Shinault's funds before allowing him to contest the seizure, the evidence supported a finding that they improperly deprived him of his right to hire counsel to represent him. Mr. Shinault used nearly all of his available money to hire an attorney, but that attorney withdrew shortly before the hearing. Mr. Shinault repeatedly requested that he be allowed to use some of the funds that Defendants had seized to retain a new attorney, but Defendants refused to release any of Mr. Shinault's own funds. Defendant's pre-deprivation seizure of Mr. Shinault's funds thus deprived Mr. Shinault of counsel at the hearing over whether Defendants had improperly seized his funds. This creates a material dispute over whether Defendants' interference with Mr. Shinault's right to counsel violates due process and the constitutional guarantee of access to the courts. And the harm from this violation was particularly acute because Mr. Shinault was forced to represent himself even though he had not finished high school, suffered from serious mental health issues, and was heavily medicated.

Third, the evidence supports a finding that the hearing held months after the deprivation did not provide Mr. Shinault a meaningful opportunity to prevent

"substantively unfair or mistaken deprivations" of his property. *See Fuentes v. Shevin*, 407 U.S. 67, 80-81 (1972). Not only was Mr. Shinault forced to represent himself, but there was no serious consideration given to Mr. Shinault's argument that Defendants should waive collection of the costs of care because he needed those funds to pay for the medication he desperately needed—even though Oregon law expressly contemplates the availability of a waiver in this situation. Nor was there any serious consideration of Mr. Shinault's evidence that he required more than the standard allowance after release from incarceration because of his lifelong medical needs. In sum, the evidence before the district court, construed in the light most favorable to Mr. Shinault, showed that Defendants improperly denied Mr. Shinault a pre-deprivation hearing, interfered with his right to hire an attorney, and refused to give any individualized consideration to his arguments despite a statutory obligation to do so. Because this creates a material dispute regarding whether Defendants violated the Fourteenth Amendment's due process guarantee, the decision below must be reversed.

In addition to these due process violations, Mr. Shinault presented sufficient evidence to raise an issue of material fact for his Eighth Amendment claim. Evidence in the record supported a finding in his favor on both the objective and subjective requirements for his claim of deliberate indifference to serious medical needs. Defendant's own admissions and other record evidence supported the

inference that Defendants knew that Mr. Shinault suffered from diabetes and that the funds in Mr. Shinault's trust account were earmarked for his future medical treatment. This Court has recognized the serious medical nature of diabetes, and has upheld a deliberate indifference claim based on the failure of prison officials to provide for the medical needs of a diabetic. *Lolli*, 351 F.3d at 418-20.

The district court ignored the evidence presented by Mr. Shinault, accepted as true Defendants' unsubstantiated assertions that Mr. Shinault had other avenues of obtaining medication, and did not credit Mr. Shinault's evidence explaining why each purported avenue was not a viable option. Construed in the light most favorable to Mr. Shinault, the evidence supports a finding that Defendants were aware of Mr. Shinault's serious medical needs and yet deprived him of all his funds under a discretionary statute that gives them the option—but not the responsibility—to charge certain inmates for the cost of incarceration. On these facts there is a material dispute over whether Defendants' actions constituted deliberate indifference, making summary judgment improper. *See Wakefield*, 177 F.3d at 1165; *Clement v. Gomez*, 298 F.3d 898, 904 (9th Cir. 2002).

Defendants were not entitled to summary judgment on Mr. Shinault's Eighth or Fourteenth Amendment claims. The judgment below should be reversed.

## STANDARD OF REVIEW

This Court reviews a grant of summary judgment de novo. *Lopez v. Smith*, 203 F.3d 1122, 1131 (9th Cir. 2000) (en banc). The Court must determine, viewing the facts in the light most favorable to Mr. Shinault, whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law. *Id.*

In addition, because the nonmoving party was a pro se plaintiff, the Court "must consider as evidence in his opposition to summary judgment all of [the pro se party's] contentions offered in motions and pleadings, where such contentions are based on personal knowledge and set forth facts that would be admissible in evidence, and where [the party appearing pro se] attested under penalty of perjury that the contents of the motions or pleadings are true and correct." *Jones*, 393 F.3d at 923. This includes the factual statements in the objections to the magistrate's opinion (ER34-58; ER59-63), because Mr. Shinault signed these objections under penalty of perjury. *Id.* at 935. Likewise, the verified complaint (ER103-16) signed under penalty of perjury "functions as an affidavit" for summary judgment purposes. *Schroeder*, 55 F.3d at 460; *Johnson v. Meltzer*, 134 F.3d 1393 (9th Cir. 1998).

## ARGUMENT

Mr. Shinault received over $100,000 in a medical liability settlement to provide care for his lifelong medical needs. Had Mr. Shinault's settlement been half that size, Defendants could not have seized any of his funds because his total assets would have been below the $55,000 threshold. O.A.R. 291-203-0040(3). But because his needs were serious enough to warrant a large settlement, Defendants seized almost all of his funds to pay for the costs of his incarceration, despite their knowledge that Mr. Shinault needed these funds to pay for critical medical care. Defendants seized Mr. Shinault's funds before giving him any opportunity to contest the deprivation, and refused to release sufficient funds for Mr. Shinault to retain counsel at the hearing. Mr. Shinault did not get a fair hearing, and there was no good reason for this injustice.

## I. DEFENDANTS SEIZED MR. SHINAULT'S FUNDS WHILE DENYING HIM SUFFICIENT PROCESS AND ACCESS TO THE COURTS

The Fourteenth Amendment prohibits a state from depriving "any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV. Money held in an inmate's trust account is a protected property interest subject to the protections of the Fourteenth Amendment. *Quick*, 754 F.2d at 1523. Defendants conceded below that Mr. Shinault "has a protected property interest in

22

[his trust account] funds, and that he is therefore entitled to due process in connection with any forfeiture thereof." D. Ct. Dkt. 92 at 3.

## A. Defendants Denied Mr. Shinault Pre-Deprivation Process

The district court's finding that Mr. Shinault received "heightened process prior to the withdrawal of funds" (ER6-7) is flatly wrong. The undisputed evidence shows that Defendants seized and froze Mr. Shinault's funds *more than four months before the October 23, 2009 hearing*. ER70; ER73; ER16 n.3. Mr. Shinault's inmate trust account statements show that ODOC withdrew $65,353.94 from Mr. Shinault's trust account on June 2, 2009. ER16 n.3. Defendants transferred these funds to a "reserve" account that Mr. Shinault could not access. *Id.*; ER70; ER73. Indeed, the magistrate acknowledged this fact in his June 11, 2012 Findings and Recommendations, noting that the documents showed that ODOC withdrew the entire sum allocated to cost of care on June 2, and that less than $10,000 remained in the account by the end of July. ER16-17 n.3. Yet despite this acknowledgment, the magistrate's later opinion disposing of Mr. Shinault's due process claim made no reference to the fact the funds were seized long before the October hearing. To the contrary, the magistrate's December 10, 2012 report wrongly states that "defendants point to evidence of record establishing that . . . before the withdrawal took place Shinault requested and received a hearing before an Administrative Law Judge." ER6. The facts—

23

including Mr. Shinault's trust account statements—contradict this finding. ER70; ER73; ER16-17 n.3.

ODOC's seizure of Mr. Shinault's trust account funds qualifies as a "deprivation" within the meaning of the Fourteenth Amendment. *See Fuentes*, 407 U.S. at 84-85 (it is well settled that "a temporary, nonfinal deprivation of property is nonetheless a 'deprivation' in the terms of the Fourteenth Amendment"); *Sniadach v. Family Fin. Corp.*, 395 U.S. 337, 338-39 (1969) (interim freezing of funds before a hearing qualifies as a "deprivation," even though funds may ultimately be unfrozen); *W. Coach Corp. v. Shreve*, 475 F.2d 754, 755 (9th Cir. 1973) (prejudgment attachment of bank account is unpermitted deprivation).

When the state deprives a citizen of a protected property interest, the test to determine what process is due turns on a balance of three factors: (1) the nature of the private interest affected; (2) the risk of an erroneous deprivation of that interest without additional procedural safeguards; and (3) the nature and magnitude of the government's countervailing interest in not providing those additional safeguards. *Matthews*, 424 U.S. at 335. The "fundamental requisite of due process of law is the opportunity to be heard . . . at a meaningful time and in a meaningful manner." *Goldberg v. Kelly*, 397 U.S. 254, 267 (1970) (citations omitted); *Brady v. Gebbie*, 859 F.2d 1543, 1554 (9th Cir. 1988) (same); *see also W. Coach Corp.*, 475 F.2d at

755 ("the right to notice and a hearing must be granted at a time when the deprivation can still be prevented").  Each of these factors weighs in favor of requiring a pre-deprivation hearing before the state can seize funds in an inmate's trust account.

First, Mr. Shinault had a very strong interest in the funds in his inmate trust account.  There was no dispute that he lawfully received these funds as the result of a medical liability settlement.  He presented evidence to support an inference that he needed the funds to pay for future diabetes care, and denying these funds would cause him substantial medical harm.  *E.g.*, ER46.  This is more than sufficient to show a significant protected property interest.  *See Goldberg*, 397 U.S. at 261-64; *W. Coach Corp.*, 475 F.2d at 754-55.

Second, post-deprivation process creates a significant risk of an erroneous deprivation.  Most basically, Defendants conceded they made several errors in the calculations when issuing the Ability to Pay Order.  ER15; *see also* ER184, ER216-18.  More broadly, post-deprivation process presents the serious risk that inmates will be forced to defend their property interests without the aid of an attorney, even though inmates have a right to counsel at any hearing. O.R.S. § 183.417(1); ER86.  The importance of assistance of counsel has long been recognized by the Supreme Court.  *E.g.*, *Powell v. Alabama*, 287 U.S. 45, 68-69 (1932); *Gideon v. Wainwright*, 372 U.S. 335, 344-45 (1963); *see also, e.g.*,

*Sniadach*, 395 U.S. at 339-40 (identifying the tremendous hardship that may come to a wage earner deprived of his funds before an opportunity to be heard and tender any defense). In this case, Mr. Shinault spent almost all of his available funds attempting to secure a lawyer, but when this attorney withdrew the Defendants refused to release any of the seized funds to allow Mr. Shinault to hire counsel for the hearing. ER227-28; ER47. Because Mr. Shinault did not have the financial capacity to retain another lawyer, he was forced to defend his property rights on his own, even though all Defendants were represented by experienced counsel. As explained more fully in Section I.B, this deprivation is itself a due process violation. Forcing an inmate who lacked a high school education, suffered from serious mental health issues, and was heavily medicated to litigate against an attorney creates a significant risk of an erroneous deprivation. This factor weighs strongly in favor of a pre-deprivation hearing.

The third *Matthews* factor also weighs in favor of requiring pre-deprivation process, because the government interest in denying a meaningful pre-deprivation hearing is negligible. Post-deprivation process is appropriate only in a limited number of "extraordinary situations," such as when quick action is necessary to secure an important governmental or general public interest. *Fuentes*, 407 U.S. at

26

90-91. ODOC has hundreds of millions of dollars in its budget[11]; the seizure of Mr. Shinault's settlement funds was neither something it planned for nor urgently needed. Defendants presented no "extraordinary situations" justifying their failure to provide Mr. Shinault with pre-deprivation process.

In *Quick v. Jones*, 754 F.2d 1521 (9th Cir. 1984), this Court found a potential due process violation in a similar situation as is presented here. The defendant prison officials seized $66 from a prisoner's trust account without affording him pre-deprivation process. *Id.* at 1524. Although the prison officials attempted to analogize this situation to *Hudson v. Palmer*, 468 U.S. 517, 533 (1984), this Court explained that the cases approving post-deprivation process typically involve "random and unauthorized action." *Id.* The classic example is when an inmate claims a prison guard unexpectedly destroyed his personal property, as was the case in *Hudson*. In those cases, because the "deprivations of property are effected through random and unauthorized conduct of a state employee, pre-deprivation procedures are simply 'impracticable' since the state cannot know when such deprivations will occur." *Hudson*, 468 U.S. at 533. In

---

[11] ODOC's total budget was over $1.3 billion for the 2007-2009 biennium. Oregon Legislative Fiscal Office, *Correctional Spending Trends*, at 4, *available at* http://www.oregon.gov/CJC/docs/2011_report_correctional_spending_trends_updated.pdf (visited May 30, 2014); *see also* ER210-11 (noting that the budget for direct care of inmates was approximately $813 million for the 2007-2009 biennium).

contrast, where the deprivation "followed an administrative process . . . the state could have provided pre-deprivation processes"—and because it could have, it should have. *Quick*, 754 F.2d at 1524.

The deprivation here was conducted under Oregon's statutory and administrative procedures; as an apparent matter of routine protocol, Defendants seized Mr. Shinault's funds in advance of a hearing or any judicial determination that the funds could lawfully be seized. ER21. This was not a random or unexpected action that would render pre-deprivation procedures ineffective, and thus Mr. Shinault was entitled to pre-deprivation process before Defendants seized his funds. *Quick*, 754 F.2d at 1524.

In sum, an evaluation of the *Matthews* factors demonstrates that Mr. Shinault had a significant property interest in his funds, post-deprivation process created a high risk of error, and pre-deprivation process was manifestly feasible. This Court should thus hold that Mr. Shinault was entitled to a meaningful hearing evaluating individual need before the state deprived him of funds in his trust account.

### B.    Mr. Shinault Was Denied the Right to Have an Attorney Present to Protect His Property Interest

Not only was Mr. Shinault deprived of pre-deprivation process, but the post-deprivation process denied him access to counsel and a meaningful opportunity to be heard. The district court therefore erred in concluding that the "process available to and pursued by Shinault was more than sufficient to ensure that his

28

Fourteenth Amendment due process rights were not violated" (ER15) and that "the record does not suggest that Shinault's right to meaningful access was abridged . . . because he was able to present his case before an ALJ." ER20.

Procedural due process is meant to protect against "the mistaken unjustified deprivation of life, liberty, or property." *Carey v. Piphus*, 435 U.S. 247, 259 (1978). The right to be heard is a

> basic aspect of the duty of government to follow a fair process of decisionmaking when it acts to deprive a person of his possessions. The purpose of this requirement is not only to ensure abstract fair play to the individual. Its purpose, more particularly, is to protect his use and possession of property from arbitrary encroachment—to minimize substantively unfair or mistaken deprivations of property . . . .

*Fuentes*, 407 U.S. at 80-81. Accordingly, the "fundamental requisite of due process of law is the opportunity to be heard . . . in a meaningful manner." *Goldberg*, 397 U.S. at 267; *see also Armstrong v. Manzo*, 380 U.S. 545, 552 (1965).

Under Oregon law, Mr. Shinault's right to a "meaningful manner" of being heard requires a trial-like proceeding called a contested case hearing. O.R.S. §§ 179.460(7), 183.417. Inmates have the right to be represented by counsel at contested case hearings. O.R.S. § 183.417(1); ER86. Oregon does not grant inmates court-appointed counsel, however, so in practice this right means inmates have the right to use their own funds to hire an attorney. All of the Defendants were represented by counsel at the hearing. ER132; O.R.S. § 183.417(1); ER86.

Mr. Shinault presented evidence sufficient to support an inference that the hearing, which occurred without an attorney representing Mr. Shinault's interests and with minimal time for Mr. Shinault to prepare, did not provide a meaningful opportunity to be heard. Most basically, although the state purported to recognize Mr. Shinault's right to counsel at the hearing, he was effectively deprived of that right because Defendants would not release sufficient funds to allow him to hire his own attorney and the court refused to appoint counsel for him. ER227-28; ER47.

As the Supreme Court explained more than 80 years ago, "[t]he right to be heard would be, in many cases, of little avail if it did not comprehend the right to be heard by counsel." *Powell*, 287 U.S. at 68-69; *Goldberg*, 397 U.S. at 270 (same); *Hernandez-Gil v. Gonzales*, 476 F.3d 803, 806-07 (9th Cir. 2007) (same). Just as it would be a clear due process violation for the state to refuse to allow Mr. Shinault to spend his own money to have an attorney represent him at the hearing, it violates due process for the state to seize his funds without a prior hearing and refuse to allow him to use those funds to hire an attorney to represent him at the subsequent hearing over the propriety of the seizure. *See Powell*, 287 U.S. at 68-69 ("If in any case, civil or criminal, a state or federal court were arbitrarily to refuse to hear a party by counsel, employed by and appearing for him,

it reasonably may not be doubted that such a refusal would be a denial of a hearing, and, therefore, of due process in the constitutional sense.").[12]

Mr. Shinault repeatedly expressed serious concern about proceeding unrepresented and asked to be allowed to have an attorney to protect his property interests. He explained his lack of education and legal training, and told the ALJ no fewer than five times that he did not understand the process or the terms used and wanted an attorney to assist him. ER146; ER159; ER179-81. The following excerpts are illustrative:

> THE PETITIONER: I reviewed [the exhibits provided to him shortly before the hearing] but I'm not very good on my spelling and reading and stuff. That's why I needed a lawyer.
>
> ALJ: Okay. We're ready to proceed.

ER146.

> THE PETITIONER: Your Honor, I don't know what I'm doing here. Okay. I'm in left field here. I told you I'm leery and I don't know how to read and write as well. I don't know what I'm doing here.
>
> ALJ: Well, just, you know, do the best you can, I guess is all I can tell you at this point. I mean, you're representing yourself.

---

[12] In the forfeiture context, a defendant's funds can only be frozen after a judicial finding of probable cause to believe that "(1) that the defendant has committed an offense permitting forfeiture, and (2) that the property at issue has the requisite connection to that crime." *See Kaley v. United States*, 134 S. Ct. 1090, 1095 (2014); *United States v. Monsanto*, 491 U.S. 600, 615 (1989). The forfeiture cases are not directly applicable here, but it bears noting that the seizure clearly did not meet the test in that context. There is no assertion that Mr. Shinault's frozen assets were connected to illegal conduct, much less any finding of probable cause. To the contrary, Mr. Shinault's funds were the product of a legal settlement. ER225-26.

31

ER159.

THE PETITIONER:  And I'm not -- I never been to a hearing like this here and I think it jeopardize $65,000 and I'm incarcerated and I don't feel comfortable doing this, you know.  I could lose my money and I don't even know what I'm doing here.

ALJ:  Well, okay.  I understand that, Mr. Shinault.  You could have hired an attorney to represent you at this hearing.

THE PETITIONER:  Yeah, but I did hire one and this is -- this is the outcome of it right now.

ALJ:  And apparently -- well, I don't have any control over that.  Apparently he withdrew.  You could have hired another attorney.

THE PETITIONER:  He withdrew in September[....]

ALJ:  And you've had --

THE PETITIONER:  That wouldn't give me enough time to find an attorney.  Attorneys you have to pay money.  I don't have money.  They have my money in hostage.

ALJ:  Okay.  Well, I understand all that, Mr. Shinault, but you don't have any authority -- I have no authority to appoint an attorney to represent you on this matter.  If you had wanted more time to hire another attorney --

THE PETITIONER:  I do want more time to hire an attorney because I can see now I'm going to need an attorney to --

ALJ:  Well, you could have made that request long before right now, at the time set for the hearing.

THE PETITIONER:  I've been incarcerated, Your Honor.

ALJ:  You've been incarcerated since October the 10th.  You had time before that you could have hired another attorney.  Okay.  Go ahead, Mr. Grant.

ER179-81 (emphases added).  Rather than evaluate whether Mr. Shinault should have the opportunity to secure the services of an attorney, the ALJ insisted the hearing continue.  ER39; ER52; ER86.

Mr. Shinault had limited time and resources to prepare to represent himself at the hearing and cross-examine the Defendants, all of whom were represented by counsel.  He did not have even a high school education and had significant mental health issues that interfered with his ability to litigate the case.  ER146; ER59.  In addition, Mr. Shinault did not have access to any of the material prepared or received by his previous counsel because Mr. Shinault was jailed days before the hearing.  ER52; ER135-36 ("I don't have no copies of nothing.  I'm . . . incarcerated right now at Marion County Jail.  All my paperwork that my lawyer has sent me is at my house right now.  So I'm not fit to have this hearing right now.  I don't have no paperwork, no nothing.").  Mr. Shinault did not even have copies of Defendants' exhibits until a few hours before the hearing, and when he did receive copies, he expressed his need for an attorney due to his limited ability to understand the documents.  ER136-38; ER146-47.  The ALJ refused to reschedule the hearing to allow Mr. Shinault more time to prepare or retain a new attorney, noting that "[i]t really was the responsibility of your attorney . . . to, you know, get you any paperwork, the exhibits, and so forth."  ER141-42; *see also* ER52.

The transcript bears out Mr. Shinault's allegations that he was not given a meaningful opportunity to be heard in the telephonic hearing. ER38; ER45; ER46 ("Shinault was not able to present his case before an AJ"); *id*. ("Shinault was not given the opportunity to present his argument"); *id.* ("if you listen to Shinault testimony at the telephone contested hearing recorder from Jail, Shinault did not understand what was going on") (errors in original). His inability to represent his interests without legal counsel was apparent. Mr. Shinault was not able to effectively cross-examine Defendants Hawks and McDaniel, both of whom testified at the hearing. ER189; ER201-02. The ALJ repeatedly cut off Mr. Shinault's questions to Defendants. For instance, when Mr. Shinault attempted to make an objection, the ALJ refused to let him speak, asked three more questions to Mr. Hawks, then told the state's attorney to proceed with his questioning without ever letting Mr. Shinault register his objection. ER192; *see also, e.g.*, ER201.

The ALJ also cut short Mr. Shinault's attempts to provide relevant evidence in response to Defendants' case, repeatedly emphasizing that Mr. Shinault could not provide any evidence until it was his turn to present his case. ER162; ER179; ER195; ER201. When it was finally Mr. Shinault's turn to present evidence, however, the ALJ immediately began questioning him about certain limited topics, ignoring most of the issues that Mr. Shinault had tried to raise earlier. While the

ALJ did tell Mr. Shinault he could present "anything additional" after the ALJ was finished with his questions (ER222), in this context a pro se prisoner with limited education and mental illness did not have a meaningful chance to present evidence—an opportunity necessary to protect against the arbitrary deprivation of property.

Defendants denied Mr. Shinault the process he was due by preventing him from using his own funds to obtain counsel to protect his rights. Mr. Shinault wanted an attorney, had the right to an attorney, and attempted to hire an attorney, but had to proceed with the hearing on his own even though he was clearly out of his league. Mr. Shinault's repeated requests for an attorney during the hearing were flatly denied without evaluation, even though Mr. Shinault expressed his concerns over continuing without representation. The district court erred in finding that this constituted a meaningful hearing. *See Powell*, 287 U.S. at 68-69; *Allen v. Sakai*, 48 F.3d 1082, 1091 (9th Cir. 1994) (inmate need only show that he could not present a claim to the courts because of the state's failure to fulfill its constitutional obligations).

### C.    Mr. Shinault Was Denied a Meaningful Opportunity to Be Heard

The district court also erred in finding that the record did not support Mr. Shinault's assertion that his right to meaningful access to the courts was abridged. Specifically, there was a material dispute over whether the Defendants

or the ALJ ever seriously considered whether Mr. Shinault required more than $5,000 for personal support after release or whether the costs of incarceration should be waived due to his medical condition, even though Oregon law requires consideration of both issues. O.A.R. 291-203-0040(5); O.A.R. 291-203-0080. The failure to assess Mr. Shinault's individualized need after release, as required by Oregon law, resulted in a hearing that did not protect Mr. Shinault's "use and possession of property from arbitrary encroachment" or "minimize substantively unfair or mistaken deprivations of property." *Fuentes*, 407 U.S. at 80-81.

The evidence in the record demonstrates there was no individualized determination of whether the standard $5,000 typically provided to inmates was sufficient to cover Mr. Shinault's post-release medical needs. Mr. Shinault presented evidence that the normal allowance was insufficient for him to survive because of his lifelong need for diabetes medication, treatment, and a special diet. ER35; ER37; ER50-51. The fact that he had received a settlement of over $107,000 designed to pay for his diabetes treatment is itself evidence that the funds were needed for that purpose. ER197; ER223-26; ER237. Defendants did not even consider departing from the standard, generic figure for post-release support, and the ALJ entirely ignored Mr. Shinault's testimony. These facts support an inference that the hearing did not provide Mr. Shinault a meaningful opportunity to be heard on the merits of the deprivation.

36

The evidence put forth by Mr. Shinault also supports an inference that the hearing did not provide a meaningful opportunity to be heard on whether he should receive a waiver. Oregon law and ODOC's regulations provide for a waiver when collection of the costs of care would be detrimental to the best interests of the inmate. O.R.S. § 179.731; O.A.R. 291-203-0080. Mr. Shinault's request for a contested hearing specifically asked Defendants "to waive any costs associated with my incarceration because of future medical costs I will be required to pay." ER90. But the hearing transcript demonstrates that neither the Defendants nor the ALJ understood (or honored) their obligation to evaluate this issue.

During the hearing, Defendants' counsel acknowledged that the waiver statute "may serve as an escape valve, if you will, in a serious case." ER240-41. But the ALJ balked on the issue of whether Mr. Shinault's request for a waiver triggered this provision, speculating that the waiver determination might be governed by a separate proceeding. For example, the ALJ asked Defendants' counsel:

> That statute is interesting, and then I guess the process would be, do you know if there's any -- have you seen any cases where someone maybe requested a waiver, I guess, would be a process where you'd be entitled to make a request for waiver and then the Department would make a decision and then would that be subject to a separate appeal, I wonder? Do you know?

ER241. Defendant Hawks answered that to his knowledge no prisoner had ever requested a waiver of the cost of care (ER241-42), even though Mr. Shinault had

37

unambiguously requested this waiver (ER90.) Rather than consider Mr. Shinault's request or ask for more evidence as to why Mr. Shinault would be entitled to a waiver, the ALJ dismissed the discussion, stating: "Okay. I'd be curious as to whether there is kind of a legal process in place for that because that could actually even be kind of like a separate hearing. Curious." ER242.

Because neither the ALJ nor Defendants gave any individualized consideration to Mr. Shinault's request for a waiver in the proceedings, there was at the least a material dispute over whether this hearing complied with the requirements of due process. Evidence in the record supported an inference that the hearing did not constitute meaningful access sufficient to prevent the arbitrary encroachment of Mr. Shinault's property and "minimize substantively unfair or mistaken deprivations of property." *See Fuentes*, 407 U.S. at 80-81. The district court's grant of summary judgment to Defendants should be reversed.

## II. DEFENDANTS ACTED WITH DELIBERATE INDIFFERENCE TO MR. SHINAULT'S SERIOUS MEDICAL NEEDS

Prison officials violate the Eighth Amendment's prohibition on cruel and unusual punishment by acting with deliberate indifference to the serious medical needs of an inmate. *Farmer v. Brennan*, 511 U.S. 825, 828 (1994). Delaying or intentionally interfering with needed medical treatment can qualify as deliberate indifference. *Hutchinson v. United States*, 838 F.2d 390 (9th Cir. 1988). Diabetes is a serious medical need, and this Court—like most circuits—has recognized

deliberate indifference claims based on the failure of prison officials to provide for the legitimate medical needs of a diabetic. *Lolli*, 351 F.3d at 418-20 (collecting cases and upholding prisoner's § 1983 suit based on delay in treating his diabetes).

To establish an Eighth Amendment violation, a plaintiff must show that (1) he suffered from an objectively serious medical need, and (2) prison officials were subjectively aware of this condition and deliberately delayed or denied access to medical care that could have reasonably been provided. *Farmer*, 511 U.S. at 837; *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006); *McGuckin v. Smith*, 974 F.2d 1050 (9th Cir. 1992), *overruled on other grounds*, *WMX Techs., Inc. v. Miller*, 104 F.3d 1133, 1136 (9th Cir. 1997).

Mr. Shinault presented evidence sufficient to support an inference that (1) he suffers from diabetes; (2) diabetes is a serious medical need, (3) Defendants knew of Mr. Shinault's serious need for diabetes medication; (4) Defendants knew that seizing Mr. Shinault's medical settlement funds would leave him unable to pay for diabetes treatment upon release; and (5) Mr. Shinault suffered harm as a result. But the district court ignored the evidence Mr. Shinault submitted and failed to draw all reasonable inferences in his favor. Because Mr. Shinault's evidence raised a dispute of material fact, the judgment must be reversed. *See Lolli*, 351 F.3d at 418-20 (prisoner stated a deliberate indifference claim based on prison official's delay in treating his diabetes); *Clement*, 298 F.3d at 904 (summary

39

judgment properly denied if officials are aware of the harmful effects of their actions but purposefully refuse to provide remedies).

### A.    Diabetes Is an Objectively Serious Medical Need

In both the hearing and in the court below, Mr. Shinault put forth sufficient evidence to support a finding that his medical needs were serious.  A serious medical need exists if the failure to treat a condition could result in the "unnecessary and wanton infliction of pain." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976); *McGuckin*, 974 F.2d at 1059.  Examples of a prisoner's serious need for medical treatment include "[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *McGuckin*, 974 F.2d at 1059-60.  Diabetes constitutes a serious medical need.  *Lolli*, 351 F.3d at 419.

Mr. Shinault presented both testimonial and circumstantial evidence of his serious diabetic condition.  There was no dispute that Mr. Shinault has been suffering from diabetes since 2004.  ER107; ER94.  Diabetes is a prevalent illness and there is widespread familiarity with the seriousness of its potential harms.  *Lolli*, 351 F.3d at 419 n.7 (noting the large number of people in the United States afflicted with diabetes).  The fact that Mr. Shinault had been prescribed medication

to treat this condition (ER107; ER55)—and this medication had been continued by the prison doctors—provides additional evidence of his identified medical need.

Mr. Shinault also provided evidence of the harm he could face without his funds, explaining that he could experience a fatal diabetic coma if deprived of his medication. ER107; ER225-26. These sworn statements are consistent with widely accepted medical fact; diabetes is the seventh leading cause of death in the United States and is responsible for numerous other medical problems. *See* Snapshot of Diabetes, *available at* http://diabetes.niddk.nih.gov/; *Diabetes in America* 1 (Maureen I. Harris, 2d ed. 1995) (compiling information on complications), *available at* http://diabetes.niddk.nih.gov/. Because of these harmful consequences, diabetes is precisely the kind of injury that qualifies as a serious medical need. *Lolli*, 351 F.3d at 419 ("Diabetes is a common yet serious illness that can produce harmful consequences if left untreated for even a relatively short period of time."); *see also, e.g.*, *Hunt v. Uphoff*, 199 F.3d 1220, 1223-24 (10th Cir. 1999) (diabetes qualifies as a serious medical need for purposes of a § 1983 suit); *Roberson v. Bradshaw*, 198 F.3d 645, 648 (8th Cir. 1999) (same).

### B. Defendants Acted with Deliberate Indifference by Intentionally Interfering with the Known Purpose of Mr. Shinault's Medical Settlement Funds

Evidence in the record supports an inference that Defendants knew that Mr. Shinault had diabetes and that the funds in his trust account were provided for

41

his future medical needs, but they nonetheless chose to seize all funds available in Mr. Shinault's inmate trust account. When the facts are viewed in the light most favorable to Mr. Shinault—as they must be at this stage—there is sufficient evidence to support a finding of deliberate indifference. *See Wakefield*, 177 F.3d at 1165 (deliberate indifference when prison officials do not give petitioner the prescribed medication he needs after his release from incarceration); *Hamilton v. Endell*, 981 F.2d 1062, 1066-67 (9th Cir. 1992) (deliberate indifference exists where prison officials deliberately ignore the orders of a physician for reasons unrelated to the medical needs of the prisoner).

A plaintiff can show the subjective recklessness required to prevail on a claim of deliberate indifference by demonstrating a "purposeful act or failure to act on the part of the defendant," *McGuckin*, 974 F.2d at 1060, particularly where the defendant's choice of conduct is in "conscious disregard of an excessive risk to plaintiff's health," *see Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996). As specifically relevant here, "prison officials act with deliberate indifference when they 'intentionally interfere with . . . treatment once prescribed.'" *Wakefield*, 177 F.3d at 1165 (quoting *Estelle*, 429 U.S. at 104-05). Mr. Shinault submitted sufficient evidence to create a reasonable dispute over whether Defendants' conduct met this test at the summary judgment stage.

First, the evidence demonstrates Defendants were aware of Mr. Shinault's diabetic condition, that he had been prescribed medication for this condition, and that he would have a lifelong need for this medication. Defendant Hawks learned months before the hearing that Mr. Shinault's funds had come from a medical liability suit against the manufacturer of the drug that caused his diabetes. ER36; ER199; ER225-26. Mr. Hawks stated that he would keep the settlement proceeds "safe," which could support an inference that he understood Mr. Shinault's need for these funds. ER105. Defendants also had access to Mr. Shinault's inmate medical files, which explained his need for diabetes medication. ER39; ER51. As Mr. Shinault testified, doctors had prescribed this medication, and denying him the medication could lead to a diabetic coma or death. ER108; ER39; ER46; ER94. Construed in Mr. Shinault's favor, this is ample evidence to create a material dispute over whether Defendants were aware of Mr. Shinault's diabetes and his need for medication.

In addition, the evidence demonstrates a genuine issue of material fact as to whether Defendants' intentional interference with the funds earmarked for Mr. Shinault's prescribed treatment constituted deliberate indifference to his medical needs. As the Supreme Court has long held, prison officials act with deliberate indifference when they deny a prisoner access to medical care because the prisoner lacks funds. *Estelle*, 429 U.S. at 103-05. Had prison officials

43

interfered with Mr. Shinault's ability to obtain his prescription diabetes medication three months before he was released from prison, their violation would be clear and indisputable. In this case, Defendants acted while Mr. Shinault was in prison to interfere with his access to needed medication soon after his release.

This Court has held that a deliberate indifference claim can lie based on prison officials' interference with the prisoner's access to medication *after his release from incarceration*. *Wakefield*, 177 F.3d at 1165. The plaintiff in *Wakefield* alleged that although a prison physician prescribed him two weeks of medication to be dispensed at the time of his release, the defendant prison official failed to provide his medication upon release. *Id.* This Court held those allegations sufficient to state a claim, reasoning that "when prison officials ignore the instructions of a treating physician they exhibit 'deliberate indifference' to the prisoner's medical needs," even when the harm from lack of medication would not occur until after the prisoner was no longer in custody. *Id*. at 1165-66. It would amount to "an abdication of [the state's] responsibility to provide medical care to those, who by reason of incarceration, are unable to provide for their own medical needs." *Id.* at 1164.

Mr. Shinault provided sufficient evidence to withstand summary judgment on his claim that Defendants abdicated their responsibility to provide medical care by interfering with Mr. Shinault's ability to obtain the medication prescribed for

him after his release from prison.[13]  Oregon statutory law and administrative rules

mandated that Defendants consider Mr. Shinault's need for medication when

determining his ability to pay his incarceration costs.  *See* O.R.S. § 179.640(1)(a);

O.A.R. 291-203-0040(5).  The rules impose no requirement that Defendants levy

the full cost of care charge, and give them ample room to waive any charges.

Yet Defendants assessed the maximum amount for cost of care for both his

current incarceration *and* the previous one, despite knowing the risks Mr. Shinault

faced without funds to cover his medication.  ER108; R39; ER46; ER94.  This

evidence supports an inference that Defendants acted with deliberate indifference

by consciously disregarding the substantial risk to Mr. Shinault's health and

interfering with the treatment prescribed by his doctors.  *See Wakefield*, 177 F.3d

at 1165; *Jackson*, 90 F.3d at 332 (deliberate indifference when defendants choose a

course of conduct in conscious disregard of an excessive risk to plaintiff's health);

*White v. Napoleon*, 897 F.2d 103, 106-10 (3d Cir. 1990) (deliberate indifference

---

[13] Although Defendants provided Mr. Shinault a temporary supply of medication
upon his release, by seizing his settlement funds earmarked for lifelong treatment,
they effectively removed his ability to prevent serious harm after this time.
"A prisoner need not prove that he was completely denied medical care" in order
to prevail on a deliberate indifference claim.  *Lopez*, 203 F.3d at 1132.

where prison doctor ignored the instructions of the prisoner's prior prison physician); *Campbell v. Beto*, 460 F.2d 765 (5th Cir. 1972).[14]

Although Defendants bore the burden of proof, they put forth no evidence to contradict Mr. Shinault's medical needs. Instead, they claimed it might be possible for him to obtain future medical treatment without paying for it. Both the ALJ and district court opinions noted three possible alternatives available to Mr. Shinault to pay for his care—private medical insurance, the Oregon Health Plan, and future incarceration. But Mr. Shinault contested the viability of each of these options, and the district court had an obligation to credit Mr. Shinault's testimony over Defendants' unsubstantiated assertions. *See Lopez*, 203 F.3d at 1131.

First, Mr. Shinault put forth evidence to contradict Defendants' assertion that he could obtain private medical insurance through a possible future employer after release from incarceration. Mr. Shinault testified that his untreated health

---

[14] Mr. Shinault provided evidence that he suffered harm from Defendants' deliberate indifference, including the characteristic harmful complications of untreated diabetes: mental and physical distress that worsened his existing mental health issues, an inability to obtain employment, and ultimately, homelessness. ER35; ER48; ER50-53. This is sufficient to raise a material dispute as to harm. *Lolli*, 351 F.3d at 420 (sufficient harm when diabetic plaintiff testified that when the defendants denied him medication or food, he experienced weakness, blurred vision, nausea, and increased urination—all symptoms of untreated diabetes); *McGuckin*, 974 F.2d at 1061 (the court need not find that the defendants' actions resulted in a significant injury to a prisoner to establish a violation of the prisoner's constitutional rights); *Helling v. McKinney*, 509 U.S. 25, 33 (1993) (noting that the likelihood that prison authorities' actions will cause future harm may be sufficient).

issues rendered him unable to obtain employment. *Id*. Disability and unemployment are prototypical complications of diabetes. *Diabetes in America* 1 (Maureen I. Harris, 2d ed. 1995), *available at* http://diabetes.niddk.nih.gov. It is more than plausible that a mentally ill former convict might have a difficult time finding steady employment, particularly employment that provides a full package of health benefits. And Mr. Shinault stated that without his settlement funds, he was left with no separate means of purchasing private insurance. ER50; ER51-52.

Second, Mr. Shinault challenged Defendants' suggestion that he had previously enrolled in an Oregon public assistance program that would supply his medication. The ALJ and district court suggested that Mr. Shinault had been on the Oregon Health Plan as recently as 2007 and that the plan would cover his medication (ER17; ER25-26; ER94; ER97), but Mr. Shinault testified he had been provided only food stamps, not medication, while on Oregon public assistance. ER40; ER52. At the hearing, even Defendants' own attorney acknowledged the confusion surrounding the type of public assistance Mr. Shinault received. ER239 ("I wasn't sure if it was Oregon Health Plan or food stamps"). Defendants provided no documentary evidence that Mr. Shinault had ever enrolled in the Oregon Health Plan, nor that this plan was a viable option for him in the future. Nor did they provide any evidence that even if he had been on the Oregon Health

Plan he would have received sufficient medication and treatment without cost-prohibitive deductibles or co-pays.

Third, Mr. Shinault contested Defendants' assertion that Oregon jails or prisons would cover his medication during his incarceration. Mr. Shinault stated that Marion County Jail—where he was at the time of the hearing—*did not* cover his medication costs. ER39. And in any event, the claim that Mr. Shinault should remain incarcerated for life merely to obtain sufficient medical treatment to survive is Kafkaesque. ER51-52.

The evidence Mr. Shinault put forth at the summary judgment stage was sufficient to establish that he needed his settlement funds for a vital medical expense, that Defendants were aware of this need, and that they intentionally disregarded this need by seizing more than $60,000 to pay the costs of incarceration. At a minimum, this creates a material dispute preventing the award of summary judgment to Defendants. *See Peralta v. Dillard*, 744 F.3d 1076, 1086 (9th Cir. 2014) (citing *Farmer*, 511 U.S. at 837).

## CONCLUSION

Mr. Shinault respectfully requests that this Court reverse the district court's grant of summary judgment.

Respectfully submitted,

Dated:  May 30, 2014

DANIEL H. BOOKIN
ANNA-ROSE MATHIESON
O'MELVENY & MYERS LLP

By:    /s/ Anna-Rose Mathieson

*Pro Bono Attorneys*
*for Appellant Lester R. Shinault*

## STATEMENT OF RELATED CASES

Counsel for Appellant Lester Shinault is not aware of any related cases currently pending before this Court.

Respectfully submitted,

Dated: May 30, 2014

DANIEL H. BOOKIN
ANNA-ROSE MATHIESON
O'MELVENY & MYERS LLP

By: /s/ Anna-Rose Mathieson

*Pro Bono Attorneys*
*for Appellant Lester R. Shinault*

## CERTIFICATE OF COMPLIANCE

Counsel for Appellant Lester Shinault certifies:

1.      This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B).  This brief contains 11,611 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the typestyle requirements of Federal Rule of Appellate Procedure 32(a)(6).  This brief has been prepared in a proportionally spaced typeface using Word 2010 in 14-point Times New Roman.

Respectfully submitted,

Dated:  May 30, 2014          DANIEL H. BOOKIN
                              ANNA-ROSE MATHIESON
                              O'MELVENY & MYERS LLP

                              By:   /s/ Anna-Rose Mathieson

                              *Pro Bono Attorneys*
                              *for Appellant Lester R. Shinault*

# Addendum

**ADDENDUM PURSUANT TO**
**NINTH CIRCUIT RULE 28-2.7**

## <u>TABLE OF CONTENTS</u>

<u>**Page**</u>

O.R.S. § 179.620  Responsibility of individual or estate for cost of care ...............1

O.R.S. § 179.640  Determination of ability to pay ....................................................2

O.R.S. § 179.701  Cost-of-care rates ........................................................................4

O.R.S. § 179.731  Waiver of amounts due ................................................................4

O.R.S. § 183.417  Contested case hearings; procedures .........................................4

O.A.R. 291-158-0010  Authority, Purpose and Policy ............................................7

O.A.R. 291-203-0020  Definitions ...........................................................................7

O.A.R. 291-203-0040  Ability to Pay Order.............................................................8

O.A.R. 291-203-0050  Determination of Charges.....................................................9

O.A.R. 291-203-0080  Waiver of Collection Action...............................................11

## O.R.S. § 179.620 (2009)[1]
### Responsibility of individual or estate for cost of care

(1)     A person and the personal estate of the person, or a decedent's estate, is liable for the full cost of care. Full cost of care is established according to ORS 179.701.

(2)     While the person is liable for the full cost of care, the maximum amount a person is required to pay toward the full cost of care shall be determined according to the person's ability to pay. Ability to pay is determined as provided in ORS 179.640.

(3)     Upon the death of a person, the decedent's estate shall be liable for any unpaid cost of care. The liability of the decedent's estate is limited to the cost of care incurred on or after July 24, 1979. The decedent's estate shall not include assets placed in trust for the person by other persons. Collection of any amount from a decedent's estate shall be pursuant to ORS 179.740.

(4)     Regardless of subsection (1) of this section and ORS 179.610 (5), assets held in trust by a trustee for a person are subject to laws generally applicable to trusts.

(5)     Notwithstanding subsections (1) and (3) of this section, the Department of Corrections, the Department of Human Services and the Oregon Health Authority may not collect the cost of care from:

(a)     Any assets received by or owing to a person and the personal estate of the person, or the decedent's estate, as compensation from the state for injury, death or, if the collection is being made by the Department of Corrections, the false imprisonment of the person that occurred when the person was in a state institution listed in ORS 179.321 or in the Eastern Oregon Training Center and for which the state admits liability or is found liable through adjudication; and

(b)     Any real or personal property of the personal estate of the person, or the decedent's estate, that the person or an authorized representative of the person can demonstrate was purchased solely with assets

---

[1] All statutes are provided as of October 23, 2009; there do not appear to be any changes material to this case from the version in effect on June 2, 2009. All regulations are provided as effective on both June 2 and October 23, 2009.

referred to in paragraph (a) of this subsection or partially with such assets, to the extent such assets were used in the purchase.

**O.R.S. § 179.640 (2009)**
**Determination of ability to pay**

(1)    (a) The Department of Corrections and the Oregon Health Authority shall establish rules for determining ability to pay for persons in their respective institutions. The rules adopted by each agency shall require, in addition to other relevant factors, consideration of the personal estate, the person's need for funds for personal support after release, and the availability of third party benefits such as, but not limited to, Medicare or private insurance. Each agency may also consider the probable length of stay at the state institution. Nothing in this section requires the Department of Corrections to investigate a person's ability to pay or to issue an ability-to-pay order.

(b)    When adopting rules under paragraph (a) of this subsection, the Department of Corrections shall consider the person's needs for funds to pay for the support of the person's children and to pay any monetary obligations imposed on the person as a result of the person's conviction.

(2)    In determining a person's ability to pay, none of the agencies may consider as part of the personal estate of the person or the decedent's estate:

(a)    Any assets received by or owing to the person and the personal estate of the person, or the decedent's estate, as compensation from the state for injury, death or, if the collection is being made by the Department of Corrections, the false imprisonment of the person that occurred when the person was in a state institution listed in ORS 179.321 and for which the state admits liability or is found liable through adjudication; and

(b)    Any real or personal property that the person or an authorized representative of the person can demonstrate was purchased solely with assets referred to in paragraph (a) of this subsection or partially with such assets, to the extent such assets were used in the purchase.

(3)    A person and the authorized representative of the person, if any, shall provide all financial information requested by the agency that is necessary to determine the person's ability to pay. To determine ability to pay, the agency may use any information available to the agency, including

information provided by the Department of Revenue from personal income tax returns pursuant to ORS 314.840, and elderly rental assistance claims. Upon request, the Department of Revenue shall release copies of tax returns to the agency. When the person or the person's authorized representative fails to provide evidence to demonstrate an inability to pay full cost of care, the agency may determine the person has the ability to pay the full cost of care.

(4)     The agency shall provide actual notice to the person and any authorized representative, if known to the agency, of its determination by issuing an ability-to-pay order. The order shall state the person's full liability and the person's determined ability to pay. Actual notice means receipt by the person and the authorized representative of notice. The notice shall include a copy of the ability-to-pay order, a description of the person's appeal rights and the date upon which appeal rights terminate and state the address where a request for hearing may be mailed or delivered. At any time, the agency may reissue an ability-to-pay order to notify an authorized representative as provided by ORS 179.653 (4).

(5)     At any time during the person's stay at the state institution or within 36 months from the date the person is released, if the agency receives new financial information that shows a change in the person's financial circumstances, the agency shall consider the changed circumstances and issue a new ability-to-pay order.

(6)     Orders issued after the person is released may not require the person to make payments toward the cost of care for more than 36 consecutive months following release. However, the agency may collect beyond the 36-month period any payments that became due but were not paid within the 36 months following release. Any remaining balance of full cost of care shall be collected as provided in ORS 179.740.

(7)     Notwithstanding ORS 183.315 (5), if a person or authorized representative disagrees with any ability-to-pay order issued pursuant to this section, the person or authorized representative may request a contested case hearing. To the extent practical, the hearing will be held at a location convenient to the person or the authorized representative. The request must be postmarked within 60 days from the date of the mailing of the ability-to-pay order. If the person or the authorized representative makes a timely request for a contested case hearing, the hearing and any appeal of the final hearing order shall be governed by ORS 183.413 to 183.497. If the person or the

authorized representative fails to make a timely request for a contested case hearing, the ability-to-pay order shall be final and not subject to judicial review, except as subsequently modified by the agency as provided in subsection (5) of this section.

(8)     On appeal, regardless of other information presented, payment of the full cost of care may be ordered if the person or the authorized representative refuses to produce financial information that the Hearings Officer or administrative law judge determines is relevant and must be produced.

### O.R.S. § 179.701 (2009)
### Cost-of-care rates

The cost-of-care rates for a person who is or was in a state institution described in ORS 179.321 shall be determined by the Department of Corrections or the Oregon Health Authority, as appropriate. The rates established shall be reasonably related to current costs of the institutions as described in ORS 179.321. Current costs shall exclude costs of outpatient services as defined in ORS 430.010 and any other costs not directly related to the care for a person at a state institution.

### O.R.S. § 179.731 (2009)
### Waiver of amounts due

If the Department of Corrections or the Oregon Health Authority determines that collection of the amount payable under ORS 179.610 to 179.770 for the cost of care of a person would be detrimental to the best interests of the person or the agency, the agency may waive the collection of part or all of the amount otherwise payable.

### O.R.S. § 183.417 (2009)
### Contested case hearings; procedures

(1)     In a contested case proceeding, the parties may elect to be represented by counsel and to respond and present evidence and argument on all issues properly before the presiding officer in the proceeding.

(2)     Agencies may adopt rules of procedure governing participation in contested case proceedings by persons appearing as limited parties.

(3)     (a) Unless prohibited by law, informal disposition may be made of any contested case by stipulation, agreed settlement, consent order or default. Informal settlement may be made in license revocation proceedings by

written agreement of the parties and the agency consenting to a suspension, fine or other form of intermediate sanction.

(b)   Any informal disposition of a contested case, other than an informal disposition by default, must be in writing and signed by the party or parties to the contested case.  The agency shall incorporate that disposition into a final order.  An order under this paragraph is not subject to ORS 183.470.  The agency shall deliver or mail a copy of the order to each party and to the attorney of record if the party is represented.  An order that incorporates the informal disposition is a final order in a contested case, but is not subject to judicial review. A party may petition the agency to set aside a final order that incorporates the informal disposition on the ground that the informal disposition was obtained by fraud or duress.

(4)   An order adverse to a party may be issued upon default only if a prima facie case is made on the record.  The record on a default order includes all materials submitted by the party.  The record on a default order may be made at the time of issuance of the order.  If the record on the default order consists solely of an application and other materials submitted by the party, the agency shall so note in the order.

(5)   At the commencement of a contested case hearing, the officer presiding at the hearing shall explain the issues involved in the hearing and the matters that the parties must either prove or disprove.

(6)   Testimony at a contested case hearing shall be taken upon oath or affirmation of the witness.  The officer presiding at the hearing shall administer oaths or affirmations to witnesses.

(7)   The officer presiding at the hearing shall place on the record a statement of the substance of any written or oral ex parte communication on a fact in issue made to the officer during the pendency of the proceeding and notify the parties of the communication and of their right to rebut the communication.  If an ex parte communication is made to an administrative law judge assigned from the Office of Administrative Hearings established under ORS 183.605, the administrative law judge must comply with ORS 183.685.

(8)   The officer presiding at the hearing shall ensure that the record developed at the hearing shows a full and fair inquiry into the facts necessary for

consideration of all issues properly before the presiding officer in the case and the correct application of the law to those facts.

(9)     The record in a contested case shall include:

(a)     All pleadings, motions and intermediate rulings.

(b)     Evidence received or considered.

(c)     Stipulations.

(d)     A statement of matters officially noticed.

(e)     Questions and offers of proof, objections and rulings thereon.

(f)     A statement of any ex parte communication that must be disclosed under subsection (7) of this section and that was made to the officer presiding at the hearing.

(g)     Proposed findings and exceptions.

(h)     Any proposed, intermediate or final order prepared by the agency or an administrative law judge.

(10)    A verbatim oral, written or mechanical record shall be made of all motions, rulings and testimony in a contested case proceeding. The record need not be transcribed unless requested for purposes of rehearing or court review. The agency may charge the party requesting transcription the cost of a copy of transcription, unless the party files an appropriate affidavit of indigency. Upon petition, a court having jurisdiction to review under ORS 183.480 may reduce or eliminate the charge upon finding that it is equitable to do so, or that matters of general interest would be determined by review of the order of the agency.

COST OF CARE REIMBURSEMENT (INMATE)
Division 203
*Temporary Adoption*
*Notice of Intent to Amend*

**Note:** The only sections open for review and comment are OAR 291-203-0020, 0040, and 0050

**291-203-0010**
**Authority, Purpose and Policy**
    (1) Authority: The authority for this rule is granted to the Director of the Department of Corrections in accordance with ORS 179.040, 179.640, 179.770, 423.020, 423.030, and 423.075.
    (2) Purpose: An inmate and the personal estate of an inmate, or a decedent's estate are liable for the full cost of care. The purpose of these rules is to establish guidelines for:
    (a) Determination of ability to pay;
    (b) Notification to the inmate of his/her obligation to pay for the cost of care; and
    (c) Appeal rights and process.
    (3) Policy: Within the inherent limitation of resources, the efficient and orderly administration of the Department and its facilities, it is the policy of the Department of Corrections to investigate and pursue reimbursement from inmates for the costs of their incarceration and care in accordance with the criteria and procedures established in these rules.
    Stat Auth: ORS 179.040, 179.610 - 179.770, 423.020, 423.030, and 423.075
    Stat Impl: ORS 179.040, 179.610 - 179.770, 423.020, 423.030, and 423.075

**291-203-0020**
**Definitions**
    (1) Assets: The total value of an inmate's (subject to the provisions of ORS 179.640(5)) equity in real and personal property of whatever kind or nature. Assets include, but are not limited to, the inmate's stocks, bonds, cash, accounts receivable, moneys due, or any other interests, whether they are self-managed, or held by the individual's authorized representative, or by any other individual or entity on behalf of the inmate. Assets held in trust are subject to laws generally applicable to trusts.
    (2) Authorized Representative: An individual or entity appointed under authority of ORS chapter 125, as guardian or conservator of an inmate, who has the ability to control the inmate's finances, and any other individual or entity holding funds or receiving benefits or income on behalf of the inmate.
    (3 [10]) Cash Assets/Liquid Reserves: Cash and cash equivalents, accounts receivable, temporary investments such as CDs or Treasury Bills, money market accounts, and bonds that can be cashed at any time.
    (4 [3]) Charges: The amount the D[d]epartment has determined that the inmate is required to pay toward the cost of care.
    (5 [4]) Cost of Care: All services including medical care, room, board, administrative costs and other costs not otherwise excluded by law.
    (6 [5]) Custody of the Department: The court ordered sentence of an inmate to the Department of Corrections to imprison in a D[d]epartment operated correctional facility or contracted housing through a county, other state, or other jurisdiction.
    (7 [6]) Dependents: The individuals for whom an inmate has a legal duty to support.
    (8 [17]) Distraint Warrant: A warrant or document issued by the D[d]epartment directed to the sheriff of any county of the state commanding the sheriff to levy upon and sell the real and personal property which is subject to satisfaction of the recoupment lien.
    (9 [7]) Fair Market Value: The cash price a capable and diligent individual could obtain in a reasonable amount of time for an asset.
    (10 [8]) Income: All funds received by an inmate, or for an inmate by an authorized representative from any source, whether earned or unearned, after making

Shinault v Hawks, 3:11-cv-436-PK
Declaration of Dick Hawks
Attachment 5, Page 1 of 6

Addendum - 7

applicable deductions for state and federal income taxes. Income includes benefits from life insurance, income protection insurance, or any other form of award to the inmate except as prohibited by ORS 179.620(5)(a).

(11 [9]) Inmate: Any person under the supervision of the Department of Corrections who is not on parole, probation, or post-prison supervision status.

(12 [11]) Personal Estate: All assets including cash, liquid reserves, stocks, bonds, accounts receivable, moneys due, or any other interests, whether they are self-managed, or held by the individual's authorized representative. Personal estate also includes benefits from income protection insurance, governmental retirement or disability insurance, such as Social Security, Veterans, state, federal, and railroad retirement benefits and benefits from life insurance or any other form of award except as prohibited in ORS 179.610(5)(a) and (5)(b).

(13 [12]) Primary Automobile: The automobile, if the person has more than one, which the person would choose to keep if required to sell all but one. If the person has only one, it is the primary personal automobile.

(14 [13]) Primary Person Residence: The home the inmate owns, or is purchasing, and in which the inmate lived prior to entering the custody of the D[d]epartment, or in which the inmate will live after leaving the custody of the D[d]epartment.

[(14) Personal Support Allowance: The cash allowed for reasonable miscellaneous expenses while in the custody of the department, including but not limited to, expenses for personal grooming and hygiene items; books, newspapers, or other publications; or snacks or refreshments not provided by the department.]

(15) Recoupment Liens: A charge or security or encumbrance upon real or personal property that can be used to satisfy the amount due for the inmate's cost of care.

(16) Support for Dependents: The cash necessary to meet the reasonable needs of the dependents, less the amount the dependent receives from any other source. Support for dependents excludes administratively or judicially ordered child and/or spousal support.

**Stat Auth: ORS 179.040, 179.610 - 179.770, 423.020, 423.030, and 423.075**

**Stat Impl: ORS 179.040, 179.610 - 179.770, 423.020, 423.030, and 423.075**

**291-203-0030**
**Requirements for Obtaining Financial Information**

(1) The department may require the inmate and/or the inmate's representative to submit financial information on forms provided by the department.

(2) The department may obtain financial information regarding the inmate from other sources the department considers reliable. These sources may include, but are not limited to, the Social Security and Veterans Administration, Oregon Department of Revenue, and other State of Oregon agencies.

**Stat Auth: ORS 179.040, 179.610 - 179.770, 423.020, 423.030, and 423.075**

**Stat Impl: ORS 179.040, 179.610 - 179.770, 423.020, 423.030, and 423.075**

**291-203-0040**
**Ability to Pay Order**

(1) An inmate and the personal estate of an inmate, or a decedent's estate, is liable for the full cost of care as established in ORS 179.701. The D[d]epartment may collect charges in advance for inmates with determinate sentences.

(2) The D[d]epartment shall make a determination of the inmate's ability to pay which is set forth in the Ability to Pay Order. The two types of Ability to Pay Orders are: determination of charges and a modification of charges. Each order shall be given one of these titles to identify the type of determination it sets forth, based on the factors and criteria described in the following sections.

(3) The inmate's ability to pay will be investigated and an Ability to Pay Order may be issued when the D[d]epartment is aware of an inmate or the inmate's representative with cash assets or liquid reserves in excess of the current biennial cost of care or $55,000 whichever is greater. This Ability to Pay threshold is applicable only to the determination of who will be reviewed for an Ability to Pay Order. (ORS 179.640(1)(b).

(4) The determination of the ability to pay may be assessed at intake or any time during the inmate's sentence, based on notification by sources the D[d]epartment considers reliable. These sources include, but are not limited to, the District Attorney's Office, the Social Security and Veterans Administration, Oregon Department of Revenue, State of Oregon agencies, or any other sources the D[d]epartment deems credible.

(5) When determining an inmate's ability to pay, in addition to other relevant factors, the Department will consider the inmate's personal estate, the inmate's need for funds for personal support after release, and the availability of third-party benefits such as, but not limited to, Medicare or private insurance.

Stat Auth: ORS 179.040, 179.610 - 179.770, 423.020, 423.030, and 423.075
Stat Impl: ORS 179.040, 179.610 - 179.770, 423.020, 423.030, and 423.075

291-203-0050
Determination of Charges

(1) The amount determined by the D[d]epartment to be the inmate's charges shall not exceed the full cost of care for the dates covered by the Ability to Pay Order, less payments and/or credits from any other sources the D[d]epartment has received, or reasonably anticipates receiving.

(2) Charges will be assessed using the inmate's equity in all assets whether the asset is controlled by the person, or by the person's authorized representative.

(a) Any asset may be liquidated in a lump sum to pay charges assessed the inmate in the Ability to Pay Order.

(b) Equity in each asset will be determined from the fair market value of the asset less any bona fide encumbrance against the asset.

(c) When assets are used as the basis for ongoing charges, the D[d]epartment will estimate the length of time the assets are expected to last. During the final 60 days of that time period, the D[d]epartment will review the inmate's financial circumstances for modifying the inmate's charges.

(3) Charges will be assessed using the total amount of all income received either by the inmate or for the inmate by the inmate's authorized representative.

(4) Charges may be assessed using the inmate's equity in a primary personal residence only if:

(a) The inmate is sentenced to death or to life without possibility of parole; and

(b) None of the following individuals reside in the residence:

(A) The inmate's spouse.

(B) The inmate's child or children under age 21, or blind or disabled children over 21.

(C) The inmate's sibling or siblings who own an interest in the residence, and who lived in the residence for at least one year immediately prior to the inmate becoming the custody of the D[d]epartment.

(D) The inmate's parents or emancipated children who are unable to work to maintain themselves as declared in ORS 109.010.

(5) Charges may be assessed using the inmate's equity in an automobile only if it is not the inmate's primary personal automobile.

(6) Deductions: The Department may allow a deduction from the inmate's assets and income for the following:

(a) Legal Obligations: Legal [Deductions may be allowed for legal] obligations, other than administratively or judicially ordered child [and/] or spousal support, as determined by the D[d]epartment.

(A [a]) Funds set aside as legal obligations may not be accumulated by, or

on behalf of the inmate, or used for purposes other than that for which it was approved.

(B [b]) The inmate must have demonstrated an intent to pay the obligation. The D[d]epartment may request verification of actual payments.

(C [e]) Any deduction allowed for the financial support of dependents must be used to provide current support. It may not be accumulated by, or on behalf of the inmate, and it may not be used for other purposes.

(b) Personal Support Following Release: Based on a showing of need, the Department may allow a deduction for the inmate's transitional support following his/her release from an ODOC institution for reasonable expenses to live in the community for three months, including rent, utilities, food, public transportation, supervision fees, and miscellaneous expenses.

(c) Personal Support While in Custody of the Department:

(A) Based on a showing of need, the Department may allow a deduction for an inmate's miscellaneous personal expenses while in the custody of the Department that are not provided by the Department and are available for purchase from the institution commissary. These include, but are not limited to, expenses for personal grooming and hygiene items; books, newspapers, or other publications; or snacks or refreshments.

(B) When a deduction is made by the Department for this purpose, the Department shall establish an allowance to reflect a reasonable monthly spending limit for the inmate for purchase from the institution commissary, consistent with the Department's rule on Trust Accounts (Inmate), OAR 291-158.

[(7) Deductions allowed for a personal expense allowance shall be established by the to reflect a reasonable monthly spending limit for use at the correctional institution canteen consistent

with the department's rule on Trust Accounts (Inmate), OAR 291-158.]

Stat Auth: ORS 179.040, 179.610 - 179.770, 423.020, 423.030, and 423.075

Stat Impl: ORS 179.040, 179.610 - 179.770, 423.020, 423.030, and 423.075

**291-203-0060**
**Modification of Charges**

(1) A modification of charges sets forth, in a new Ability to Pay Order, a change to the inmate's charges established by a prior Ability to Pay Order. When issuing a modification to charges, the department will consider the same factors as described in OAR 291-203-050. A modification to charges may be made to reflect:

(a) A change in the inmate's financial circumstances that affects the inmate's ability to pay ongoing monthly charges; or

(b) A reduction in the cost of care amount due to a change in the previously scheduled release date.

Stat Auth: ORS 179.040, 179.610 - 179.770, 423.020, 423.030, and 423.075

Stat Impl: ORS 179.040, 179.610 - 179.770, 423.020, 423.030, and 423.075

**291-203-0070**
**Notice of Ability to Pay**

The department shall provide actual notice to the inmate and any authorized representative, where known, of the inmate's ability to pay.

(1) The notice shall include the inmate's full liability, a description of the person's appeal rights under a contested case hearing, the date those rights terminate, and the address where a request for hearing may be mailed or delivered.

(2) If the inmate has an authorized representative, the original Ability to Pay Order shall be delivered to the representative, and a copy shall be delivered to the inmate. Any Ability to Pay Order delivered to an authorized representative shall include an explanation of the department's right to demand payment of the charges assessed by the

order, and the consequences to the authorized representative of failing to comply, as provided by ORS 179.653(3).

Stat Auth: ORS 179.040, 179.610 - 179.770, 423.020, 423.030, and 423.075

Stat Impl: ORS 179.040, 179.610 - 179.770, 423.020, 423.030, and 423.075

291-203-0080
Waiver of Collection Action

The department may issue a waiver to the collection of all or part of an inmate's unpaid charges based upon the best interest of the inmate or the department. Charges may be reassessed at a later time by a new Ability to Pay Order if the basis for waiver under this section ceases to exist.

Stat Auth: ORS 179.040, 179.610 - 179.770, 423.020, 423.030, and 423.075

Stat Impl: ORS 179.040, 179.610 - 179.770, 423.020, 423.030, and 423.075

291-203-0090
Hearing/Appeal Rights, Effect of Final Order

(1) If an inmate or the inmate's authorized representative disagrees with any Ability-to-Pay Order issued by the department, the inmate or the inmate's authorized representative may request a contested case hearing. The request must be postmarked within 60 days from the date of the mailing of the Ability-to-Pay Order.

(2) If the inmate or the inmate's authorized representative makes a timely request for a contested case hearing, the hearing and any appeal of the final hearing order shall be governed by ORS 183.413 to 183.497. If the inmate or the inmate's authorized representative fails to make a timely request for a contested case hearing, the Ability-to-Pay Order shall be final and not subject to judicial review, except as subsequently modified by the department as provided in ORS 179.640(5).

(3) On appeal, regardless of other information presented, payment of the full cost of care may be ordered if the inmate or the inmate's authorized representative refuses to produce financial information that

the hearings officer determines is relevant and must be produced.

(4) Effect of Order on Authorized Representatives:

(a) An authorized representative who has not had an opportunity to request a contested case hearing, either because the authorized representative was not appointed at the time of the Ability-to-Pay Order became final, or was not given notice of the Ability-to-Pay Order as required by ORS 179.640(4), shall not be bound by the department's order. To bind the authorized representative, the department must reissue the Ability-to-Pay Order and provide notice to the authorized representative as required by ORS 179.640(4).

(b) The authorized representative shall have the same appeal rights as if the order had originally been issued to the authorized representative.

(c) After the order becomes final, the authorized representative shall be bound by the order as provided in ORS 179.653.

(d) The department will not issue an execution of a lien or foreclose against property held by or in the control of the authorized representative until the authorized representative is bound by the department's order as provided in ORS 179.653.

Stat Auth: ORS 179.040, 179.610 - 179.770, 423.020, 423.030, and 423.075

Stat Impl: ORS 179.040, 179.610 - 179.770, 423.020, 423.030, and 423.075

291-203-0100
Enforcement of Lien

If an inmate refuses to pay for the cost of care, the unpaid amount plus interest shall be a lien in favor of the State of Oregon. The lien shall be upon the title to and interest in the real and personal property of the personal estate.

(1) If any amount due the department for the cost of care of an inmates is not paid within 30 days after it becomes due, and no provision is made to secure the payment by bond, deposit or otherwise, pursuant to these rules, the department may enforce its recoupment lien

Addendum - 11

created by ORS 179.653 by issuance of a Distraint Warrant in the manner provided in ORS 179.655.

(2) Any warrant issued by the department pursuant to ORS 179.655 shall clearly provide that the sheriff or other person executing the warrant shall not levy upon and sell any real or personal property that would be exempt under Oregon law from execution pursuant to a judgment. However, the department shall not issue a warrant pursuant to ORS 179.655 where:

(a) The amount due the department for the cost of care of an inmate is not at least 30 days over due;

(b) Provision has been made to secure the payment by bond or deposit or otherwise in conformation with this rule;

(c) The inmate has exercised the right to appeal the Ability to Pay Order pursuant to OAR 291-203-0090;

(d) Sixty-one days have not passed since the issuance of the Ability to Pay Order; or

(e) The inmate or the inmate's authorized representative has not been given at least ten days prior notice that the department intends to issue such a warrant.

(3) Securing Satisfaction of Ability to Pay Order:

(a) The issuance of a warrant to the sheriff to enforce collection of delinquent money will be stayed either by paying the amount due and accrued interest after it becomes due or by securing payment of that amount by bond or deposit.

(b) The bond given by the inmate to an inmate's authorized representative must be for an amount not less than the amount due, plus interest for a reasonable period of time as determined by the department.

(A) The bond must be executed by a surety company that is registered with, and

under the supervision of, the insurance commissioner of the State of Oregon.

(B) The department may allow more than two sureties to justify several amounts less than that expressed in the undertaking, if the whole justification is equivalent to that of two sufficient undertakings.

(C) Any one of the following items or combination of items acceptable to the department, equal to the amount due, plus accrued interest thereon, may be deposited with the department:

(i) A deposit of money;

(ii) A certified check or checks on any state or national bank within the State of Oregon payable to the department;

(iii) Satisfactory bonds negotiable by delivery, or obligations by the U. S. Government negotiable by delivery; or

(iv) Any other security satisfactory to the department.

(c) The department may require additional security whenever, in its opinion, the value of the security pledged is no longer sufficient to adequately secure the payment of the amount due, plus accrued interest thereon.

(d) Release of Tax Lien and Clouds on Title: When such a warrant is not in fact a lien on title to the real property, but merely a cloud on the title, a request for release of a warrant shall include the reason why the warrant does not constitute a lien and a copy of the current title report. The department may require other documentary proof showing the present condition of the title to the property in question.

Stat Auth: ORS 179.040, 179.610 - 179.770, 423.020, 423.030, and 423.075

Stat Impl: ORS 179.040, 179.610 - 179.770, 423.020, 423.030, and 423.075

Addendum - 12

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on May 30, 2014.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Respectfully submitted,

Dated: May 30, 2014

DANIEL H. BOOKIN
ANNA-ROSE MATHIESON
O'MELVENY & MYERS LLP

By:  /s/ Anna-Rose Mathieson

*Pro Bono Attorneys
for Appellant Lester R. Shinault*