Appeal No. 13-35290

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

————————

LESTER R. SHINAULT,
*Appellant*,

*v.*

DICK HAWKS; TAMI DOHRMAN; MARTHA MCDANIEL; OREGON
DEPT. OF CORRECTIONS GENERAL SERVICE DIVISION,
*Appellees*.

————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON
THE HONORABLE ANNA J. BROWN, JUDGE
CASE NO. 3:11-CV-00436-PK

————————

## EXCERPTS OF RECORD
## VOLUME I OF II

————————

O'MELVENY & MYERS LLP
DANIEL H. BOOKIN
ANNA-ROSE MATHIESON
TWO EMBARCADERO CENTER, 28TH FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3823
TELEPHONE: (415) 984-8700
FACSIMILE: (415) 984-8701

*Pro Bono Attorneys for Appellant Lester R. Shinault*

## VOLUME I INDEX

| Tab No. | D. Ct. Dkt. No. | Filing Date | Document Description | Page |
|---|---|---|---|---|
| 1 | 106 | 03/05/2013 | Judgment | ER001 |
| 2 | 105 | 03/05/2013 | Order Adopting Magistrate's Findings and Recommendation and Granting Motion for Summary Judgment as to Lester Shinault's Due Process Claim | ER002 |
| 3 | 92 | 12/10/2012 | Findings and Recommendation as to Lester Shinault's Due Process Claim | ER004 |
| 4 | 85 | 09/06/2012 | Order Adopting in Part Magistrate's Findings and Recommendation and Granting Motion for Summary Judgment as to Lester Shinault's First, Sixth, and Eighth Amendment Claims and Conspiracy Claim | ER009 |
| 5 | 61 | 06/11/2012 | Findings and Recommendation as to Lester Shinault's First, Sixth, and Eighth Amendment Claims and Conspiracy Claim | ER012 |

## VOLUME II INDEX

| Tab No. | D. Ct. Dkt. No. | Filing Date | Document Description | Page |
|---|---|---|---|---|
| 6 | 109 | 04/08/2013 | Notice of Appeal | ER029 |
| 7 | 76 | 08/02/2012 | Objections to Findings and Recommendation with Exhibits | ER034 |
| 8 | 67 | 07/10/2012 | Motion for Reconsideration with Exhibits | ER059 |
| 9 | 29 | 11/10/2011 | Declaration of Dick Hawks | ER064 |
| 10 | 29-1 | 11/10/2011 | Lester Shinault's Trust Account Statement (Attachment 3 to Declaration of Dick Hawks) | ER070 |

| 11 | 29-1 | 11/10/2011 | May 29, 2009 Ability to Pay Order (Attachment 6 to Declaration of Dick Hawks) | ER076 |
|----|------|------------|------------------------------------------------------------------------------|-------|
| 12 | 29-1 | 11/10/2011 | Notice of Right to Hearing on Ability to Pay Order (Attachment 7 to Declaration of Dick Hawks) | ER084 |
| 13 | 29-1 | 11/10/2011 | June 2, 2009 Request for Contested Hearing on Ability to Pay Order (Attachment 8 to Declaration of Dick Hawks) | ER090 |
| 14 | 29-1 | 11/10/2011 | December 29, 2009 Second Amended Proposed Order of Administrative Law Judge Ken L. Betterton (Attachment 10 to Declaration of Dick Hawks) | ER092 |
| 15 | 9 | 05/27/2011 | Declaration in Support of Plaintiff's Motion for Reconsideration of the Court's Order Denying Appointment of Counsel | ER100 |
| 16 | 2 | 04/06/2011 | Complaint | ER103 |
| 17 |   | 10/23/2009 | Certified Transcript of Ability to Pay Hearing[1] | ER132 |
| 18 |   |   | Court Docket | ER248 |

[1] This transcript is part of the administrative record for the case, and is the subject of Mr. Shinault's pending Unopposed Motion to Supplement the Record (Dkt. 19).

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON


LESTER R. SHINAULT,                          3:11-CV-00436-PK

          Plaintiff,                         JUDGMENT

     v.

DICK HAWKS, TAMI DOHRMAN,
MARTHA McDANIEL, and OREGON
DEPARTMENT OF CORRECTIONS,

          Defendants.


     Based on the Court's Opinion and Order issued March 4, 2013,

the Court **DISMISSES** this matter **with prejudice.**

     IT IS SO ORDERED.

     DATED this 5th day of March, 2013.


                              _____
                              ANNA J. BROWN
                              United States District Judge


1 - JUDGMENT

ER 001

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

LESTER R. SHINAULT,                         3:11-CV-00436-PK

              Plaintiff,                    ORDER

v.

DICK HAWKS, TAMI DOHRMAN,
MARTHA McDANIEL, and OREGON
DEPARTMENT OF CORRECTIONS,

              Defendants.


BROWN, Judge.

    Magistrate Judge Paul Papak issued Findings and
Recommendation (#92) on December 10, 2012, in which he recommends
the Court grant Defendants' Motion (#27) for Summary Judgment as
to Plaintiff's remaining claim for violation of Plaintiff's right
to due process under the Fourteenth Amendment and dismiss this
matter with prejudice.  The matter is now before this Court

1 - ORDER

pursuant to 28 U.S.C. § 636(b)(1)(B) and Federal Rule of Civil Procedure 72(b).

Because no objections to the Magistrate Judge's Findings and Recommendation were timely filed, this Court is relieved of its obligation to review the record *de novo*. *United States v. Reyna-Tapia*, 328 F.3d 1114, 1121 (9th Cir. 2003)(*en banc*). *See also United States v. Bernhardt*, 840 F.2d 1441, 1444 (9th Cir. 1988). Having reviewed the legal principles *de novo*, the Court does not find any error.

## CONCLUSION

The Court **ADOPTS** Magistrate Judge Papak's Findings and Recommendation (#92). Accordingly, the Court **GRANTS** Defendants' Motion (#27) for Summary Judgment as to Plaintiff's remaining claim for violation of Plaintiff's right to due process under the Fourteenth Amendment and **DISMISSES** this matter **with prejudice.**

IT IS SO ORDERED.

DATED this 5th day of March, 2013.

/s/ Anna J. Brown

_____
ANNA J. BROWN
United States District Judge

2 - ORDER

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

LESTER R. SHINAULT,

       Plaintiff,

                                3:11-CV-436-PK

v.                                     FINDINGS AND
                                     RECOMMENDATION

DICK HAWKS, TAMI DOHRMAN,
MARTHA McDANIEL, and OREGON
DEPARTMENT OF CORRECTIONS,

          Defendants.

PAPAK, Magistrate Judge:

       Plaintiff Lester R. Shinault, an incarcerated prisoner proceeding *pro se*, filed this action *in*

*forma pauperis* against defendants Dick Hawks, Tami Dohrman, Martha McDaniel, and the

Oregon Department of Corrections on April 6, 2011. By and through his complaint as originally

filed, Shinault alleged defendants' liability under 42 U.S.C. §§ 1983, 1985, and 1986 for the

violation of his rights under the First, Sixth, Eighth, and Fourteenth Amendments to the United

States Constitution, and under Oregon common law for torts identified in Shinault's complaint as

"grievous harm" and "extortion." On June 11, 2012, I recommended that summary judgment be

granted in the defendants' favor as to all of Shinault's claims, and on September 6, 2012, Judge

Page 1 - FINDINGS AND RECOMMENDATION

Brown adopted my recommendation as to all of Shinault's claims other than his Section 1983 claim premised on the violation of his Fourteenth Amendment due process rights. As to that claim, Judge Brown noted that I inadvertently failed to address the merits of the claim in my Findings of Recommendation of June 11, 2012. In consequence, Judge Brown referred defendants' motion (#27) for summary judgment back to me for further proceedings in connection with Shinault's Fourteenth Amendment claim.

Now before the court, therefore, is defendants' motion (#27) for summary judgment to the extent it addresses Shinault's single remaining claim, for violation of his Fourteenth Amendment rights, only. I have considered the motion and all of the papers and pleadings on file. For the reasons set forth below, the motion should be granted.

## LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Summary judgment is not proper if material factual issues exist for trial. *See, e.g., Celotex Corp. v. Catrett*, 477 U.S. 318, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995), *cert. denied,* 116 S.Ct. 1261 (1996). In evaluating a motion for summary judgment, the district courts of the United States must draw all reasonable inferences in favor of the nonmoving party, and may neither make credibility determinations nor perform any weighing of the evidence. *See, e.g., Lytle v. Household Mfg., Inc.*, 494 U.S. 545, 554-55 (1990); *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000).

Page 2 - FINDINGS AND RECOMMENDATION

## MATERIAL FACTUAL BACKGROUND

The parties are familiar with the facts underlying this dispute, and they are stated in full in the body of my Findings and Recommendation dated June 11, 2012. I therefore do not restate the facts here, and instead incorporate by reference and rely upon the statement and findings of fact contained in my Findings and Recommendation (#61) dated June 11, 2012.[1]

## ANALYSIS

Shinault takes the position that the withdrawal of funds from his inmate trust account that formed the basis for his Section 1983 claim premised on the violation of his constitutional right to access the courts also supports a Section 1983 claim premised on the violation of his right to due process. Defendants concede that Shinault has a protected property interest in those funds, and that he is therefore entitled to due process in connection with any forfeiture thereof. However, defendants argue that Shinault has already received all process to which he was entitled in connection with the involuntary withdrawal of funds from his inmate trust account. In support, defendants point to evidence of record establishing that Shinault received pre-withdrawal notice of the possibility that funds would be withdrawn from his account, that before the withdrawal took place Shinault requested and received a hearing before an Administrative Law Judge at which he had the opportunity to be represented by counsel, to present evidence, and to respond to the evidence offered by defendants and other ODOC staff members. In addition, it is undisputed that Shinault had available to him post-deprivation process in the form of the grievance procedures available to all ODOC detainees and prisoners.

I agree with the defendants that the evidence establishes that Shinault received all process

_____

[1] Judge Brown adopted my factual findings without modification.

Page 3 - FINDINGS AND RECOMMENDATION

to which he was due in connection with the withdrawal of funds from his inmate trust account.

> It is axiomatic that due process "is flexible and calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer*, 408 U.S. [471,] 481 [(1972)]; *Cafeteria & Restaurant Workers v. McElroy*, 367 U.S. 886, 895 (1961); *Joint Anti-Fascist Refugee Committee v. McGrath*, 341 U.S. 123, 162-163 (1951) (Frankfurter, J., concurring). The function of legal process, as that concept is embodied in the Constitution, and in the realm of factfinding, is to minimize the risk of erroneous decisions. Because of the broad spectrum of concerns to which the term must apply, flexibility is necessary to gear the process to the particular need; the quantum and quality of the process due in a particular situation depend upon the need to serve the purpose of minimizing the risk of error. *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).

*Greenholtz v. Inmates of Neb. Penal & Correctional Complex*, 442 U.S. 1, 12-13 (1979). Here, Shinault received pre-deprivation process in the form of a quasi-judicial proceeding with a right to appeal the administrative law judge's decision to the Oregon Court of Appeals, and post-deprivation process in the form of the right to file grievances and to appeal therefrom. Although it does not appear that the Ninth Circuit has weighed in on the question of the process to which a prisoner may be entitled before funds may be withdrawn from the prisoner's inmate trust account, other courts have held that the constitutional minima of due process to which such a prisoner may be entitled are satisfied by the availability of post-deprivation grievance procedures alone. *See, e.g.*, *Tillman v. Lebanon County Correctional Facility*, 221 F.3d 410, 421-422 (3d Cir. 2000). The process available to and pursued by Shinault was more than sufficient to ensure that his Fourteenth Amendment due process rights were not violated.

## CONCLUSION

For the reasons set forth above, defendants' motion (#27) for summary judgment should be granted as to Shinault's claim under 42 U.S.C. § 1983 premised on the violation of his Fourteenth Amendment due process rights. A final judgment should be prepared.

Page 4 - FINDINGS AND RECOMMENDATION

## SCHEDULING ORDER

The Findings and Recommendation will be referred to a district judge.  Objections, if any, are due fourteen (14) days from service of the Findings and Recommendation.  If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

If objections are filed, then a response is due fourteen (14) days after being served with a copy of the objections.  When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

## NOTICE

A party's failure to timely file objections to any of these findings will be considered a waiver of that party's right to *de novo* consideration of the factual issues addressed herein and will constitute a waiver of the party's right to review of the findings of fact in any order or judgment entered by a district judge.  These Findings and Recommendation are not immediately appealable to the Ninth Circuit Court of Appeals.  Any notice of appeal pursuant to Rule 4(a)(1) of the Federal Rules of Appellate Procedure should not be filed until entry of judgment.


Dated this 10th day of December, 2012.

Honorable Paul Papak
United States Magistrate Judge

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

LESTER R. SHINAULT,                          3:11-CV-00436-PK

        Plaintiff,                        ORDER

v.

DICK HAWKS, TAMI DOHRMAN,
MARTHA McDANIEL, and OREGON
DEPARTMENT OF CORRECTIONS,

        Defendants.

BROWN, Judge.

    Magistrate Judge Paul Papak issued Findings and
Recommendation (#61) on June 11, 2012, in which he recommends the
Court grant Defendants' Motion (#27) for Summary Judgment and
dismiss Plaintiff's claims with prejudice.  On August 21, 2012,
Plaintiff filed a document the Court construed as Objections to
the Findings and Recommendation.  The matter is now before this

1 - ORDER

Court pursuant to 28 U.S.C. § 636(b)(1) and Federal Rule of Civil Procedure 72(b).

When any party objects to any portion of the Magistrate Judge's Findings and Recommendation, the district court must make a *de novo* determination of that portion of the Magistrate Judge's report. 28 U.S.C. § 636(b)(1). *See also United States v. Reyna-Tapia*, 328 F.3d 1114, 1121 (9th Cir. 2003)(*en banc*); *United States v. Bernhardt*, 840 F.2d 1441, 1444 (9th Cir. 1988).

In his Objections Plaintiff reiterates the arguments contained in his Response to Defendants' Motion for Summary Judgment. This Court has carefully considered Plaintiff's Objections and concludes they do not provide a basis to modify the Findings and Recommendation.

The Court also has reviewed the pertinent portions of the record *de novo* and does not find any error in the Magistrate Judge's Findings and Recommendation with respect to Plaintiff's claims that Defendants violated his rights under the First, Sixth, and Eighth Amendments to the United States Constitution as well as Plaintiff's claim that Defendants conspired to interfere with his civil rights.

In their Response to Plaintiff's Objections, however, Defendants point out that in the Findings and Recommendation the Magistrate Judge did not address the claim that Plaintiff arguably raised and that Defendants addressed in their Motion for

2 - ORDER

Summary Judgment regarding Plaintiff's allegation that Defendants violated Plaintiff's rights to due process under the Fourteenth Amendment.  The Court agrees.  The Court, therefore, refers to the Magistrate Judge for further Findings and Recommendation Plaintiff's allegation that Defendants violated Plaintiff's rights to due process under the Fourteenth Amendment.

CONCLUSION

The Court **ADOPTS in part** Magistrate Judge Acosta's Findings and Recommendation (#61) to the extent that the Court **GRANTS** Defendants' Motion (#27) for Summary Judgment as to Plaintiff's claims for violation of the First, Sixth, and Eighth Amendments and Plaintiff's claim for conspiracy to interfere with his civil rights **DISMISSES** those claims **with prejudice.**  The Court, therefore, **REFERS** to the Magistrate Judge for further Findings and Recommendation Plaintiff's allegation that Defendants violated Plaintiff's rights to due process under the Fourteenth Amendment.

IT IS SO ORDERED.

DATED this 6th day of September, 2012.

ANNA J. BROWN
United States District Judge

3 - ORDER

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

LESTER R. SHINAULT,

      Plaintiff,

                                    3:11-CV-436-PK

                                    FINDINGS AND
                                    RECOMMENDATION

v.

DICK HAWKS, TAMI DOHRMAN,
MARTHA MCDANIEL, OREGON
DEPARTMENT OF CORRECTIONS,
et al.

      Defendants.

_____

PAPAK, Magistrate Judge:

      Incarcerated plaintiff Lester R. Shinault filed this action *pro se* against Dick Hawks, Tami

Dohrman, Martha McDaniel, and the General Services Division of the Oregon Department of

Corrections on April 6, 2011. In his complaint, Shinault alleges defendants' liability under 42

U.S.C. §§ 1983, 1985, and 1986 for the violation of Young's civil rights arising under the First,

Page 1 - FINDINGS AND RECOMMENDATION

Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. This court has federal question jurisdiction over Shinault's federal claims pursuant to 28 U.S.C. § 1331.

Now before the court is the defendants' motion (#27) for summary judgment. I have considered the motion and all of the pleadings on file. For the reasons set forth below, defendants' motion should be granted.

## LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Summary judgment is not proper if material factual issues exist for trial. *See, e.g., Celotex Corp. v. Catrett*, 477 U.S. 318, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995), *cert. denied,* 116 S.Ct. 1261 (1996). The substantive law governing a claim or defense determines whether a fact is material. *See Moreland v. Las Vegas Metro. Police Dep't*, 159 F.3d 365, 369 (9th Cir. 1998). In evaluating a motion for summary judgment, the district courts of the United States must draw all reasonable inferences in favor of the nonmoving party, and may neither make credibility determinations nor perform any weighing of the evidence. *See, e.g., Lytle v. Household Mfg., Inc.*, 494 U.S. 545, 554-55 (1990); *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000).

## FACTUAL BACKGROUND

Shinault is, and at all material times was, incarcerated with the Oregon Department of Corrections ("ODOC"). He was incarcerated with ODOC from May 19, 2005 until February 5,

Page 2 - FINDINGS AND RECOMMENDATION

2007, and from October 23, 2008 until August 14, 2009, as a result of felony convictions. He was arrested on October 10, 2009 on parole violations, released from jail on October 19, and re-arrested on October 21. He remains incarcerated at the Marion County Jail.

The Oregon Department of Corrections Central Trust Accounting Unit establishes a single trust account for each inmate in ODOC custody. *See* O.A.R. 291-158-0015(1). Funds in such an account are generally held for the benefit of the inmate for which the account was established. ODOC is permitted to access funds held in an inmate trust account only under specifically prescribed circumstances: "for sanctions resulting from the inmate's disciplinary hearings; garnishment actions determined by the courts; court-ordered costs and fees in judicial review proceedings, in habeas corpus and post-conviction cases, in tort actions against a public body, or in other proceedings as authorized or requirement by law; damages or destruction caused by willful misconduct; costs associated with the facility, release, and programs; copies; postage; medically required services including prostheses or other devices; authorized self-elected activities; or to correct illegal and erroneous transactions." *See* O.A.R. 291-158-0015(1). Accordingly, an incarcerated person and the personal estate of that person is liable for the full cost of care while incarcerated. *See* O.R.S. § 179.620(1). ODOC determines an inmate's cost-of-care rates, which includes the cost of room and board, medical care, and other necessities provided by the institution. *See* O.R.S. § 179.701.

The maximum amount a person is required to pay toward the full cost of care is determined according to the person's ability to pay. *See* O.R.S. § 179.620(2). In determining the ability to pay, ODOC considers assets other than those received by or owing to the person and the personal estate of that person, as compensation from the state for injury or death. *See* ORS §

Page 3 - FINDINGS AND RECOMMENDATION

179.640(2)(a).  To pay for the cost of care while incarcerated, ODOC may deduct funds from an

inmate trust account in advance for an inmate with determinate sentences.  *See* O.A.R. 291-203-

0040(1).  However, if ODOC determines that collection of the amount payable for the inmate's

cost of care would be detrimental to the best interests of that person or the agency, then the

agency may waive the collection of part or all of the amount otherwise payable.  *See* O.R.S. §

179.731.  Shinault's claim for relief, alleging defendants' violation of his constitutional right to

meaningful access to the courts, is premised in part on Shinault's allegations that the defendants

improperly withdrew funds from his inmate trust account, for the purpose of paying for Shinault's

cost of care while he was incarcerated from May 29, 2005 until February 5, 2007, and from

October 23, 2008 to August 14, 2009.

On April 3, 2009, prior to ODOC's withdrawal from Shinault's trust account, Shinault

received $107,416.48 as proceeds from civil litigation against a drug manufacturing company, all

of which ODOC deposited into Shinault's inmate trust account.  On May 18, 2009, ODOC

deducted $21,717.00 from Shinault's inmate trust account to satisfy a garnishment from the

Multnomah County Circuit Court for back child support, leaving $85,699.48 in the account.  On

May 29, 2009, ODOC issued its Ability to Pay Order and Determination of Charges.  In that

order, ODOC provided Shinault with a statement containing ODOC's calculations of Shinault's

assets and cost of care while incarcerated, as well as a Notice of Right to Hearing on Ability to

Pay Order.  ODOC calculated Shinault's cost of care to be $65,353.94.[1]  On June 2, 2009,

---

[1] From July 1, 2005 through June 30, 2007, the average cost of care for an inmate was
$67.53 per day.  From July 1, 2007 through June 30, 2009, the average cost of care of an inmate
was $77.78 per day.  Since Shinault was incarcerated for 628 days between May 19, 2005 and
February 5, 2007, and for 295 days between October 23, 2008 and August 14, 2009, his total cost
of care while incarcerated was $65,353.94.

Page 4 - FINDINGS AND RECOMMENDATION

Shinault submitted his request for a contested hearing before an Administrative Law Judge

("ALJ").

At the time of issuing the Ability to Pay Order, ODOC had adopted a schedule to estimate

funds an inmate will need to cover living expenses for the first three months after release from

incarceration.[2] *See* O.A.R. 291-203-0050(6). This schedule is based on estimates of costs for a

one bedroom apartment in Salem, Oregon, and is applied statewide in Oregon. In June 2009,

ODOC withdrew $4,404 from Shinault's trust account to cover Shinault's living expenses for the

first three months after release from incarceration. ODOC then adjusted that amount upward to

$5,000 to allow for variable expenses, such as security deposits for housing and for variations of

living expenses in other parts of Oregon. ODOC also allowed Shinault to keep $30 a month for

the last three months of his incarceration for personal expenses for basic hygiene, snacks, and

personal items. After deducting $5,000 for post-release living expenses and $90 for three months

of personal expenses while incarcerated, Shinault had $80,609.48 left in his account.

In July 2009, ODOC deducted $4,088.96 from Shinault's inmate trust account as a result

of three garnishments served on his inmate account for restitution and related court costs on his

prior criminal cases. Also, at Shinault's request, ODOC released approximately $11,000 to

Shinault's attorney. At the time of his release from incarceration on August 14, 2009, Shinault

had $61,352.39 left in his account.[3] After his release, Shinault was arrested on October 10, 2009

---

[2] As of December 1, 2009, ODOC has adopted a schedule to estimate funds an inmate
will need to cover living expenses for the first six months after release from incarceration.

[3] The parties agree that Shinault had $61,352.39 remaining in his inmate trust account on
August 14, 2009. However, documentary evidence submitted by Dick Hawks as part of his
declaration to the court, including Shinault's inmate trust account statements between January
and July 2009, show that ODOC withdrew $65,353.94 from the account on June 2, 2009 to pay

Page 5 - FINDINGS AND RECOMMENDATION

on parole violations, released from jail on October 19, and re-arrested on October 21.

On October 23, 2009, Shinault remained in jail during a contested hearing on the Ability to Pay Order before the ALJ. Shinault had retained an attorney to represent him; however, the attorney withdrew prior to the hearing. At the hearing, defendants Dick Hawks and Martha McDaniel presented evidence to support ODOC's calculations for Shinault's cost of care. Shinault asserted that ODOC would be "murdering" him if he was not given the money remaining in his account to pay for diabetes medications. Shinault also requested that ODOC waive the cost of his incarceration; however, he did not provide any evidence to ODOC prior to his release or at the administrative hearing as to any specific medical needs or the projected cost of those needs. The ALJ found that since Shinault was still in jail as of the date of the hearing, his medications and medical costs would be paid for by the institution holding him.

The ALJ also found that Shinault presented no evidence that he could not work when he was not incarcerated. Therefore, Shinault's medical costs and medications may be covered by medical insurance through his employment. Since Shinault had been on the Oregon Health Plan as recently as 2007, that plan remained an option for him if his medication costs were not covered through work or another third-party provider. On December 29, 2009, the ALJ issued a Second Amended Proposed Order, finding that Shinault had the ability to pay for the cost of his care while incarcerated, and ordered him to pay $61,352.39.

## ANALYSIS

Having reviewed and analyzed Shinault's complaint, it appears that Shinault intends to

---

for the cost of care of Shinault's incarceration. Account statements show that Shinault had $9,639.01 remaining in his account on July 20, 2009, and do not show any balances beyond this date.

Page 6 - FINDINGS AND RECOMMENDATION

state the following three claims for relief under 42 U.S.C. § 1983, and one claim for relief under 42 U.S.C. §§ 1985 and 1986. First, Shinault alleges that defendants are liable under Section 1983 for the violation of Shinault's rights under the First and/or Fourteenth Amendment in connection with defendants' alleged actions in improperly withdrawing money from Shinault's inmate trust account to pay for his cost of care while incarcerated. Second, Shinault alleges defendants' liability under Section 1983 for the violation of Shinault's rights under the Sixth Amendment in connection with defendants' denying or interfering with Shinault's right to counsel during the contested hearing. Third, Shinault alleges defendants are liable under Section 1983 for violation of Shinault's rights under the Eighth Amendment for not providing Shinault with necessary medications to treat his diabetes after his release from incarceration. Lastly, Shinault alleges defendants' liability under Sections 1985 and 1986 for conspiring to interfere with and/or to violate Shinault's rights under the First, Sixth, Eighth, and Fourteenth Amendments.

Defendants maintain that none of Shinault's constitutional rights have been violated, and Shinault has not presented evidence that defendants conspired to violate his rights. Even if Shinault's constitutional rights have been violated, defendants claim entitlement to qualified immunity. The parties do not appear to dispute the material facts in this case, and largely rely upon the findings of fact presented in the ALJ's Second Amended Proposed Order issued on December 29, 2009. Defendants also rely on the declaration of defendant Dick Hawks, offering as evidence portions of Shinault's inmate trust account statements between January and July 2009, the Ability to Pay Order issued by ODOC on May 29, 2009, as well as Shinault's history of incarceration with ODOC between 1991 and 2009. As stated above, defendants move for summary judgment as to each of Shinault's claims.

Page 7 - FINDINGS AND RECOMMENDATION

I.    **Impaired Access to the Courts**

Shinault contends that defendants denied his right to due process by improperly

withdrawing funds from his inmate trust account to pay for his cost of care while incarcerated

without giving notice or holding proper court proceedings.  Shinault further asserts that the ALJ's

order is not appealable to a higher court.  In *Bounds v. Smith*, 430 U.S. 817 (1977), the United

States Supreme Court affirmed the already well-established proposition that "prisoners have a

constitutional right of access to the courts."  *Bounds*, 430 U.S. at 821.  Indeed, the court noted

that, more specifically, prisoners have a right to "adequate, effective, and meaningful" access to

the courts, *id.* at 822, and that "the touchstone" of this constitutional right is "[m]eaningful

access," *id.*, *quoting Ross v. Moffitt*, 417 U.S. 600, 611, 612, 615 (1974).  In *Lewis v. Casey*, 518

U.S. 343 (1996), the court clarified that to establish violation of the First and Fourteenth

Amendment right of access to the courts, a prisoner must establish that abridgement of the right

of access caused actual injury, namely, actual impairment of the prisoner's capacity to bring or

prosecute an action to challenge his or her sentence or the conditions of his or her confinement,

whether directly or collaterally.  *See Lewis*, 518 U.S. at 355.  Impairment of any other litigating

capacity is one of incidental consequences of conviction and incarceration, and are perfectly

constitutional.  *Id.*

An inmate and the personal estate of an inmate are liable for the full cost of care while

incarcerated.  *See* O.R.S. § 179.701.  Any assets received by or owing to the person and the

personal estate of the inmate as compensation from the state for injury, death, or false

imprisonment of the person are not considered as part of the inmate's personal estate.  *See* O.R.S.

§ 179.640(2)(a).  ODOC determines the amount each inmate shall pay and provides actual notice

Page 8 - FINDINGS AND RECOMMENDATION

to the person of its determination by issuing an ability-to-pay order. *See* O.R.S. § 179.640(4). The order states the person's full liability and the person's determined ability to pay. *Id.* The notice includes a copy of the ability-to-pay order, a description of the person's appeal rights, and the dates upon which appeal rights terminate and states the address where a request for hearing may be mailed or delivered. *Id.* Jurisdiction for judicial review of contested cases is conferred upon the Court of Appeals. *See* O.R.S. § 183.482(1).

In this case, ODOC calculated Shinault's ability to pay based on the proceeds he received from litigation against a drug manufacturing company. Because Shinault did not receive these monies as compensation from the state, ODOC was entitled to include them in its calculations. ODOC issued the Ability to Pay Order on May 29, 2009, and included the Notice to a Right of Hearing, as well as calculations of Shinault's liability and ability to pay. The Notice to a Right of Hearing informed Shinault where his request to a contested hearing must be mailed or delivered, and that it must be postmarked within 60 days of the Ability to Pay Order. Shinault asserts in his complaint that he had no notice of the Ability to Pay Order and did not comprehend that ODOC's notice of withdrawal of funds. Since Shinault exercised his right to a contested case hearing before the ALJ, it is assumed that he received actual notice of the Ability to Pay Order and the Notice to a Right of Contested Hearing. Also, because Shinault requested a hearing on June 2, 2009, it appears that he did comprehend that ODOC was withdrawing funds from his trust account, and was prepared to contest it.

Furthermore, the record does not suggest that Shinault's right to meaningful access was abridged, or that he suffered any actual injury from defendants' withdrawal of funds, because he was able to present his case before an ALJ, who issued an order on December 29, 2009. Since

Page 9 - FINDINGS AND RECOMMENDATION

the record shows that defendants adhered to state law in issuing the Ability to Pay Order, and

Shinault exercised his right to a contested hearing before an ALJ, Shinault's claim that

defendants deprived him of his constitutional right of meaningful access to courts necessarily

fails. Defendants' motion for summary judgment should be granted as to Shinault's Section 1983

claim premised on the violation of his rights under the First and/or Fourteenth Amendments.

## II.    Interference with Right to Counsel at the ALJ Hearing

Shinault asserts that defendants deprived him of his right under the Sixth Amendment to

be represented by an attorney, and the right to present his argument aside from requesting a

contested hearing before an ALJ. The *Sixth Amendment* provides that "in all criminal

prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his

defence." *U.S. Const. amend VI.* Here, Shinault's hearing before the ALJ was not a criminal

prosecution. In an administrative hearing, Oregon law allows parties to "be represented by

counsel to respond and present evidence and argument on all issues properly before the presiding

officer in the proceeding." O.R.S. § 183.417(1). It is clear from the ALJ's Second Amended

Proposed Order that Shinault was given the opportunity to present his argument, because he

testified at the hearing from jail. At the hearing, he also had the opportunity to, and did, assert

his claim that defendants were "murdering" him by withdrawing funds from his inmate trust

account to pay for his incarceration, which would deprive him of the ability to obtain medications

to treat his diabetes.

Both Shinault and defendants agree that, in July 2009, Shinault requested ODOC to

release $11,000 from his inmate trust account to an attorney that he had retained for the ALJ

hearing. However, in September 2009, Shinault's attorney withdrew before the hearing. Under

Page 10 - FINDINGS AND RECOMMENDATION

Oregon law, Shinault was entitled to retain an attorney for his hearing before the ALJ at all times. *See* O.R.S. § 183.417(1). At the time of his release on August 14, 2009, Shinault still had $61,352.39 left in his inmate trust account, showing that he had the financial capacity to retain another attorney to represent him at the contested hearing, which was not held until October 2009. For the foregoing reasons, defendants' motion for summary judgment should be granted as to Shinault's claim for relief under Section 1983 premised on the violation of his rights under the Sixth Amendment.

## III.   Deliberate Indifference to Serious Medical Need

Shinault contends that because defendants were deliberately indifferent to his medical needs by withdrawing funds from his inmate trust account to pay for his cost of care, and not providing medications to treat his diabetes after release from incarceration, they violated the Eighth Amendment's prohibition against cruel and unusual punishment. The Supreme Court has established that a public official's "deliberate indifference to a prisoner's serious illness or injury" violates the Eighth Amendment's prohibition against cruel and unusual punishment. *Estelle v. Gamble*, 429 U.S. 97, 105 (1976). To prevail on an Eighth Amendment deliberate indifference claim, a prisoner must establish both (i) that he suffered an objectively serious illness or injury while incarcerated and (ii) that prison officials were subjectively aware of the seriousness of the condition and deliberately denied or delayed access to medical care that could reasonably have been provided. *See Clement v. Gomez*, 298 F.3d 898, 904-905 (9th Cir. 2002). The objective component is satisfied "whenever the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain." *Id.* at 904 (internal quotation marks omitted) (*citing McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992) (*quoting Estelle*,

Page 11 - FINDINGS AND RECOMMENDATION

429 U.S. at 104)).

Under applicable Ninth Circuit case law, "[a] determination of 'deliberate indifference' involves an examination of two elements: [1] the seriousness of the prisoner's medical need and [2] the nature of the defendant's response to that need." *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992). A finding of "deliberate indifference" necessarily requires "inquiry into a prison official's state of mind." *Farmer v. Brennan*, 511 U.S. 825, 838 (1994), *quoting Wilson v. Seiter*, 501 U.S. 294, 299 (1991). Specifically, the United States Supreme Court has defined "deliberate indifference" in the Eighth Amendment context to mean that "a prison official cannot be found liable . . . for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837.

Moreover, under applicable Ninth Circuit jurisprudence, "there are certain [additional] minimum requirements before deliberate indifference can be established." *McGuckin*, 974 F.2d at 1060.

First, there must be a purposeful act or failure to act on the part of the defendant. "An *accident*, although it may produce added anguish, is not on that basis *alone* to be characterized as wanton infliction of unnecessary pain" sufficient to demonstrate deliberate indifference, [*Estelle*], 429 U.S. at 105 (emphases added), nor does "an *inadvertent* failure to provide adequate medical care" by itself to create a cause of action under § 1983. *Id.* A defendant must purposefully ignore or fail to respond to a prisoner's pain or possible medical need in order for deliberate indifference to be established.

Second, when, as here, a claim alleges "mere delay of surgery," a prisoner can make "no claim for deliberate medical indifference unless the denial was harmful." *Shapley v. Nevada Board of State Prison Comm'rs*, 766 F.2d 404, 407 (9th Cir. 1985) (*per curiam*). However, a finding that the defendant's activities

Page 12 - FINDINGS AND RECOMMENDATION

> resulted in "substantial" harm to the prisoner is not necessary, see *Wood*, 900 F.2d
> at 1339-40; *see also Hudson*, 112 S. Ct. at 998-1000 (rejecting "significant injury"
> requirement and noting that the Constitution is violated "whether or not
> significant injury is evident"), although a finding that the inmate was seriously
> harmed by the defendant's action or inaction tends to provide additional *support* to
> a claim that the defendant was "deliberately indifferent" to the prisoner's medical
> needs: the fact that an individual sat idly by as another human being was seriously
> injured despite the defendant's ability to prevent the injury is a strong indicium of
> callousness and deliberate indifference to the prisoner's suffering. *See* [*Estelle*],
> 429 U.S. at 106 (holding that a defendant's action or inaction could be
> "sufficiently harmful to evidence deliberate indifference to serious medical
> needs"); *Ortiz* [*v. City of Imperial*], 884 F.2d [1312,] 1313-14 (reversing summary
> judgment in part because inaction of doctors and nurses resulted in inmate's
> death).

*Id.* (emphasis original; footnote omitted). Nevertheless, "[t]he requirement of deliberate

indifference is less stringent in cases involving a prisoner's medical needs than in other cases

involving harm to incarcerated individuals because 'the State's responsibility to provide inmates

with medical care ordinarily does not conflict with competing administrative concerns.'" *Id.*,

*quoting Hudson*, 503 U.S. at 6, *citing Whitley v. Albers*, 475 U.S. 312, 320 (1986).

Under Oregon law, an inmate and the personal estate of an inmate are liable for the full

cost of care. *See* O.R.S. § 179.701. When determining an inmate's ability to pay, in addition to

other relevant factors, ODOC will consider the inmate's personal estate, the inmate's need for

funds for personal support after release, and the availability of third party benefits such as, but

not limited to, Medicare or private insurance. *See* O.A.R. 291-203-0040(5). If collection of an

inmate's cost of care would be detrimental to the best interests of the person or agency, the

agency may waive collection of part or all of the amount otherwise payable. *See* O.R.S. §

179.731.

Here, Shinault asserts that ODOC's deprivation of funds amounts to cruel and unusual

Page 13 - FINDINGS AND RECOMMENDATION

punishment. However, ODOC's withdrawal from Shinault's inmate trust account was intended to reimburse the State of Oregon for the cost of his incarceration, not to punish him. Although Shinault requested that ODOC waive the cost of his incarceration, he did not provide evidence prior to his release or at the contested hearing as to any specific medical needs or the projected cost of those needs. Indeed, in both his complaint and motion in opposition to summary judgment submitted to this court, Shinault still has not provided evidence of any specific medical needs or projected costs of those needs, only asserting that the withdrawal of funds from his inmate trust account would lead to his inability to pay for medications associated with diabetes.

Shinault also maintains that defendants refused to provide him with medications to treat his diabetes after being released from incarceration. However, the ALJ found that at the time of his release on August 14, 2009, ODOC gave Shinault a 60-day prescription to both medications necessary to treat his diabetes. The ALJ also noted that Shinault was arrested on October 10, released from jail on October 19, and re-arrested on October 21, 2009. Since Shinault is currently incarcerated at the Marion County Jail, the jail or any other institution holding him will continue to provide him with the necessary medications and medical care.

At the contested hearing, Shinault did not provide evidence that he would be unable to work once he was released from incarceration. The ALJ found that Shinault's medical costs and medications could be covered by medical insurance through his employment. Even if Shinault's medication costs were not covered through work or any other third-party provider, the Oregon Health Plan remained an option for him. In his complaint and motion in opposition to summary judgment, Shinault still has not provided evidence that he would be unable to work once he is released from incarceration. Therefore, given that Shinault's medications and medical costs will

Page 14 - FINDINGS AND RECOMMENDATION

continue to be covered by Marion County Jail or any other institution holding him while he remains incarcerated, and that medical insurance through future employment or the Oregon Health plan remain viable options to pay for his medical care once he is released, Shinault's assertion that defendants' withdrawing funds from his inmate trust account amounts to "deliberate indifference" to his medical needs are unfounded.  Indeed, defendants have adhered to ODOC policy and state law and responded to Shinault's medical needs by providing him with a 60-day supply of medications to treat his diabetes after release from incarceration in August 2009, as well as continuing to provide medications and medical care to him while he remains incarcerated.  For the foregoing reasons, defendants' motion for summary judgment should be granted as to Shinault's Section 1983 claim premised on the violation of his rights under the Eighth Amendment.

## IV.    Conspiracy to Interfere with Civil Rights

Shinault asserts that defendants are liable under Sections 1985 and 1986 for conspiring to interfere with and/or to violate his civil rights under the First, Sixth, Eighth, and Fourteenth Amendments.  Other than claiming that defendants held proceedings or meetings without Shinault present, he does not allege any facts or provide any evidence -- either direct or circumstantial -- that defendants intended to obstruct justice, interfere with Shinault's civil rights, or engage in race discrimination.  The record shows that the only proceeding held with respect to Shinault was the administrative hearing on October 23, 2009.  No other evidence provides that defendants conspired to abridge any of Shinault's constitutional rights.  Therefore, defendants' motion for summary judgment should be granted as to Shinault's Sections 1985 and 1986 claims premised on the violation of his civil rights.

Page 15 - FINDINGS AND RECOMMENDATION

V.    **Qualified Immunity**

Having found no constitutional violation, there is no need to address defendants' qualified immunity defenses.

## CONCLUSION

For the reasons set forth above, defendants' motion (#27) for summary judgment should be granted, and Shinault's claims in this action should be dismissed with prejudice. A final judgment should be prepared.

## SCHEDULING ORDER

The Findings and Recommendation will be referred to a district judge. Objections, if any, are due fourteen (14) days from service of the Findings and Recommendation. If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

If objections are filed, then a response is due fourteen (14) days after being served with a copy of the objections. When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

## NOTICE

A party's failure to timely file objections to any of these findings will be considered a waiver of that party's right to *de novo* consideration of the factual issues addressed herein and will constitute a waiver of the party's right to review of the findings of fact in any order or judgment entered by a district judge. These Findings and Recommendation are not immediately appealable to the Ninth Circuit Court of Appeals. Any notice of appeal pursuant to Rule 4(a)(1) of the Federal Rules of Appellate Procedure should not be filed until entry of judgment.

Page 16 - FINDINGS AND RECOMMENDATION

Dated this 11th day of June, 2012.

Honorable Paul Papak
United States Magistrate Judge

ER 028

Appeal No. 13-35290

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

————————

LESTER R. SHINAULT,
*Appellant*,

*v.*

DICK HAWKS; TAMI DOHRMAN; MARTHA MCDANIEL; OREGON
DEPT. OF CORRECTIONS GENERAL SERVICE DIVISION,
*Appellees*.

————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON
THE HONORABLE ANNA J. BROWN, JUDGE
CASE NO. 3:11-CV-00436-PK

————————

## EXCERPTS OF RECORD
## VOLUME II OF II

————————

O'MELVENY & MYERS LLP
DANIEL H. BOOKIN
ANNA-ROSE MATHIESON
TWO EMBARCADERO CENTER, 28TH FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3823
TELEPHONE: (415) 984-8700
FACSIMILE: (415) 984-8701

*Pro Bono Attorneys for Appellant Lester R. Shinault*

## VOLUME I INDEX

| Tab No. | D. Ct. Dkt. No. | Filing Date | Document Description | Page |
|---|---|---|---|---|
| 1 | 106 | 03/05/2013 | Judgment | ER001 |
| 2 | 105 | 03/05/2013 | Order Adopting Magistrate's Findings and Recommendation and Granting Motion for Summary Judgment as to Lester Shinault's Due Process Claim | ER002 |
| 3 | 92 | 12/10/2012 | Findings and Recommendation as to Lester Shinault's Due Process Claim | ER004 |
| 4 | 85 | 09/06/2012 | Order Adopting in Part Magistrate's Findings and Recommendation and Granting Motion for Summary Judgment as to Lester Shinault's First, Sixth, and Eighth Amendment Claims and Conspiracy Claim | ER009 |
| 5 | 61 | 06/11/2012 | Findings and Recommendation as to Lester Shinault's First, Sixth, and Eighth Amendment Claims and Conspiracy Claim | ER012 |

## VOLUME II INDEX

| Tab No. | D. Ct. Dkt. No. | Filing Date | Document Description | Page |
|---|---|---|---|---|
| 6 | 109 | 04/08/2013 | Notice of Appeal | ER029 |
| 7 | 76 | 08/02/2012 | Objections to Findings and Recommendation with Exhibits | ER034 |
| 8 | 67 | 07/10/2012 | Motion for Reconsideration with Exhibits | ER059 |
| 9 | 29 | 11/10/2011 | Declaration of Dick Hawks | ER064 |
| 10 | 29-1 | 11/10/2011 | Lester Shinault's Trust Account Statement (Attachment 3 to Declaration of Dick Hawks) | ER070 |

| 11 | 29-1 | 11/10/2011 | May 29, 2009 Ability to Pay Order (Attachment 6 to Declaration of Dick Hawks) | ER076 |
|---|---|---|---|---|
| 12 | 29-1 | 11/10/2011 | Notice of Right to Hearing on Ability to Pay Order (Attachment 7 to Declaration of Dick Hawks) | ER084 |
| 13 | 29-1 | 11/10/2011 | June 2, 2009 Request for Contested Hearing on Ability to Pay Order (Attachment 8 to Declaration of Dick Hawks) | ER090 |
| 14 | 29-1 | 11/10/2011 | December 29, 2009 Second Amended Proposed Order of Administrative Law Judge Ken L. Betterton (Attachment 10 to Declaration of Dick Hawks) | ER092 |
| 15 | 9 | 05/27/2011 | Declaration in Support of Plaintiff's Motion for Reconsideration of the Court's Order Denying Appointment of Counsel | ER100 |
| 16 | 2 | 04/06/2011 | Complaint | ER103 |
| 17 | | 10/23/2009 | Certified Transcript of Ability to Pay Hearing[1] | ER132 |
| 18 | | | Court Docket | ER248 |

---

[1] This transcript is part of the administrative record for the case, and is the subject of Mr. Shinault's pending Unopposed Motion to Supplement the Record (Dkt. 19).

Lester R. Shinault
SID # 8041974
777 Stanton Blvd.
Ontario, Oregon 97914
(541) 881-4537

FILED 08 APR '13 10:58 USDC-ORP

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

### PORTLAND DIVISION

| | |
|---|---|
| LESTER R. SHINAULT, | **File Number <u>3:11-cv-00436-PK</u>** |
| Plaintiff, | **NOTICE OF APPEAL** |
| vs. | |
| HAWKS, et al., | |
| Defendants. | |

Notice is hereby given that Lester R. Shinault, in the above named case, hereby appeal to the United States Court of Appeals for the Ninth Circuit from the final judgment and Findings and Recommendation (#92) entered in this action on the 4th day of March, 2013.

Dated this 3rd day of April, 2013.

Respectfully Submitted,

*Lester R Shinault*

Lester R. Shinault
SID # 8041974
Snake River Correctional Inst.
777 Stanton Blvd.
Ontario, Oregon 97914

Page 1 of 1 Notice of Appeal and Certificate of Service

Form 39.040                                                                    ER 029

## CERTIFICATE OF SERVICE

**CASE NAME:** Lester R. Shinault v. Hawks et, al.

**CASE NUMBER:** 3:11-cv-00436-PK

COMES NOW, Lester R. Shinault, and certifies the following:

That I am incarcerated by the Oregon Department of Corrections at the Snake River Correctional Institution in Ontario Oregon.

That on the 3rd day of April, 2013 I personally placed in the Correctional Institution's mailing service A TRUE COPY of the following:

Notice of Appeal and Motion for Appointment of Counsel

I placed the above in a securely enclosed, postage prepaid envelope, to the person(s) named at the places addressed below:

The United States District Court
Office of the Clerk
District of Oregon
740 United States Courthouse
1000 S.W. 3rd Ave.
Portland, Oregon 97204

Lester R. Shinault
SID# 8041974
Snake River Correctional Institution
777 Stanton Blvd.
Ontario, Oregon 97914-8335
(541) 881-4537

Page 1 of 1 Notice of Appeal and Certificate of Service

Form 39.040

ER 030

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

LESTER R. SHINAULT,                         3:11-CV-00436-PK

            Plaintiff,                      ORDER

v.

DICK HAWKS, TAMI DOHRMAN,
MARTHA McDANIEL, and OREGON
DEPARTMENT OF CORRECTIONS,

            Defendants.

BROWN, Judge.

    Magistrate Judge Paul Papak issued Findings and
Recommendation (#92) on December 10, 2012, in which he recommends
the Court grant Defendants' Motion (#27) for Summary Judgment as
to Plaintiff's remaining claim for violation of Plaintiff's right
to due process under the Fourteenth Amendment and dismiss this
matter with prejudice.  The matter is now before this Court

1 - ORDER

ER 031

pursuant to 28 U.S.C. § 636(b)(1)(B) and Federal Rule of Civil Procedure 72(b).

Because no objections to the Magistrate Judge's Findings and Recommendation were timely filed, this Court is relieved of its obligation to review the record *de novo*. *United States v. Reyna-Tapia*, 328 F.3d 1114, 1121 (9th Cir. 2003)(en banc). *See also United States v. Bernhardt*, 840 F.2d 1441, 1444 (9th Cir. 1988). Having reviewed the legal principles *de novo*, the Court does not find any error.

### CONCLUSION

The Court **ADOPTS** Magistrate Judge Papak's Findings and Recommendation (#92). Accordingly, the Court **GRANTS** Defendants' Motion (#27) for Summary Judgment as to Plaintiff's remaining claim for violation of Plaintiff's right to due process under the Fourteenth Amendment and **DISMISSES** this matter **with prejudice.**

IT IS SO ORDERED.

DATED this 5th day of March, 2013.

/s/ Anna J. Brown

_____

ANNA J. BROWN
United States District Judge

2 - ORDER

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

LESTER R. SHINAULT,                          3:11-CV-00436-PK

        Plaintiff,                        JUDGMENT

    v.

DICK HAWKS, TAMI DOHRMAN,
MARTHA McDANIEL, and OREGON
DEPARTMENT OF CORRECTIONS,

        Defendants.


      Based on the Court's Opinion and Order issued March 4, 2013,

the Court **DISMISSES** this matter **with prejudice**.

      IT IS SO ORDERED.

      DATED this 5th day of March, 2013.


                           ANNA J. BROWN
                           United States District Judge


1 - JUDGMENT

# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

FILED 02 AUG '12 10:49 USDC-ORP

LESTER R. SHINAULT,

    Plaintiff,

      CASE NO. 3:11-CV-436-PK

   V.

      OBJECTIONS TO
      FINDINGS AND
      RECOMMDATION.

DICK HAWKS, TAMI DOHRMAN,
MARTHA MCDANIEL, OREGON
DEPARTMENT OF CORRECTIONS,
et al.      Defendants.

Incarcerated plaintiff Lester R. SHinault filed a action pro se against Dick Hawks, Tami DoHrman, Martha Mc — Daniel, and the General Services Division of the Oregon Department of Corrections on April 6, 2011. In the Complaint, Plaintiff alleges defendant's liability under 42 U.S.C. §§ 1983, 1985, and 1986 for the Violation of SHinaults civil rights arising under the First, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

### First OBJECTIONS

Defendant's motion (#27) for Summary Judgement should not be granted. Because based upon the legal findings from ORS. The O.D.O.C. was in voilation of Plaintiff rights reguarding plaintiff finance. NO where in or Law states money can be taking for room an board, Settlement moneys are exempt from garnishment.

Pg. 1. oBJection To Findings and Recommendation

## Second OBJECTION

The Oregon Department of Corrections (O.D.O.C.) Central Trust Account. Do to the wrongful doing of O.D.O.C. illegally removing money from Shinault trust account during plaintiff stay in the ODOC. I've since went through an array of mental and physical distress. 1) physically it's lead me to be homeless and in and out of jail which was not my intent. Mentally I've had a break down which has compelled and worsend my already mental health issues.

## Third OBJECTION

O.D.O.C. central Trust Accounting Unit don't take funds from a inmate account are generally held for the benefit of the inmate. As you can see EX. 1, 2 Marion County Corrections Facility inmate request form, I have limited access to the law library so I can't look up case laws (ORS's) (OAR's) so my rights are being voilated. O.D.O.C don't have "none" of OAR 291-158-0015(1) O.R.S. § 179.620(1), O.R.S. § 179.701, O.R.S. 179.640(2)(a) OAR 291-203-0040(1), O.R.S § 179.731 are in the O.D.O.C. hand book when an inmate is house at the O.D.O.C.

## Four OBJection

The maximum amount a person is required to pay toward the full cost of care, only if it don't put a "burden" on the

on the person that have to pay for there cost of care.
This money $61,352.39 O.D.O.C. has taken from the plaintiff is
for future hospitalization bills, medication cost and others.

### Fifth OBJection

I object to all the O.A.R 291-203-0040(1), O.D.O.C.
should not be able to deduct funds from an inmate
trust account in advance for an inmate with determinate
sentences. Plaintiff is a diabetic for life and need his
$61,352.39 for future Hospitalization bills, medication
cost in others. Agency should have waive the collection
of part or all of the amount. See ORS. § 179.731.

### Six OBJection

O.D.O.C. saying that I have not shown any proof about
where the $107,416.48. The O.D.O.C. Central Trust Dick
Hawks talk to Watt's Law firm in order to deposite $107,416.48
in the ODOC Central Trust Account.

On April 3, 2009, Stinault received $107,416.48 deposited
in O.D.O.C. Central Trust Account through Dick Hawks meniger
at ODOC. central trust. The $107,416.48 was proceeds from
a Civil litigation against a drug manufacturing company that
made the pill Ziprexa which gave Stinault diabete's. On
May 18, 2009, ODOC. Central trust deducted $21,717.00 from
Stinault inmate central trust account to satisfy a garnish-

ment from the Multnomah County Circuit Court for back child support without his consent, lieving $85,699.48 in SHinault's O.D.O.C. Central Trust inmate account. On May 29, 2009, O.D.O.C. Central Trust issued a Ability to pay order and Determination of charges and Garnished $65,353.94 out of SHinault's O.D.O.C. Inmate Central Trust Account with out sHinault consent. SHinault ask for a Notice of Right to a Hearing on the Ability to pay order and the garnishment of $65,353.94. O.D.O.C. calculated SHinault's cost of care to be $65,353.94. From July 1, 2005 through June 30, 2007. The average cost of care for an inmate was $67.53 per day. From July 1, 2007 through June 30, 2009 the average cost of care of an inmate was $77.78 per day his total cost of care while incarcerated was $65,353.94. On June 2, 2009 SHinault submitted his request for a contested telephone hearing befor on Administrative Judge which was paid by O.D.O.C. At the time of issuing the Ability to pay order, O.D.O.C. had estimate funds on inmate will need to cover living expenses "not three months" but 6 months after release from O.D.O.C. See OAR. 291-203-0050 (6). I was release with 3 months $5,000 which it should of be for 6 months $10,000 do to the fact, I was only giving $5000 I struggle to pay bills, so I had to go into 'survive'. O.D.O.C Central Trust only allow SHinault to keep $30 a month for the last three months of his incarceration for personal expenses for basic hygiene, I have a commusary sHeet as evidence in Trail. I've never spent $90 for three month, if I did spent $90 it was out of my money. SHinault had $80,609.48 left in his O.D.O.C. inmate Central Trust Ac-

Pg. 4. OBJection To Findings and Recommendation

count.

In July 2009, O.D.O.C. Central Trust Dick Hawks manager deducted $4,088.96 from SHinault's inmate Trust account as a result of three garnishment served on SHinault inmate Trust acount for restitution and related court cost on his prior criminal cases. SHinault funds in O.D.O.C. inmat central Trust Account should have been protected. Also, at SHinault request $11,000 to SHinault's attorney. At the time of his release from incarceration on August 14, 2009 SHinault "should have been giving addiction 5,000 for the three month ODOC didn't give SHinault for living expensen". On August 14, 2009, SHinault had $61,352.39 left in his O.D.O.C. central inmate Trust Account under O.D.O.C. supervision. garnishment. O.D.O.C. Central Trust with drew $65,353.94 from SHinault inmate Trust account on June 2, 2009 to pay for his cost of care of SHinault's incarceration without SHinault consent. After SHinault release, SHinault was arrested on October 10, 2009 at Marion County Jail for parole Violations, released from jail on October 19, 2009, and re-arrested on October 21, 2009. On October 23, 2009, SHinault remained in jail during a telephone contest Hearing on the Ability to Pay Order before the Administrative Judge "(AJ)" which SHinault didn't understand what was going on in the telephone contest hearing because SHinault had stated several time in the telephone contest hearing that he don't understand the words and need a Attorney to represent SHinault in this telephone contest hearing on the Ability to Pay Order because SHinault's Attorney withdrew prior to the

telephone contest hearing. Do to the fact SHinault did not under-
stand anything in the telephone contest hearing. The AJ was
suppose to stop the telephone contest hearing to evluate SHinault
ability to understand or give SHinault some time to get a Attorney
to represent SHinault in the telephone contest hearing which
everything was said in the telephone contest hearing is record-
ed and on a C.D. which I plan to use in Trail. At the time
of the telephone contest hearing in front of the AJ,
defendants Dick Hawks and Martha McDaniel presented
ODOC's calculations for SHinault's cost of care which the
money ODOC took was for future Hospitalization bills
and medication for my diabetes. SHinault asserted that O-
DOC would be "murdering" him if he was not given the
$61,352.39 remaining in his inmate Central Trust account
to pay for his diabetes medication bills and future Hos-
pitalization bills. SHinault also requested that O.D.O.C.
waive the cost of care of his incarceration; however,
There was no need to provide information (evedince)
that could be obtained from medical records that DOC
already had and I did provide ODOC evidence of
my medical needs to ODOC, but at the AJ hearing, I was
incarcerated at Marion County Jail when I had the tele-
phone contested hearing which my rights to represent me
with attorney was violated. SHinault was still in jail as
of the date of the telephone contest hearing. and
SHinault medication and medical costs, SHinault had
to pay for himself not Marion County Jail SHinault
could not work because of the medication SHinault

Pg. 6. OBJection To Findings and Recommendation
ER 039

was taken. Therefore, SHinault's medical costs and medication was not covered by medical insurance because SHinault had no job and The Oregon Health plan only gave SHinault food stamps, for food only and it doesn't remained an option for SHinault if his medication cost were not cover, SHinault would do without medication which is bad for SHinault health do to the diabetes SHinault have and without his diabetes medication SHinault can go into diabetic coma or Die. SHinault should not have depend on another third-party provider or Oregon Health Plan or medical insurance through employment when SHinault had the $ 61,552.39, SHinault can take care of it his self. On December 29, 2009 The AJ issued a second Amended Proposed Order. The same AJ That did the Telephone contest hearing did the second amended proposed order without me being there or getting any paperwork. AJ finding that SHinault had to pay the ability to pay for the cost of his care while incarcerated, and order SHinault to pay $ 61,352.39 which left SHinault no funds in his inmate Central Trust account to pay for SHinault future Hospitalization bills and medication bill, do to SHinault's diabete's.

SHinault's complaint states several claims for relief under 42 U.S.C. § 1983, and claim for relief under 42 USC §§ 1985 and 1986. SHinault complaint that defendants are liable under section 1983 for the violation of SHinault's rights under the First, Fourteenth Amendment for defendant's alleged

action in improperly withdrawing money from SHinault inmate trust account to pay court fines, child support and for SHinault cost of care while incarcerated without SHinault consent. SHinault also alleges that the defendant's liability under section 1983 for the Violation of SHinault's rights under the Six Amendment for not stopping the telephone contested hearing when SHinault stated in the tele—phone contested hearing that he don't understand and copperhond the words they war using in the telephone contested hearing and defendant's denying or interfering with SHinault's right to be represented with counsel during the telephone contested hearing. SHinault alleges defendants are liable under section 1983 for violation of SHinault's rights under the Eighth Amendment taking #61,352.39 out of SHinault's inmate trust account without SHinault consent and not providing SHinault with money to buy necessary medications to treat his diabetes after his release from incarceration. Lastly, SHinault alleges defendant's liability under section 1985 and 1986 for conspiring to interfere with and/or to violate SHinault's rights under the First, Sixth, Eighth, and Fourteenth Amend—ments.

I.    SHinault will provide the court evidence that defendants has conspired to violate SHinault's rigths in many ways and SHinault's constitutional rights have been violated. will be proving in Trail. Defendant's can not claim entitlement to qualified immunity if the defendants has violated a constitutional right

Which defendants has violated SHinault's constitutional rights under the First, Sixth, Eighth, and Fourteenth Amendments. The Defendants do not appear to dispute the material facts in this case and largely reling upon the findings of fact presented in the AJ's Second Amended Proposed Order issued on Dec. 29, 2009. Defendants also relying on the declaration of defendant Dick Hawks, offering as evidence portions of SHinault's inmate trust account statements between Jan. and July 2009, the Ability to Pay Order issued by O.D.O.C. on May 29, 2009, as well as SHinault's history of incarceration with O.D.OC. between 1991 and 2009. SHinault contends that defendants denied SHinault of his right to due process by improperly withdrawing funds from his inmate trust account to pay for his cost of care while incarcerated, child support, and court fines. O.D.O.C. Central Trust should have protected SHinault funds in O.D.OC. inmate Central Trust Account. Also SHinault contends that defendants denied SHinault right to Due Process by improperly withdrawing funds from his inmate trust account to pay for SHinault cost of care while incarcerated without giving notice or holding proper court proceedings. SHinault further asserts that the AJ's order is not appealable to a higher court. In Bounds V. Smith, 430 U.S. 817 (1977), The United States Supreme Court affirmed the already well-established proposition that "prisoners have a constitutional right of access to the courts." Bounds, 430 U.S. at 821. Indeed, the court noted that, more specifically, prisoners have a right to "adequate, effective, and meaningful"

pg. 9. Objection To Findings and Recommendation

ER 042

access to the courts, id. at 822, and that "the touchstone" of this constitutional right is "[m]eaningful access," id., quoting Ross v. Moffitt, 417 U.S. 600, 611, 612, 615 (1974). In Lewis v. Casey, 518 U.S. 343 (1996), the court clarified that to establish violation of the First and Fourteenth Amendment right of access to the courts, a prisoner must establish that abridgement of the right of access caused actual injury, namely, actual impairment of the prisoner's capacity to bring or prosecute an action to challenge his or her sentence or the conditions of his or her confinement, whether directly or collaterally. See Lewis, 518 U.S. at 355. Impairment of any other litigating capacity is one of incidental consequences of conviction and incarceration, and are prefectly constitutional. Id.

An inmate and the personal estate of a inmate are liable for the full cost of care while incarcerated. See O.R.S. § 179.___, unless any assets recieved by or owing to the person and the personal estate of the inmate as compensation from the state for injury, death or false imprisonment of the person are not considered as part of the inmate's personal estate. See O.R.S. § 179.___. Any assets recieved by or owing to the person and the personal estate of the inmate as compensation from the state for injury, death, or false imprisonment of the person are not considered as part of the inmate's personal estate. See all of ORS 179.640, I recieved compensation, a settlement which are exmept from garnishment's and the Drug Manufacture Company made a pill "Zyprexa" that

gave SHinault diabetes which is a injury and can cause a slow death. I got the pill "Zyprexa" from Cascadia Behavoral Health-care located in Portland, Oregon. This pill "Zyprexa" gave me diabetes and the $61,352.39 for cost of care while incar-ceration, $21,717.00 for back child support and $4,088.96 for three garnishment for restiution and court costs on SHinault prior criminal cases. The 107,416.48 from civil litigation against a drug manufacturing company is my injury, and I can die if I do not get the proper treatment and medication for SHinault injury (diabetes) which cost money. SHinault have recently reviewed both the 2010 version and the 2012 version of the ORS and still have not found the codes for the ability-to-pay order. The Criminal Code of Oregon, The Oregon Revised Statutes (2011 Edition) and still not found the codes for the ability to pay order. O.D.O.C Central Trust single out inmates with money and determines the amount an inmate with money shall pay. ODOC Central Trust calculated SHinault ability to pay order based on the proceeds SHinault recieved from the civil litigation against a drug manufacturing company that made the Pill Zyprexa that gave SHinault diabetes. Cascadia Behavoral Healthcare Inc. located in Portland, Ore-gon, gave SHinault the prescription of Zyprexa which SHinault is seeking litigation because Zyprexa gave SHinault diabetes. Because SHinault did not recieve the $107,416.48 as compensation from the state, O.D.O.C. Central Trust was not entitled to in-clude there calculations because for one Civil litigation and settlement compensation is exempt from garnishment.

pg. 11. Objection To Findings and Recommendation

On May 29, 2009, ODOC central Trust manager Dick Hawks issue a ability to Pay Order, and included the *Notice to a Right of a Telephone Hearing*. SHinault request to a contested hearing with in postmarked within 60 days of the *Ability to Pay Order*. SHinault asserts in his complaint not comprehend that ODOC central trust notice of withdrawal of funds which SHinault rights was violated in the telephone contested hearing before the AJ, you should hear the recorder of the *Telephone contested Hearing*, On October 23, 2009. I plan to play it in Trial. SHinault was seeking help through the prison law Library, the jail house Lawyers help SHinault request for a hearing on June 2, 2009, so SHinault had no comprehend to the withdrawing of funds from his inmate trust account and still don't comprehand what's happen to his funds.

    SHinault's rights to meaningful access and that SHinault suffered mental health issues from defendant's withdrawal of funds because SHinault was not able to present his case before on AJ, who issued an order on Dec. 29, 2009. Since the record shows that defendant's adheared to State Law in issuing the *Ability to Pay Order*, and SHinault had help with a prison Jail house Lawyer to exercised his right to a telephone contested hearing before on AJ, SHinault's claim that defendant's deprived SHinault of his constitutional right of meaningful access to the courts necessarily fails. Defendant's motion for Summary judgment should be granted as to SHinault's Section 1983 claim premised ' on the violation of his rights under the First and/or Fourteenth Amendments.

II.

SHinault asserts that defendants deprived SHinault of his right under the Six Amendment to be represented by an attorney because SHinault could not comprehend or represent himself. because SHinault do not have a GED or educated enough to comprehend Attorney language. See, Telephone contested Hearing on October 23, 2009. SHinault had "Officer Hayman" Marion County SHeriff as a witness at the Telephone contested Hearing on October 23, 2009 before an AJ. See Telephone Contested Hearing recorder or C.D. on October 23, 2009 at Marion County Jail. SHinault did not have the opportunity to have assistance of counsel for SHinault defence, The Six Amendment provides that, the accused shall enjoy the right to have the assistance of counsel for SHinault defence. In an administrative Hearing, Oregon law allows parties to be represented by counsel to respond and presend evidence and argument on all issued properly before the presiding officer in the proceeding, see ORS. 3 183.417(1) SHinault was not given the opportunity to present his argument because one, SHinault don't comprehend on what's going on and if you listen to SHinault testamony at the telephone contested hearing recorder from Jail, SHinault did not understand what was going on or did not comprehend to represent his argument, all SHinault now that ODOC Central Trust "(defendant's)" were" murdering him by withdrawing funds out of SHinault inmate trust account to pay for SHinault incarceration, which would deprive SHinault of the ability to obtain medications to Treat his diabetes and Future Hospitalization bills.

Both SHinault and defendant's agree that, in July 2009, requested ODOC central Trust Dick Hawks to release $11,000 from SHinault inmate trust account to an (Kevin Carolson) attorney that SHinault retained for the AJ Telephone contested Hearing. However, in September 2009, SHinault attorney withdrew before the hearing. Under Oregon law, SHinault was entitled to retain an attorney for the Telephone Contested Hearing before the AJ at all time, See O.R.S. § 183. 417 (1). But the defendants had already violated SHinault rights by not rescheduling the telephone Contested Hearing because SHinault had no Attorney to properly repersent in the Telephone Contested Hearing. At the time of SHinault release on August 14, 2009 SHinault had $61,352.39 left in his ODOC Central inmate trust account under garnishment. SHinault try to ask Dick Hawks ODOC Central Trust Manager and Dick H. said the $61,352.39 will remain in his care until this matter is resolve. SHinault did not have the financial capacity to retain another lawyer to represent SHinault at the Telephon Contested Hearing, which was held on October 23, 2009. Defendants motion for Summary judgment should be granted as to, SHinault's claim for relief under Section 1983 premised on the violation of SHinault rights under the Six Amendment.

III.

SHinault contends that because defendant's were deliberately indifferent to SHinault medical need and future Hospilalization bills needs by withdrowing funds from SHinault inmate trust account to pay for SHinault cost of care and not providing medications and funds to treat SHinault's diabetes

Pg. 14. OBjection To Findings and Recommendation

after release from prison, ODOC Central trust violated the Eighth Amendment's and cruel unusual punishment. The Supreme Court has estblished that a public offical's "deliberate indifference to a prisoner's serious illness or injury" violates the Eighth Amendment and cruel and unusual punishment. *Estelle V. Gamble,* 429 US. 97, 105 (1976). To prevail on an Eighth Amendment deliberate indifference claim, a prisoner must establish both (i) that SHinault suffered an objective serious illness or injury while incarcerated which SHinault can prove that ODOC Central Trust, Mentally ive had break down which has compelled and worsend my mental health issue's and (ii) that prison officials were subjectively aware of the seriousness of the condition and deliberately denied or delayed access to medical care that could reasonably have been provided. See *Clement U. Gomez,* 298 F.3d 898, 904-905 (9th Cir. 2002). The objective component is satisfied "whenever the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain or suffering." Id. at 904 (internal quotation marks omitted) (citing *McGuckin V. Smith,* 974 F2d. 1050, 1059 (9th Cir. 1992) (quoting *Estelle,* 429 U.S. at 104)).

   Under applicable *Ninth Circuit case law,* "[a] determination of 'deliberate indifference' involves an examination of two elements: [1] the seriousness of the prisoner's medical needs which ODOC Central Trust paid out money SHinault need for future Hospitalization bills and medication for his diabetes and the #61,352.39 is for the same reason; future hospitalization bills and medication for his diabetes and medical bills. [2] The nature of the defendant's response to that need." *McGuckin*

v. Smith, 974 F2d 1050, 1059 (9th Cir. 1992). The nature of the defendant's response to that need, is ODOC Central Trust are not responding to SHinault's medical need. SHinault got out of prison in March 8, 2012 and ODOC Central trust only gave SHinault $25.00 and 30 days supply of medication for SHinault's diabetes and his mental health issue's which ODOC Central Trust still had SHinault $61,352.39 under Garnishment which was still SHinault funds do to OAR 291-203-0050 (6) funds an inmate will need to cover living expenses for the first six months after release from incarceration. this OAR was adopted December 1, 2009 which O.D.O.C. Central Trust release SHinault with $25.00 in cash and 30 Days supply of medication for SHinault's diabetes and mental health issue's. A finding of "deliberate indifference" "inquiry into a prison official's state of mind." Farmer V. Brennan, 511 U.S. 825, 838 (1974), quoting Wilson U. Seiter, 501 U.S. 294, 299 (1991). The United States Supreme Court has defined "deliberate indifference" in the Eighth Amendment context to mean that "a prison official cannot be found liable... for denying an inmate humane conditions of confinement unless the official Knows of and disregards an excessive risk to inmate health or safety; The ODOC Central trust was aware that the $107,416.48 came from civil litigation against a drug manufacturing company and $61,352.39 was for future Hospitalization bills and medication for diabetes which a pill Zyprexa gave SHinault. The official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists. Id. at 837.

Moreover, under applicable Ninth Cir. Jurisprudence, "there are

certain [additional] minimum requirements before deliberate indifference can be established" McGuckin, 974 F.2d at 1060. SHinault has a serious medical need do to his diabetes which is a serious physical disease and a disease is a serious injury.

Under Oregon law, an inmate and the personal estate of an inmate are liable for the full cost of care. See ORS. § 179.701. When determining on inmate's ability to pay, ODOC Central trust Manager Dick Hawks will consider the inmate's personal estate, the inmate's need for funds for personal supper after release, and the availability of third party benefits such as, but not limited to Medicare or private insurance which cost money and SHinault do not have because ODOC Central Trust has taken the $61,352.39 for cost of care, $21,717.00 from SHinault's inmate trust account to satisfy a garnishment from the Multnomah County Cir. Court for back child support, deducted $4,088.96 from SHinault inmate's trust account as a result of three garnishment served on SHinault inmate account for restitution and related court costs. ODOC Central Trust Manager Dick Hawks had alert child support, and Courts which SHinault funds in ODOC Central Trust Account should have been protected and SHinault rights has been violated. If collection of an inmate's cost of care would be detrimental to the best interests of the inmate, the ODOC may waive collection. By taken SHinault $61,352.39 for cost of care while incarceration, paying $21,717.00 to child support, and paying $4,088.96 for court cost, Lieving with "no" funds to pay for future Hospitalization bills, medication bill and private insurance. SHinault has been homeless and in and out of prison and suffering with mental Health

issue's and can't work because SHinault's mental Health issued, and medication SHinault is taken. SHinault have deprivate by ODOC of funds amounts to cruel and unusual punishment. However, ODOC Central Trust withdrawal funds from SHinault's inmate trust account was not intended to reimburse the state of Oregon for the cost of SHinault incarceration, to punish him. SHinault has a health problem (diabetes) and a mental Health issue's and ODOC knew because they got records of these issue's. SHinault requested that ODOC waive the cost of his incarceration, and SHinault did provide written evidence to the OBJECTION Hearing which was held without SHinault, on Nov. 2011. SHinault Rights was violated again by ODOC. SHinault has provide the type of medication SHinault is taken. It said right in this finding and Commendation on page 14, On August 14, 2009 ODOC gave SHinault a 60 day prescription to both medications necessary to treat SHinault diabetes. There evidence to show, SHinault was being treated of diabetes in prison and ODOC Did not give SHinault 60 days prescription, they gave me 30 days prescription of medication and ODOC, Oregon State Penitentiary Salem, Oregon release SHinault on   March 8, 2012, and the record will show that SHinault was release with medication for his diabetes and mental Health issue's. So the withdrawal of funds from SHinault inmate trust account would lead to his inability to pay for medication associated with diabetes and his mental health issue. Reguardless of my incarceration that #6,352.39, 21,717.00 and 4,088.96 the ODOC Central Trust has taken from SHinault it should have been available to SHinault

to pay for his own medication and private insurance and others. SHinault should not have to depend on institution to pay for his medication, when SHinault had the money to pay it himself.

At The Telephone Contested Hearing before the AJ, SHi'nault was incarcerated and do not had access to any of his paper-work which SHinault ask the AJ to rescedule the Telephone Contested Hearing befor the AJ so that SHinault can get an attorney to properly represent SHinault, but Dick Hawks Central Trust manager lawyer would not allow it and SHinault stated several times in the Telephone Contested Hearing before the AJ That SHinault do not understand or comperhend to the legal words that was use in the Hearing before the AJ. The Telephone Contested Hearing was supposed to stop so SHinault can be evaluted to see if SHinault was too incompatant to re-present himself which SHinault right was violated again. Going back to SHinault has not provided evidence of any specific medical needs or projected costs of these needs. On Pg. 14-Findings and Recommendation at the last pargraph; The AJ found that SHinault's medical cost and medication could be coverd by medical insurance through SHinault employ-ment, will it cost money for medical insurance and The Oregon Health Plan only help SHinault with food stamps, not medication so SHinault would go with out medication for months which is bad for his health and his mental Health issue's. SHinault would be unable to work once SHinault is release from incarceration because his mental state of mind and the medications SHinault takes. But when SHinault

Pg. 19. OBJection To Findings and Recommendation

get release from Marion County Jail, SHinault will do with-
out his medication because SHinault has no money to pay
for his medication or a place to stay. The OOOC Central Trust
withdraw funds from SHinault inmate trust account
amounts to "deliberate indifference" to SHinault medical
needs are unfounded. For the foregoing reasons, defendant's
motion for summary judgment shouldn't be granted as to
SHinault's Section 1983 claim premised on the violation of
SHinault rights under the Eighth Amendment. See EX. A

IV    SHinault asserts that defendant's are liable under Sections
1985 and 1986 for conspiring to interfere and violate SHinault
civil rights under the First, Sixth, Eighth and Fourteenth
Amendments. SHinault claims that defendants held proceeding
and meetings without SHinault present, like the OBJection
Hearing on Nov. 2011. That defendants intended to obstruct
justice, interfere with SHinault's civil rights. There fore defendants
motion for summary judgment should not be granted as to
SHinault 1985 and 1986 claims premised on the violation of
SHinault's civil rights.

V    The defendant's has violated SHinaulté constitutional
rights by withdrawing money out of SHinault inmate
Central Trust Account without SHinault consent and over
looking the damage it has cause SHinault in the pass, pre-
sent ant future. Defendants motion (27) for summary
judgment should not be granted, and SHinault's claims
Section 1983, 1985, and 1986 under First, Sixth, Eighth and the

Fourteenth Amendments claims premised on the Violation of SHinault rights. SHinault Should be granted a Jury Trail.

I declare under penalty of perjury that the foregoing is True and correct.

Signed this 25 day of July, 2012

Lester R Shinault
Lester R SHinault #8041974
[singature]

"EX. A"

# MARION COUNTY HEALTH SERVICES
## MEDICAL REQUEST FORM

"EX. A"

105

**NAME:** SHinault Lester R        **SID#:** 8041974
Last *(Apellida)*      **First** *(Nombre)*      M.I. *(Inicial)*      *(Numero de Identificacion)*

**Location: POD:** E5   **Cell:** 105   **Date of Birth:** 6-13-67   **Today's Date:** 7-27-2012
*(Ubicacion)*   *(Selda)*      *(Fecha de Nacimiento)*      *(Fecha de hoy)*

**Do you have any allergies to medications? If yes, list:** Codene
*(Tiene alergias a algunos medicamentos?) Por favor diga a cuales*

**Tell us about your health problem:** I need a print-out of all medication I'm
*(Describa su problema de salud)* taken at this time because I need to show the
District Courts that I'm on medication for my diabetes and
my mental Health issue's. I have a dead-line 8·6·2012 to have
this print-out of all medication to the courts.

*Thank you for your Time!*

**How long have you had this problem?** —
*(Por cuanto tiempo ha tenido este problema?)*

This is my permission to get psychiatric, medical or dental exams and treatment from jail staff. I understand that the jail may charge me for some of these services and deduct it from my account during the current or future stays in jail. I will get necessary health care even if I am unable to pay.
*(Este documento representa mi permiso para recibir examenes medicos, tratamiento psiquiatrico o dental por parte del personal de salud de la carcel. Yo entiendo que la carcel puede cobrarme por algunos de estos servicios y deducirlos de mi cuenta, durante la presente o futuras estadias en la carcel. Yo puedo recibir cuidado medico incluso si no pudiera pagar.)*

**Signature:** Lester Shinault
*(Firma)*

**If you have an emergency, tell the jail staff right away!**
*(Si usted tiene una emergencia medica avise a los oficiales pronto!)*

**Received By Alpha #:** A213   **Date:** 7·27·12   **Time:** 0941

### Health Services Nursing note/plan

**Date:** 7·28·12·1249: Remeron 45mg at Nighttime
Vistaril 50mg 3 times per day
Trazodone 50mg at Night. May repeat
repeat dose once it not asleep in 30 min.
Metformin 850mg twice per day
Aspirin 325 mg po in the Morning
Risperdone 3mg at Nighttime

**Nurse's Initials:** M   **Juliet #:** 529

ER 055

EX. 1          MARION COUNTY CORRECTIONS FACILITY     EX. 1
                    INMATE REQUEST FORM

NAME: Lester S Hinault                          DATE: 7·18·12
SID#: 8081974               POD: E5     ROOM: 105

CHECK ONE:     (—)REQUEST     ( ) GRIEVANCE     (ᵢ) APPEAL

*******************************************************************************

REQUEST: I have to answer to the court Findings
and Commendal Recommendation and the
case # is 3:11-CV-436-PK. I have a dead-
line 8·6·2012. And I need Help!

_____

_____

*******************************************************************************

RECEIVED BY: 228

DATE/TIME: 7-18-12 . 1051

ROUTED TO:     ( ) PROGRAMS     ( ) CUSTODY     ( )MEDICAL

*******************************************************************************

ANSWER:     ( ) APPROVED     (X) DENIED
REASON: What is it you need?

_____

_____

_____

BY: 4479.

MCCF-POD-12

（略）

Ex. 2     MARION COUNTY CORRECTIONS FACILITY     Ex. 2
                    INMATE REQUEST FORM

NAME: Lester S Hinault                          DATE: 7-23-12
SID#: 8041974                    POD: E5      ROOM: 105
CHECK ONE:   (✓) REQUEST    ( ) GRIEVANCE    ( ) APPEAL
*****************************************************************

REQUEST: I need Yellow legal paper to write
letters to Lawyer and Judge's and Civil matter.

_____

_____

_____

_____
*****************************************************************

RECEIVED BY:    22X
DATE/TIME:      2 23-12   0957
ROUTED TO:    ( ) PROGRAMS    ( ) CUSTODY    ( ) MEDICAL
*****************************************************************

ANSWER:     ( ) APPROVED    (X) DENIED
REASON: Paper is available form Commisery

_____

_____

_____

BY: 44790

MCCF-POD-12

Ex.3

MARION COUNTY CORRECTIONS FACILITY
INMATE REQUEST FORM

Ex.3

NAME: _Lester Shinoult, SHinoult_ DATE: 7·24·12

SID#: ~~SHinoult~~ #8041974 POD: E5   ROOM: 105

CHECK ONE:    ( ✓ )REQUEST    ( ) GRIEVANCE    ( ) APPEAL

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

REQUEST: I wrote you on the 18 of July asking
for time in the Law Library to do reseach and
answer to Document 61 Findings and Commend-
ation. Case NO. 3:11-CV-436-PK. I have a dead-
line 8·6·2012 This is my second Request form
Please respond.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

RECEIVED BY: _See A222_

DATE/TIME: _7-29-12  1405_

ROUTED TO:    ( ) PROGRAMS    ( ) CUSTODY    ( )MEDICAL

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ANSWER:    ( ) APPROVED    (X) DENIED

REASON: I responded To your earlier leytes.
I told You That The Law Library is for
Criminal matters only. I also asked what
You needed. You never responded.

BY: _441290_

MCCF-POD-12

United States Courthouse
1000 South West Third Ave, Room 740
Portland, Oregon 97204

Date 6·6·2012

Case #: 3:11-CV-436-PK

RE: Reconsideration to "not" dismiss my case

Dear Judge,

I'm incarcerated at Marion County jail, 4000 Aumsville HWY SE, Salem, Oregon 97317. Please send all paper work to this address. As you can see EX 1, EX 2, and EX 3, I've being DenieD of the use of the Law Library here at Marion County jail, plus I'm heavily medicated and can't focus on what's important. When I was in prison, I had help with the legal law Library employment which allow me to go pro se. I don't have a education or a GED. Ive been in ERC classes why'll in school which is special education class so I Beg of you to not to dismiss my case with the Federal courts and please give me counsel so my rights would not be violated
              Thank you for your time!

          Lester R Shinault #8041974
          4000 Aumsville HWY SE
          Salem, Oregon 97317

ER 059

MARION COUNTY CORRECTIONS FACILITY
INMATE REQUEST FORM

EX. 1

NAME: Kesten Shinault          DATE: 6-21-2012

SID#: 8041974          POD: S-5     ROOM: 217

CHECK ONE:     ( ✓ )REQUEST     ( ) GRIEVANCE     ( ) APPEAL

**************************************************************

REQUEST: Can I get some law library time
to do some research and submit papers and
letters so that my civil matter is not dis-
missed out of court: 3:11-CV-436-PK.

_____

_____

**************************************************************

RECEIVED BY: Juter    A213

DATE/TIME: '6-22-12

ROUTED TO:     ( ) PROGRAMS     ( ) CUSTODY     ( )MEDICAL

**************************************************************

ANSWER:     ( ) APPROVED     (✗) DENIED

REASON: Law Library is for Criminal Law.

_____

_____

_____

BY: 44240

MCCF-POD-12

ER 060

MARION COUNTY CORRECTIONS FACILITY
INMATE REQUEST FORM

EX. 2

NAME: Lester Shinault                    DATE: 6-25-12

SID#: 8041974              POD: 8 B      ROOM: 219

CHECK ONE:    (✓) REQUEST    ( ) GRIEVANCE    ( ) APPEAL

*****************************************************************

REQUEST: I need copys as soon as possible

*urgent*

_____

_____

_____

_____

*****************************************************************

RECEIVED BY:

DATE/TIME:

ROUTED TO:    ( ) PROGRAMS    (✓) CUSTODY    ( ) MEDICAL

*****************************************************************

ANSWER:    ( ) APPROVED    (X) DENIED

REASON: What Case is This for?

_____

_____

BY: 44 2 90

MCCF-POD-12

ER 061

MARION COUNTY CORRECTIONS FACILITY
INMATE REQUEST FORM

EX. 3

NAME: Lester Shimault          DATE: 6·26·12

SID#: 8041974          POD: 25    ROOM: 219

CHECK ONE:    ( ) REQUEST    ( ) GRIEVANCE    ( ) APPEAL

REQUEST: I need copy's, please!

* URGENT *

RECEIVED BY: A265

DATE/TIME: 062612  1713

ROUTED TO:    ( ) PROGRAMS    ( ) CUSTODY    ( ) MEDICAL

ANSWER:    ( ) APPROVED    (X) DENIED

REASON: Your Attorney Mr. Halgroud should
be making copies for you.

BY: 44290

MCCF-POD-12

Name _Lester Stinnult_
SID # _8041974_
LEGAL/OFFICIAL MAIL ONLY
Marion County Sheriff's Office–Jail
4000 Aumsville Hwy SE
Salem, Oregon 97317

5720432537

SALEM OR 973

09 JUL 2012   PM 2 L

United States District
Courthouse
1000 S.W. Third Ave Room 740
Portland, Oregon 97204



Purple Martin

FOREVER
USA

ER 063

JOHN R. KROGER
Attorney General
JACQUELINE KAMINS  #064972
Assistant Attorney General
Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
Telephone: (503) 947-4700
Fax: (503) 947-4794
Email:  Jacqueline.Kamins@doj.state.or.us

Attorneys for Defendants Hawks, Dohrman, McDaniel

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| LESTER R. SHINAULT, | Case No. 3:11-cv-436-PK |
| Plaintiff, | DECLARATION OF DICK HAWKS |
| v. | |
| DICK HAWKS, et al., | |
| Defendants. | |

I, Dick Hawks, declare and say:

1.     The Oregon Department of Corrections (ODOC) employs me as Procurement and Contracts Manager.  In that capacity, I am one of the custodians of the records of ODOC.  From August 1, 2005 to July 31, 2011, I was employed as Manager of ODOC Central Trust.

2.     I make this declaration from a combination of personal knowledge and in reliance on the attached ODOC records, all of which are regularly maintained in the normal course of business.

Page 1 -   DECLARATION OF DICK HAWKS
JK/gcz/2980652-v1

3.      Inmate Lester Shinault, SID #8041974, was admitted to the custody of ODOC on four occasions:  November 20, 1997 to October 28, 2002; May 19, 2005 to February 6, 2007, October 23, 2008 to August 14, 2009, and from June 17, 2010 to the present.  His earliest release date is March 8, 2012.[1]

4.      I understand Inmate Shinault filed this lawsuit on April 4, 2011, alleging that "*O.D.O.C. took $61,352.39 from my trust account to pay for 'cost of care' and various other court fines and child support*" without authorization.[2]

5.      When an inmate is admitted to the custody of ODOC, a trust account will be established for the inmate that corresponds to the inmate's SID number.  ODOC Administrative Rules, Chapter 291, Division 158, entitled *Trust Accounts (Inmate)* govern the establishment and administration of the inmate trust account.[3]

6.      The inmate's trust account will accrue interest and all monies received for an inmate that are authorized by Rule will be credited to the inmate's trust account.  ODOC may assess an inmate's trust account for "*...garnishment actions determined by the courts; ...costs associated with the facility, release, and programs...*"[4]

### GARNISHMENT

7.      On April 3, 2009, $107, 416.48 was deposited into Inmate Shinault's inmate trust account.[5]

8.      On May 19, 2009, ODOC Central Trust received a *Writ of Garnishment For Past Due Support* in Multnomah County Circuit Court Case No. 910362551.[6]

---

[1] *See* Attachment 1, Housing History.

[2] *See* Plaintiff's Complaint.

[3] *See* Attachment 2, OAR Chapter 291, Division 158, *Trust Accounts (Inmate)*

[4] *See* Attachment 2, p. 3, OAR 291-158-0015(1) and (2).

[5] *See* Attachment 3, p. 3, plaintiff's ODOC Trust Account Statement as of July 2009.

[6] *See* Attachment 4, Writ of Garnishment.

Page 2 -   DECLARATION OF DICK HAWKS
        JK/gcz/2980652-v1

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

9.      To satisfy the *Writ*, ODOC Central Trust staff withdrew $21,717.00 from Inmate Shinault's trust account and forwarded payment to Multnomah County Circuit Court.[7]

10.     After an *Ability to Pay Order (*discussed below in the following paragraphs) was issued, ODOC deducted $4,088.96 from Inmate Shinault's inmate as a result of four garnishments served on his inmate account for restitution and related court costs on his prior criminal cases.[8]

COST OF CARE REIMBURSEMENT

11.     Inmates are liable for the cost of their care while incarcerated. The ODOC Administrative Rules governing *Cost of Care Reimbursement (Inmate)* are found in Chapter 291, Division 203.[9] *The purpose of these Rules is to establish guidelines for (a) Determination of ability to pay; (b) Notification to the inmate of his/her obligation to pay for the cost of care; and (c) Appeal rights and process.* [10]

12.     OAR 291-203-0040(a) provides that "*An inmate and the personal estate of an inmate, or a decedent's estate is liable for the full cost of care as established in ORS 179.701.*"[11]

13.     On May 29, 2009, ODOC issued an *Ability to Pay Order, Determination of Charges* to Inmate Shinault.[12]  ODOC calculated Inmate Shinault's cost of care to be $65,353.94 based on Inmate Shinault's assets, total days of incarceration and the average daily costs of care.

14.     Inmate Shinault assets were $107,416.48 from monies deposited in his inmate trust account minus $21,717.00 paid in satisfaction of garnishment orders for child support issued by Multnomah County Circuit Court.  Inmate Shinault was incarcerated from May 19, 2005 until February 6, 2007 (628 days), and from October 23, 2008 until August 14, 2009 (295

---

[7] *See* Attachment 3, p. 4.

[8] *See* Attachment 9, Writs of Garnishment.

[9] *See* Attachment 5, OAR Chapter 291, Division 203, *Cost of Care Reimbursement (Inmate)*.

[10] *See* Attachment 5, p. 2, OAR 291-203-0010(2).

[11] *See* Attachment 5, p. 3.

[12] *See* Attachment 6, *Ability to Pay Order, Determination of Charges* dated May 29, 2009.

Page 3 -   DECLARATION OF DICK HAWKS
            JK/gcz/2980652-v1

days) for a total of 923 days. The average daily cost for the direct care of an inmate for all prisons in the State of Oregon during the 2003-2005 biennium was $64.08; during the 2005-2007 biennium it was $67.53; during the 2007-2009 biennium it was $77.78; and, during the 2009-2011 biennium it was $84.46.[13]

15.    After calculating Inmate Shinault's cost of care, ODOC then must consider his ability to pay. ORS 179.640(1)(a) requires that the rules adopted by the agency must allow consideration of a personal estate, the need for funds for personal estate after release, and the availability of third-party benefits such as Medicare.

16.    DOC has adopted a schedule to estimate the funds an inmate will need to cover living expenses for the first three months after release from incarceration. The schedule is applied statewide in Oregon, and it is based on estimates of costs for a one bedroom apartment in Salem, Oregon. The cost also includes utilities, public transportation, food, supervision fees, treatment fees, and miscellaneous expenses.

17.    In the case of Inmate Shinault, ODOC estimated his living expenses for three months to be $4,404. ODOC adjusted that amount upward to $5000 to allow for variable expenses.[14] ODOC also allowed Inmate Shinault to keep $30 a month for the last three months of his incarceration for personal expenses for basic hygiene, snacks and personal items.[15]

18.    After deducting $5000 for financial support after release and $90 for three-months of personal expenses while incarcerated from the $85,699.48, Inmate Shinault had $80,609.48 in his inmate account as of May 29, 2009.[16] As a result, the *Ability to Pay Order* was issued on

---

[13] *See* Attachment. 6, pp. 4, 7-8.

[14] *See* Attachment 6, p. 6.

[15] *See* Attachment 6, pp. 6, 8.

[16] *See* Attachment 6, p. 8.

Page 4 -    DECLARATION OF DICK HAWKS
            JK/gcz/2980652-v1

May 29, 2009[17] and mailed to Inmate Shinault on June 1, 2009 along with a *Notice of Right to Hearing on Ability to Pay Order Determination of Charges*.[18]

19.     On June 2, 2009, Inmate Shinault requested and received a contested case hearing, as defined in ORS 183.414, on the *Ability to Pay* order issued May 29, 2009.[19]

20.     On August 14, 2009, Inmate Shinault was released from incarceration. At the time of his release $61,352.39 remained available in his inmate account to pay for his cost of care, less than the cost of care total of $65,353.94.

21.     An administrative hearing was held on October 23, 2009, and the matter was taken under advisement.

22.     On December 29, 2009, the Office of Administrative Hearings issued a Second Amended Proposed Order, finding that Inmate Shinault had the ability to pay for the cost of his care while he was incarcerated, and he should do so."[20]

23.     ODOC acted in compliance with all pertinent statutes and rules.

**I declare under penalty of perjury and the laws of the State of Oregon that the foregoing is true and correct to the best of my knowledge, information, and belief.**

DATED this 2ₙd day of November, 2011.

_____
DICK HAWKS

---

[17] *See* Attachment 6, p. 1.

[18] *See* Attachment 7.

[19] *See* Attachment 8, plaintiff's *Request for Contested Hearing on Ability to Pay Order.*

[20] *See* Attachment 10, *Second Amended Proposed Order.*

Page 5 -   DECLARATION OF DICK HAWKS
            JK/gcz/2980652-v1

**CERTIFICATE OF SERVICE**

I certify that on November _10_, 2011, I served the foregoing DECLARATION OF DICK

HAWKS upon the parties hereto by the method indicated below, and addressed to the following:

Lester R. Shinault                              ___ HAND DELIVERY
SID #8041974                                    _X_ MAIL DELIVERY
Oregon State Penitentiary                       ___ OVERNIGHT MAIL
2605 State Street                               ___ TELECOPY (FAX)
Salem OR  97310-0500                            ___ E-MAIL
                                                ___ E-FILE



JACQUELINE KAMINS #064972
Assistant Attorney General
Trial Attorney
Tel (503) 947-4700
Fax (503) 947-4794
Jacqueline.Kamins@doj.state.or.us
Of Attorneys for Defendants

Page 1 -   CERTIFICATE OF SERVICE
           JK/gcz/2852823-v1

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

07/20/2009 09:09          DEPARTMENT OF CORRECTIONS          Page      1 Of     6
                                                                    OTRFASTB
                                                                    4.12.0.0.1TR
                   T R U S T   A C C O U N T   S T A T E M E N T

    SID#  0008041974    Name: SHINAULT, LESTER RUBIN              REG#  1411242
    LOCATION: DRCI-EE200-EE231


        Account Balance Today ( 20-JUL-09    )    Current :  79,994.95
                                                  Hold    :       0.00
                                                            _____
                                                  Total   :  79,994.95

        Account Balance as of  20-JUL-09                     79,994.95

                           01/01/2009        07/20/2009
    SUB ACCOUNT            START BALANCE      END BALANCE
    INMATE SPENDING ACCOUNT         0.17         9,639.01
    RESERVE OFFICAL                 0.00             0.00
    RESERVED MEDICAL                0.00             0.00
    INMATE RE-ENTRY SAVINGS         0.00         5,002.00
    ACCOUNT
    RESERVED TRIPS                 50.00             0.00
    RESERVED MISCELLANEOUS          0.00        65,353.94


                        DEBTS AND OBLIGATIONS

    WRITE TYPE    PAYABLE                INFO NUMBER    AMOUNT OWING    AMOUNT PAID
      COPA      COPY ADVANCE             12222000            0.00           0.20
      FDISA     DISCIPLINARY FINES ADVANCE  02072000          0.00         235.00
      OCICA     OCIC POSTAGE ADVANCE     05262005            0.00          30.91
      EOCIA     EOCI POSTAGE ADVANCE     09262000            0.00           3.43
      OSCIA     OSCI POSTAGE ADVANCE     07102002            0.00           0.28
      DRCIA     DRCI POSTAGE ADVANCE     01292009            0.00           0.42


                                                INMATE SPENDING  SUB-ACCOUNT
              TRANSACTION DESCRIPTIONS --                ACCOUNT

    DATE        TRANSACTION DESCRIPTION    RECEIPT#    TRANSACTION AMT    BALANCE
    01/02/2009  Disciplinary Fines Advance                    25.00        25.17
    01/02/2009  Disciplinary Fines                       (    25.00)        0.17
                Debt/0812E013A19
    01/02/2009  Deduction-OCICA-05262005 D               (     0.17)        0.00
    01/05/2009  REV DUP DISC FINE DEBT 1/2/09                  25.00        25.00
    01/05/2009  REV DUP DISC FINE DEBT 1/2/09            (    25.00)        0.00

07/20/2009 09:09          DEPARTMENT OF CORRECTIONS       Page    2 Of    6
                                                                 OTRFASTB
                    T R U S T   A C C O U N T   S T A T E M E N T          4.12.0.0.1TR

SID# 0008041974    Name: SHINAULT, LESTER RUBIN          BKG# 1411242
LOCATION: DRCI-EE200-EE231

| DATE | TRANSACTION DESCRIPTION | RECEIPT# | TRANSACTION AMT | BALANCE |
|------|------------------------|----------|-----------------|---------|
| 01/05/2009 | FROM TRIP RESERVE | | 0.12 | 0.12 |
| 01/08/2009 | AWARDS 12/2008 SCI | | 7.40 | 7.52 |
| 01/08/2009 | Deduction-CLR-Allocation D | | ( 3.70) | 3.82 |
| 01/08/2009 | | | 3.70 | 7.52 |
| 01/08/2009 | Deduction-CLR-Allocation D | | ( 1.33) | 6.19 |
| 01/08/2009 | Deduction-OCICA-05262005 D | | ( 0.20) | 5.99 |
| 01/08/2009 | Deduction-COPA-12222008 D | | ( 2.17) | 3.82 |
| 01/08/2009 | Deduction-FDISA-02072000 D | | 0.21 | 4.03 |
| 01/08/2009 | AWARDS 12/2008 SCI | | ( 0.11) | 3.92 |
| 01/08/2009 | Deduction-CLR-Allocation D | | 0.11 | 4.03 |
| 01/08/2009 | Deduction-CLR-Allocation D | | ( 0.10) | 3.93 |
| 01/08/2009 | Deduction-FDISA-02072000 D | | 0.10 | 4.03 |
| 01/13/2009 | Interest Distribution | | | |
| 01/30/2009 | CRS SAL ORD #2940531DRCI | | ( 3.79) | 0.24 |
| 01/29/2009 | UNIT POSTAGE ADVANCE | | 0.42 | 0.66 |
| 01/29/2009 | DRCI POSTAGE DEBT | | ( 0.42) | 0.24 |
| 01/30/2009 | Deduction-FDISA-02072000 D | | ( 0.24) | 0.00 |
| 02/05/2009 | AWARDS 01/2009 SCI | | 24.15 | 24.15 |
| 02/05/2009 | Deduction-CLR-Allocation D | | ( 12.00) | 12.07 |
| 02/05/2009 | Deduction-CLR-Allocation D | | 12.08 | 24.15 |
| 02/05/2009 | Deduction-FDISA-02072000 D | | ( 12.07) | 12.08 |
| 02/05/2009 | | | 0.66 | 12.74 |
| 02/05/2009 | AWARDS 01/2009 SCI | | ( 0.33) | 12.41 |
| 02/05/2009 | Deduction-CLR-Allocation D | | 0.33 | 12.74 |
| 02/05/2009 | Deduction-CLR-Allocation D | | ( 0.33) | 12.41 |
| 02/05/2009 | Deduction-FDISA-02072000 D | | 30.30 | 42.71 |
| 02/05/2009 | AWARDS 01/2009 DRCI | | ( 15.15) | 27.56 |
| 02/05/2009 | Deduction-CLR-Allocation D | | 15.15 | 42.71 |
| 02/05/2009 | Deduction-CLR-Allocation D | | ( 10.09) | 32.62 |
| 02/05/2009 | Deduction-FDISA-02072000 D | | ( 0.42) | 32.20 |
| 02/05/2009 | Deduction-DRCIA-01292009 D | | ( 31.81) | 0.39 |
| 02/09/2009 | CRS SAL ORD #2966248DRCI | | 7.70 | 8.09 |
| 02/10/2009 | CSR SAL ORD #2966248 | | ( 5.65) | 2.44 |
| 02/10/2009 | CRS SAL ORD #2970307DRCI | | ( 0.05) | 2.39 |
| 02/10/2009 | Copy Sales | | ( 0.40) | 1.99 |
| 02/17/2009 | Copy Sales | | 1.68 | 0.31 |
| 02/24/2009 | DRCI POSTAGE SALES | | | |

07/20/2009 09:09        DEPARTMENT OF CORRECTIONS        Page    3 Of    6
                                                                OTRTASTB
                                                                4.12.0.0.1TR
T R U S T   A C C O U N T   S T A T E M E N T

SID#  0008041974    Name:  SHINAULT, LESTER ROBIN              BK8#  1411242
LOCATION:  DRCI-EE200-EE231

| DATE | TRANSACTION DESCRIPTION | RECEIPT# | TRANSACTION AMT | BALANCE |
|------|-------------------------|----------|-----------------|---------|
| 02/24/2009 | Copy Sales | | ( 0.17) | 0.14 |
| 03/05/2009 | AWARDS 02/2009 DRCI | | 47.27 | 47.41 |
| 03/05/2009 | Deduction-CLR-Allocation D | | ( 23.64) | 23.77 |
| 03/05/2009 | Deduction-CLR-Allocation D | | 23.64 | 47.41 |
| 03/05/2009 | AWARDS 02/2009 DRCI | | 0.24 | 47.65 |
| 03/05/2009 | Deduction-CLR-Allocation D | | ( 0.12) | 47.53 |
| 03/05/2009 | Deduction-CLR-Allocation D | | 0.12 | 47.65 |
| 03/05/2009 | CRS SAL ORD #3005004DRCI | | ( 44.74) | 2.91 |
| 03/09/2009 | CRS SAL ORD #3006025DRCI | | ( 1.40) | 1.51 |
| 03/23/2009 | CRS SAL ORD #3026133DRCI | | ( 1.20) | 0.31 |
| 04/03/2009 | SETTLEMENT 63526 RUSTY S | ODOC1032058 | 107,416.48 | 107,416.79 |
| 04/03/2009 | Deduction-CLR-Allocation D | | ( 30.00) | 107,386.79 |
| 04/03/2009 | Deduction-CLR-Allocation D | | 30.00 | 107,416.79 |
| 04/06/2009 | CRS SAL ORD #3041514DRCI | | ( 38.99) | 107,377.80 |
| 04/07/2009 | DESIREE CHILDRESS | ODOC1033203 | 40.00 | 107,417.80 |
| 04/09/2009 | AWARDS 03/2009 DRCI | | 50.85 | 107,468.65 |
| 04/09/2009 | AWARDS 03/2009 DRCI | | 0.46 | 107,469.11 |
| 04/13/2009 | CRS SAL ORD #3050400DRCI | | ( 3.00) | 107,466.11 |
| 04/13/2009 | CRS SAL ORD #3050409DRCI | | ( 16.99) | 107,449.12 |
| 04/13/2009 | CRS SAL ORD #3050427DRCI | | ( 91.99) | 107,357.13 |
| 04/13/2009 | CRS SAL ORD #3050435DRCI | | ( 79.99) | 107,277.14 |
| 04/13/2009 | CRS SAL ORD #3050446DRCI | | ( 69.95) | 107,207.19 |
| 04/13/2009 | CSR SAL ORD #3050435 | | 79.99 | 107,287.18 |
| 04/13/2009 | CRS SAL ORD #3050537DRCI | | ( 84.13) | 107,203.05 |
| 04/13/2009 | CRS SAL ORD #3050559DRCI | | ( 38.07) | 107,164.98 |
| 04/16/2009 | CSR SAL ORD #3050559 | | 1.00 | 107,166.78 |
| 04/15/2009 | CRS SAL ORD #3057149DRCI | | ( 1.90) | 107,164.98 |
| 04/20/2009 | CRS SAL ORD #3061530DRCI | | ( 3.00) | 107,161.98 |
| 04/20/2009 | CRS SAL ORD #3061649DRCI | | ( 66.99) | 107,094.99 |
| 04/20/2009 | CRS SAL ORD #3061656DRCI | | 260.00 | 106,834.99 |
| 04/20/2009 | CRS SAL ORD #3061797DRCI | | 58.25) | 106,776.74 |
| 04/20/2009 | CRS SAL ORD #3061821DRCI | | ( 123.02) | 106,652.82 |
| 04/24/2009 | RESERVE EYE EXAM | | ( 45.00) | 106,607.92 |
| 04/27/2009 | CRS SAL ORD #3071199DRCI | | ( 3.00) | 106,604.92 |
| 04/27/2009 | CRS SAL ORD #3071247DRCI | | ( 59.22) | 106,545.70 |

07/20/2009 09:09        DEPARTMENT OF CORRECTIONS        Page    4 Of    6
                                                                OTRTASTB
                                                                4.12.0.0.1TR
          T R U S T   A C C O U N T   S T A T E M E N T

SID: 0008041974    Name: SHINAULT, LESTER RUBIN        BKG#: 1411242
LOCATION: DRCI-SE200-ER231

| DATE | TRANSACTION DESCRIPTION | RECEIPT# | TRANSACTION AMT | BALANCE |
|------|------------------------|----------|-----------------|---------|
| 05/04/2009 | CRS SAL ORD #3080144DRCI | | ( 50.79) | 106,486.91 |
| 05/05/2009 | Interest Distribution | | 53.30 | 106,540.21 |
| 05/05/2009 | | | 51.30 | 106,591.51 |
| 05/07/2009 | AWARDS 04/2009 DRCI | | ( 25.65) | 106,565.86 |
| 05/07/2009 | Deduction-CLR-Allocation D | | 25.65 | 106,591.51 |
| 05/07/2009 | Deduction-CLR-Allocation D | | ( 214.17) | 106,377.34 |
| 05/08/2009 | CRS SAL ORD #3086612DRCI | | ( 233.48) | 106,143.86 |
| 05/08/2009 | CRS SAL ORD #3086620DRCI | | ( 2.25) | 106,141.61 |
| 05/11/2009 | CRS SAL ORD #3089019DRCI | | ( 40.49) | 106,101.12 |
| 05/11/2009 | CRS SAL ORD #3088116DRCI | | ( 69.95) | 106,031.17 |
| 05/11/2009 | CRS SAL ORD #3088124DRCI | | ( 58.06) | 105,973.11 |
| 05/11/2009 | CRS SAL ORD #3088139DRCI | | ( 852.00) | 105,121.11 |
| 05/14/2009 | WILSONVILLE HELP STORAGE UNIT C-48 | | ( 300.00) | 104,821.11 |
| 05/15/2009 | VAC | | ( 71.99) | 104,749.12 |
| 05/18/2009 | CRS SAL ORD #3100344DRCI | | ( 59.81) | 104,689.31 |
| 05/18/2009 | CRS SAL ORD #3100378DRCI | | ( 21,717.00) | 92,972.31 |
| 05/19/2009 | GARN / MULT CO 910362651 | | ( 43.25) | 82,929.06 |
| 05/21/2009 | RESERVE GLASSES | | ( 1.25) | 82,927.81 |
| 05/21/2009 | RESERVE MEDICAL COPIES | | ( 59.60) | 82,868.21 |
| 05/26/2009 | CRS SAL ORD #3209796DRCI | | ( 0.30) | 82,867.91 |
| 05/27/2009 | Copy Sales | | ( 71.99) | 82,795.92 |
| 06/01/2009 | CRS SAL ORD #3110462DRCI | | ( 57.78) | 82,738.14 |
| 06/01/2009 | CRS SAL ORD #3110484DRCI | | 75.80 | 82,813.94 |
| 06/01/2009 | Interest Distribution | | ( 65,353.94) | 17,460.00 |
| 06/02/2009 | COST OF CARE | | ( 5,000.00) | 12,460.00 |
| 06/02/2009 | TO RE-ENTRY SAVINGS | | 51.30 | 12,511.30 |
| 06/04/2009 | AWARDS 06/2009 DRCI | | ( 25.65) | 12,485.65 |
| 06/04/2009 | Deduction-CLR-Allocation D | | 25.65 | 12,511.30 |
| 06/04/2009 | Deduction-CLR-Allocation D | | ( 35.09) | 12,476.21 |
| 06/08/2009 | CRS SAL ORD #3126345DRCI | | ( 57.81) | 12,417.40 |
| 06/08/2009 | CRS SAL ORD #3126369DRCI | | 0.45 | 12,417.85 |
| 06/10/2009 | CSR SAL ORD #3126369 | | ( 35.00) | 12,382.85 |
| 06/11/2009 | LAW FIRM KEVIN CAROLAN | | ( 71.69) | 12,311.16 |
| 06/15/2009 | CRS SAL ORD #3138989DRCI | | ( 1.00) | 12,310.16 |
| 06/16/2009 | Copy Sales | | ( 0.80) | 12,309.36 |
| 06/16/2009 | Copy Sales | | | |

07/20/2009 09:09          DEPARTMENT OF CORRECTIONS          Page    5 OF    6
                                                            CTRTASTB
                                                            4.12.0.0.1TR
                        T R U S T   A C C O U N T   S T A T E M E N T

SID# 0008041974    Name: SHINAULT, LESTER RUBIN              DXG# 1411242
LOCATION: DRCI-EE200-EE231

| DATE | TRANSACTION DESCRIPTION | RECEIPT# | TRANSACTION AMT | BALANCE |
|------|------------------------|----------|-----------------|---------|
| 06/16/2009 | Copy Sales | | ( 0.10) | 12,309.26 |
| 06/16/2009 | Copy Sales | | ( 0.90) | 12,308.36 |
| 06/16/2009 | DRCI POSTAGE SALES | | ( 0.44) | 12,307.92 |
| 06/16/2009 | DRCI POSTAGE SALES | | ( 0.44) | 12,307.48 |
| 06/16/2009 | DRCI POSTAGE SALES | | ( 9.64) | 12,307.04 |
| 06/19/2009 | DRCI POSTAGE SALES | | ( 0.61) | 12,297.40 |
| 06/19/2009 | DRCI POSTAGE SALES | | ( 0.61) | 12,296.79 |
| 06/19/2009 | DRCI POSTAGE SALES | | ( 16.99) | 12,296.18 |
| 06/22/2009 | CRS SAL ORD #3149305DRCI | | ( 59.78) | 12,279.19 |
| 06/22/2009 | CRS SAL ORD #3149339DRCI | | ( 200.00) | 12,219.41 |
| 06/24/2009 | VAC | | ( 84.99) | 12,019.41 |
| 06/29/2009 | CRS SAL ORD #3157502DRCI | | ( 74.19) | 11,934.42 |
| 06/29/2009 | CRS SAL ORD #3157658DRCI | | ( 1.00) | 11,860.23 |
| 06/30/2009 | Copy Sales | | ( 0.10) | 11,859.23 |
| 06/30/2009 | Copy Sales | | ( 0.60) | 11,859.13 |
| 06/30/2009 | Copy Sales | | ( 2,000.00) | 11,858.53 |
| 07/01/2009 | KEVIN CAROLAN PC | | 64.03 | 9,858.53 |
| 07/01/2009 | Interest Distribution | | ( 69.95) | 9,922.56 |
| 07/06/2009 | CRS SAL ORD #3164167DRCI | | ( 85.18) | 9,852.61 |
| 07/06/2009 | CRS SAL ORD #3164321DRCI | | 9.25 | 9,767.43 |
| 07/08/2009 | CRS SAL ORD #3164321 | | 51.30 | 9,776.69 |
| 07/09/2009 | AWARDS 06/2009 DRCI | | ( 25.65) | 9,827.99 |
| 07/09/2009 | Deduction-CLR-Allocation D | | 25.65 | 9,802.33 |
| 07/09/2009 | Deduction-CLR-Allocation D | | ( 20.00) | 9,827.98 |
| 07/13/2009 | CRS SAL ORD #3173182DRCI | | ( 73.84) | 9,807.98 |
| 07/13/2009 | CRS SAL ORD #3173226DRCI | | ( 26.25) | 9,734.14 |
| 07/20/2009 | CRS SAL ORD #3184530DRCI | | ( 60.08) | 9,707.89 |
| 07/20/2009 | CRS SAL ORD #3184557DRCI | | | 9,639.01 |

                TRANSACTION DESCRIPTIONS --          RESERVE OPTICAL SUB-ACCOUNT

| DATE | TRANSACTION DESCRIPTION | RECEIPT# | TRANSACTION AMT | BALANCE |
|------|------------------------|----------|-----------------|---------|
| 04/24/2009 | RESERVE EYE EXAM | | 45.00 | 45.00 |
| 05/21/2009 | RESERVE GLASSES | | 43.25 | 88.25 |
| 05/29/2009 | COMP EYE EXAM | | ( 45.00) | 43.25 |
| 06/12/2009 | COMP GLASSES | | ( 43.25) | 0.00 |

07/20/2009 09:09          DEPARTMENT OF CORRECTIONS          Page     6 Of     6
                                                                   OTRTASTB
                     T R U S T   A C C O U N T   S T A T E M E N T      4.12.0.0.1TR

SID: 0000041974    Name: SHINAULT, LESTER RUBIN            SRC: 1411242
LOCATION: DRCI-EE200-EE231

| TRANSACTION DESCRIPTIONS -- | | RESERVED MEDICAL SUB-ACCOUNT | | |
|---|---|---|---|---|
| DATE | TRANSACTION DESCRIPTION | RECEIPT# | TRANSACTION AMT | BALANCE |
| 05/21/2009 | RESERVE MEDICAL COPIES | | 1.25 | 1.25 |
| 06/12/2009 | CCMF MEDICAL COPIES | | ( 1.25) | 0.00 |

| TRANSACTION DESCRIPTIONS -- | | INMATE RE-ENTRY SUB-ACCOUNT SAVINGS ACCOUNT | | |
|---|---|---|---|---|
| DATE | TRANSACTION DESCRIPTION | RECEIPT# | TRANSACTION AMT | BALANCE |
| 06/02/2009 | TO RE-ENTRY SAVINGS | | 5,000.00 | 5,000.00 |
| 07/02/2009 | Interest Distribution | | 2.00 | 5,002.00 |

| TRANSACTION DESCRIPTIONS -- | | RESERVED TRIPS SUB-ACCOUNT | | |
|---|---|---|---|---|
| DATE | TRANSACTION DESCRIPTION | RECEIPT# | TRANSACTION AMT | BALANCE |
| 01/05/2009 | OREGON DEPARTMENT OF CORRECTIONS | | ( 49.88) | 0.12 |
| 01/05/2009 | FROM TRIP RESERVE | | ( 0.12) | 0.00 |

| TRANSACTION DESCRIPTIONS -- | | RESERVED SUB-ACCOUNT MISCELLANEOUS | | |
|---|---|---|---|---|
| DATE | TRANSACTION DESCRIPTION | RECEIPT# | TRANSACTION AMT | BALANCE |
| 05/19/2009 | CASH / BOLT CO 910362651 | | 21,717.00 | 21,717.00 |
| 05/21/2009 | DIVISION OF CHILD SUPPORT HOLT CO 910362 | | ( 21,717.00) | 0.00 |
| 06/02/2009 | COST OF CARE | | 65,353.94 | 65,353.94 |

STATE OF OREGON
DEPARTMENT OF CORRECTIONS

| | | |
|---|---|---|
| IN THE MATTER OF: | ) | Agency Case No. COC.VP.8041974 |
| | ) | |
| Lester Shinault | ) | ABILITY TO PAY ORDER |
| | ) | DETERMINATION OF CHARGES |
| SID: 8041974 | ) | |

To:   LESTER SHINAULT, SID 8041974, Deer Ridge Correctional Institution, 3920 East
Ashwood Rd, Madras, OR 97741

The State of Oregon, Department of Corrections (DOC) hereby issues this Ability to Pay
Order—Determination of Charges. DOC is entitled to charge an inmate, the personal estate of an
inmate, or the estate of a deceased inmate who resided in one of its institutions for the cost of care
that he or she is financially able to pay. DOC may collect charges in advance for inmates with
determinate sentences. The cost of care includes room and board, medical care, and other
necessities provided by the institution. A person will be charged for the cost of care in accordance
with his or her ability to pay.

DOC has determined that you are financially able to pay $65,353.94 for the cost of your care
at the Deer Ridge Correctional Institution and other DOC facilities. Now therefore, DOC hereby
issues this Ability To Pay Order—Determination of Charges.

IT IS HEREBY ORDERED THAT you have the ability to pay $65,353.94 for the cost of
your care during the term of your incarceration with the DOC. Accordingly, you are hereby ordered
to pay the sum of $65,353.94 to DOC. This obligation is due immediately. Your payment shall be
mailed or delivered to the following address: Department of Corrections, Central Trust Unit,
Attention: Ability-to-Pay Coordinator, P.O. Box 14400, Salem, OR 97309.

The information relied upon by DOC in issuing this order is listed in the Table of Contents
and the following pages which are incorporated herein by reference and are part of this order. If
you believe that the charges assessed by DOC are incorrect, or that you are unable to pay for all or
part of the assessed charges, you may appeal this order by following the instructions contained in
the attached Notice of Right to Hearing on Ability to Pay Order Determination of Charges.

Dated: May 29, 2009.

Dick Hawks
Central Trust Manager
State of Oregon, Department of Correction

ABILITY TO PAY ORDER (Shinault)          1          Document #13780

TABLE OF CONTENTS

|             |     |                                                                          | PAGE |
| ----------- | --- | ------------------------------------------------------------------------ | ---- |
| Section     | I   | GENERAL INFORMATION ABOUT THIS ORDER                                     | 3    |
| Section     | II  | ASSETS                                                                   | 4    |
| Section     | III | INCOME                                                                   | 5    |
| Section     | IV  | ALLOWANCE FOR MONTHLY OR ONE-TIME OBLIGATIONS AND EXPENSES; AND POST-RELEASE SUPPORT | 6    |
| Section     | V   | COST OF CARE                                                             | 7    |
| Section     | VI  | LIABILITY FOR COST OF CARE                                               | 8    |

ABILITY TO PAY ORDER (Shinault)          2          Document #1378011

Shinault v Hawks; 3:11-cv-436-PK
Declaration of Dick Hawks
Attachment 6, Page 2 of 8
ER 077

SECTION I:          GENERAL INFORMATION

The Department of Corrections (DOC) is entitled by law to determine an inmate's ability to pay toward the cost of his or her care in a state institution. DOC considers the inmate's income, assets, liabilities and other expenses in determining his or her ability to pay. Charges will be assessed using inmate's equity in all assets whether those assets are controlled by the inmate or the inmate's authorized representative.

It is important that the financial information given to DOC be complete and accurate. This allows DOC to charge inmates only what they are able to pay.

DOC's determination of your ability to pay toward the cost of your care must be made in accordance with Oregon Revised Statute 179.640 and Oregon Administrative Rules 291-203-0010 through 291-203-0100. You and/or your authorized representative may request copies of these laws and rules from Department of Corrections, Central Trust Unit, Attention: Ability-to-Pay Coordinator, P.O. Box 14400, Salem, OR 97309.

Please immediately notify DOC in writing if you have an authorized representative. This written notice needs to include your authorized representative's name, address and telephone number. At this time, DOC understands that you do not have an authorized representative.

DOC used information from the sources listed in the following sections of this Order in making its determination of your ability to pay.

ABILITY TO PAY ORDER (Shinault)          3          Document #1378011

SECTION II:       ASSETS

| Type | Amount |
|------|--------|
| A. Monies deposited into inmate central trust account: | $107,416.48 |
| B. Other personal property (except for primary personal automobile): (Money held for Julie Ann Crabtree by Wells Fargo Bank) | $0.00 |
| C. Real property (other than primary personal residence, unless such residence is subject to consideration under OAR 291-203-0050(4)): | N/A |
| Subtotal: | $107,416.48 |
| D. Less outstanding mortgage/lien: | N/A |
| E. Less other (list): Garnishment-Child Support Multnomah County | $21,717.00 |
| TOTAL AVAILABLE ASSETS: | $85,699.48 |

ABILITY TO PAY ORDER (Shinault)        4          Document #1378011

Shinault v Hawks; 3:11-cv-436-PK
Declaration of Dick Hawks
Attachment 6, Page 4 of 8

SECTION III:    INCOME

Type                                                              Amount

A.  Income received directly by inmate:                           N/A

B.  Income received for the inmate by authorized representative:  N/A

                              TOTAL INCOME:    N/A

ABILITY TO PAY ORDER (Shinault)        5            Document #1378011

SECTION IV:    ALLOWANCE FOR MONTHLY OR ONE-TIME OBLIGATIONS
AND EXPENSES; AND POST-RELEASE SUPPORT

A. LEGAL OBLIGATIONS (List all legal obligations other than support obligations):

   1. MONETARY OBLIGATIONS IMPOSED IN CRIMINAL
     MONEY JUDGMENT FOR CRIME(S) THAT LED TO
     THE INMATE'S CURRENT INCARCERATION:

      a)   Total One-Time Obligation:            N/A

      b)   Total Monthly Obligation:            N/A

B. MONTHLY PERSONAL EXPENSE ALLOWANCE
WHILE INCARCERATED:                        $30.00

C. FINANCIAL SUPPORT OF DEPENDENTS:

   1. Total monthly current child support obligation owed
     pursuant to administrative or judicial order:        N/A

   2. Total additional amount needed to support inmate's children:   N/A

D. FUNDS NEEDED FOR PERSONAL SUPPORT AFTER RELEASE:   $5,000.00

Shinault v Hawks; 3:11-cv-436-PK
Declaration of Dick Hawks
Attachment 6, Page 6 of 8

ER 081

SECTION V:        COST OF CARE

A. Current inmate daily cost of care (may be modified in the future):          $77.78
   • Inmate daily cost of care for previous incarceration 5/19/05-2/05/07       $67.53

B. Estimated length of incarceration (days) between 10/23/2008 and 8/14/1009:   295 days
   • Previous incarceration: (days) between 5/19/2005 and 2/05/2007             628 days
C. Estimated full cost of care (daily cost multiplied by length of incarceration):   $65,353.94

D. Monthly charge to be collected;                                             N/A

       OR

   Lump sum payment to be collected:                                           $65,353.94

E. Payments received to date:                                                  $0

F. Other resources to be charged:                                             $0

FULL COST OF CARE FOR WHICH INMATE IS LIABLE:                                  $65,353.94

ABILITY TO PAY ORDER (Shinault)        7            Document #1378011

SECTION VI:        LIABILITY FOR COST OF CARE

A.  Assets and Income Available to Inmate (Sections II and III)

|  |  |  |
|---|---|---|
| Total Assets from Section II: | | $85,699.48 |
| Total Income from Section III: | | $0 |
| Subtotal A: | | $85,699.48 |

B.  Obligations and Expenses (Section IV)

|  |  |  |
|---|---|---|
| Legal obligations: | | $0 |
| Personal expense allowance: (monthly amount x # of months remaining in sentence) | | $90.00 |
| Financial support for dependents: | | $0 |
| Funds needed for personal support after release: | | $5,000.00 |
| Subtotal B: | | $5,090.00 |

C.  Assets/income minus obligations/expenses (Subtotal A – Subtotal B):        $80,609.48

D.  Full cost of care (Section V):        $65,353.94

E.  AMOUNT FOR WHICH DEFENDANT IS LIABLE
TO THE OREGON DEPARTMENT OF CORRECTIONS
(LESSER OF LINE C OR D):        $65,353.94

ABILITY TO PAY ORDER (Shinault)        8        Document #1378011

Shinault v Hawks; 3:11-cv-436-PK
Declaration of Dick Hawks
Attachment 6, Page 8 of 8

ER 083

STATE OF OREGON
DEPARTMENT OF CORRECTIONS

IN THE MATTER OF:                    )     Agency Case No. COC.VP.8041974
                                     )
LESTER SHINAULT                      )     NOTICE OF RIGHT TO HEARING
                                     )     ON ABILITY TO PAY ORDER
       SID: 8041974                  )     DETERMINATION OF CHARGES

To:    LESTER SHINAULT, SID 8041974, Deer Ridge Correctional Institution,
       3920 East Ashwood Rd, Madras, OR 97741

The State of Oregon, Department of Corrections ("DOC") has issued an Ability to Pay Order—
Determination of Charges. This order determines that you have the ability to pay $65,353.94, for
the cost of your care during the term of your incarceration at DOC and orders you to immediately pay
this sum to DOC. The statutes involved in this matter are ORS 179.610 through 179.745. The
Oregon Administrative Rules involved in this matter are OAR 291-203-0010 through 291-203-0100.

You have the right to a request a hearing if you disagree with this Ability to Pay Order (See ORS
179.640(7) and OAR 291-203-0090). If you or your authorized representative makes a timely
request for a contested case hearing, the hearing and any appeal of the final order shall be governed
by ORS 183.411 to 183.497. Your request for a contested case hearing on the Ability to Pay Order
must be mailed or delivered to:

Department of Corrections
Central Trust Unit
Attention: Ability-to-Pay Coordinator
P.O. Box 14400
Salem, OR 97309

Your request for a contested case hearing must be in writing and should contain the following
information:

1. The name and address of the person appealing;
2. The case number and date of the Ability to Pay Order(s) being appealed;
3. A statement as to why you disagree with the Ability to Pay Order(s);
4. The specific relief requested, and
5. The signature of the person appealing or his/her authorized representative.

If your request for a contested hearing is made by mail, it must be postmarked within 60 days of the
mailing of the attached Ability to Pay Order. If your request for a contested case hearing is delivered,
it must be received within 60 days of the mailing of the attached Ability to Pay Order. The attached
Ability to Pay Order was mailed on May 29, 2009, and your right to appeal will terminate unless your
mailed or delivered request for a contested case hearing is postmarked or received by DOC no later
than July 28, 2009.

You will waive your right to a contested case hearing if you fail to make a timely request for a
contested case hearing on the attached Ability to Pay Order. If this occurs, the order will be final and
not subject to judicial review, except that it may be subsequently modified by DOC as provided for in
ORS 179.640(5).

You have the right to be represented by an attorney at a contested case hearing in this matter. Only
you or your attorney may present your case to the administrative law judge. If you need help finding
an attorney, you may call the Oregon State Bar's Lawyer Referral Service at (503) 684-3763 or toll
free in Oregon at (800) 452-7636. In addition, legal aid organizations may be able to assist you if
you have limited financial resources.

NOTICE OF RIGHT TO HEARING                    1                           13786

Shinault v Hawks, 3:11-cv-436-PK
Declaration of Dick Hawks
Attachment 7, Page 1 of 6

ER 084

## NOTICE TO AUTHORIZED REPRESENTATIVE

In accordance with ORS 179.653(3), any authorized representative who has received an Ability to Pay Order, and had an opportunity to appeal the Ability to Pay Order, shall comply with the Ability to Pay Order upon demand by the Department of Corrections. This demand may be made any time after the Ability to Pay Order has become final.

An authorized representative who does not comply with the demand may be ordered by the court to comply with the Ability to Pay Order pursuant to ORS 179.653(8). Pursuant to ORS 179.653(9), an authorized representative who willfully fails or refuses to comply with a court order directing payment of an Ability to Pay Order may be found in contempt of court and may be held personally responsible.

## RULES FOR DETERMINING ABILITY-TO-PAY

The rules, which DOC must follow in determining your ability to pay for the cost of your care, are available upon request. Copies can be obtained from the Department of Corrections, Central Trust Unit, Attention: Ability-to-Pay Coordinator, P.O. Box 14400, Salem, OR 97309.

## UNPAID CHARGES FOR COST OF CARE

Oregon law provides that if an inmate refuses to pay for the cost of care, the unpaid amount plus interest shall be a lien in favor of the State of Oregon. This lien shall be upon the title to and interest in the real and personal property of the inmate's personal estate. Furthermore, you are hereby notified that DOC intends to issue a distraint warrant against you pursuant to ORS 179.655 and OAR 291-203-0100 if: (1) you fail to request a hearing on this order by the deadline set forth above and fail to provide satisfactory security for the cost of care or (2) the order becomes final after a contested case hearing, you fail to pay the cost of care within 30 days after the order becomes final, and you fail to provide satisfactory security for the cost of care.

Oregon law allows DOC to participate in the Department of Revenue Offset Program. This program allows the Department of Revenue to keep state tax refunds to pay debts owed to state agencies. DOC may request refunds from the Department of Revenue to pay unpaid charges for cost of care on accounts that are over thirty (30) days old.

DOC is also authorized to charge interest on delinquent accounts. Simple interest will be charged at 9 percent per year. Interest will not be compounded. Each month that your account remains unpaid, you will receive a separate billing statement for interest due. To avoid interest charges, the account must be paid in full.

This Ability to Pay Order and Notice of Right to Hearing has been mailed to the inmate and his/her authorized representative (if applicable) as shown below.

Lester Shinault, SID #8041974
Deer Ridge Correctional Institution
3920 East Ashwood Rd.
Madras, OR. 97741

NOTICE OF RIGHT TO HEARING                    2                          1378056

Shinault v Hawks, 3:11-cv-436-PK
Declaration of Dick Hawks
Attachment 7, Page 2 of 6

ER 085

### Notice of Contested Case Rights and Procedures

Pursuant to ORS 183.413(2), you are entitled to be informed of the following:

1. Time and place of hearing.
The hearing is not yet scheduled. You will receive notice from the Office of Administrative Hearings of the time, date and place of the hearing once the hearing is scheduled.

2. Issues to be considered at the hearing.

The issues to be considered at hearing are: the amount of your assets, income, allowable obligations and expenses; the cost of your care at the Coffee Creek Correctional Facility; whether you have the ability to pay $65,353.94 for this cost of care; the amount necessary for your personal support after release; and whether you are liable in the amount of $65,353.94 to the Oregon Department of Corrections for the cost of your care.

You have the right to respond to all issues properly before the presiding officer and to present evidence and witnesses on those issues.

3. Authority and Jurisdiction for Hearing. The matter set for hearing is a contested case. The hearing will be conducted as provided in Chapter 183 and 179.640(7) and (8) of the Oregon Revised Statutes; the administrative rules of the Department of Corrections; OAR 291-203-0090; and the Attorney General's Office of Administrative Hearing Rules, OAR 137-003-0501 to 137-003-0700.

4. Right to attorney. You may be represented by an attorney at the hearing. Parties are ordinarily and customarily represented by counsel. You are not required to be represented by counsel, unless you are an agency, trust, corporation, or association. If you are not represented at the hearing and during the hearing you determine that representation by an attorney is necessary, you may not request a recess to allow you an opportunity to secure the services of an attorney. The hearing officer or administrative law judge will decide whether to grant such a request. The Department of Corrections will be represented by an attorney.

Legal aid organizations may be able to assist a party with limited financial resources.

5. Administrative Law Judge. The person presiding at the hearing is known as the administrative law judge (ALJ). The ALJ will rule on all matters that arise at the hearing, subject to agency consideration of matters transmitted for agency decision under OAR 137-003-0635 or matters subject to agency review under OAR 137-003-0640 or OAR 137-003-0570. The ALJ will be assigned by the Chief ALJ from the Office of Administrative Hearings (OAH). The OAH consists of employees of, and independent contractors with, the Chief ALJ. The ALJ does not have the authority to make the final decision in the case. The final determination will be made by the Department of Corrections.

6. Discovery. Discovery is permitted in this proceeding as provided in OAR 137-003-0570, OAR 137-003-0572 and OAR 137-003-0573. You must first ask the agency to provide you with copies of documents or other information relevant to this proceeding. If you are not satisfied with the response of the agency, you may ask the ALJ to order production of the information you seek in accordance with applicable rules.

7. Witnesses. A witness must testify under oath or affirmation to tell the truth. The agency or ALJ will issue subpoenas for witnesses on your behalf upon a showing that their testimony is relevant to the case and is reasonably needed by you to establish your position. If you are

represented by an attorney, your attorney may issue subpoenas for attendance of witnesses at hearing. Payment of witness fees and mileage to the person subpoenaed is your responsibility.

8. Order of evidence. A hearing is similar to a court proceeding but is less formal. Its general purpose is to determine the facts and whether the Department of Corrections' proposed action is appropriate. The order of presentation of evidence is normally as follows:
   a. Testimony of witnesses and other evidence of Department of Corrections in support of its proposed action.
   b. Testimony of your witnesses and your other evidence.
   c. Rebuttal evidence by the Department of Corrections and by you.

9. Burden of presenting evidence. The burden of presenting evidence to support an allegation or position rests upon the proponent of the allegation or position. If you have the burden of proof of an issue, or if you intend to present evidence on an issue in which the agency has the burden of proof, you should approach the hearing prepared to present the testimony of witnesses, including yourself, and other evidence that will support your position. All witnesses are subject to cross-examination and also to questioning by the ALJ.

10. Admissible evidence. Relevant evidence of a type commonly relied upon by reasonably prudent persons in the conduct of their serious affairs is admissible and will be received. Evidence that is irrelevant, immaterial, or unduly repetitious is excluded. Hearsay evidence is often admissible. The fact that it is hearsay generally affects how much reliance the agency or ALJ will place it in reaching a decision.
   There are four kinds of evidence:
   a. Knowledge of the agency or ALJ. The agency or ALJ may take "official notice" of facts based on the agency's or ALJ's knowledge in a specialized field. This includes notice of general, technical or scientific facts. The agency or ALJ may also take "judicial notice" of a fact that is not subject to reasonable dispute in that it is generally known or is capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned. You will be informed if the agency or ALJ takes "official notice" or "judicial notice" of any fact and you will be given an opportunity to contest any facts so noticed.
   b. Testimony of witnesses. Testimony of witnesses, including you, who have knowledge of the facts may be received in evidence.
   c. Writings. Written documents including letters, maps, diagrams and other written material may be received in evidence.
   d. Experiments, demonstrations and similar means used to prove a fact. The results of experiments and demonstrations may be received in evidence.

11. Objections to evidence. Objections to the admissibility of evidence must be made at the time the evidence is offered. Objections are generally made on one of the following grounds:
a. The evidence is unreliable;
b. The evidence is irrelevant or immaterial and has no tendency to prove or disprove any issue involved in the case;
c. The evidence is unduly repetitious and duplicates evidence already received.

12. Continuances. There are normally no continuances granted at the end of the hearing for you to present additional testimony or other evidence. However, if you can show that the record should remain open for additional evidence, the ALJ may grant you additional time to submit such evidence.

13. Record. A record will be made of the entire proceeding to preserve the testimony and other evidence for appeal. This may be done by use of tape or digital recorder or court reporter. The record is generally not transcribed, unless there is an appeal to the Court of Appeals. However, you may obtain a copy of the tape recording upon payment of the costs of making a copy of the

tape. If a court reporter is used, you may obtain a transcript or a copy of the court reporter's transcript upon payment of a transcription fee or other fee that the parties may agree upon.

14. Proposed Order and Exceptions.

The ALJ will issue a proposed order in the form of findings of fact, conclusions of law and recommended agency action. You will be provided with a copy and you will be given an opportunity to make written objections, called "exceptions," to the ALJ's recommendations. You will be notified when exceptions to the proposed order must be filed.

15. Final Order.

The agency will render the final order in this case. The agency may modify the proposed order issued by the ALJ. If the agency modifies the proposed order in any substantial manner, the agency in its order will identify the modification and explain why the agency made the modification. The agency may modify a proposed finding of "historical" fact only if the proposed finding is not supported by a preponderance of the evidence in the record.

16. Appeal. If you wish to appeal the final order, you must file a petition for judicial review with the Oregon Court of Appeals within 60 days after the final order is served upon you. *See* Oregon Revised Statues 183.482.

# CERTIFIED MAIL
### RECEIPT AND DELIVERY

## INMATE INFORMATION

Name: _Shinault, Lester_          INMATE VERIFICATION BY ID CARD:

SID: _8041974_          Verified By: _P. Voulker_

Bunk: _6 231_          Date: _6-1-09_

Subject: _Agency Case No. COC VIP 8041974_

## MAILROOM RECEIPT

Receipt of Certified Mail From:

_____

_____

_____

_Samuel VanWert_                    _6-1-09_
Mailroom Manager or Assigned Designee          Date

## DELIVERY TO INMATE

Mail Formally Delivered By:

X _Samuel VanWert_    _6-1-09_    _3:51 PM_
   Signature          Date        Time

Inmate Receipt of Mail:

X _Lester Shinault_    _6-1-09_    _____
   Signature          Date        Time

Receipt of Mail Witnessed By:

X _Jessica Anderson_    _6-1-09_    _3:52 pm_
   Signature          Date        Time

## CERTIFIED MAIL RECEIPT
(please attach below)

STATE OF OREGON
DEPARTMENT OF CORRECTIONS

IN THE MATTER OF:                )      Agency Case No. COC.VP.8041974
                                 )
LESTER SHINAULT                  )      REQUEST FOR CONTESTED
                                 )      HEARING ON ABILITY TO PAY
    SID 8041974                  )      ORDER
                                 )

1. This order is being appealed by:

               Lester Shinault, #8041974
               Dear Ridge Correctional Institution
               3920 E. Ashwood Rd.
               Madras, Oregon 97741

                                                    *Received*
                                                    JUN 0 4 2009
                                                    ODOC Central Trust

2. Case Number of Ability to Pay Order:      COC.VP.8041974
   Date of Order:                            May 29, 2009

3. The money that ODOC has expressed an intention to attach is the proceeds of a medical
   liability settlement which is to provide for ongoing medical costs which are the direct
   result of a product that has caused diabetes that will have continuous and unreimbursed
   costs to me for the rest of my life.

4. I request ODOC to waive any costs associated with my incarceration because of the
   future medical costs I will be required to pay.

5. Dated this 2nd day of June, 2009

   "I hereby declare that the above statement is true to the best of my knowledge and belief.
   I understand that it is made for use as evidence in court and is subject to penalty for
   perjury."

                                    /s/ Lester Shinault #8041974
                                    Lester Shinault, #8041974

Page 1 of 1 – Request for Contested Hearing re: Ability to Pay Order - COC.VP.8041974

·CERTIFICATE OF SERVICE

CASE NAME:  In the Matter of Lester Shinault

CASE NUMBER COC.VP.8041974

COMES NOW, Lester Shinault, and certifies the following:

That I am incarcerated by the Oregon Department of Corrections at Deer Ridge Correctional Institution, 3920 E. Ashwood Rd., Madras, OR 97741.

That on the 2ⁿᵈ day of June, 2009, I personally placed in the Deer Ridge Correctional Institution's mailing service A TRUE COPY of the following:

"Request for Contested Hearing on Ability to Pay Order"

I placed the above in a securely enclosed, postage prepaid envelope, to the person(s) named at the places addressed below:

Department of Corrections
Central Trust Unit
Attention: Ability-to-Pay Coordinator
P.O. Box 14400
Salem, Or 97309

Lester R. Shinault #8041974

Lester Shinault, #8041974
Deer Ridge Correctional Institution
3920 E. Ashwood Road
.Madras, OR 97741  .
(541) 325-5630

Page 1 of 1 -- Certificate of Service                    8/7/2008

Shinault v Hawks; 3:11-cv-436-PK
Declaration of Dick Hawks
Attachment 8, Page 2 of 2
ER 091

265

BEFORE THE OFFICE OF ADMINISTRATIVE HEARINGS
STATE OF OREGON
for the
OREGON DEPARTMENT OF CORRECTIONS

| | | |
|---|---|---|
| IN THE MATTER OF: | ) | **SECOND AMENDED** |
| | )) | **PROPOSED ORDER** |
| LESTER SHINAULT | ) | |
| | ) OAH Case No.: 901172 | |
| SID: 8041974 | ) Agency Case No.: COC.VP.8041974 | |
| | ) | |

HISTORY OF THE CASE

On May 29, 2009, the Oregon Department of Corrections (DOC) issued an Ability to Pay Order, Determination of Charges to Lester Shinault (Shinault). Shinault requested a hearing on June 4, 2009.

DOC referred the hearing request to the Office of Administrative Hearings (OAH) on June 12, 2009. The case was assigned to Senior Administrative Law Judge (ALJ) Ken L. Betterton. The case was scheduled for hearing by telephone on August 10, 2009.

In late July 2009, Shinault retained an attorney to represent him at hearing. The hearing was postponed at the attorney's request for more time to prepare for hearing. The hearing was rescheduled for October 23, 2009. The attorney withdrew as attorney of record in late September 2009.

A hearing was held by telephone on October 23, 2009. Shinault appeared *pro se*. DOC was represented by Assistant Attorney General Michael Grant. Dick Hawks, Central Trust Manager for DOC; and Martha McDaniel, DOC Budget Manager, testified for DOC. Shinault testified on his own behalf.

The record closed October 23, 2009, and the matter was taken under advisement.

ISSUE

Whether Lester Shinault has the ability to pay for the cost of his care while incarcerated with DOC, and if so, in what amount? (ORS 179.620, ORS 179.640, OAR 291-203-0010(2) and OAR 291-203-0040(1).)

EVIDENTIARY RULING

Exhibits A through A14, offered by DOC, were admitted into evidence over Shinault's objections as to the relevance of some of the exhibits. Shinault offered no exhibits.

Item # 19

Lester Shinault, SID #8041974 v Hawks, et al.; 3:11-cv-436-PK - 0265

Shinault v Hawks; 3:11-cv-436-PK
Declaration of Dick Hawks
Attachment 10, Page 1 of 8

ER 092

266

### FINDINGS OF FACT

(1) Shinault was incarcerated with DOC from May 19, 2005 until February 5, 2007, and from October 23, 2008 until August 14, 2009, as a result of felony convictions. His most recent incarceration resulted from a probation violation for felony convictions for Delivery of a Controlled Substance (methamphetamine) and felony Attempt to Elude a Police Officer from Marion County, Oregon. (Dick Hawks's testimony.)

(2) On April 3, 2009, $107,416.48 was deposited into Shinault's inmate central trust account with DOC. (Dick Hawks's testimony; Ex. A1 at 4.) The funds were Shinault's share of proceeds from civil litigation he pursued against a drug manufacturing company. (Lester Shinault's testimony.) DOC paid $21,717.00 from the account to satisfy a garnishment from Multnomah County, Oregon against Shinault for back child support, leaving a balance of $85,699.48 in his account. (Dick Hawks's testimony; Ex. A1 at 4.)

(3) During the 2003-2005 biennium (July 1, 2003 through June 30, 2005), the average daily cost for the direct care of an inmate for all prisons in the State of Oregon was $64.08. The average daily cost for inmate care was $67.53 during the 2005-2007 biennium (July 1, 2005 through June 30, 2007). The average daily cost for inmate care was $77.78 during the 2007-2009 biennium (July 1, 2007 through June 30, 2009). (Ex. A1 at 7.) The average daily cost for inmate care is $84.46 for the 2009-2011 biennium (July 1, 2009 through June 30, 2011). (Martha McDaniel's testimony.)

(4) DOC issued its Ability to Pay Order, Determination of Charges to Shinault on May 29, 2009. (Ex. A1 at 1.) In that order, DOC calculated Shinault's cost of care to be $65,353.94 [(previous incarceration of 628 days between May 19, 2005 and February 5, 2007 x $67.53/per day = $42,408.84) + (most recent incarceration of 295 days x $77.78/per day = $22,945.10) = $65,353.94]. (*Id.* at 7.)

(5) DOC has adopted a schedule to estimate the funds an inmate will need to cover living expenses for the first three months after release from incarceration. The schedule is applied statewide in Oregon, but is based on estimates of costs for a one bedroom apartment in Salem, Oregon. The costs also include utilities, public transportation, food, supervision fees, treatment fees, and miscellaneous expenses. DOC estimated living expenses for three months for Shinault upon his release to be $4,404. DOC then adjusted that amount upward to $5,000 to allow for variable expenses, such as additional security deposits for housing and for variations of living expenses in other parts of Oregon. (Ex. A7.)

(6) DOC allowed Shinault to keep $30 a month for the last three months of his incarceration for personal expenses for basic hygiene, snacks and personal items. (Dick Hawks's testimony.)

(7) After deducting $5,000 for financial support after release and $90 for three months of personal expenses while incarcerated, from the $85,699.48, Shinault had $80,609.48 left in his inmate account as of May 29, 2009. (Ex. A1 at 8.)

Item # 19

Page 62

*In the Matter of Lester Shinault,* OAH Case No. 901172
Page 2 of 8

267

(8) After the Ability to Pay Order was issued, DOC deducted $4,088.96 from Shinault's inmate account as a result of three garnishments served on his inmate account for restitution and related court costs on his prior criminal cases. (Dick Hawks's testimony.)

(9) In July 2009, DOC released, at Shinault's request, approximately $11,000 to Shinault's attorney then on the case. (Dick Hawks's testimony.)

(10) At the time of Shinault's release from incarceration on August 14, 2009, $61,352.39 remained available in Shinault's inmate account to apply to pay for his cost of care. (Dick Hawks's testimony.)

(11) Upon his release from incarceration in August 2009, Shinault lived in the Salem, Oregon area. He was arrested on October 10, 2009 on parole violations, released from jail on October 19, and re-arrested on October 21. He remained in jail at the time of his hearing on October 23, 2009. (Lester Shinault's testimony.)

(12) Shinault is 42 years old. He developed diabetes in 2004. At the time of his release from incarceration in August 2009, Shinault was taking two medications for diabetes. (Lester Shinault's testimony.) DOC paid for and provided his medications while he was incarcerated. DOC gave claimant a 60-day supply of his medications upon his release from prison on August 14, 2009. (Dick Hawks's testimony.) Shinault was on the Oregon Health Plan in 2007, when he was not incarcerated. His medications were provided during that time through the Oregon Health Plan. (Lester Shinault's testimony.)

(13) On his request for hearing on the Ability to Pay Order, Shinault asserted that he is diabetic and requested that DOC "waive" any costs associated with his incarceration because of future medical costs he might be required to pay. (Ex. A5 at 1.) Other that his assertion about diabetes and the request on his request for hearing, Shinault did not given DOC any specific evidence of any special medical needs before or after his release from incarceration. (Dick Hawks's testimony.)

(14) Shinault claims that DOC will be "murdering" him if he is not given his funds so that he can provide for his medical needs following his release from incarceration. (Lester Shinault's testimony.)

## CONCLUSION OF LAW

Lester Shinault has the ability to pay $61,352.39 for the cost of his care while incarcerated with DOC.

## OPINION

DOC has the burden of proof to establish its allegation. ORS 183.450(2) and (5); *Harris v. SAIF*, 292 Or 683 (1980). DOC must prove its case by a preponderance of the evidence. *Cook v. Employment Division*, 47 Or App 437 (1980). Proof by a preponderance of the evidence

Item # 19

Page 63

*In the Matter of Lester Shinault*, OAH Case No. 901172
Page 3 of 8

Shinault v Hawks; 3:11-cv-436-PK
Declaration of Dick Hawks
Attachment 10, Page 3 of 8

ER 094

268

means that the fact finder is persuaded that the facts asserted are more likely true than not true. *Riley Hill General Contractor v. Tandy Corp.*, 303 Or 390 (1989). DOC has met its burden.

DOC has the statutory authority to require a person incarcerated under its jurisdiction to pay for the full cost of care. ORS 179.620. Shinault was incarcerated with the DOC on two separate occasions since May 2005. His most recent incarceration ended August 14, 2009.

The cost-of-care rates for an incarcerated person are determined by DOC and are reasonably related to costs directly related to the care for a person at a state institution. ORS 179.701. DOC calculated the cost of care for Shinault's two periods of incarceration as $65,353.94. DOC miscalculated Shinault's cost of care; however, the error was in his favor. DOC used the average daily rate of care of $67.53 for the 2005-2007 biennium for the period May 19, 2005 through June 30, 2005. The average daily cost of care for that period should have been the average daily rate of $64.08 from the 2003-2005 biennium. However, DOC used an average daily cost of care of $77.78 for the 2007-2009 biennium for the period July 1, 2009 through August 14, 2009. DOC should have used the average daily cost of care of $84.46 for the 2009-2011 for that period. If DOC had used the correct average daily cost figures, Shinault's total cost of care would have been slightly higher than the amount DOC sought in its Ability to Pay Order, Determination of Charges.

After calculating Shinault's cost of care while he was incarcerated, DOC then needed to consider his ability to pay. ORS 179.640(1)(a) governs determining the ability to pay:

> Both the Department of Human Services and the Department of Corrections shall establish rules for determining ability to pay for persons in their respective institutions. The rules adopted by each agency shall require, in addition to other relevant factors, consideration of the personal estate, the person's need for funds for personal support after release, and the availability of third-party benefits, such as, but not limited to, Medicare or private insurance.

Under statutory authority, DOC has adopted administrative rules to govern the process for determining an inmate's ability to pay for his or her cost of care. OAR 291-203-0040 provides, in relevant part:

> (1) An inmate and the personal estate of an inmate, or a decedent's estate, is liable for the full cost of care as established in ORS 179.701. The Department may collect charges in advance for inmates with determinate sentences.
> * * * * *
> (5) When determining an inmate's ability to pay, in addition to other relevant factors, the Department will consider the inmate's personal estate, the inmate's need for funds for personal support after release, and the availability of third-party benefits such as, but not limited to, Medicare or private insurance.

Item # 19

Page 64

*In the Matter of Lester Shinault*, OAH Case No. 901172
Page 4 of 8

Lester Shinault, SID #8041974 v Hawks, et al.; 3:11-cv-436-PK - 0268

Shinault v Hawks; 3:11-cv-436-PK
Declaration of Dick Hawks
Attachment 10, Page 4 of 8

ER 095

269

DOC must also deduct certain sums from an inmate's assets to allow for the inmate's personal support while incarcerated and for the inmate's post-release living expenses. OAR 291-203-0050(6) provides, in relevant part:

Deductions: The Department may allow a deduction from the inmate's assets and income for the following:
* * * *

(b) Personal Support Following Release: Based on a showing of need, the Department may allow a deduction for the inmate's transitional support following his/her release from an ODOC institution for reasonable expenses to live in the community for three months, including rent utilities, food, public transportation, supervision feeds, and miscellaneous expenses.

(c) Person Support While in Custody of the Department:

(A) Based on a showing of need, the Department may allow a deduction for an inmate's miscellaneous expenses while in the custody of the Department that are not provided by the Department and are available for purchase from the institution commissary. These include, but are not limited to, expenses for personal grooming and hygiene items; books, newspapers, or other publications; or snacks or refreshments.

(B) When a deduction is made by the Department for this purpose, the Department shall establish an allowance to reflect a reasonable monthly spending limit for the inmate for purchase from the institution commissary, consistent with the Department's rule on Trust Accounts (Inmate), OAR 291-158.

Pursuant to OAR 291-203-0050(6)(b), DOC has adopted a schedule of estimated charges for the cost of an inmate's personal support for three months following release from incarceration. DOC calculates such costs based on housing in the Salem area. Although DOC's calculation totaled $4,404, it revised the amount up to $5,000 to allow for variations in costs.

Consistent with OAR 291-203-0050(6)(c), DOC allowed a deduction of $30 per month, for a total of $90, for Shinault for personal support for the three months he was incarcerated between when DOC issued its Ability to Pay Order on May 29, 2009 and his release from custody on August 14, 2009. The monthly amount of $30 is determined pursuant to OAR 291-158-0065(1), which provides:

An inmate who is indebted to the Department of Corrections for whatever reason shall be permitted to spend on commissary during the calendar month one half of the first $60 (up to $30) of funds that have been received and posted for that inmate during the calendar month.

After allowing for $5,000 for support for three months following release, and $90 for three months of personal support while incarcerated, and after other deductions, $61,352.39 remained in Shinault's inmate account to pay for his cost of care (which is $65,353.94).

Item # 19

Page 65

*In the Matter of Lester Shinault*, OAH Case No. 901172
Page 5 of 8

270

Shinault has the ability to pay $61,352.39 for the cost of his care while incarcerated with DOC.

Shinault argues that DOC will be "murdering" him if he is not given the money remaining in his account. He asserts he needs that money to pay for his diabetes medications and related medical costs for the rest of his life.

ORS 179.731[1] allows DOC to waive collection of an inmate's cost of care under certain circumstances. No evidence was presented that ORS 179.731 should apply to Shinault's case.

Shinault presented no evidence to DOC prior to his release as to any specific medical needs or the projected cost of those needs. He presented no evidence at hearing as to those costs. Other than Shinault's request on his request for hearing that DOC "waive" any costs associated with his incarceration, DOC was unaware of any special medical needs he had.

DOC provided and paid for Shinault's diabetes medications while he was incarcerated. DOC also gave him a 60-day supply of his medications upon his release. Shinault was back in jail in October 2009 within 60 days of his release from DOC's custody on August 14, 2009. He was still in jail as of the date of the hearing. As long as Shinault is incarcerated in an institution, his medication and medical costs will be paid for by the institution holding him.

Shinault presented no evidence that he cannot work when he is not incarcerated. If he is employed, his medical costs and medications may be covered by medical insurance through his employment. Shinault has been on the Oregon Health Plan as recently as 2007. That plan remains an option for him if his medication costs are not covered through work or another third-party provider.

Shinault has the ability to pay for the cost of his care while he was incarcerated, and he should do so.

## ORDER

I propose the DOC issue the following order:

Lester Shinault is required to pay $61,352.39 for the cost of his care while incarcerated.

---

[1] ORS 179.731 provides, in relevant part:
If the Department of Human Services or the Department of Corrections determines that collection of the amount payable under ORS 179.610 to 179.770 for the cost of care of a person would be detrimental to the best interests of the person or the agency, the agency may waive the collection of part or all of the amount otherwise payable.

Item # 19

Page 66

*In the Matter of Lester Shinault*, OAH Case No. 901172
Page 6 of 8

Lester Shinault, SID #8041974 v Hawks, et al.; 3:11-cv-436-PK - 0270

Shinault v Hawks; 3:11-cv-436-PK
Declaration of Dick Hawks
Attachment 10, Page 6 of 8

ER 097

271

Ken L. Betterton
Senior Administrative Law Judge
Office of Administrative Hearings

ISSUANCE AND MAILING DATE: December 29, 2009

### EXCEPTIONS

The inmate (or his/her authorized representative, if applicable) may file exceptions to the proposed order and to present argument to the Department. The Department hereby determines that such exceptions and argument shall be in writing. Furthermore, they shall be filed with the Department no later than fourteen (14) days after the proposed order is mailed to or otherwise served upon the parties to the administrative hearing. The written exceptions and argument shall be filed by mailing them to:

Tami Dohrman, Assistant Director for General Services Division
Department of Corrections
2575 Center Street NE
Salem, Oregon 97301

### FINAL ORDER

The Assistant Director for General Services Division is designated as the Department's representative with authority to prepare and issue the final orders in cost of care proceedings. This designation may be changed by the Department.

Item # 19

Page 67

*In the Matter of Lester Shinault,* OAH Case No. 901172
Page 7 of 8

272

## CERTIFICATE OF MAILING

On December 29, 2009, I mailed the foregoing Amended Proposed Order in OAH Case No. 901172.

By: First Class Mail

Lester Shinault, SID 8041974
Marion County Jail
4000 Aumsville Hwy SE
Salem OR 97317

Dick Hawks
Department of Corrections
Central Trust Unit
P.O. Box 14400
Salem OR 97309

Michael Grant
Assistant Attorney General
Department of Justice
1162 Court St NE
Salem OR 97301-4096

Pam Arcari
Administrative Specialist
Hearing Coordinator

Item # 19

Page 68

*In the Matter of Lester Shinault*, OAH Case No. 901172
Page 8 of 8

Shinault v Hawks; 3:11-cv-436-PK
Declaration of Dick Hawks
Attachment 10, Page 8 of 8

ER 099

FILED27MAY '11 10:51USDC-ORP

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON

LESTER SHINAULT,              )    Civil no. 11-436-PK
                  Plaintiff,  )    DECLARATION IN
      V.                      )    SUPPORT OF PLAINTIFF'S
DICK HAWKS, TAMI              )    MOTION FOR RECONSIDERATION
Dohrman, Martha McDaniel,     )    OF THE COURT'S ORDER DENYING
Oregon Department of          )    APPOINTMENT OF COUNSEL
Corrections    Defendants.    )

      I, Lester A. Shinault, hereby declare under
penalty of perjury that the following information is
based upon by personal knowledge and belief
and is reliable. I further state that I am over
the age of 18 years and competent to testify
regarding the matters herein.
      Plaintiff is imprisoned and does not have sufficient
access to jailhouse lawyers or to a lawyer that
would help litigate my cause for sufficient money
payment in advance due to defendants depriving
plaintiff of his property under color of state
law in the sum of $ 61.352 39 Prior to
giving plaintiff proper Notice and sufficient
time to obtain and pay for a lawyer of
his choice to defend his interest.
PAGE 1 of 2

Plaintiff lacks the knowledge and ability to litigate his cause before this Court to protect his property interest and due process of law rights against defendants professional lawyers that amounts to unfair proceedings when plaintiff does not have a G.E.D. or any legal training.

Plaintiff's imprisonment subjects him to restrictive movements and he can not comply with fed. R. Civ. P. pertaining to timely filing of pleadings in response to court's order or defendants pleadings due to lack of timely access to legal library area and help from a jailhouse lawyer.

DATED This 12 day of May, 2011.

/S/ Lester R Shinault
Signature of Plaintiff
Lester R. Shinault
#8041974
2605 State Street
Salem, Or. 97310

PAGE 2 of 2   Declaration in support of plaintiff's motion for Reconsideration of the Court's order denying appointment of counsel civil No. 11-436-PK

## PROOF OF SERVICE

I Lester R. Shinault, hereby declare under the penalty of perjury that I have served the following original with one true copy thereof Motion for Reconsideration of the court's order denying Appointment of counsel, by first class U.S. mailing on the __26__ day of __May__ 2011 by c/o mail pick up and placed in the institution mailing system from Salem, Oregon addressed to:

1. To the Clerk of U.S. District Court
   Office of the Clerk
   District of Oregon
   740 United State Court House
   1000 S.W. Third Ave. Portland, Oregon 97204-2902

Further one true copy thereof on:

2. To the Attorney General of oregon
   Department of Justice
   1162 Court Street N.E.
   Salem, or. 97310

                              /s/ Lester R. Shinault
                              Signature of Plaintiff
                              Lester R. Shinault
                              #8041974
                              2605 State Street
                              Salem, OR. 97310

ER 102

FILED'11 APR 06 11:24USDC-ORP

# IN THE UNITED STATES DISTRICT COURT

## FOR THE STATE OF OREGON

| | | |
|---|---|---|
| **Lester, Shinault** | ) | Case No. **CV '11 -- 436-** · PK |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **Civil Rights Complaint** |
| | ) | |
| **Dick Hawks, Tami Dohrman, Martha** | ) | |
| **McDaniel, Oregon Department of** | ) | |
| **Corrections,General Service, et, al,** | ) | |
| **Defendant.** | ) | **Jury Trial Demanded** |
| | ) | |
| | ) | |

## PRELIMINARY STATEMENT

This is a Civil Rights action filed by Lester Shinault, SID#8041974, a state prisoner, for

damages under 42 U.S.C. § 1983, 1985(2)(3), 1986, alleging violation of the Sixth, Eighth, and

Fourteenth amendments to the U. S. Constitution; in violation of the assistance of counsel, creul

and unusual punishment and due process clause. The plaintiff also claims state tort action for

grievious harm and extortion by the Oregon Department of Correction General Service Division.

## JURISDICTION

1.    This is a Civil action authorized by Title 42 U.S.C. § 1983, 1985(2)(3), 1986; to redress

the deprivation under color of State Law, Statues, Ordinance,Regulation, Customs, or usuage of

any rights of privileges or immunities secured by the constitution of the United States.

**CIVIL RIGHTS COMPLAINT**
LESTER SHINAULT R.
SID# 8041974
2605 State Street
Salem , Oregon
97301

2.      This court also has jurisdiction under 20 U.S.C. § 1709, Title 28 U.S.C. § 1331(a), and 1343(a)(3).

3.      The Federal Rules of Civil Procedures (F,R,C,P,) 8, which states in part: This Federal Court shall have original jurisdiction of any civil action authorized by Law to be commenced by any person.

4.      To recover damages for injuries to person or property, or because the deprivations of any rights or privileges of a citizen of the United States by any act done in furtherance of any conspiracy mentioned in § 1885(3) and 1986 of Title U.S.C. 42.

5.      Pursuant to Title 28 U.S.C. § 1367 this Federal District shall have "pendant" jurisdiction over all state tort claims.

## PARTIES

6.      The plaintiff, Lester Shinault, SID# 8041974, is incarcerated at Snake River Correctional Institution, 777 Stanton Blvd,Ontario, Oregon, 97914, during the deprivation of Constitutional .unfariness described herein this U.S.C. § 1983 Civil Rights Complaint.

        The defendant, Oregon Department of Corrections General Service Division is the Central Trust offices where the aforementioned deprivations occurred, located at 2575 Center Street NE, Salem, Oregon, 97301; and is being sued in respondent Superior Capacity.

7.      The defendant Dick Hawks is the Central Trust Manager, Oregon Department of Corrections when the deprivations occurred; and is being sued in his official and individual capacities; at P.O. Box 14400, Salem, Oregon, 97309.

**CIVIL RIGHTS COMPLAINT**
LESTER SHINAULT R.
SID# 8041974
2605 State Street
Salem , Oregon
97301

ER 104

8.    The defendant, Tami Dohrman, is the Assistant Director of General Service at the time

deprivations occurred, located at 2575 Center Street NE ,Salem ,Oregon 97301; and is being sued

in her official and individual capacities.

9.    The defendant Martha McDanial is the D.O.C. Budget Manager, located at the P.O. Box

14400, Salem, Oregon, 97309, when the deprivations occurred; and is being sued in her official,

and individual capacities.

## FACTS

10.    The plaintiff Lester Shinault was incarcerated with D.O.C. from May 19, 2005 until

Febuary 5, 2007, and from October 23, 2008 until August 14, 2009 as a result of felony

convictions . His most recent incarceration resulted from a probation violation for felony

Convictions for Delivery of a controlled substance (methamphetamine); and felon attempt to

elude a policer from Marion, County, Oregon. Ex. La

12.    On April 3, 2009, $ 107, 416.48 was deposited into Lester Shinault inmate Central Trust

Account with D.O.C. Dick Hawks Central Trust Manager saying ;Lester Shinault money is

SAFE. The funds were Lester Shinault share of proceeds from CIVIL CITIGATION, he pursued

agianst a drug manufaturing company. D.O.C. paid $21,717.00 from to satisfy a garnishment

from Multnomah County, Oregon, against Shinault for back Child Support, leaving a balance of

$85,699.48 in his account. Ex. La

13.    During the 2003-2005, the average daily cost for the direct care of an inmate for all

prisons in the State of Oregon was $64.08, and $67.53 during the 2005-2007 biennium; again the

**CIVIL RIGHTS COMPLAINT**
LESTER SHINAULT R.
SID# 8041974
2605 State Street
Salem , Oregon
97301

ER 105

cost of inmate care was $77.78 daily during the 2007-2009 biennium, and lastly the average daily cost is $84.46 for the year 2009-2011 biennum. Ex. La

14.    D.O.C. issued its Abilitl To Pay Order, determination of charges to Shinaults on May 29,2009. In that order, D.O.C. calculated Shinaults cost of care to be $65,353.94; (previous incarceration of 628 days between May 19,2005 and Febuary 5,2007 x $67.53/ per day = $42,408.84 )+ ( most recent incarceration of 295 day x $77.78/ per day = $22,945.10) = $65,353.94. Ex. La

15.    D.O.C. has adopted a schedule to astimate the funds an inmate will need to cover living expenses for the first three months after release from incarceration.The schedule is applied state wide in oregon, but is based on estimates of cost for a one bedroom apartment in Salem, Oregon. The cost also includes utilities, public Transportation, food, Supervision fees, treatment fees and miscellaneous expenses. D.O.C. estimated living expenses for THREE MONTHS for Shinault up his release to be $4,404. D.O.C. then adjusted that amount upward to $5,000 to allow for variable expenses,such as additional security deposits for housing and variations of living expenses in other part of Oregon.D.O.C. has violated Oregon Administrative Rule OAR. 291-203-0050 (b) which states; Personal Support Following Release: Based on a showing of need, the Department may allow a deduction for the inmates transtitional support following his/her release from an ODOC institution for reasonable expenses to live in the community for SIX MONTHS , including rent, utilities, food, public transportation, supervision fees, and miscellaneous expenses.

16.    D.O.C. allow Shinault to keep $30.00 a month for the last three months of his incarceration for personal expenses for basic hygiene, snacks, and personal items.

**CIVIL RIGHTS COMPLAINT**
LESTER SHINAULT R.
SID# 8041974
2605 State Street
Salem , Oregon
97301
ER 106

17.     After deducting $5,000 for financial support after release and $90 for three months of personal expenses while incarcerated from the $85,699.48, Shinault had $85,609.48 left in his inmate account as of May 29,2009.

18.     After the Ability to Pay Order was issued, D.O.C. deducted $ 4,088.96 from Shinaults inmate account as a result of three garnishments served on his inmates account for restitution related court costs on his prior criminal cases.

19.     In July 2009, D.O.C. released at Shinaults request, approximately $ 11,000.00 for Shinaults attorney then on the case.

20.     At the time of Shinaults release from incarceration on August 14,2009, $61,352.39 remained available in Shinaults inmate account to apply to pay for his cost of care.

21.     Upon his release from incarceration in August, 2009, Shinault lived in the Salem, Oregon area. Shinault was arrested on October 10,2009 on parole violation, released from jail on October 19,2009, and re-arrested on October. He remained in jail at time of his hearing on October 23,2009, present with a Marion County Sheriff Officer Mr.Haymen.

22.     Shinault is 43 years old. He developed <u>DIABETES</u> in 2004.At the time of his release from incarceration in August 2009, Shinault was taking two medications for diabetes. D.O.C. paid for and provided his medications while he was incarcerated. D.O.C. gave claimant a 30 day supply of his medications upon his release from prison on August 14. 2009. Shinault was on the Oregon Health Plan in 2007, when he was not incarcerated. His medications were provided during that time through the Oregon Health Plan.

23.     On his request for hearing on the Ability To Pay Order, Shinault asserted that he is a diabetic and requested that D.O.C. "waive" any cost associated with his incarceration because of future medication or medical costs he might be requested to pay. Other then his assertions about

CIVIL RIGHTS COMPLAINT
LESTER SHINAULT R.
SID# 8041974
2605 State Street
Salem , Oregon
97301

ER 107

diabetes and the request on his request for hearing; Shinault did not give D.O.C. any specific evidence of any special medical needs before or after his release from incarceration.

24.     Shinault claims that D.O.C. will be "murdering"him if he is not given his funds so he can provided for his medical needs following his release from incarceration.

25.     For further information on the History of facts of the case, Issue, Evidentiary Ruling Conclusion of Law, Opinion, and order. See- Ex.1a, 1b, 1c., 1d., 1e., 1f., 1g.

### Denial of Due Process

26.     42 U.S.C. § 1983, 1985(2)(3), 1986; for plaintiff to sustain his causes of action against defendants, he must for conspiracy under 42 U.S.C. § 1983, 1985(2)(3), must show that (1) a conspiracy exists and that (2) the conspiracy deprives them of rights protected by federal law.

27.     A conspiracy is a combination of two or more persons acting in concert to commit an unlawful act, the principal element of which is an agreement between the parties to inflict a wrong agains plaintiff, or injury upon another, and overy act that results in damage.

28.     A plaintiff seeking redress need not prove that each participant in a conspiracy knows the exact limits of the illegal plan or the identity of all participants therein.

29.     A plaintiff must simply show that there is a single plan or objective, the essential nature and general scope of which is known to each person who is to be held responsible for its consequences.

30.     Civcumstantial Evidence may provide adequate proof of conspiracy; a 42 U.S.C. 1985 conspiracy, Liability may also be predicated upon not only participation but upon neglect to prevent under 42 U.S.C. § 1986.

CIVIL RIGHTS COMPLAINT
LESTER SHINAULT R.
SID# 8041974
2605 State Street
Salem , Oregon
97301

31. ·    U.S. Const. Amend. XIV entitles the indivduals to a fair opportunity to present his or her claim, and such right exist where the claim has a reasonable basis in fact or law.

32.    The defendants conspired to keep plaintiff from his right to fair judicial redress, and there by interfered with the due process right of access to the court, which is protected by 42 U.S.C. § 1985(2)(3).

33.    Judicial access must be "adequate", effective and meaningful; 42 U.S.C.§ 1985(2)(3); Creates a cause of action against conspiracies designed to deprive persons of the equal protections of the Laws, or equal privileges and immunities under the Law.

34.    Plaintiff was denied the right to be represnted by an Attorney, and denied the right to be present at all hearings or meetings the defendants held without him present.

35.    Plaintiff was "never" given a final order of the court that he could appeal to a higher court that was signed by Judge Ken. L. Betterton.

36.    Plaintiff can recover damages for injuries, emotional distress resulting from a deprivation; punitive damages in a 42 U.S.C.§ 1983 action can be awarded when shown to be motivated by evil motive or intent, or when it involves reckless or callous indefference to the federally protected rights of others.

37.    Plaintiff asserts that § 1983 entitles him to recover damages arising from the deprivation of life without due process, perpetrated under color of state law.

38.    Such constitutional interference deprived plaintiff of due process, and equal protections rights. The deprivatiopn and concomitant pain, humiliation, and frustration are compensable under § 1983, 1985(2)(3), and 1986.

39.    The court should pursuant to Federal Rules of Civil Procedure 56(d) view plaintiff factual contentions as existing without substanttial controversy and except them as true, namely that

**CIVIL RIGHTS COMPLAINT**
LESTER SHINAULT R.
SID# 8041974
2605 State Street
Salem , Oregon
97301

defendants violated plaintiffs due process rights under the Fourteenth Amendment, Sixth

Amendment right to have assistance of counsel, and Eighth Amendment of cruel and unusual

punishment for the deliberate indifference with reckless evil motive or intent of mental anguish,

humiliation, frustration and concomitant pain.

40.     Plaintiff Shinault has standing to seek redress for aforementioned alleged constitutional

deprivation of life, liberty, and property.

41.     Although, the due process clause protects plaintiff from unlawful interfernce and thus the

express language of § 1983 provides a remedy for the deprivation of this constitutional right

where the defendants interfernce is committed under color of state law.

42.     Plaintiff has proffered substantial evidence regarding his health, and medical needs that

defendants with deliberate indifference and reckless evil motive or intent over look.

43.     A state law rule should not be applied towards plaintiff if its inconsistent with the

constitutional rigths to be protected or the policy of § 1983.

44.     Given the egregiousness of defendants acts committed under of state law, and the

irreversible nature of the unconstitutional deprivation; it would be inconsistent with federal

policy to limit any amount of damages plaintiff seeks to recover from the defendants conspiracy

of wrongful acts done.

45.     The expressed language in § 1983, 1985, and 1986 providing defendants "shall be liable"

for deprivations of rigths.

46.     The Court of Appeals implicity has recognized the applicability of [ the compensation ]

priciple to action under § 1983 by stating that damages are available under that § for "actions

found –to have been violative of –Constitutional rights and to have caused compensable injury."

CIVIL RIGHTS COMPLAINT
LESTER SHINAULT R.
SID# 8041974
2605 State Street
Salem , Oregon
97301

47.   The policy underlying § 1983 include compensation of persons injured by deprivation of federal rights and prevention of abuses of power by these acting under color of state law.

48.   Where federally protected rights have been invaded it has been the rule from the beginning that courts will be alert to adjust their remedies so as to grant the necessary relief.

49.   Once Shinault had the $107,416.48 deposited into Shinault inmate Trust account on April 3,2009, with Dick Hawks stating to the insurance company that Shinault money( $107,416.48) is safe in D.O.C. Bank. The named defendants took action to place a lien on plaintiffs funds for Ability to Pay Order by any means necessary.

50.   The defendants payed out funds to Multnomah County for $21,717.00 for back child support without any prior notice to plaintiff, and later payed an additional $4,404.00 for restitution of court fees imposed.

51.   The defendants conspired to take plaintiff funds without proper court proceedings taking place.

52.   Defendants fed off the plaintiff not being articulate enough to understand fully what the Department of Corrections was doing to his funds that was awarded to him as a result of an law suit from Civil Litigation against a drug manufacturer company.

53.   Lester Shinault, plaintiff, does not comprehend that his $61,352.39 was finally ordered granting the Oregon Department of Corrections General Services Division to take his funds to be applied to his cost of care on November 24.2010.

54.   The plaintiff has had to seek mental health guidance and medication for deep depression, stress, mental anguish, mood disorders, humiliation, frustration, lack of sleep, and concomitant pain.

**CIVIL RIGHTS COMPLAINT**
LESTER SHINAULT R.
SID# 8041974
2605 State Street
Salem , Oregon
97301

55.     Plaintiff argues that the conspiracy to distort and conceal the facts interfered with his rights to due process with the hearings held, and the limited access to the courts.

56.     The defendants were motivated by a invidious racial discrimination, on the basis of § 1985 (2)(3); conspiracy to deprive constitutional rights under color of state law; plus 1986 of neglect to prevent § 1985 conspiracy.

57.     Rarely in a conspiracy case will there be direct evidence of an express agreement among all the conspirations to conspire, so circumstantial evidence may provide adequate proof of conspiracy.

58.     Plaintiff, at a minimum must show that the officials at least implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct.

59.     Plaintiff brings a civil conpiracy action under § 1983 and 1985 on the grounds that defendants acts wrongfully interfered with access to state court to pursue a lawful hearing; where the Fourteenth Amendment entitles the plaintiff to a fair opportunity to present his claim or defense.

60.     Such a right exist where the claim has a reasonable basis in fact or law; through judicial redress with the due process rights to the access to courts.

61.     To deny such access defendants need not literally bar the courthouse door shut, for a constitutional right is lost where, as here the officials violated plaintiffs due process at the second hearing and during the objections phase by not allowing Shinault to participate in speaking up on his own behalf outside of the written notice of objection letter.

62.     The right to due process has sheilded these defendants with the encouragement to conceal the hearings from plaintiff on all fronts since May 29,2009 through approximately November 24,2010.

**CIVIL RIGHTS COMPLAINT**
LESTER SHINAULT R.
SID# 8041974
2605 State Street
Salem , Oregon
97301

ER 112

63.    Plaintiff has not been adequately afforted any representation to help him in a defense

from O.D.O.C. collecting the $61,352.39 as they imposed on Ability to Pay Order notice on

May29,2009 and a second Ability to Pay Order notice of intent to setoff as of October19,2010.

64.    The lack of representation at the scond hearing of intent to setoff and the objection

hearing was violative of plaintiff Sixth, and Fourteenth Amendment to the U.S. Constitution.

65.    As the Supreme Court enuciated the right of access to the courts- is founded in the Due

Process Clause and ensures no person will be denied the opportunity to present to the courts

allegations concerning violations of Fundamental Constitutional Rights.

66.     The right to seek redress is gounded in the First Amendment.

## Claims For Release

67.    The actions of defendants, Hawk, Dohrman, Mc Daniel, and Department of Corrections

General Service Division using the Ability to Pay Order in a manner of greed, excessive

charges without need or provocation. By failing to provide a fair impartial hearing under the

Laws of the Court; were all done in a evil motive or intent to cause grievous harm to plaintiff

when seizing Shinaults fund for past cost of care that stemmed from prior incarceration.

68.    The action of Mr. Hawk, Mr. Mc Danial pay off past child support, and restitution fees

without notifying the plaintiff was violation of his due process; because he was not given any

opportunity to contest the funds being removed.

69.    Defendants never gave plaintiff any statements or signed orders from the courts to prove

garnishment or the restitution fees was order by the courts; as there is "no" documentation

shown that premitted O.D.O.C. Trust Fund to pay out plaintiffs funds of $21.717.00 and

$4,404.00 signed by any judge.

**CIVIL RIGHTS COMPLAINT**
LESTER SHINAULT R.
SID# 8041974
2605 State Street
Salem , Oregon
97301

ER 113

70.    The failure of Department of Corrections General Service Division, and Tami Dohrman not seeing to it that plaintiff funds be issued out to him for his cost of living after being release from jail is a showing of lack of rehabilitation tactics that are not O.D.O.C. policy or statue.

71.    The actions of all defendants knowingly conspiring to lien plaintiff fund by any means necessary shows a cause of deliberate indifference with reckless regard to the health or living status of the plaintiff.

72.    By defendants not taking in the consideration of medical needs the plaintiff may or will face in the present and future also shows deliberate indifference that will effect Shinault upon release from carceration.

73. The action brought out by all mentioned defendants find plaitiff with "no" evidence to support their claim of Ability to Pay Order in setoff imposed.

74.    Defendants has denied the plaintiffs due process of law in violation of Shinault Fourteenth Amendment to the United States Constitution.

**75.**    The actions by defendants not allowing the plaintiff a waiver on Shinault account, or supplying an allowance for personal items; and funds for future release is aviolation of O.D.O.C. policy, or statues, and state law.

76.    The failure to allow the plaintiff to be represented by an outside attorney or someone that could explain to Shinault what the O.D.O.C. rules or regulations are during the coarse of Shinault hearing was a violation of the Fourteenth, Sixth Amendments

## Relief Requested

Wherefore, plaintiff requests that the court grant the following relief:

A.  Issue a declatory judgment stating that:

**CIVIL RIGHTS COMPLAINT**
LESTER SHINAULT R.
SID# 8041974
2605 State Street
Salem , Oregon
97301

1.      The deliberate indifference by defendants: Mr. Hawk, Ms.Dohrman, Mr. Mc Daniel, and D.O.C. violated the plaintiffs rigths under the Eighth Amendment to the United States Constitution and Constituted Reckless indifference with evil motive or intent. Under color of state law.

2.      The O.D.O.C. failure to take action to curb the deprivation of conspiracy of defendants wrongful acts done in furtherance to lien plaintiffs funds accrued in Shinault inmate account; violated the Fourteenth Amendment to the United States Constitution and Constituted Mental anguish, distress, frustration, humiliation, mood disorders, lack of sleep, and concomitant pain.

3.      The defendants Mr.Hawk, Mr. Mc Daniel,and Ms. Dohrman conducting second Ability to Pay  Order; also the objection hearing without plaintiff taking in the proceedings violated plaintiff rights under the Due Process Clause of the Fourteenth Amendment to the United States Constitution

4.      The defendants D.O.C. Mr. Hawk, Mr. Mc Daniel, and Ms. Dohrman not providing assistance of counsel or some other method to help plaintiff who is not articulate enough to understand the statutes, policy, or regulations of state laws violated plaintiffs rights under the Sixth, Fourteenth Amendments to the United States Constitution.

B.      Award compensatory damages in the following amounts:

1.      $500,000 jointly and severally against defendants D.O.C, Mr. Hawk, Mr. Mc Daniel, Ms. Dohrman for the emotional injuries sustained as a result of the plaintiffs deprivation of life, liberty, and property.

2.      $25,000 jointly and severally against defendants Mr. Hawk, Mr. Mc Daniel, and Ms. Dohrman for creul and unusual punishment and emotional injury resulting from their denial

**CIVIL RIGHTS COMPLAINT**
LESTER SHINAULT R.
SID# 8041974
2605 State Street
Salem , Oregon
97301

ER 115

of Due Process connection with plaintiffs Ability to Pay Order hearing; and Objection

hearing.

3.      $75,000 jointly and severally against all named defendants for the emotional stress,

mental anguish, frustration, humiliation, mood disorders, and concomitant pain resulting

from their failure to provide adequate representation to plaintiff who is incompetent to

represent himself and understand the proceedings that took place between May 29,2009

through approximately November 24, 2010.

C.      Award punitive damages $50,000 against defendants O.D.O.C.,Dick Hawk, Martha

McDaniel,Tami Dohrman

D.      Grant such other relief as it may appear that plaintiff is entitled.

       DATE:              RESPECTFULLY SUDMITTED

I declare under penalty of perjury that the foregoing is true and correct.

DATED this 4·4·201 day of    April          , 2011.

                              Lester R Shinault

                        LESTER SHINAULT # 8041974
                              2605 State Street
                            Salem , Oregon 97301

**CIVIL RIGHTS COMPLAINT**
LESTER SHINAULT R.
SID# 8041974
2605 State Street
Salem , Oregon
97301

FORM TO BE USED IN FILING A COMPLAINT UNDER THE CIVIL RIGHTS ACT, 42 U.S.C. § 1983

FILED '11 APR 06 11:24USDC-ORP

## CV '11 - - 4 3 6 -    PK

### IN THE UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF OREGON

LESTER SHINAULT ) 
_____ ) 
(Enter full name of every plaintiff) ) Civil No.
)
Plaintiff(s), )
)
v. )
)
DICK HAWKS, TAMI DOHRMAN, MARTHA ) COMPLAINT
MCDANIEL, OREGON DEPARTMENT OF )
CORRECTIONS, GENERAL SERVICE, ET, AL.)
_____ )
(Enter full name of every defendant.) )
)
Defendant(s). )

I.

A.  Have you brought any other action or appeal in a court of the United States while a prisoner?

Yes _____                     No ⊠

B.  If your answer to A is yes, how many? _N/A_. Describe the lawsuit in the space below. (If there is more than one lawsuit, describe the additional lawsuits on another piece of paper, using the same outline.)

1.  Parties to this previous lawsuit:

Plaintiff(s): _____ N/A _____

Defendant(s): _____ N/A _____

_____

1 -COMPLAINT

Form 39.01

2. Court: _____ N/A _____

3. Docket Number: _____ N/A _____

4. Name of judge to whom case was assigned: _____ N/A _____

5. Disposition (Was the case dismissed? Was it appealed? Is it still pending?)

    _____ N/A _____

6. Approximate date of filing: _____ N/A _____

7. Approximate date of disposition: _____ N/A _____

II.

A.   Place of confinement: ~~State Stern Correctional Institution~~ Oregon State Penitentiary

B.   Is there a prisoner grievance procedure in this institution?

         Yes  X             No _____

C.   Have you filed a grievance concerning the facts relating to this complaint?

         Yes  X             No _____

         If your answer is no, explain why not: _____ .

         _____

D.   Is the grievance process completed?

         Yes  X             No _____

III.

PARTIES

(In item A below, place your name in the first blank and place your present address in the second blank. Do the same for additional plaintiffs, if any.)

A.   Name of plaintiff: LESTER SHINAULT
     Prisoner Identification No.: 8041974
     Address: ~~717 Stanton Blvd~~ 2605 State Street
     ~~Ontario Oregon 97914~~ Salem OR 97301

(In item B below, place the full name of the defendant in the first blank, his/her official position in the second blank, and his/her place of employment in the third blank. Use item C for the

2 -COMPLAINT

names, positions, and places of employment of any additional defendants.)

B.  Defendant ___DICK HAWKS___ is employed as ___CENTRAL TRUST manager___
at ___OREGON DEPARTMENT OF CORRECTIONS "CENTRAL TRUST"___

C.  Defendant ___TAMI DOHRMAN___ is employed as ___Assistant director for___
at ___GENERAL SERVICES DIVISION, at OREGON DEPARTMENT of corrections___

Defendant ___MARTHA McDANIEL___ is employed as ___D.O.C  Budget___
___Manager, at OREGON DEPARTMENT OF CORRECTIONS___

Defendant _____ is employed as _____
at _____

Defendant _____ is employed as _____
at _____

Additional defendants: _____

_____

_____

## IV.

## STATEMENT OF CLAIM

## Claim I

The following civil right has been violated:

___DEFENDANTS VIOLATED PLAINTIFFS SIXTH, EIGHTH AND___
___FOURTEENTH AMENDMENT RIGHTS, assistance of counsel, Cruel and unusual___
___punishment, due process clause .___

Supporting Facts: (State here as briefly as possible the facts of your case. Describe how each defendant is involved. Include, also, the names of any other persons involved, dates, and places. Do not give any legal arguments or cite any cases or statutes.)

___O.D.O.C  took ($) 352.39 (01.____) from my trust account to pay for___
___"Cost of CARE" and Various other court FINES And child___
___SUPPORT, DICK HAWKS, TAMI DOHRMAN, MARTHA McDANIEL and THE___
___DEPARMENT OF CORRECTIONS violated my right to assistance of___
___counsel when they did not allow me to have an attorney present___
___at the administrative HEARING in regards to the money being taken. 10/23/20___
___Also they violated my right to be free from Cruel and___
___unusual punishment and my right to Due process when they___
___did not allow me to be present at the administrative action___
___on 10/23/2010. ALL DEFENDANTS were And still ARE directly involved___
___with the management of my trust account they are the people___
___with the authority and ability to except and disperse money___
___money to and from my account. They were present at___

3 -COMPLAINT

the hearings and are the people who took the money,
they know I am incometent and they took advantage
of me.

Claim II

The following civil right has been violated:

N/A

Supporting Facts: (State here as briefly as possible the facts of your case. Describe how each defendant is involved. Include, also, the names of any other persons involved, dates, and places. Do not give any legal arguments or cite any cases or statutes.)

N/A

Claim III

The following civil right has been violated:

N/A

Supporting Facts: (State here as briefly as possible the facts of your case. Describe how each defendant is involved. Include, also, the names of any other persons involved, dates, and places. Do not give any legal arguments or cite any cases or statutes.)

N/A

4 -COMPLAINT

(If you have additional claims, describe them on another piece of paper, using the same outline.)

V.

RELIEF

State briefly exactly what you want the court to do for you. Make no legal arguments. Cite no cases or statutes.

I would like to be reimbursed for the $ 61,352.39 taken from my trust account. I would also like $500,000 for the emotional injuries sustained as a result from my deprivation of life liberty or property without due process. $25,000 for the denial of due process for the "Ability to Pay" hearings and $75,000 for emotion distress, mental anguish, frustration, humiliation, mood disorder and commitment pain. AND $50,000 for punitive damages.

Signed this  4  day of    April    , ~~19~~ 2011

(Signature of plaintiff)

I declare under penalty of perjury that the foregoing is true and correct.

DATED this  4  day of    April    , ~~19~~ 2011

(Signature of plaintiff)

5 -COMPLAINT

FILED 11 APR 11 10:24USDC-ORP

BEFORE THE OFFICE OF ADMINISTRATIVE HEARINGS
STATE OF OREGON
for the
OREGON DEPARTMENT OF CORRECTIONS

| | | |
|---|---|---|
| IN THE MATTER OF: | ) | **SECOND AMENDED** |
| | )) | **PROPOSED ORDER** |
| LESTER SHINAULT | ) | |
| | ) OAH Case No.:  901172 | |
| SID:  8041974 | ) Agency Case No.:  COC.VP.8041974 | |
| | ) | |

## HISTORY OF THE CASE

On May 29, 2009, the Oregon Department of Corrections (DOC) issued an Ability to Pay Order, Determination of Charges to Lester Shinault (Shinault).  Shinault requested a hearing on June 4, 2009.

DOC referred the hearing request to the Office of Administrative Hearings (OAH) on June 12, 2009.  The case was assigned to Senior Administrative Law Judge (ALJ) Ken L. Betterton.  The case was scheduled for hearing by telephone on August 10, 2009.

In late July 2009, Shinault retained an attorney to represent him at hearing.  The hearing was postponed at the attorney's request for more time to prepare for hearing.  The hearing was rescheduled for October 23, 2009.  The attorney withdrew as attorney of record in late September 2009.

A hearing was held by telephone on October 23, 2009▮▮▮▮▮▮▮▮▮▮▮▮▮▮DOC was represented by Assistant Attorney General Michael Grant.  Dick Hawks, Central Trust Manager for DOC; and Martha McDaniel, DOC Budget Manager, testified for DOC▮▮▮▮▮▮▮▮

The record closed October 23, 2009, and the matter was taken under advisement.

## ISSUE

Whether Lester Shinault has the ability to pay for the cost of his care while incarcerated with DOC, and if so, in what amount?  (ORS 179.620, ORS 179.640, OAR 291-203-0010(2) and OAR 291-203-0040(1).)

## EVIDENTIARY RULING

Exhibits A through A14, offered by DOC, were admitted into evidence over Shinault's objections as to the relevance of some of the exhibits.  Shinault offered no exhibits.

*In the Matter of Lester Shinault*, OAH Case No. 901172
Page 1 of 8

## FINDINGS OF FACT

(1) Shinault was incarcerated with DOC from May 19, 2005 until February 5, 2007, and from October 23, 2008 until August 14, 2009, as a result of felony convictions. His most recent incarceration resulted from a probation violation for felony convictions for Delivery of a Controlled Substance (methamphetamine) and felony Attempt to Elude a Police Officer from Marion County, Oregon. (Dick Hawks's testimony.)

(2) On April 3, 2009, $107,416.48 was deposited into Shinault's inmate central trust account with DOC. (Dick Hawks's testimony; Ex. A1 at 4.) The funds were Shinault's share of proceeds from civil litigation he pursued against a drug manufacturing company. (Lester Shinault's testimony.) DOC paid $21,717.00 from the account to satisfy a garnishment from Multnomah County, Oregon against Shinault for back child support, leaving a balance of $85,699.48 in his account. (Dick Hawks's testimony; Ex. A1 at 4.)

(3) During the 2003-2005 biennium (July 1, 2003 through June 30, 2005), the average daily cost for the direct care of an inmate for all prisons in the State of Oregon was $64.08. The average daily cost for inmate care was $67.53 during the 2005-2007 biennium (July 1, 2005 through June 30, 2007). The average daily cost for inmate care was $77.78 during the 2007-2009 biennium (July 1, 2007 through June 30, 2009). (Ex. A1 at 7.) The average daily cost for inmate care is $84.46 for the 2009-2011 biennium (July 1, 2009 through June 30, 2011). (Martha McDaniel's testimony.)

(4) DOC issued its Ability to Pay Order, Determination of Charges to Shinault on May 29, 2009. (Ex. A1 at 1.) In that order, DOC calculated Shinault's cost of care to be $65,353.94 [(previous incarceration of 628 days between May 19, 2005 and February 5, 2007 x $67.53/per day = $42,408.84) + (most recent incarceration of 295 days x $77.78/per day = $22,945.10) = $65,353.94]. (*Id.* at 7.)

*1/ook* (5) DOC has adopted a schedule to estimate the funds an inmate will need to cover living expenses for the first three months after release from incarceration. The schedule is applied statewide in Oregon, but is based on estimates of costs for a one bedroom apartment in Salem, Oregon. The costs also include utilities, public transportation, food, supervision fees, treatment fees, and miscellaneous expenses. DOC estimated living expenses for three months for Shinault upon his release to be $4,404. DOC then adjusted that amount upward to $5,000 to allow for variable expenses, such as additional security deposits for housing and for variations of living expenses in other parts of Oregon. (Ex. A7.)

(6) DOC allowed Shinault to keep $30 a month for the last three months of his incarceration for personal expenses for basic hygiene, snacks and personal items. (Dick Hawks's testimony.)

(7) After deducting $5,000 for financial support after release and $90 for three-months of personal expenses while incarcerated, from the $85,699.48, Shinault had $80,609.48 left in his inmate account as of May 29, 2009. (Ex. A1 at 8.)

(8) After the Ability to Pay Order was issued, DOC deducted $4,088.96 from Shinault's inmate account as a result of three garnishments served on his inmate account for restitution and related court costs on his prior criminal cases. (Dick Hawks's testimony.)

(9) In July 2009, DOC released, at Shinault's request, approximately $11,000 to Shinault's attorney then on the case. (Dick Hawks's testimony.)

(10) At the time of Shinault's release from incarceration on August 14, 2009, $61,352.39 remained available in Shinault's inmate account to apply to pay for his cost of care. (Dick Hawks's testimony.)

(11) Upon his release from incarceration in August 2009, Shinault lived in the Salem, Oregon area. He was arrested on October 10, 2009 on parole violations, released from jail on October 19, and re-arrested on October 21. He remained in jail at the time of his hearing on October 23, 2009. (Lester Shinault's testimony.)

(12) Shinault is 42 years old. He developed diabetes in 2004. At the time of his release from incarceration in August 2009, Shinault was taking two medications for diabetes. (Lester Shinault's testimony.) DOC paid for and provided his medications while he was incarcerated. DOC gave claimant a 60-day supply of his medications upon his release from prison on August 14, 2009. (Dick Hawks's testimony.) Shinault was on the Oregon Health Plan in 2007, when he was not incarcerated. His medications were provided during that time through the Oregon Health Plan. (Lester Shinault's testimony.)

(13) On his request for hearing on the Ability to Pay Order, Shinault asserted that he is diabetic and requested that DOC "waive" any costs associated with his incarceration because of future medical costs he might be required to pay. (Ex. A5 at 1.) Other that his assertion about diabetes and the request on his request for hearing, Shinault did not given DOC any specific evidence of any special medical needs before or after his release from incarceration. (Dick Hawks's testimony.)

(14) Shinault claims that DOC will be "murdering" him if he is not given his funds so that he can provide for his medical needs following his release from incarceration. (Lester Shinault's testimony.)

## CONCLUSION OF LAW

Lester Shinault has the ability to pay $61,352.39 for the cost of his care while incarcerated with DOC.

## OPINION

DOC has the burden of proof to establish its allegation. ORS 183.450(2) and (5); *Harris v. SAIF*, 292 Or 683 (1980). DOC must prove its case by a preponderance of the evidence. *Cook v. Employment Division*, 47 Or App 437 (1980). Proof by a preponderance of the evidence

means that the fact finder is persuaded that the facts asserted are more likely true than not true. *Riley Hill General Contractor v. Tandy Corp.*, 303 Or 390 (1989). DOC has met its burden.

DOC has the statutory authority to require a person incarcerated under its jurisdiction to pay for the full cost of care. ORS 179.620. Shinault was incarcerated with the DOC on two separate occasions since May 2005. His most recent incarceration ended August 14, 2009.

The cost-of-care rates for an incarcerated person are determined by DOC and are reasonably related to costs directly related to the care for a person at a state institution. ORS 179.701. DOC calculated the cost of care for Shinault's two periods of incarceration as $65,353.94. DOC miscalculated Shinault's cost of care; however, the error was in his favor. DOC used the average daily rate of care of $67.53 for the 2005-2007 biennium for the period May 19, 2005 through June 30, 2005. The average daily cost of care for that period should have been the average daily rate of $64.08 from the 2003-2005 biennium. However, DOC used an average daily cost of care of $77.78 for the 2007-2009 biennium for the period July 1, 2009 through August 14, 2009. DOC should have used the average daily cost of care of $84.46 for the 2009-2011 for that period. If DOC had used the correct average daily cost figures, Shinault's total cost of care would have been slightly higher than the amount DOC sought in its Ability to Pay Order, Determination of Charges.

After calculating Shinault's cost of care while he was incarcerated, DOC then needed to consider his ability to pay. ORS 179.640(1)(a) governs determining the ability to pay:

> Both the Department of Human Services and the Department of Corrections shall establish rules for determining ability to pay for persons in their respective institutions. The rules adopted by each agency shall require, in addition to other relevant factors, consideration of the personal estate, the person's need for funds for personal support after release, and the availability of third-party benefits, such as, but not limited to, Medicare or private insurance.

Under statutory authority, DOC has adopted administrative rules to govern the process for determining an inmate's ability to pay for his or her cost of care. OAR 291-203-0040 provides, in relevant part:

> (1) An inmate and the personal estate of an inmate, or a decedent's estate, is liable for the full cost of care as established in ORS 179.701. The Department may collect charges in advance for inmates with determinate sentences.
> * * * * *
> (5) When determining an inmate's ability to pay, in addition to other relevant factors, the Department will consider the inmate's personal estate, the inmate's need for funds for personal support after release, and the availability of third-party benefits such as, but not limited to, Medicare or private insurance.

*In the Matter of Lester Shinault*, OAH Case No. 901172
Page 4 of 8

Ex. 1e

DOC must also deduct certain sums from an inmate's assets to allow for the inmate's personal support while incarcerated and for the inmate's post-release living expenses. OAR 291-203-0050(6) provides, in relevant part:

> Deductions: The Department may allow a deduction from the inmate's assets and income for the following:
> \* \* \* \* \*
> (b) Personal Support Following Release: Based on a showing of need, the Department may allow a deduction for the inmate's transitional support following his/her release from an ODOC institution for reasonable expenses to live in the community for three months, including rent utilities, food, public transportation, supervision feeds, and miscellaneous expenses.
> (c) Person Support While in Custody of the Department:
> (A) Based on a showing of need, the Department may allow a deduction for an inmate's miscellaneous expenses while in the custody of the Department that are not provided by the Department and are available for purchase from the institution commissary. These include, but are not limited to, expenses for personal grooming and hygiene items; books, newspapers, or other publications; or snacks or refreshments.
> (B) When a deduction is made by the Department for this purpose, the Department shall establish an allowance to reflect a reasonable monthly spending limit for the inmate for purchase from the institution commissary, consistent with the Department's rule on Trust Accounts (Inmate), OAR 291-158.

Pursuant to OAR 291-203-0050(6)(b), DOC has adopted a schedule of estimated charges for the cost of an inmate's personal support for three months following release from incarceration. DOC calculates such costs based on housing in the Salem area. Although DOC's calculation totaled $4,404, it revised the amount up to $5,000 to allow for variations in costs.

Consistent with OAR 291-203-0050(6)(c), DOC allowed a deduction of $30 per month, for a total of $90, for Shinault for personal support for the three months he was incarcerated between when DOC issued its Ability to Pay Order on May 29, 2009 and his release from custody on August 14, 2009. The monthly amount of $30 is determined pursuant to OAR 291-158-0065(1), which provides:

> An inmate who is indebted to the Department of Corrections for whatever reason shall be permitted to spend on commissary during the calendar month one half of the first $60 (up to $30) of funds that have been received and posted for that inmate during the calendar month. *that if I owe fines*

After allowing for $5,000 for support for three months following release, and $90 for three months of personal support while incarcerated, and after other deductions, $61,352.39 remained in Shinault's inmate account to pay for his cost of care (which is $65,353.94).

*In the Matter of Lester Shinault*, OAH Case No. 901172
Page 5 of 8

Shinault has the ability to pay $61,352.39 for the cost of his care while incarcerated with DOC.

Shinault argues that DOC will be "murdering" him if he is not given the money remaining in his account. He asserts he needs that money to pay for his diabetes medications and related medical costs for the rest of his life.

ORS 179.731[1] allows DOC to waive collection of an inmate's cost of care under certain circumstances. No evidence was presented that ORS 179.731 should apply to Shinault's case.

Shinault presented no evidence to DOC prior to his release as to any specific medical needs or the projected cost of those needs. He presented no evidence at hearing as to those costs. Other than Shinault's request on his request for hearing that DOC "waive" any costs associated with his incarceration, DOC was unaware of any special medical needs he had.

DOC provided and paid for Shinault's diabetes medications while he was incarcerated. DOC also gave him a 60-day supply of his medications upon his release. Shinault was back in jail in October 2009, within 60 days of his release from DOC's custody on August 14, 2009. He was still in jail as of the date of the hearing. As long as Shinault is incarcerated in an institution, his medication and medical costs will be paid for by the institution holding him.

Shinault presented no evidence that he cannot work when he is not incarcerated. If he is employed, his medical costs and medications may be covered by medical insurance through his employment. Shinault has been on the Oregon Health Plan as recently as 2007. That plan remains an option for him if his medication costs are not covered through work or another third-party provider.

Shinault has the ability to pay for the cost of his care while he was incarcerated, and he should do so.

## ORDER

I propose the DOC issue the following order:

Lester Shinault is required to pay $61,352.39 for the cost of his care while incarcerated.

---

[1] ORS 179.731 provides, in relevant part:

If the Department of Human Services or the Department of Corrections determines that collection of the amount payable under ORS 179.610 to 179.770 for the cost of care of a person would be detrimental to the best interests of the person or the agency, the agency may waive the collection of part or all of the amount otherwise payable.

*In the Matter of Lester Shinault*, OAH Case No. 901172
Page 6 of 8

<u>Ken L. Betterton</u>
Senior Administrative Law Judge
Office of Administrative Hearings

ISSUANCE AND MAILING DATE:   December 29, 2009

## EXCEPTIONS

The inmate (or his/her authorized representative, if applicable) may file exceptions to the proposed order and to present argument to the Department. The Department hereby determines that such exceptions and argument shall be in writing. Furthermore, they shall be filed with the Department no later than fourteen (14) days after the proposed order is mailed to or otherwise served upon the parties to the administrative hearing. The written exceptions and argument shall be filed by mailing them to:

> Tami Dohrman, Assistant Director for General Services Division
> Department of Corrections
> 2575 Center Street NE
> Salem, Oregon 97301

## FINAL ORDER

The Assistant Director for General Services Division is designated as the Department's representative with authority to prepare and issue the final orders in cost of care proceedings. This designation may be changed by the Department.

*In the Matter of Lester Shinault,* OAH Case No. 901172
Page 7 of 8

## CERTIFICATE OF MAILING

On December29, 2009, I mailed the foregoing Amended Proposed Order In OAH Case No. 901172.

By: First Class Mail

Lester Shinault, SID 8041974
Marion County Jail
4000 Aumsville Hwy SE
Salem OR 97317

Dick Hawks
Department of Corrections
Central Trust Unit
P.O. Box 14400
Salem OR 97309

Michael Grant
Assistant Attorney General
Department of Justice
1162 Court St NE
Salem OR 97301-4096

Pam Arcari
Administrative Specialist
Hearing Coordinator

*In the Matter of Lester Shinault,* OAH Case No. 901172
Page 8 of 8

The law library provides envelopes to inmates who do not have the funds in their trust account to cover the cost of mailing supplies to make court required filings. If you have an account balance, you will be required to purchase mailing supplies from the canteen. Envelopes are not provided to mail material to your attorney. **IN LIBRARY**

Envelope request forms are to be completely filled out. Incomplete forms will be returned unprocessed.

Prior to requesting an envelope, the material to be mailed, must be completed and ready to be mailed. When the envelope is issued and the material has been inspected, put the material into the envelope, seal the envelope, attach a completed CD-28, and return it the issuing staff. Envelopes issued by the library are to be mailed through the law library, they are not authorized to be in an inmates cell, or be mailed through any other source.

Name: _Lester R SHinault_   SID# _8041974_   Cell: _E.377.B_

| Envelope 1 | To: Portland Divisional Office |

**Approved**

Address: _1000 SW Third Avenue Suite 740_

City/State/Zip: _Portland OR 97204-2902_

Number of pages being sent: _31_   Is this a new case? _____

Case name and case number: _____

Type of document being mailed: _____

| Envelope 2 | To: Dick HAWk Central Trust Manager |

**Denied**

Address: _P.O Box 14400_

City/State/Zip: _Salem, OR 97309_

Number of pages being sent: _31_   Is this a new case? _____

Case name and case number: _____

Type of document being mailed: _____

| Envelope 3 | To: Tami Dohrman Ability.To.Pay Coor. |

**Denied**

Address: _P.O Box 14400_

City/State/Zip: _Salem OR 97309_

Number of pages being sent: _31_   Is this a new case? _____

Case name and case number: _____

Type of document being mailed: _____

Inmate Signature _Lester Shinault_   Date: _4.7.2011_

| Envelopes Approved _1_ Irg Date: _4/7/11_ |
| Envelopes Denied: _2_ Date _4/7/11_   Reason: _#2 + #3_ |
| _not authorized per rule._ |

The law library provides envelopes to inmates who do not have the funds in their trust account to cover the cost of mailing supplies to make court required filings. If you have an account balance, you will be required to purchase mailing supplies from the canteen. Envelopes are not provided to mail material to your attorney. **IN LIBRARY**

Envelope request forms are to be completely filled out. Incomplete forms will be returned unprocessed.

Prior to requesting an envelope, the material to be mailed, must be completed and ready to be mailed. When the envelope is issued and the material has been inspected, put the material into the envelope, seal the envelope, attach a completed CD-28, and return it the issuing staff. Envelopes issued by the library are to be mailed through the law library, they are not authorized to be in an inmates cell, or be mailed through any other source.

Name: Lester Shinault        SID# 8041974  Cell: E 377 B

| Envelope 1 | To: Martha McDaniel Department of Corrections |
| | General Service Division |
| | Address: 2575 Center Street NE |
| | City/State/Zip: Salem, OR 97301 |

Denied

Number of pages being sent: 31    Is this a new case? _____

Case name and case number: _____

Type of document being mailed: _____

| Envelope 2 | To: _____ |
| | Address: _____ |
| | City/State/Zip: _____ |

Number of pages being sent: _____    Is this a new case? _____

Case name and case number: _____

Type of document being mailed: _____

| Envelope 3 | To: _____ |
| | Address: _____ |
| | City/State/Zip: _____ |

Number of pages being sent: _____    Is this a new case? _____

Case name and case number: _____

Type of document being mailed: _____

Inmate Signature: Lester Shinault      Date: 4·7·2011

Envelopes Approved _____  Date: _____

Envelopes Denied: X  Date: 4/7/11    Reason: Not authorized

per rule.

Envelope request 10-03.doc

(OSP 0056)

1          IN THE COURT OF APPEALS

2          OF THE STATE OF OREGON

3

4   LESTER SHINAULT,         )Appellate Case No. A145489
                             )Agency Case No. COC.VP.8041974
5            Petitioner,     )OAH Case No. 901172
                             )
6      v.                    )
                             )
7   OREGON DEPARTMENT OF     )
    CORRECTIONS,             )
8            Respondent.     )
                             )
9

10          <u>TRANSCRIPT OF PROCEEDINGS</u>

11      BE IT REMEMBERED That, pursuant to notice duly given

12   to all parties in interest, the above-entitled cause came

13   on regularly before Ken Betterton, Administrative Law

14   Judge, on the 23rd day of October, 2009.

15

16             <u>APPEARANCES</u>

17      Mr. Lester Shinault, the Petitioner, appeared pro se

18

19      Mr. Michael Grant, Assistant Attorney General,
    appeared on behalf of the State

20

21

22

23          Transcribed by:
              Robin Curl
24          Court Transcriber
            P. O.  Box 5966
25          Salem, OR 97304
            (503)585-7252

Index                                    2

1                          Witness Index

                                                Page
2       DICK HAWKS

3           Direct Examination by Mr. Grant          23
            Cross-Examination by the Petitioner      65
4
        MARTHA McDANIEL
5
            Direct Examination by Mr. Grant          70
6
        DICK HAWKS (recalled)
7
            Direct Examination by Mr. Grant          83
8           Cross-Examination by the Petitioner      84

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Colloquy                 1

1                                   October 23, 2009

2

3    (Whereupon, the following proceedings were had, to-wit:)

4

5                    ALJ:   This is Administrative Law Judge
6    Betterton speaking.   Is Michael Grant on the line?

7                    MR. GRANT:  Yes, I am, Your Honor.

8                    ALJ:   Okay.   Is Lester Shinault on the
9    line?

10                   THE PETITIONER: Yes, he is.

11                   ALJ:  Okay.  That's you, Mr. Shinault?

12                   THE PETITIONER:  Yes, it is.

13                   ALJ:  Okay.  Mr. Grant, is there anybody
14   else on the line on your end?

15                   MR. GRANT:  In the room with me here, Your
16   Honor, I have Dick Hawks and Martha McDaniel, both from
17   the Department of Corrections.

18                   ALJ:  Okay.   And they're going to be
19   witnesses in the hearing?

20                   MR. GRANT: Yes, Your Honor.

21                   ALJ:  Okay.  There's a lot of background
22   noise there.   Is there anybody else on the line who
23   hasn't been named or identified?  Okay.  We'll go ahead
24   and get started.  The proceeding -- the hearing will be
25   recorded.  This is October 23, 2009.  The time is 9:00

Colloquy        2

1   a.m.   This  is  a  telephone  hearing.   Case  No.  901172

2   involving  the  Department  of  Corrections  and  Lester

3   Shinault.  The parties and other individuals are present

4   who   have   identified   themselves.     My   name   is   Ken

5   Betterton.  I'm an administrative law judge employed by

6   the  Oregon  Office  of  Administrative  Hearings.    I'm

7   independent  of  the  Attorney  General's  Office  and  the

8   Department of Corrections.  This matter comes before me

9   on  a  order  issued  by  the  Department  of  Corrections

10  entitled inability to pay order, determination of charges

11  in which the Department is seeking to charge Mr. Shinault

12  $65,353.94  for  his  costs  of  incarceration  when  he  was

13  incarcerated  under  the  jurisdiction  of  the  Corrections

14  Division.  To that, Mr. Shinault has requested a hearing

15  and essentially that's what brings us all together today.

16  I  would  note  that  this  hearing  was  scheduled  back  in

17  August and was postponed at the request of Mr. Shinault

18  on his behalf by an individual who -- an attorney who had

19  just  been  hired  to  represent  him  and  then  subsequent  to

20  that hearing date, the attorney has withdrawn.  So, let's

21  see,  Mr.  Shinault  then,  you're  going  to  be  representing

22  yourself  in  this  hearing?

23          THE PETITIONER: Yes, sir.

24          ALJ:  Okay.  All right.  And I have before

25  me some exhibits that have been sent in by Mr. Grant on

1   behalf of his client, the Department of Corrections,

2   Exhibits A1 through A14.  Mr. Shinault, do you have a

3   copy of those?

4                    THE PETITIONER:  I don't have no copies of

5   nothing.  I'm apparently incarcerated right now at Marion

6   County Jail.  All my paperwork that my lawyer has sent me

7   is at my house right now.  So I'm not fit to have this

8   hearing right now.   I don't have no paperwork, no

9   nothing.  All I've got is what you guys sent me on the

10  date of the hearing.

11                   ALJ:  Okay.  Well, did you receive from

12  Mr. Grant those exhibits back, I guess, before the last

13  hearing was scheduled back in August?

14                   THE PETITIONER:  I haven't got nothing.

15  Everything was supposed to have went to my lawyer instead

16  of coming to me and he hasn't sent me nothing.  My ex-

17  lawyer.

18                   ALJ:  Okay.  You said you're currently in

19  the Marion County Jail?

20                   THE PETITIONER: Yes, sir.

21                   ALJ:  When did you get placed in jail?

22                   THE PETITIONER:  I got placed in jail

23  yesterday.  I've been here -- they let me out to attend

24  this hearing and they re-arrested me yesterday.

25                   ALJ:   Well, re-arrested you yesterday.

Colloquy                4

1    Had you been in jail in the last couple of months?

2                   THE PETITIONER:  Have I been in jail?  I

3    just got released from prison.  I've been in jail for 30

4    days.  I came for a sanction.

5                   ALJ:  Okay.  You got released from the

6    Corrections Division.  When was that?  What date?  Do you

7    remember?

8                   THE PETITIONER:  That was back in -- was

9    it August?

10                  ALJ:  Okay.  And then when did you next --

11   how long were you out before you got arrested the next

12   time?

13                  THE PETITIONER:  Thirty day.

14                  ALJ:  Okay.  So when were you arrested

15   then?

16                  THE PETITIONER: I was arrested in -- was

17   it October 20th?  October 10th I was arrested.

18                  ALJ:  Okay.  That was about two weeks ago

19   tomorrow, Saturday?

20                  THE PETITIONER: Yeah.

21                  ALJ:  Okay.  And then did you get released

22   again then?

23                  THE PETITIONER:  I got released on October

24   20th and then they re-arrested me the 21st.  They released

25   me on a Monday morning and they re-arrested me on the

ER 137

Colloquy                    5

1    21st.

2                    ALJ:  Monday morning would be the 19th.

3                    THE PETITIONER:  Well, then that's when I

4    got released then.

5                    ALJ:   And then you were re-arrested

6    Wednesday morning, on the 21st?

7                    THE PETITIONER: Yes.

8                    ALJ:   And have you been in jail then

9    continuously since the 21st?

10                   THE PETITIONER: Yes.

11                   ALJ:  Okay.

12                   THE PETITIONER: I don't have no place to

13   stay because I don't got no assess to my money and I mean

14   everything's just been going downhill because when I got

15   released from prison, I had a little money and I haven't

16   got me a place to stay and everything and I didn't have

17   no money to pay my rents and stuff like that and I don't

18   got no medication and none of that stuff because I don't

19   have no money.

20                   ALJ:   Okay.   Mr. Grant, what's your

21   position with respect to his contention that he does not

22   have the exhibits that I guess you did mail to his -- at

23   that time his attorney, Mr. Kevin Carolan?

24                   MR. GRANT:  Well, Your Honor, we did give

25   them to his attorney.   Obviously I can't say what his

Colloquy          6

1   attorney did or didn't do and I don't want to speculate

2   there as to what a reasonable lawyer would do under the

3   circumstances when the representations cease.     I'm

4   wondering, Your Honor, if I may have maybe a moment or

5   two -- or maybe a minute or two to talk to my paralegal

6   who is upstairs about any information she has, and I

7   apologize for making the request.    I didn't anticipate

8   this would be an issue.

9              ALJ:  Okay, sure.  Do you want to just put

10  the phone down and take a couple minute break?

11             MR. GRANT:  That would be great.  I'll be

12  back in a moment.

13             ALJ:  Okay.  Thank you.

14             THE   PETITIONER:    I   don't   even   know

15  anything about  a  paralegal.   They're  trying  to  take

16  $65,000 from me.

17             ALJ:  Well, let's see, Mr. Shinault, is

18  there somebody there with you?

19             THE PETITIONER:  Well, I've got an officer

20  with me here, sitting here.

21             ALJ:  Oh, I see.  Okay.

22             THE PETITIONER:  I have to be watched, you

23  know.

24             ALJ:  Okay.  Yeah.  No, that's fine.

25             THE PETITIONER:  Is there going to be by

Colloquy 7

1    any chance that I can ask questions?

2              ALJ:  Yeah, we'll cover all of that in a

3    little bit.  Let's wait until Mr. Grant gets back.  Okay?

4              THE PETITIONER:  Who is Mr. Grant?

5              ALJ:  Mr. Grant is the Assistant Attorney

6    General representing the Department of Corrections in

7    this case.

8              THE PETITIONER:  Oh, okay.

9              ALJ:  He's their lawyer.

10             THE PETITIONER:  Okay.

11             DEPUTY:  Your Honor, would you prefer the

12   phone to be off the speaker?

13             ALJ:  It doesn't matter to me as long as

14   he gets -- he can hear okay and we can hear him and so

15   far it's been all right.  Sometimes speaker phones, my

16   experience has been, don't work real great in these

17   conference call situations, but the one you've got seems

18   to be doing okay at this point.

19             DEPUTY:  Okay.  Very good.

20                  (Pause)

21             MR. GRANT:  Your Honor, Michael Grant

22   here.  I just walked back in the room.

23             ALJ:  Okay.

24             MR. GRANT:  I wanted to look at the file

25   and see what we had.  It looks like, according to the

ER 140

Colloquy          8

1   file materials, we sent a copy of the list and the
2   exhibits to his lawyer on July 30, 2009.  And again, I
3   can't say what he did or didn't do.  My concern with
4   delaying this, Your Honor, is it's been delayed once
5   already and, you know, I think the Department of
6   Corrections would kind of like to have the hearing and be
7   able to move forward here.  At the same time, I think on
8   this issue where he's saying he doesn't have the
9   exhibits, I would defer to Your Honor about how to
10  proceed.

11            ALJ:  Okay.  And I've got a copy of the
12  letter -- I guess it was an original letter you sent to
13  me with the exhibits dated July 30th that shows a cc to
14  Mr. Carolan, and I think at that point it looked like the
15  case was scheduled for a hearing I think on August the
16  17th, my recollection, or August the 10th, one of the two.

17            THE PETITIONER:  It was August the 10th.

18            ALJ:  Was it August the 10th?  Okay.  And
19  then sometime between July 30th and August the 10th, it
20  was rescheduled at the request of Mr. Carolan.  I guess
21  my concern, Mr. Shinault, is this hearing's been
22  continued once already.  It really was the responsibility
23  of your attorney at that time and he represented you
24  actually up until sometime subsequent to all of that.
25  I'm looking for his notice of withdrawal.  He didn't

Colloquy                    9

1   withdraw until about September 25th in this case.  That
2   was his --
3                    THE PETITIONER:  I'm leery --
4                    ALJ:  Let me finish, would you, please.
5   That was his responsibility to, you know, get you any
6   paperwork, the exhibits and so forth.  You're currently
7   in jail.  Do you have any idea when you're going to get
8   released from jail this time?
9                    THE PETITIONER:  Well, I'm only doing a
10  sanction and I'd say no more than a couple of weeks I'll
11  be here.
12                   ALJ:  Okay.
13                   MR. GRANT: Your Honor?
14                   ALJ:  Yes.
15                   MR. GRANT:  Michael Grant here.
16                   ALJ:  Yes.
17                   MR. GRANT:  I don't know what Your Honor's
18  schedule is like this morning.  I can try to make
19  arrangements to get these exhibits delivered over to Mr.
20  Shinault at the -- I assume he's at the Marion County
21  Jail, Mr. Shinault?
22                   THE PETITIONER:  Yes, sir.
23                   MR.  GRANT:  I  could  try  to  make
24  arrangements to get the exhibits delivered over to him
25  and we could try to reconvene in an hour, but I don't

Colloquy          10

1    know how that works for your schedule or whether Mr.

2    Shinault would be available for that.

3              THE PETITIONER:   I should be.   I'm not

4    going nowhere, I'm here.

5              ALJ:  Yeah, I don't think he's going

6    anywhere.  One little difficulty I have.  I had a pre-

7    hearing set at 1:00 p.m. this afternoon with one of your

8    colleagues, Mr. Grant, on another case.  I've been told

9    that that's been bumped up to 11:30 this morning.  So I

10   don't know how long your presentation would take.   I

11   think this is scheduled for a couple of hours.

12             MR. GRANT: Yeah.  It probably would be

13   pushing it there.

14             ALJ:  Well, could you do it at 1:00 --

15   well, 1:00 or 1:30?

16             MR. GRANT:  Yeah, I can do it at that

17   time.  The other thing I was going to suggest, Your

18   Honor, is I could conference in Mr. Carolan's office and

19   see what they have to say about sending Mr. Shinault a

20   copy of the documents.  I don't know if they're available

21   or not.

22             ALJ:  Well, yeah.  And that's probably --

23   I'd prefer not to do that at this point.  If you can --

24   let's see, there's a jailer there I think with Mr.

25   Shinault.  Sir, could you bring Mr. Shinault back at,

Colloquy                11

1    let's say, 1:00?

2                DEPUTY:  Yeah, that would be just fine.

3                ALJ:  Okay.

4                MR.  GRANT:  Your  Honor,  may  I  ask  a

5    question of the gentleman who's there with Mr. Shinault?

6                ALJ:  Go ahead.

7                MR. GRANT:  My name is Michael Grant from

8    the Attorney General's Office.  What's the fastest way

9    that I can get a packet of documents over to Mr. Shinault

10   today?  They would be legal documents.

11               DEPUTY:  If you could have somebody drop

12   them off at the visiting desk, the visiting staff could

13   come back and drop them off or we could go up and pick

14   them up.

15               MR.  GRANT:  All right.  And what is your

16   name, sir?

17               DEPUTY:  My name is Deputy Hayman, H-a-y-

18   m-a-n.

19               MR. GRANT:  All right.  Thank you.

20               ALJ:  Okay.  And the address out there,

21   Deputy Hayman, for them to deliver is what?

22               DEPUTY:  It's 4000 Aumsville Highway.

23               MR.  GRANT:  I know where it's at, Your

24   Honor.

25               ALJ:  Okay.  And your witnesses can come

Colloquy          12

1   back at, let's say, at 1:00 p.m., Mr. Grant?

2                   MR. GRANT: Yes, Your Honor.

3                   ALJ:  Okay.  All right.  Let's do that.

4   We'll reconvene at 1:00 p.m. and one thing you might want

5   to do, Mr. Grant, is I assume you're probably going to

6   get on it right away and get the documents out there, is

7   to maybe double check during the lunch hour or before

8   1:00 to make sure that they got to Mr. Shinault and

9   they're not, you know, being routed around somewhere out

10  there in the jail.  So when 1:00 hits, we'll -- you know,

11  we know that he's got them.  You might want to just

12  double check on that.

13                  MR. GRANT:  I will, Your Honor.  Thank

14  you.

15                  ALJ:  Okay.  Then we'll be in recess until

16  1:00 p.m. this afternoon.  Thank you all.

17                  THE PETITIONER:  Thank you.

18                  ALJ:  Bye.

19                     (Recess taken)

20                  ALJ:  This is Administrative Law Judge

21  Betterton speaking.  Is Michael Grant on the line?

22                  MR. GRANT: I am, Your Honor.

23                  ALJ:  Okay.  And is Lester Shinault on the

24  line?

25                  THE PETITIONER: I am, Your Honor.

Colloquy          13

1        ALJ:  Okay.  I believe we're ready to

2   resume.  This is 1:00 p.m. on October 23rd, 2009.  We

3   commenced this hearing this morning at the scheduled

4   time, 9:00 a.m. and it was continued to 1:00 p.m. this

5   afternoon for Mr. Shinault to get the exhibits from the

6   Department of Corrections.  Did you get those, Mr.

7   Shinault?

8        THE PETITIONER: Yes, I did, Your Honor.

9        ALJ:  Okay.  You've had a chance to review

10  them?

11       THE PETITIONER:  I reviewed them but I'm

12  not very good on my spelling and reading and stuff.

13  That's why I needed a lawyer.

14       ALJ:  Okay.  We're ready to proceed.  I

15  started the pre-hearing explanation and got to the

16  exhibits and that's where we learned that Mr. Shinault

17  apparently did not have them.  Mr. Shinault, I've not

18  received any exhibits for the hearing today from either

19  you or from your prior attorney, so I take it you haven't

20  submitted any exhibits for this hearing; is that right?

21       THE PETITIONER:  That's what I'm saying.

22  I've been here, my attorney is no longer with me no more

23  because I had to release him.  I'm pretty sure that he

24  sent them to my house but I'm not for sure they're there

25  or not.  That's why I'm not ready for --

Colloquy          14

1          ALJ:  Sent what to your house?

2          THE PETITIONER:  He probably sent -- my

3     sister told me that I have some papers there at the house

4     in a big envelope.

5          ALJ:  Okay.  Well, that may well be, but

6     he certainly didn't send any exhibits to me for the

7     hearing today and I haven't received any from you, so

8     we'll just go with what the State has produced as

9     exhibits.  Mr. Shinault, with the original notice of

10    ability to pay order that was sent to you way back that

11    you requested a hearing on, there would have been a

12    document that was entitled a notice of contested case

13    rights and procedures.  Did you review that document?

14         THE PETITIONER:  Okay.  Is that in this

15    exhibit I got right now?

16         ALJ:  It's one of them, but there's a copy

17    there but you had received one previously, I believe,

18    when they originally served this notice on you that they

19    were going to order you to pay $65,000.  It would have

20    been with that material as well.

21         THE PETITIONER:  Okay.  I have one with me

22    right -- a notice of rights to a hearing and ability to

23    pay and order determination of charges.

24         ALJ:  Okay.  That sounds like it's

25    probably about the same thing, yeah.  Yeah, and there's

1  a document right after that, it would be Exhibit A3 in

2  the lower right-hand corner of the documents that you

3  were provided this morning.

4                    THE PETITIONER:  A3.  Okay.  A notice of

5  contest --

6                    ALJ:  Yeah, contested case rights and

7  procedures.

8                    THE PETITIONER:  Okay.  I don't think I

9  have that.

10                    ALJ: It should be there with the exhibits

11  that Mr. Grant provided you this morning.

12                    THE PETITIONER:  Okay.

13                    ALJ:  Do you see in the lower right-hand

14  corner a document that says Exhibit A3?

15                    THE PETITIONER: Yeah.

16                    ALJ:  A total of three pages long?

17                    THE PETITIONER:  I have that.  There's

18  three pages.

19                    ALJ:  Yeah.  Let me just kind of go

20  through a little bit of that with you because that

21  explains, I don't know if you've had a chance this

22  morning to review that carefully.  That talks about how

23  hearings like this are conducted.

24                    THE PETITIONER: Okay.

25                    ALJ:  And essentially what's going to

Colloquy          16

1   happen today is that the State is seeking to recover this

2   money from you and they will put on evidence of their

3   case through witnesses and these documents.  All

4   testimony will be under oath and recorded.  They'll call

5   their witnesses one at a time.  Mr. Grant will ask his

6   witnesses questions, I'll probably have some questions of

7   the Corrections Department's witnesses, and after each

8   one has testified in what's called direct examination,

9   you'll have a chance to cross-examine those witnesses and

10  ask them questions about their testimony.  When the

11  Department finishes presenting its case, then we'll move

12  on to your side of the case and you'll have a chance to

13  present your side to me, explain why you think they

14  should not be granted the relief they're seeking.  It's

15  their burden since they're moving forward against you to

16  recover this money, they're going to have to establish a

17  grounds and basis for recovering that money from you.

18  You'll have a chance to present your side of the case in

19  this matter.  Your testimony will also be under oath and

20  recorded, and Mr. Grant on behalf of the Department will

21  have a chance to cross-examine you or ask you questions

22  about your testimony.  When we're finished with all of

23  the direct and cross-examination, each party will have a

24  chance to present rebuttal evidence, if you have any,

25  which is simply evidence to rebut what's come out in the

Colloquy                    17

1   other side's case if they went after you.  In order of

2   presenting evidence, you can present rebuttal testimony,

3   and then I'll take the matter under advisement and I'll

4   be issuing a written proposed order within about 45 days

5   from when the record closes, which probably will be

6   today.  I have the authority to hold the record open to

7   receive additional evidence or written closing arguments,

8   but I would anticipate that probably we'll close the

9   record today and then you can expect to get a copy of my

10  order which is a proposed order.  In this case the

11  Department will issue the final order after my proposed

12  order is issued and the parties, you and the Department

13  of Corrections, has an opportunity to object to it and

14  file any objections to my proposed order.  After the

15  final order is issued, then any appeal by the party

16  that's unhappy with that order would go to the Oregon

17  Court of Appeals.  Now, let's see.  I have your current

18  mailing address.  Let's make sure we've got that.  I show

19  a mailing address for you of 4882 Lancaster Drive

20  Northeast, Unit 91, Salem, Oregon 97305; is that still

21  accurate?

22              THE PETITIONER:  Yes.

23              ALJ:  Okay.  And do you have any questions

24  about the procedure I've outlined for the hearing today?

25              THE PETITIONER:  No, Your Honor.  Let's

ER 150

Colloquy          18

1    get it on.

2              ALJ:   Okay.   Now, at this stage the

3    parties have a chance to make an opening statement if

4    they wish, which is kind of a preview of what they

5    anticipate their case will consist of.    Opening

6    statements are not evidence in and of themselves because

7    no one is under oath at this stage, but I'll give you a

8    chance to make an opening statement in a little bit, if

9    you wish.   Mr. Grant, do you have an opening statement

10   you want to make?

11             MR. GRANT:   Yes, Your Honor.   Thank you.

12   Michael Grant, I'm an Assistant Attorney General with the

13   Oregon  Department  of  Justice,  and  I  represent  the

14   Department of Corrections in today's proceeding.   Present

15   with me in the room is Dick Hawks and Martha McDaniel

16   from  the  Department  of  Corrections,  and  they'll  both

17   testify today.    Your Honor, this is a cost of care

18   hearing.   Oregon law provides that inmates with financial

19   means  may  be  required  to  reimburse  the  Department  of

20   Corrections for the cost of their incarceration.    Your

21   Honor, Lester Shinault was an inmate at the Department of

22   Corrections  between  May  19th,  2005,  and  February  5th,

23   2007,  and  after  that  he  got  out  and  then  was

24   reincarcerated on October 23rd, 2008, through August 14th,

25   2009.   The Department of Corrections incurred costs to

Colloquy          19

1    incarcerate him during that time.  During his most recent

2    period of incarceration, approximately $107,000 was

3    deposited into his inmate trust account.  After that, the

4    Department of Corrections issued an ability to pay order

5    to Mr. Shinault, and that's Exhibit A1.  This required

6    him to pay $65,353.94 for his cost of care.  Mr. Shinault

7    was also served with the notices that are marked as

8    Exhibit A2 and A3 in the State's exhibits.  Mr. Shinault

9    requested a hearing, and that's marked as Exhibit A5.

10   Thereafter, the case was referred to the Office of

11   Administrative Hearings.  Your Honor, Mr. Shinault has

12   been released from the Department of Corrections on

13   August 14th, 2009 was his release date.  At this time the

14   Department of Corrections is holding the sum of

15   $61,352.39 and Department of Corrections expects the

16   evidence to show that he has the ability to pay this

17   amount for the cost of his incarceration.  Thank you.

18            ALJ:  Okay.  Let me ask you on that then,

19   so actually the amount of money left is less than what

20   you were seeking in your original notice?

21            MR. GRANT:  That is correct, Your Honor,

22   and I expect the evidence on that point to show that the

23   Department of Corrections had actually set aside

24   $65,353.94 to be applied to his cost of care.  After that

25   money was set aside, the Department of Corrections, I

ER 152

Colloquy        20

1    believe   the   evidence   will   show,   received   three

2    garnishments from the Oregon Judicial Department and

3    those garnishments were honored from the $65,000.  So at

4    this point the Department of Corrections is only holding

5    the $61,352.39, and therefore that's all they'll be

6    asking the order be issued for in this case.

7                    ALJ:  Okay.  What about the $5,000 that

8    was going to be set aside for his continued care after

9    release?

10                   MR. GRANT:  I believe the evidence will

11   show that the garnishment was not honored out of those

12   moneys and that that was given to him upon his release.

13                   ALJ: Okay. Anything further, Mr. Grant?

14                   MR. GRANT:  No, Your Honor.  Thank you.

15                   ALJ:  All right.  Mr. Shinault, do you

16   want to make an opening statement?

17                   THE PETITIONER:  First of all, can I make

18   a clarification real quick because I didn't kind of

19   understood what he was just saying.  He's saying that

20   he's holding 61,000 and how come I'm seeing that he's

21   holding 65,000?

22                   ALJ:  Well, that'll be part of the

23   evidence that'll be presented.  Just pay attention and

24   that'll be explained under oath by some witness, I'm

25   assuming.  Do you want to make an opening statement, Mr.

ER 153

Colloquy                    21

1   Shinault?

2                 THE PETITIONER: Well, what I'm here to do

3   is to let them know that this money is for my health

4   because I'm a diabetic and that's where this money came

5   from and I'm going to show that without this money, it's

6   just like you guys -- they'd be committing murder because

7   this is supposed to pay for my medicine, my insurance, my

8   life insurance and stuff like that.  So that's what I'm

9   here to do so I can keep my money so I can survive out

10  here.  And that's it.

11                 ALJ:  Okay.  Thank you.  Mr. Grant, why

12  don't you call your first witness.

13                 MR. GRANT:  Thank you, Your Honor.  Call

14  Dick Hawks.

15                 ALJ:  Okay.  Mr. Hawks, can you hear me

16  okay?

17                 MR. HAWKS:  Yes, I can.

18                 ALJ:  If you'd raise your right hand,

19  please.

20

21                 DICK HAWKS,

22     was thereupon produced as a witness and having been

23  first duly sworn to tell the truth, the whole truth and

24  nothing but the truth, testified as follows:

25

Colloquy          22

1                         ALJ:   Please state your name and spell

2      your first and last names.

3                         THE WITNESS:  Dick Hawks, D-i-c-k, H-a-w-

4      k-s.

5                         ALJ:   And do you work for the Department

6      of Corrections?

7                         THE WITNESS: Yes, I do.

8                         ALJ:  What's your current position there?

9                         THE   WITNESS:   I'm  the  central  trust

10     manager.

11                        ALJ:   Okay.  And what does that mean and

12     what do your job duties entail?

13                        THE   WITNESS:   Central  trust  is  the

14     Department's internal banking system.  Each inmate has

15     their own trust account that money gets deposited to from

16     the outside or from the inside as well, and the inmates

17     are able to use that money to spend in the commissary or

18     to  help  support  dependents  on  the  outside,  various

19     things, very much like a bank account does, and I'm the

20     manager of that unit, and I employ approximately seven

21     employees who receive in and disburse funds.

22                        ALJ:   Okay.  Go ahead, Mr. Grant.

23                        MR. GRANT:   Thank you, Your Honor.

24

25

1                    <u>DIRECT EXAMINATION</u>

2     BY MR. GRANT:

3          Q     Mr. Hawks, has Lester Shinault ever been an

4     inmate at the Department of Corrections?

5          A     Yes, he has.

6          Q     What was the first day of his most recent

7     period of incarceration?

8          A     I show that was October 23rd, 2008.

9          Q     Is he incarcerated with the Department of

10    Corrections at this time?

11         A     No.

12         Q     When was he released?

13         A     August 14th, 2009.

14         Q     And what was his most recent institution that

15    he was housed in?

16         A     The Deer Ridge Correctional Institution.

17         Q     And do you know what charges led to his most

18    recent incarceration?

19         A     Information I have is violating probation for

20    possession of meth, delivery of meth and attempting to

21    elude police.

22         Q     Prior to his most recent period of

23    incarceration, had Mr. Shinault ever been incarcerated

24    with the Department of Corrections before?

25         A     Yes, he has.

Hawks - D          24

1      Q     How many times?

2      A     I believe prior to this there was two previous

3  times.

4      Q     The second most recent period of time, when did

5  that start?

6      A     I show it in May of 2005.

7      Q     May what?

8      A     Let's see.  Let me look at my notes here.  May

9  19th, 2005.

10     Q     And what was his release date from that second

11  most recent period of incarceration?

12     A     February 5th, 2007.

13     Q     Are you familiar with the cost of care order

14  issued by the Department of Corrections to Mr. Shinault?

15     A     Yes.

16     Q     Would you please look at Exhibit A1.

17     A     Okay.

18     Q     Do you recognize that document?

19     A     Yes, I do.

20     Q     What is that document?

21     A     That is the ability to pay order, determination

22  of charges.

23     Q     Did you issue this order on behalf of the

24  Department of Corrections?

25     A     Yes, I did.

Hawks - D                25

1       Q    And in this order did the Department of

2    Corrections make a determination as to whether Mr.

3    Shinault had the ability to pay any money for his cost of

4    care?

5       A    Yes, we did.

6       Q    What was the determination?

7       A    $65,353.94.

8       Q    And did the order require Mr. Shinault to pay

9    this amount of money to the Department of Corrections?

10      A    Yes, it did.

11      Q    Was this order served upon Mr. Shinault?

12      A    Yes, it was.

13      Q    When was it served?

14      A    It was mailed on May 29th, 2009, and received

15   by him in the institution on June 1st, 2009.

16                MR. GRANT: Your Honor, I'll offer Exhibit

17   A1.

18                ALJ:    Mr. Shinault, do you have any

19   objection to A1?

20                THE PETITIONER: To A1? I'm looking at it

21   right here and this is -- it wasn't everything that they

22   gave me.

23                ALJ: Okay. You can ask questions about

24   that. Do you have any objection to this exhibit, A1?

25                THE PETITIONER: No, I don't.

                                    Hawks - D            26

 1                  ALJ:  Okay.  A1 is admitted.  Now, this is

 2    eight pages long; is that right?

 3                  THE PETITIONER:  Your Honor, I don't know

 4    what I'm doing here.  Okay.  I'm in left field here.  I

 5    told you I'm leery and I don't know how to read and write

 6    as well.  I don't know what I'm doing here.

 7                  ALJ:  Well, just, you know, do the best

 8    you can, I guess is all I can tell you at this point.  I

 9    mean, you're representing yourself.  My question to you

10    is, Mr. Hawks, this Exhibit A1, it looks like it's a

11    total of eight pages; is that right?

12                  THE WITNESS: Yes, it is.

13                  ALJ:  Okay.  And this was served on him

14    and he received it, what day did you say, something in

15    June?

16                  THE WITNESS:  I believe it was June 1st,

17    2009.

18                  ALJ:  Okay.  Go ahead.

19                  MR. GRANT: Thank you, Your Honor.

20    BY MR. GRANT:  (Continuing)

21        Q    Mr. Hawks, would you please look at Exhibit A2.

22        A    Okay.

23        Q    Do you recognize this document?

24        A    Yes, I do.

25        Q    What is it?

Hawks - D          27

1      A     It is a notice of right to hearing on ability

2   to pay order, determination of charges.

3      Q     Did you issue this notice?

4      A     Yes, I did.

5      Q     And did you serve this notice on Mr. Shinault?

6      A     Yes, I did.

7      Q     When?

8      A     It was sent with the ability to pay order on

9   May 29th, received by him on June 1st.

10      Q     And how was it served upon him?

11      A     By certified mail.

12           MR. GRANT: Your Honor, I'll offer Exhibit

13   A2.

14           ALJ: Okay. Any objection, Mr. Shinault,

15   to A2?

16           THE PETITIONER: Huh-uh. There is none.

17           ALJ: Okay. A2 is admitted as well.

18           MR. GRANT: Thank you.

19   BY MR. GRANT: (Continuing)

20      Q     Mr. Hawks, please look at Exhibit A3.

21      A     Okay.

22      Q     Do you recognize this document?

23      A     Yes, I do.

24      Q     What is that?

25      A     Notice of contested case rights and procedures.

Hawks - D                    28

1       Q    And did you issue this notice?

2       A    Yes, I did.

3       Q    Did you serve this notice on Mr. Shinault?

4       A    June 25th, 2009.

5       Q    How did you serve it on Mr. Shinault?

6       A    By certified mail.

7               MR. GRANT:  Your Honor, I'll offer Exhibit

8    A3.

9               ALJ:  Any objection to Exhibit A3, Mr.

10   Shinault?

11              THE PETITIONER:  Nuh-uh.

12              ALJ:  Okay.  Admitted.

13   BY MR. GRANT:  (Continuing)

14      Q    Would you please look at Exhibit A4.

15      A    Okay.

16      Q    Do you recognize that document?

17      A    Yes, I do.

18      Q    What is it?

19      A    It is a certified mail receipt and delivery

20   form, and I believe that's an internal form that the Deer

21   Ridge Correctional Institution uses to have inmates sign

22   when they receive certified mail.

23      Q    Do you know what this certified mail form is

24   for?

25      A    Yes, it's for the delivery of the cost of care

Hawks - D          29

1   order, ability to pay order.

2        Q    The one that's marked as Exhibit A1?

3        A    Yes.

4        Q    Is it also for the document marked as Exhibit

5   A2?

6        A    Yes, it is.

7                  THE PETITIONER: No, it's not.

8                  MR. GRANT:  Your Honor, I'll offer Exhibit

9   A4.

10                 ALJ:  Any objection to A4, Mr. Shinault?

11                 THE PETITIONER:  Okay.  I remember signing

12  this for A1 but not for A2 and A3.

13                 ALJ:  I don't think it was for A3, but it

14  was for A1 and A2.

15                 THE PETITIONER:  No, I just signed it for

16  A1.

17                 ALJ:  Okay.  I don't see on here anything

18  about A1 versus A2, Mr. Grant.

19                 MR. GRANT:  Your Honor, the testimony is

20  it was for A1 and A2 and I guess if Mr. Shinault wants to

21  disagree with that, he can question on it or raise it

22  when he's testifying.

23                 ALJ:  Okay.  I'm going to admit Exhibit

24  A4, Mr. Shinault.  I guess you can testify about what

25  your recollection of what you got on that day is.  Go

Hawks - D          30

1    ahead, Mr. Grant.

2                    MR. GRANT:  Thank you, Your Honor.

3    BY MR. GRANT:  (Continuing)

4         Q    Mr. Hawks, would you please look at Exhibit A5.

5    Do you recognize Exhibit A5?

6         A    Yes.

7         Q    And what is it?

8         A    It is a request for contested hearing on

9    ability to pay order issued by Mr. Shinault.

10        Q    And did you receive this from Mr. Shinault?

11        A    Yes.

12        Q    And after you received this hearing request,

13   did the Department of Corrections refer this matter to

14   the Office of Administrative Hearings?

15        A    Yes, we did.

16                    MR. GRANT:  Your Honor, I'll offer Exhibit

17   A5.

18                    ALJ:  Any objection to A5, Mr. Shinault?

19                    THE PETITIONER:  Nuh-uh.  There's none.

20                    ALJ:  Okay.  Admitted.

21   BY MR. GRANT:  (Continuing)

22        Q    Okay.  Mr. Hawks, let's turn back to Exhibit A1

23   now, and please turn to page 4 of A1.  That's marked as

24   section 2, assets.

25        A    All right.

Hawks - D          31

1       Q    Now, section A2 lists -- excuse me, section 2A

2    says money deposited into inmate's central trust account,

3    and it lists $107,416.48.

4       A    That's correct.

5       Q    Were these moneys deposited into Mr. Shinault's

6    account?

7       A    Yes, they were.

8       Q    And when were they deposited?

9       A    On April 3rd, 2009.

10       Q    Now, if we stay on page 4 of Exhibit A1, line

11    E says less garnishment, child support, Multnomah County,

12    $21,717.  What does that mean?

13       A    We received a child support garnishment order

14    for that amount from Multnomah County so we were bound to

15    honor that garnishment.  We paid those moneys out.

16       Q    And so the net total available assets after you

17    deducted the $21,717 was what?

18       A    $85,699.48.

19       Q    Now, earlier when the judge was asking you

20    questions about your duties, you talked about the inmate

21    trust -- central trust being kind of like a bank account

22    for inmates.  Are inmates paid interest on their money in

23    this account?

24       A    Yes, they are.

25       Q    And what rate of interest?

1      A      It varies depending on what the Treasury
2  Department puts out each month.  It's been as high as
3  five percent and currently it's just under one percent.
4      Q      Now, after the Department of Corrections issued
5  the ability to pay order marked as Exhibit A1, did it
6  withhold the sum of $65,353.94 from Mr. Shinault's inmate
7  trust account pending resolution of this case?
8      A      Yes, we did.
9      Q      And after it withheld that amount, did it
10  receive any additional writs of garnishment?
11      A      Yes.
12      Q      And who did it receive them from?
13      A      From the Department of Justice.
14      Q      And what was the combined amount of the
15  garnishment?
16      A      $4,088.96.
17      Q      How many garnishments were there total?
18      A      I believe there were three.
19      Q      Did the Department of Corrections honor these
20  three garnishments?
21      A      Yes, we did.
22      Q      And how did it honor them?
23      A      We paid the money out of what we were holding
24  for his cost of care, out of that $65,000.
25              ALJ: What were the three garnishments for

Hawks - D                    33

1    from the Department of Justice?

2                    THE WITNESS:    Let's see.    Find them.

3    (Pause)    Looks like they were for criminal cases.

4                    ALJ:  Like restitution or something or --

5                    THE WITNESS: I believe so.  Normally when

6    we receive a garnishment order from Department of

7    Justice, unless it's in child support, it's usually has

8    to do with restitution.

9                    ALJ:  Okay.  And that was 4,488.96?

10                    THE WITNESS:  4,088.96.

11                    ALJ:  4,088.96?

12                    THE WITNESS: Yes, sir.

13                    ALJ:  Okay.  Go ahead, Mr. Grant.

14                    MR. GRANT:    Your Honor, may I have 30

15   seconds here?

16                    ALJ:  Sure.

17                    MR. GRANT:  Thank you.

18                         (Pause)

19                    MR. GRANT:  Thank you, Your Honor.

20   BY MR. GRANT:  (Continuing)

21        Q    Mr. Hawks, I want to clarify something.  You

22   said three garnishments were received after the 65,000

23   was withheld from Mr. Shinault's inmate trust account.

24   Was that accurate?

25        A    No.  Actually, it was four garnishments.

Hawks - D          34

1      Q      The total amount of $4,088.96 was accurate

2   though?

3      A      Yes, it is.

4      Q      Now, at the time when the Department of

5   Corrections received those four garnishments totaling

6   $4,088.96, was it holding any other moneys for Mr.

7   Shinault besides the 65,353.94?

8      A      We were holding $5,000 for his release to have

9   for his living expenses.

10      Q      And the Department of Corrections made the

11   decision to not take the garnishment moneys out of that

12   $5,000?

13      A      That's correct.

14      Q      And why was that?

15      A      Because the Department in our rule states that

16   we must consider the needs of the inmate upon release to

17   -- for the first three months after their release to find

18   housing and transportation and pay for utilities, and so

19   our rule allows us to at this time just to set aside

20   $5,000 to cover their first three months of their

21   expenses upon release.

22      Q      Okay.

23              ALJ:   Mr. Hawks, let me ask you.  There

24   also is $90 -- I'm looking at Exhibit A1, page 8, $90 for

25   his expenses.  Was that withheld too or --

ER 167

Hawks - D          35

1          THE WITNESS:  No, Your Honor.  That is

2     money that when an inmate is considered indigent, our

3     rule allows that when they receive money into their

4     account each month, they can keep up to $30 so that they

5     can purchase some items on the commissary and personal

6     hygiene items and so when we go through these cost of

7     care orders, we also make sure that we allow them to at

8     least have $30 each month from that money, if nothing

9     else, so that they can have -- take care of their

10    expenses.

11         ALJ:  Yeah.  Maybe my question wasn't

12    stated clearly.  Was that money then that was set aside

13    for him for his use?

14         THE WITNESS: That was left in his regular

15    spending account.

16         ALJ:  Okay.  I see on this Exhibit A1,

17    page 8, the total amount was the 5,000 plus the $90,

18    which was 5,090.  So that was the money that was set

19    aside for him?

20         THE WITNESS:  Actually, the $90 was not

21    set aside for upon his release, it was left in his

22    spending account and just spent as he wants to the last

23    three months of his incarceration, and the $5,000 was set

24    aside to be used only upon his release.

25         ALJ:  Okay.  But the $90 came out of the

Hawks - D                    36

1   85,699.48, didn't it?

2                THE WITNESS:   Yes.

3                ALJ:   Okay.   So in other words, he used

4   that up to basically the last three months that he was in

5   prison?

6                THE WITNESS:   The $90.

7                ALJ: Yeah, the 90 bucks.   Uh-huh.   Okay.

8   Go ahead, Mr. Grant.

9                MR. GRANT:   Thank you, Your Honor.

10  BY MR. GRANT:   (Continuing)

11       Q.   At this time, Mr. Hawks, how much money is the

12  Department of Corrections presently holding with interest

13  for Mr. Shinault?

14       A    $61,352.39.

15       Q    I should clarify this when I say for Mr.

16  Shinault.  Let me re-ask the question.  How much money is

17  the Department of Corrections holding at this time

18  pending the outcome of this hearing?

19       A    $61,352.39.

20       Q    Would you please turn to Exhibit A6.

21       A    Okay.

22       Q    Do you recognize this document?

23       A    Yes, I do.

24       Q    What is this?

25       A    It is a trust account statement that is issued

Hawks - D                    37

1   monthly to every inmate in the Department.

2        Q    And what was the date on this trust account

3   statement?

4        A    July 20th, 2009.

5        Q    So if a transaction happened after July 20th,

6   2009, would it show up on Exhibit A6?

7        A    No, it would not.

8        Q    As of July 20th, 2009, what was the account

9   balance in Mr. Shinault's account?

10       A    $79,994.95.

11            ALJ:  Just a second, hold up.  Let me see,

12  where are you reading that balance at?

13            THE WITNESS:  If you look under where it

14  says, towards the top it says account balance as of

15  today, 20 July '09.

16            ALJ:  What page are you on?

17            THE WITNESS:  On page A6, page 1.

18            ALJ:  Page 1.  Okay.  Got it.  Go ahead.

19            MR. GRANT: Thank you, Your Honor.

20  BY MR. GRANT:  (Continuing)

21       Q    Now, this $79,994.95, does that reflect the

22  account balance after the $21,717 child support

23  garnishment was taken out of his account?

24       A    Yes, it does.

25       Q    Let's stay on page 1 and look at the bottom of

Hawks - D                38

1    page 1 of Exhibit A6.  There are a couple of numbers that

2    are not in parentheses and a few that are in parentheses.

3    When a number is in parentheses, what does that mean?

4         A    That is a deduction from their account.

5              MR. GRANT:  And, Your Honor, before I go

6    any further, I should offer Exhibit A6 so I don't forget.

7              ALJ:  Okay.  Mr. Shinault, any objection

8    to Exhibit A6?

9              THE PETITIONER: No objection.

10             ALJ:  Okay.  It's admitted.

11   BY MR. GRANT:  (Continuing)

12        Q    Now, Mr. Hawks, turning to page 3 of Exhibit

13   A6, just by way of example, let's look at the entry for

14   March 9, 2009.  That says CRS SAL ORD followed by a pound

15   sign, a number and a DRCI.  What do those entries refer

16   to?

17        A    Those   are   canteen   or   commissary   sales,

18   purchases that inmate Shinault made.

19        Q    Now, would you please turn to page 5 of Exhibit

20   A6.  On the entry of July 1ˢᵗ, 2009, there is -- it says

21   Kevin Carolan, P.C., and then in parentheses $2,000.

22   What does that refer to?

23        A    That is a -- Mr. Shinault asked to have $2,000

24   removed from his account and sent to Mr. Carolan, who was

25   his attorney.

1    Q    What was the total amount of money that Mr.

2    Shinault transferred to Mr. Carolan before he left the

3    prison on August 14th, 2009?

4    A    $11,035.

5    Q    On Exhibit A6, let's stay on page 5.  On July

6    9th, 2009, it says awards 6-2009 DRCI.  And then it says

7    51.30.  What does that refer to?

8    A    The awards are what they call performance and

9    recognition awards.  It's a system the Department has for

10   inmates who successfully program each month, do other

11   education or work assignments.  They're given points and

12   those points are converted to cash and that would be his

13   award for that month.

14   Q    And did Mr. Shinault receive monthly awards

15   between March and July 2009?

16   A    I believe he did.

17   Q    And what was the approximate amount of each

18   monthly award?

19   A    Approximately $50.

20   Q    Now, when the Department of Corrections was

21   determining the amount of Mr. Shinault's assets and

22   income to determine whether he had the ability to pay for

23   his cost of incarceration, did it include these monthly

24   awards?

25   A    No, it did not.

Hawks - D                40

1    Q    So if we turn back to Exhibit A1, page 4, these

2  awards are not included in the assets shown on section 2?

3    A    That's correct.

4    Q    And if we turn to page 5 of Exhibit A1, were

5  they included in the income shown in section 3?

6    A    No, they were not.

7    Q    Why didn't the Department of Corrections

8  consider these awards?

9    A    The awards are not considered income and they

10  are used for the inmates there again for successfully

11  programming so they can buy commissary items and such.

12    Q    Staying with Exhibit A1, can you please turn to

13  page 6.  And looking at page 6, which is section 4, can

14  you look at section 4B.

15    A    Okay.

16    Q    And the judge asked you about this a moment

17  ago.  This monthly personal expense allowance while

18  incarcerated would be $30.

19    A    Yes.

20    Q    And you mentioned something about this expense

21  being either based upon or correlating to an

22  administrative rule?

23    A    Yes, I did.

24    Q    And is this administrative rule OAR 291-125-

25  0065(1)?

Hawks - D          41

1     A    Yes.

2     Q    And this is the rule you refer to when you said

3     that it allows an inmate who owes money to the Department

4     of Corrections to spend $30 a month for canteen or

5     commissary purchases?

6     A    That's correct.

7     Q    When Mr. Shinault was incarcerated with the

8     Department of Corrections, did Corrections provide for

9     his food and drink and basic living needs?

10    A    Yes, we did.

11         ALJ:  Hold up for a second.  The rule you

12    cited, 291, what was the rest of that?

13         MR. GRANT:  158-0065(1).

14         ALJ:  Okay.  Go ahead.

15    BY MR. GRANT:  (Continuing)

16    Q    While the -- okay.  So when Mr. Shinault was

17    incarcerated, you said the Department of Corrections

18    provided for his food and drink and basic needs?

19    A    Yes.

20    Q    What can an inmate purchase from commissary?

21    A    Depending on their incentive -- what they call

22    their incentive level, they can -- inmates can purchase

23    basic hygiene needs, they can purchase snacks such as

24    chips and candy bars and some food items that they can

25    prepare in their cells, they could purchase radios and

Hawks - D          42

1    televisions if their incentive level is high enough, and

2    shoes.

3         Q    Could you please look at section 4D of Exhibit

4    A1, still on page 6 of A1.

5         A    Okay.

6         Q    And this says the funds needed for personal

7    support after release, $5,000.

8         A    Yes.

9         Q    And is this the $5,000 that you testified

10   earlier that was set aside for Mr. Shinault?

11        A    Yes, that is correct.

12        Q    Let's have you turn to Exhibit A7.  Do you

13   recognize A7?

14        A    Yes, I do.

15        Q    What is it?

16        A    It is a cost of living after release chart that

17   was put together by our transitional services unit and it

18   describes what the average living expenses would be for

19   a person after they're released from prison, what they

20   would need to get by on the first month, two months or

21   three months.

22        Q    And Exhibit A7 says the three-month cost is

23   what?

24        A    Full cost is $4,404.

25        Q    So if the total cost is $4,404, why does the

Hawks - D          43

1    Department allow the inmate a $5,000 figure in section 4D
2    of its ability to pay order?
3        A    Well, because inmates will release in various
4    parts of the state and these are just estimates.  The
5    cost of living may be higher in some areas of the state
6    and also we decided that if they rounded the figure up to
7    $5,000, it would help ensure that they had enough money
8    once they're released to meet their basic needs for the
9    first few months.
10       Q    When  the  Department  of  Corrections  was
11   calculating the Exhibit A7 --
12                THE PETITIONER:  Can I object anytime?
13                ALJ:  Well, yeah, if you have -- what's
14   your objection?
15                THE PETITIONER:  My objection is when he
16   says that this is a -- this is not true.  This is -- I'm
17   trying to think of the word he said.  He said that this
18   is an estimate.
19                ALJ:  Okay.  So what's your objection to
20   that?
21                THE PETITIONER:  My objection is if this
22   is an estimate, then the estimate is usually not true.
23                ALJ:  Well, that's something you can
24   cross-examine and ask him questions about.  I don't
25   believe that's a basis for objecting to his testimony.

Hawks - D                    44

1   He can testify about it being an estimate and that's

2   exactly what it is, an estimate.  He has the capability

3   of giving his opinion as to estimates, so go ahead.

4                    MR. GRANT:  Thank you, Your Honor.

5   BY MR. GRANT:  (Continuing)

6        Q    When   the   Department   of   Corrections   was

7   calculating the cost of living allowance in Exhibit A7,

8   did it base this on any administrative rule?

9        A    Yes.

10       Q    And what administrative rule did it base it on?

11       A    The administrative rule was our cost of care

12  rule, OAR 291-203-0050(6)(b).

13                   MR. GRANT:  Your Honor, may I read this

14  for the record?

15                   ALJ:  Okay.  Go ahead.

16                   MR. GRANT:  Personal support following

17  release.  Based on a showing of need, the Department may

18  allow a deduction for the inmate's transitional support

19  following  his/her  release  from  a  Department  of

20  Corrections institution for reasonable expenses to live

21  in  the  community  for  three  months,  including  rent,

22  utilities, food, public transportation, supervision fees

23  and miscellaneous expenses.

24  BY MR. GRANT:  (Continuing)

25       Q    Okay.  Mr. Hawks, how much did the Department

Hawks - D          45

1    of  Corrections  give  to  Lester  Shinault  when  he  was

2    released on August 14th, 2009?

3        A     Five thousand dollars.

4        Q     Was there any interest on that at the time or

5    was it a flat 5,000?

6        A     No,  there  was  some  interest.    It  came  to

7    $5,006.

8                  MR. GRANT:  Your Honor, I'll offer Exhibit

9    A7.

10                 ALJ:  Okay.

11                 THE PETITIONER:  Objection.

12                 ALJ:  What's your objection?

13                 THE  PETITIONER:    My  objection  is  it's

14   $5,002.

15                 ALJ:  Well, okay.  Mr. Hawks, could it

16   have been -- was it $5,002 or was it $5,006?

17                 THE WITNESS:  Let me look for a moment

18   here to see if I can find out.  (Pause)

19                 THE  PETITIONER:    I  went  to  Bank  of

20   America.

21                 ALJ:  Just hold on.

22                 THE PETITIONER:  They still have a copy of

23   the check, I believe.

24                 THE WITNESS:  Okay.  I show that a -- it

25   looks like there was $5,006 that was released to him.

Hawks - D          46

1          ALJ:  Was that in a check form or what?

2          THE  WITNESS:   It  looks  like  he  had

3  requested some of the money on the Oregon Trail Card and

4  the rest was in a check.  I believe it looks like $459.63

5  or maybe -- approximately $459 was put on his debit card,

6  the trail card, and so the remainder minus that would

7  have gone into a check to him.

8          ALJ:  Okay.  Well, I'm going to overrule

9  your objection on that.  I don't think it's --

10         THE PETITIONER:  Your Honor --

11         ALJ:  Mr. Shinault, no, just hold on for

12  a second.  I don't think it's significant in the overall

13  scheme of things whether it was 506 or 502.

14         THE PETITIONER:  No.

15         ALJ:  You can testify about what it was

16  and if that becomes important, I'll weigh both sides'

17  testimony on that particular point.

18         THE PETITIONER:  Your Honor, I never been

19  to a hearing like this here, for the record.  I want to

20  put this for the record.

21         ALJ:  Okay.

22         THE PETITIONER:  And I'm not -- I never

23  been to a hearing like this here and I think it

24  jeopardize $65,000 and I'm incarcerated and I don't feel

25  comfortable doing this, you know.  I could lose my money

Hawks - D          47

1    and I don't even know what I'm doing here.

2                    ALJ:  Well, okay.  I understand that, Mr.

3    Shinault.  You could have hired an attorney to represent

4    you at this hearing.

5                    THE PETITIONER:  Yeah, but I did hire one

6    and this is -- this is the outcome of it right now.

7                    ALJ:  And apparently -- well, I don't have

8    any control over that.  Apparently he withdrew.  You

9    could have hired another attorney.

10                   THE PETITIONER:  He withdrew in September

11   September, Your Honor.

12                   ALJ:  And you've had --

13                   THE PETITIONER:  That wouldn't give me

14   enough time to find an attorney.  Attorneys you have to

15   pay money.  I don't have money.  They have my money in

16   hostage.

17                   ALJ:  Okay.  Well, I understand all that,

18   Mr. Shinault, but you don't have any authority -- I have

19   no authority to appoint an attorney to represent you on

20   this matter.  If you had wanted more time to hire another

21   attorney --

22                   THE PETITIONER:  I do want more time to

23   hire an attorney because I can see now I'm going to need

24   an attorney to --

25                   ALJ:  Well, you could have made that

ER 180

Hawks - D            48

1    request long before right now, at the time set for the

2    hearing.

3                    THE PETITIONER:  I've been incarcerated,

4    Your Honor.

5                    ALJ:    You've been incarcerated since

6    October the 10th.  You had time before that you could

7    have hired another attorney.  Okay.  Go ahead, Mr. Grant.

8                    MR. GRANT:  Thank you, Your Honor.

9    BY MR. GRANT:   (Continuing)

10        Q    Mr. Hawks, I'm going to stick with Exhibit A7

11   for  a  moment.    These  estimates  --  how  did  the

12   transitional team come up with these estimates in Exhibit

13   A7?

14        A    They  did  some  searching  through  the  housing

15   market on costs for one bedroom apartments throughout the

16   Salem area.  They contacted the utility companies to find

17   out  what  the  monthly  rates  on  average  would  be  in  the

18   Salem area.  They looked at some different documentation

19   available to them for food and things like that, what it

20   would cost for a person to basically, you know, live for

21   a period of time.

22                    THE PETITIONER:  I have an objection.

23                    ALJ:    What's  your  objection  to  his

24   testimony?

25                    THE PETITIONER:  The objection is do they

Hawks - D          49

1    notify all of this with Mr. Shinault?  Do they give all

2    this to Mr. Shinault upon his release?

3                    ALJ:  Give you all of what?

4                    THE PETITIONER:  All this stuff that he's

5    saying that he got from Salem, he done contact Salem's

6    housing and stuff like that.  Did Mr. Shinault -- did

7    they notify Mr. Shinault up on all this?

8                    ALJ:  Well, you're Mr. Shinault.  Do you

9    mean do they notify you?

10                   THE PETITIONER:  Yeah.

11                   THE WITNESS:  No.  We didn't send --

12                   THE PETITIONER:  Thank you.  That's it.

13                   THE WITNESS:  -- that information to him.

14                   ALJ:  Okay.  You've answered his question.

15   Okay.  Go ahead with your next question, Mr. Grant.

16                   MR. GRANT: Your Honor, I apologize, I got

17   myself a little bit off here.  Did I offer Exhibit A7?

18                   ALJ: Yes.  That's been admitted.

19                   MR. GRANT:  Thank you, Your Honor.  I

20   apologize for that.

21   BY MR. GRANT:  (Continuing)

22      Q    Okay.  Let's turn back to Exhibit A1, Mr.

23   Hawks.

24                   ALJ:  Let me ask a few questions here, Mr.

25   Hawks.  On these estimates, do you always use the Salem

Hawks - D                    50

1    area or do you try to tailor it toward where the inmate

2    tells you they're going to go when they get released?

3                THE WITNESS:   These estimates were based

4    on Salem, Your Honor.  We have had some previous cost of

5    care hearings since these estimates came out where some

6    inmates were releasing and -- were going to be releasing

7    in Portland, and so they've also done some research into

8    the Portland area and they did find some very similar

9    estimates for the Portland area as well.

10               ALJ:  Okay.  But when you sit down to do

11   one of these estimates for an inmate like Mr. Shinault,

12   do you look at where they are going to be released?  I

13   see he was apparently -- he's living in Salem now, so I

14   guess he went to Salem as soon as he got released.

15               THE WITNESS:   Our transitional services

16   unit that puts these estimates together, they don't

17   tailor them per inmate.  It's just an overall estimate

18   for inmates in general.

19               ALJ:  Okay.  And you found that the

20   estimates for Portland were about the same as Salem?

21               THE WITNESS:  They were very similar, Your

22   Honor.

23               ALJ:  Okay.  Go ahead, Mr. Grant.

24               THE PETITIONER:  Objection.

25               ALJ:  What are you objecting to?

Hawks - D          51

1                    THE PETITIONER:  Never mind.  Go ahead.

2                    ALJ:  Okay.  Go ahead, Mr. Grant.

3                    MR. GRANT:  Thank you, Your Honor.

4     BY MR. GRANT:  (Continuing)

5          Q    Mr. Hawks, let's turn to Exhibit A1, page 7.

6          A    All right.

7          Q    Now, this is section 5 of the cost of care

8     order.

9          A    Correct.

10         Q    Can you explain to the judge how you came up

11    with the full cost of care of $65,353.94.

12         A    Sure.  We started out by using the average cost

13    of daily are for inmates that the Department has been

14    granted legislative authority for.  For his most recent

15    incarceration that was $77.78 a day.  And then we also

16    used for his previous incarceration the figures for that

17    biennium which was $67.53 per day.  We multiplied those

18    by 295 days for the 77.78 and 628 days for the 67.53

19    figure and came up with the estimate full cost of care of

20    65,353.94.

21         Q    All right.  Let me ask you this.  Can you tell

22    the judge what the calculations were, the subtotals if

23    you will, for the 2007 through 2009 biennium.

24         A    2007 to 2009 was $42,408.84.  Is that the one

25    you're looking -- no, you're looking at the previous one.

Hawks - D          52

1   For the most recent one, for the 295 days, it was

2   $22,945.10.

3        Q    All right.

4                  ALJ:  Hold it, hold it.  You got that by

5   multiplying the 295 times the 77.78?

6                  THE WITNESS:  Yes.

7                  THE PETITIONER:  Objection.

8                  ALJ:  What's your objection?

9                  THE PETITIONER:  My objection is that, is

10  that from 2005 to 2007?

11                 ALJ:  No, that was from 2008 to 2009, I

12  believe.

13                 THE PETITIONER:  2008 to 2009 was 295

14  days?

15                 ALJ: Yes.

16                 THE PETITIONER:  Okay.  And how much that

17  was?

18                 ALJ:  That breakdown was I believe -- why

19  don't you go ahead and tell him again, Mr. Hawks.

20                 THE WITNESS:  77.78 a day times 295 days

21  is $22,945.10.

22                 THE PETITIONER:  Okay.  From the 2005 to

23  2007; is that 295 days from 628 days, is that separate?

24                 ALJ:  Those are separate, yes, I believe.

25                 THE PETITIONER:  Oh, okay.

Hawks - D          53

1            ALJ:  Okay.  Go ahead, Mr. Grant.

2    BY MR. GRANT:  (Continuing)

3        Q    All right.  And then looking at the other

4    calculation, the 67.53 times 628 days, what was the

5    subtotal on that?

6        A    $42,408.84.

7        Q    And so when you add that to the $22,945.10, you

8    came up with the $65,353.94?

9        A    That's correct.

10            THE PETITIONER:  Objection.

11            ALJ:  What's your objection?

12            THE PETITIONER:  Excuse me?

13            ALJ:  What's your objection?

14            THE PETITIONER:  Okay.  How would you use

15    2005 to 2007, how would you use that incarceration in

16    this ordeal?  I mean, when the money wasn't even thought

17    of until 2008 and 2009.

18            ALJ:  Okay.  Mr. Hawks, that is kind of an

19    interesting question, because he apparently didn't come

20    by the money until after that first incarceration, so how

21    is it legally that you can, I guess, reach back and

22    charge him for that prior incarceration?

23            THE WITNESS:  One moment, Your Honor.

24            ALJ:  Or that may be a better question for

25    you, Mr. Grant.

ER 186

Hawks - D          54

1                    MR. GRANT:  I'm happy to address it, Your

2      Honor, and Mr. Hawks can, I guess, tell me if I'm getting

3      it correctly.  I want to pull up the actual authority for

4      that before I answer, if that's okay.

5                    ALJ:  Okay.

6                         (Pause)

7                    THE PETITIONER:  I believe, Your Honor --

8                    ALJ:  Hold up, Mr. Shinault.  He's looking

9      up for the answer, so just hold up.

10                   THE PETITIONER:  Okay.

11                        (Pause)

12                   MR. GRANT:  Your Honor, I think the answer

13     is found in ORS 179.640 which says -- in .640(5), which

14     says at any time during the person's stay at the state

15     institution or within 36 months from the date the person

16     is  released,  if  the  agency  receives  new  financial

17     information that shows a change in the person's financial

18     circumstances, the agency shall consider the change of

19     circumstances and issue a new ability to pay order.

20                   ALJ:  Did the Department issue an ability

21     to  pay  order  then  back  in,  I  guess,  after  the  first

22     incarceration?

23                   THE PETITIONER:  Is that to me?

24                   ALJ:   No,  I'm  asking  Mr.  Grant  or  Mr.

25     Hawks.

1          MR. GRANT:  I think we can ask Mr. Hawks.

2     I think the answer is no.  Mr. Hawks, do you -- you're

3     the witness.

4          THE WITNESS:  No, we don't issue ability

5     to pay orders to all inmates.  They're issued if it's

6     discovered that they have assets and in the previous

7     incarceration he did not have assets at that time.

8          ALJ:  Okay.  I guess, Mr. Grant, I'm just

9     kind of curious, it says a new ability to pay order which

10    would indicate there would I guess need to be a previous

11    one.

12         MR. GRANT: Your Honor, our position would

13    be that a new order -- any time you issue an order, it's

14    a new one, whether there was a previous one or not.  This

15    provides basically within 36 months after the inmate is

16    released, if the inmate comes into money, the inmate can

17    be required to pay it back.  All inmates are liable for

18    their full cost of care.  However, they are only made to

19    pay that which they have the ability to pay, but the

20    Legislature here has allowed basically a 36-month look-

21    back, if you will, for holding them liable for the cost

22    of their care.

23         ALJ:  Okay.  So, Mr. Hawks, just out of

24    curiosity, do you folks kind of monitor inmates for 36

25    months to see who maybe has hit the lottery or inherited

Hawks - D          56

1      money or anything like that?

2                     THE WITNESS:    If  it  comes  to  our

3      attention, then we're bound to investigate and research

4      that.

5                     ALJ:   Okay.

6                     THE PETITIONER:   I have a question.

7                     ALJ:   Well, you'll have to hold up your

8      question, Mr. Shinault, until we come to cross-

9      examination and then you can cross-examine him.

10                    THE PETITIONER:   Okay.

11                    ALJ:   Okay.  Go ahead, Mr. Grant.

12                    MR. GRANT:   Thank you, Your Honor.

13     BY MR. GRANT:   (Continuing)

14        Q    Now, Your Honor, I'll note for the record that

15     Martha McDaniel is here to testify about the daily cost

16     of care figures.   Mr. Hawks, I'll ask you, is Ms.

17     McDaniel the better person to testify about these

18     figures?

19        A    Oh, yes, she is.

20        Q    How many days was Mr. Shinault incarcerated on

21     his most recent charges?

22        A    (inaudible)

23        Q    And the second to the most recent incarceration

24     was how many days?

25        A    628 days.

Hawks - D                    57

1    Q    And, Mr. Hawks, looking at Exhibit A1, on page

2    7, is there anything that we need to -- that you would

3    like to correct calculations on that page?

4    A    Only that where we list he's liable for

5    $65,353.94, at this time the assets that we're aware of

6    that he has is $61,352.39, so therefore that is all that

7    we are going to charge him for at this time.

8              ALJ:  Let me just do some quick math.

9    (Pause)  I'm a little curious, Mr. Hawks, if you just

10   subtract $5,000 from that $65,000 figure, you don't come

11   up with 61,352, so to me in just doing kind of quick math

12   in my head, the numbers aren't kind of adding up quite

13   right.

14             THE WITNESS: Well, Your Honor, $85,699.48

15   in his account at one time, and then of course we

16   subtracted the $5,090 which left him $80,609.48, and the

17   rest was either spent by him or was garnished against his

18   account, which left him with the $65,000 figure that we

19   originally charged him with.

20             ALJ:  Okay.  So how do we get from 65,353

21   down to 61,352.39 then?

22             THE WITNESS:  That had to do with the

23   garnishments from Department of Justice.

24             ALJ:  Okay.  Anything else in that number

25   or just the -- I guess if we subtracted the -- what was

1   that -- four thousand and something?

2               THE WITNESS:  Well, his account has also

3   been earning interest, Your Honor, while this money has

4   been holding in it.

5               ALJ:  Okay.

6               THE WITNESS:  So it's been earning -- it

7   earned $87.41 interest at this point.

8               ALJ:  Okay.  Go ahead, Mr. Grant.

9               MR. GRANT:  Thank you, Your Honor.

10  BY MR. GRANT:  (Continuing)

11      Q    Mr. Hawks, could you please look at Exhibit A1,

12  page 8.

13      A    Okay.

14      Q    Now, you were discussing with the judge the --

15  how you came up with the cost of care of 65,000

16  originally.  Does this page 8 show the calculations that

17  you went through to get to that $65,000 figure?

18      A    Yes, it does.

19      Q    On section 6A still on page 8, the total assets

20  are the 85,699.48?

21      A    That's correct.

22      Q    Are those the total assets after the $21,717

23  child support garnishment was taken out of his account?

24      A    I believe it was, yes.

25      Q    After that you took the 85,699 and deducted the

Hawks - D                59

1  5,090?

2      A     Correct.

3      Q     And from that he had a net of 80,609.48 that he

4  could spend on whatever he wanted, minus your 65?

5      A     Yes.

6                THE PETITIONER:  I've got an objection.

7                ALJ:  Well, you'll have to hold up for a

8  second, Mr. Shinault.  Let's see, and now this number was

9  the 80,609.48 would have been calculated as of -- do you

10  have the date when that would have been -- number would

11  have been generated?

12                THE WITNESS:  Let's see here.  That was

13  from May 29th, 2009.

14                ALJ:  Okay.  And so since then, there were

15  a number of things, including, I guess, $11,000 that went

16  out to an attorney.

17                THE WITNESS:  Yes, that's correct.

18                ALJ:  Because, you know, there's roughly

19  about $15,000 difference between the 80,000 and the 65.

20                THE WITNESS:  And he had some other items

21  that he spent some money on as well.

22                ALJ:  Right.  Okay.  Go ahead, Mr. Grant.

23                MR. GRANT:  Thank you, Your Honor.

24  BY MR. GRANT:  (Continuing)

25      Q     Mr. Hawks, after Lester Shinault received

Hawks - D        60

1    $107,000, you testified that he transferred just over

2    11,000 to an attorney.  Did he attempt to transfer any

3    other money to any other people?

4         A    Yes, he did.

5         Q    And would you describe these attempts.

6         A    He tried to send -- well, he wanted to send

7    $4,500 to an Aaron Koenig, $2,000 to a Demery Childress

8    and $1,000 to a Tammy Lee Jettson.  But according to our

9    rules, these folks were not his dependents or relatives

10   of his and we had no verifiable reason for him to send

11   those moneys out to so they were denied and he

12   subsequently asked for two of those to come back to him.

13   He did not want to -- he changed his mind on wanting to

14   send the money out on the $4,500 one and the $2,000

15   requests.

16        Q    Now, Mr. Hawks, are you familiar with a

17   database maintained by the Department of Corrections

18   called the offender information system report?

19        A    Yes.

20        Q    And are there any entries for Mr. Shinault on

21   October 21st, 2009?

22        A    Yes, there is.

23        Q    All right.  And could you read the entry for

24   October 21st, 2009.

25             ALJ: Hold it.  Is that an exhibit here,

1  Mr. Grant?

2            MR. GRANT:  It is not, Your Honor.  This

3  is -- it shows an entry from Wednesday of this week.

4            ALJ:  Okay.

5            THE WITNESS:  This was entered in by, it

6  looks like, probably Marion County --

7            THE PETITIONER:  I object.  What has that

8  got to do with this what we're going through right now?

9            ALJ:  What would be the relevance of this,

10  Mr. Grant?

11            MR. GRANT:  Your Honor, I presume Mr.

12  Shinault is going to say that he needs money for his

13  living expenses and for caring for whatever needs he has

14  and this entry, Your Honor, would show the circumstances

15  leading to his current incarceration which involved -- it

16  looked like drug paraphernalia, and it would be our

17  position that that's relevant to showing what his plans

18  are to do with -- what his plans would be to do with the

19  money or what he's likely to do with the money if it's

20  returned to him, not care for his living allowance but

21  use it on drug-related activities.

22            THE PETITIONER:  I don't use drugs, so I

23  don't know what you're talking about.

24            ALJ:  Well, okay.  I'll let him go ahead

25  and testify.  I'll overrule the objection.

Hawks - D          62

1              THE PETITIONER:  Okay.

2              THE WITNESS:  The text that was entered

3    said  contacted  offender  at  4678  Hayesville  Court

4    Northeast, MSCO Street Crimes conducted a knock and talk

5    at the residence regarding offender's girlfriend, Heather

6    Asley.   Let's  see,  knocked,  offender  looked  out  the

7    window  and  then  took  off,  wouldn't  open  the  door.

8    Eventually gained consent to enter the residence, found

9    offender  in  the  back  bedroom.   Also  located  digital

10   scale,  marijuana  pipes,  bongs  in  the  bedroom.   Asked

11   offender about drug use, offender denied but refused to

12   submit to a UA.  Authorized detainer for drug possession,

13   failure  to  submit  to  a  UA  and  the  offender  was

14   transported  to  Marion  County  Correctional  Facility.

15             THE PETITIONER:  I have an objection.

16             ALJ: What's your objection?

17             THE  PETITIONER:   My  objection  is  that  I

18   was in that house for like four minutes.  I walked in --

19             ALJ:   That  would  not  be  a  basis  for

20   objecting to the admissibility.  You can testify to the

21   extent  it's  relevant,  you  can  testify  about  those

22   circumstances but I'm going to overrule the objection.

23   Go ahead.

24             THE PETITIONER: But do that have anything

25   to do with our case though?

ER 195

1           ALJ:    I overruled the objection.   Go

2    ahead, Mr. Grant.

3           MR. GRANT:   Thank you, Your Honor.

4    BY MR. GRANT:   (Continuing)

5       Q    Mr. Hawks, is there anything else you think the

6    administrative law judge should know in making his

7    decision in this matter?

8       A    No, I don't think so.

9           MR. GRANT:   No further questions, Your

10   Honor.

11          ALJ:   Mr. Hawks, I've got a couple

12   questions for you.  In the rule that talks about personal

13   support following release, and there's some reference in

14   Mr. Shinault's request for hearing, he refers to medical

15   problems and that sort of thing.  Do you -- when you guys

16   calculate this number, in this case $5,000, do you take

17   into account any kind of special medical needs that an

18   inmate may have or not?

19          THE WITNESS:  We try to look at if there's

20   any -- if there are any problems he may encounter as far

21   as medical needs upon release, any charges or things like

22   that.  I was not made aware of anything other than when

23   he indicated that he was -- when he sent his appeal in,

24   that he was diabetic.

25          ALJ:  Uh-huh.  But in looking at the rule,

1    it says reasonable living expenses to live in the

2    community for three months, including rent, utilities,

3    food, public transportation, as opposed to private,

4    supervision fees and miscellaneous expenses. What kind

5    of things do you consider in the miscellaneous expense

6    category?

7                THE WITNESS: Anything that the person

8    would deem necessary for them to purchase, and that could

9    include any type of prescriptions, I imagine.

10                ALJ: Well, for, what, three months or for

11    the rest of their life or, you know, how do you -- what

12    do you look at in a case?

13                THE WITNESS: For three months.

14                ALJ: Okay. You cap it at three months?

15                THE WITNESS: Yes.

16                ALJ: Okay. All right. Okay. Any

17    further questions, Mr. Grant?

18                MR. GRANT: Yes, Your Honor.

19    BY MR. GRANT: (Continuing)

20      Q    Mr. Hawks, has Lester Shinault given you any

21    evidence of his medical needs?

22      A    The only thing that I've received from him was

23    when he sent in his, I believe, appeal letter asking for

24    an appeal and stating that -- I believe he said in the

25    letter that he was diabetic.

1     Q    And are you familiar with how medical needs are

2    provided for in jails and prisons?

3     A    Yes.  All their medically necessary items are

4    provided to them.

5     Q    Are we still within the three-month window

6    since Mr. Shinault was released from prison?

7     A    Yes, we are.

8     Q    And during the time when he's incarcerated at

9    the Marion County Jail based on your experience, do you

10   have an opinion as to whether they would be providing for

11   his medical needs?

12    A    I believe that they -- I don't know that for a

13   fact but I believe that they would.

14           MR.  GRANT:  No  further  questions,  Your

15   Honor.

16           ALJ:  Okay.  Now, Mr. Shinault, do you

17   have any questions you want to ask Mr. Hawks about his

18   testimony?

19           THE PETITIONER:  Yes, sir.

20

21              CROSS-EXAMINATION

22   BY THE PETITIONER:

23    Q    Mr. Hawks.

24    A    Yes.

25    Q    Julianne Cabbletry (phonetic) from where the

Hawks - X                  66

1   money come from, do you remember you talked to her on the

2   phone?

3         A    Who?

4         Q    She asked you would my money be safe in sending

5   this money to my account, and you guys had a

6   conversation?  Do you remember talking to her?

7         A    Not exactly.  I receive calls all the time from

8   people asking, you know, if they can send money to

9   inmates' accounts.

10        Q    I'm talking about from this specific person,

11  her name is Julianne Cabbletry.

12        A    I don't --

13        Q    I talked to her when --

14             ALJ:  Mr. Shinault, let him answer the

15  question as best he can.

16             THE PETITIONER:  Okay.

17             THE WITNESS:  You know, I don't remember

18  her specifically.  If she called and asked if inmates had

19  an account the money could be sent to, I would have told

20  her yes.  I'm not sure who this money actually came from.

21  I know that we received a check from the -- I believe it

22  was from an insurance company or pharmaceutical company.

23  I don't remember for sure.

24             ALJ:  Okay.  Next question.

25

                                          Hawks - X          67

1   BY THE PETITIONER: (Continuing)

2       Q    My next question is, is it stated in your law

3   that if this money come from my health -- is liability

4   money, is it okay for you guys to take from those people

5   if this money is liability?

6       A    Our rule indicates that when a person has

7   assets that meets the threshold which I believe is

8   $50,000, that we're required to research their assets to

9   determine if they qualify to pay for cost of care.  And

10  it doesn't stipulate where the money comes from.

11            ALJ:  Does $50,000 -- I kind of looked

12  through the statutes, Mr. Grant, where does that come

13  from, kind of a $50,000 floor?

14            MR.  GRANT:    I  think  it's  in  the

15  administrative rules, Your Honor.

16            ALJ:  Okay.

17            THE WITNESS:  It's $55,000.

18            ALJ:  Mr. Hawks, do you have that -- the

19  cite to that rule handy or --

20            MR. GRANT: I have the citation here, Your

21  Honor.  Mr. Grant talking.

22            ALJ:  Okay.

23            MR. GRANT: It's 291-203-0040, and this is

24  (3).

25            ALJ: I see.  Okay.  I hadn't looked at

1   that earlier.

2                    THE PETITIONER:  Can I speak, please?

3                    ALJ:  No.  Hold up.  (Pause)  Okay.  Let's

4   see.  I guess we are on cross-examination.  Your next

5   question, Mr. Shinault, of Mr. Hawks.

6   BY THE PETITIONER:  (Continuing)

7        Q    My next question is, ain't there a ruling that

8   you gotta go back -- you gotta go back three years back

9   and then you guys can take from there?  Ain't that also

10  a ruling?  DOC rules.  Do you know what I'm talking

11  about, Mr. Hawks?

12       A    That is in the statute, Mr. Shinault.

13       Q    Yeah.  But it's in your law library though.

14       A    I assume it is if the ORSes are available in

15  the law libraries.

16       Q    Okay.  Up under the ORSes it states that you

17  have to go back three years.

18                   ALJ:  Mr. Shinault, you're kind of arguing

19  with him now.  This is cross-examination, so that was his

20  answer.  You'll need to move on to your next question and

21  you can -- when you testify, you can explain anything you

22  want to say about that.

23                   THE PETITIONER:  Okay.  I'm sorry.  I'm

24  not trying to argue though.

25                   ALJ:  Okay.  Just go ahead with your next

Colloquy                    69

1    question.  That's fine.

2                    THE PETITIONER:  I'm okay.  I'll just wait

3    until I come up.

4                    ALJ:  Okay.  Let's see.  Your next witness

5    then.

6                    MR.  GRANT:    The  State  calls  Martha

7    McDaniel.

8                    ALJ:  And, Ms. McDaniel, can you hear me?

9                    MS. McDANIEL:  Yes, I can.

10                   ALJ:  Okay.  And if you'd raise your right

11   hand and tell me when you've done that.

12                   MS. McDANIEL:  I've done so.

13

14                   MARTHA McDANIEL,

15       was thereupon produced as a witness and having been

16   first duly sworn to tell the truth, the whole truth and

17   nothing but the truth, testified as follows:

18

19                   ALJ:  If you'd state your name and spell

20   your first and last names, please.

21                   THE WITNESS:  Martha McDaniel, M-a-r-t-h-

22   a, M-c-D-a-n-i-e-l.

23                   ALJ:  And what's your position?

24                   THE WITNESS:  I'm the budget manager for

25   the Department of Corrections.

McDaniel - D                    70

1          ALJ:  Okay.  Go ahead, Mr. Grant.

2          MR. GRANT:  Thank you.

3

4                    DIRECT EXAMINATION

5   BY MR. GRANT:

6      Q    Ms. McDaniel, what are your job duties?

7      A    I manage and coordinate the developments and

8   monitoring of the Department of Corrections budget.

9      Q    And are you familiar with how the Department of

10  Corrections calculates the daily cost of care rate for

11  its inmates?

12     A    Yes, I am.

13     Q    For the 2005 through 2007 biennium, what was

14  the daily cost of care for a Department of Corrections

15  inmate?

16     A    $67.53.

17     Q    And for the 2007 through 2009 biennium, what

18  was  the  daily  cost  of  care  for  a  Department  of

19  Corrections inmate?

20     A    $77.78.

21     Q    Would you please turn to Exhibit A8.

22     A    Okay.

23     Q    Do you recognize this document?

24     A    Yes, I do.

25     Q    What is it?

McDaniel - D          71

1      A      This is a list of the budget elements that make

2    up the Department's budget and cost per day rate.

3      Q      At the top of page 1 of Exhibit A8, we see 2005

4    through '07 CPD rate $67.53.  What does that refer to?

5      A      Cost per day.

6      Q      And so this is showing the numbers that you

7    testified about a moment ago, 67.53 for the 2005 through

8    '07 biennium, and the 77.78 for the '07 through '09

9    biennium?

10      A      Yes.

11                  MR. GRANT:  Your Honor, I'll offer Exhibit

12    A8.

13                  ALJ:  Okay.  Any objection to A8, Mr.

14    Shinault?

15                  THE PETITIONER:  I don't understand what

16    he was just talking about.  I'm trying to figure that out

17    right now.

18                  ALJ:  Well, all Exhibit A8 is is just some

19    budgetary figures for the Department of Corrections,

20    their budget for the biennium which is a 24-month period

21    that state agencies are required to budget for all of

22    their expenses.  That's all this really pertains to.  I'm

23    going to admit Exhibit A8.  I guess, Ms. McDaniel, what's

24    the difference between Exhibit A8 and A8, page 2?

25                  THE WITNESS:  Page 1 of Exhibit A8 lists

McDaniel - D                72

1    the elements that are included in the cost per day rate

2    calculations.  Page 2 of Exhibit A8 are the elements that

3    are not included in cost per day rate.

4              ALJ:  Okay.  So just could you tell me

5    then, what numbers do you divide by what numbers to

6    arrive at the 67.53 figure then?

7              THE WITNESS:  We take the -- cost of care

8    rate is calculated based on the budget elements reflected

9    on page 1.

10             ALJ:  Okay.

11             THE WITNESS:  Those numbers are divided by

12   the budgeted population in each institution and then the

13   rate is averaged across all institutions.

14             ALJ:  Okay.  So for 05-07, you would take

15   the -- that would be 655,426,023 and divide that by the

16   number of inmates and somehow average that all out?

17             THE WITNESS:  That is correct.

18             ALJ:  Okay.  And what's the relevance of

19   page 2 of Exhibit A8 then?

20             THE WITNESS:  It is to show that we do not

21   include in our cost per day rate those elements that are

22   not directly related to the cost of care of the inmate.

23             ALJ:  I see.  Okay.  Go ahead, Mr. Grant.

24             MR. GRANT:  Thank you, Your Honor.

25

McDaniel - D                    73

1    BY MR. GRANT: (Continuing)

2        Q    Ms. McDaniel, turning back to page 1 of Exhibit

3    A8, there are two different columns on page 1 and the

4    column on the left with all the numbers there, does that

5    refer to the 2005 through '07 biennium?

6        A    That's correct.

7        Q    And the column on the right, what does that

8    refer to?

9        A    The 2007-2009 biennium.

10       Q    And the same for page 2?

11       A    Correct.

12       Q    On page 1 of Exhibit A8, there are elements

13   included in the cost per day rate.  Maybe it would be

14   helpful if you could tell the judge briefly what's

15   included in each of the divisions starting with the

16   operations division.

17       A    The operations division, there's a list of all

18   the different elements, but to go down the list, the

19   health services portion provides the medical and dental

20   services for the inmates.  Mental health services is

21   pretty self-explanatory.  Pharmacy provides the

22   prescription services for inmates.  The institution

23   administration is the overall administration of the

24   institution.  Counseling services are such as listed,

25   they are counseling services provided to inmates.  The

McDaniel - D          74

1   activities are activities or recreation provided to

2   inmates.    Libraries are things such as the legal

3   libraries and so forth that were referred to earlier.

4   Food services are the services that are provided related

5   to food such as the kitchen services.  Physical plant is

6   the maintenance of the actual institutions themselves,

7   including like heat and all the utilities.  Inmate work

8   programs are those programs for which inmates may

9   participate and receive the awards that were mentioned

10  previously.  Security is the security officers and all

11  the security that needs to take place at an institution.

12  Intake and assessment is when an inmate comes to the

13  Department of Corrections, they go through the intake

14  process and assessment process for determination of

15  placement.  Assistant director of operations is the

16  department that does overall oversight of all the

17  institutions.    Inmate welfare fund is a fund that

18  provides specific -- by statute, specific inmate-related

19  activities, funding for those activities.  Chief of

20  security is also part of the overall security of the

21  facilities and the statewide oversight for that.

22  Transport is the transportation of inmates throughout our

23  system.    Operations division policy is again the

24  statewide policy for all the institutions.

25               ALJ:  Why weren't those figures in the 05-

McDaniel - D                    75

1    07 budget?

2              THE WITNESS:  This has been fine tuned as

3    time has gone on and things are lumped together in the

4    past that now get separated out, so some of the rates may

5    have been in like an institution administration rate and

6    now it's being broken out separately.

7              ALJ:  Okay.  Go ahead.

8              MR. GRANT:  Thank you.  Your Honor, asked

9    the question I was going to ask next.

10   BY MR. GRANT:  (Continuing)

11       Q    Let's see.  On the operations division, the

12   health services, that's for the 07-09 biennium, that was

13   $99,398,768?

14       A    That's correct.

15       Q    And would that provide for an inmate's diabetes

16   needs if the inmate is incarcerated with the Department

17   of Corrections?

18       A    It would provide the medical care, the

19   pharmaceutical care -- if there is any pharmaceutical

20   care, it would be covered under the pharmacy area.

21       Q    All right.  The administration division for the

22   '05 through '07 biennium, that's blank.  Were those costs

23   lumped into a different division at that time?

24       A    That's correct.  It was part of the operations

25   division previously.

McDaniel - D                76

1      Q    All right.  And the administrative division is
2  what?

3      A    It includes the population management which
4  coordinates the movement of all the population throughout
5  the system.  A group that relate -- that monitors and
6  provides the prison rape elimination act oversight as
7  directed by the federal government, and then the rental
8  beds that we do not have sufficient space in our
9  institutions and need to rent beds in county jails or so
10 forth is also the administration division.

11     Q    And the public services division is what?

12     A    Those are for special projects that come up
13 related to inmates that need to be just addressed.

14     Q    The general services division?

15     A    That provides the wireless and radios that are
16 used within our institutions.  The food services
17 administration related to the commissaries and overall
18 food services and then the commissary, administration
19 commissary activity itself.

20     Q    And the transitional services division.

21     A    Transitional    services    admin    is    the
22 administration of the entire division, transition
23 releases, that area that provides services when inmates
24 are getting close to release and providing the
25 transitional services there.  Work force development

McDaniel - D                77

1    administration is the oversight of the work based

2    education, the cognitive programs and the education

3    programs, and those are programs that are offered to

4    inmates.    Alcohol and drug administration is the

5    oversight for the alcohol and drug treatment programs.

6    Religious services administration is the oversight for

7    the religious services provided to the inmate.

8         Q    So when Mr. Shinault was getting ready to be

9    discharged from the Department of Corrections on August

10   14th, 2009, would he have received transitional services

11   that would have fallen within the transitional services

12   division costs?

13        A    It would probably be within that, as well as

14   within his counseling services and operations division.

15             ALJ:   I'm kind of curious, Ms. McDaniel.

16   As we've already indicated, there's a number of these

17   items that don't appear in the 2005-07 budget but do in

18   the 07-09 budget column, and there's some pretty

19   significant numbers in there.   Did these numbers in the

20   07-09, were these pulled from the second page or would

21   these have all appeared in the other numbers in the

22   column on 05-07 on page 1?

23             THE WITNESS:   They are from the page 1.

24   I'll direct you to the education area which is under the

25   transitional services division, for example.   Everything

McDaniel - D          78

1   was lumped under education whereas now it's broken down

2   into cognitive program work based education and

3   administration.

4            ALJ: Okay. Well, that explains that one,

5   but what about things like wireless radio, almost $8

6   million.

7            THE WITNESS: That would have been within

8   the operations division. As we have reorganized the

9   Department over time, we have found the need to separate

10  those items out from the overall umbrella of the

11  operations division and track them separately. So in

12  previous biennium it would have been within most likely

13  the security aspect of the operations division.

14           ALJ: Okay. And the two budgets, we go

15  from 655 million to 813 which is about $150 million,

16  pretty significant percentagewise increase. What was the

17  basis for that?

18           THE WITNESS: The basis -- the way the

19  budget is developed is based on our forecasted population

20  that the Department receives from the Office of Economic

21  Analysis and we build our budget based on the anticipated

22  number of inmates we will be receiving throughout the

23  biennium.

24           ALJ: Okay. So you've got --

25  percentagewise, roughly, you've got that percentage of

McDaniel - D                    79

1    increase in inmates during those time periods?

2                    THE WITNESS:  Correct.

3                    ALJ:  Okay.  Go ahead, Mr. Grant.

4                    MR. GRANT:  Thank you.

5    BY MR. GRANT:  (Continuing)

6        Q    Ms. McDaniel, I need to ask you a couple other

7    questions that don't show up on Exhibit A8.  First, the

8    cost of care rate for the 2003 through 2005 biennium --

9                    ALJ:  You said 2003?

10                   MR. GRANT:  2003 through 2005 biennium.

11                   ALJ:  Okay.

12                   THE WITNESS:  Yes.  That's 65.08.

13   BY MR. GRANT:  (Continuing)

14       Q    And the 2003 through 2005 biennium, when would

15   that biennium have ended?

16       A    June 30th of 2005.

17       Q    Now, do you have the cost of care rate for the

18   2009 through 2011 biennium?

19       A    Yes, I do.

20       Q    What is that?

21       A    $84.46.

22       Q    And that cost of care rate would go into effect

23   as of what date?

24       A    July 1st, 2009.

25       Q    So for the period of time between -- actually,

McDaniel - D                    80

1    I'll withdraw the question, Your Honor.

2                ALJ:  Well, okay.  I guess, is the point

3    you're trying to get at, is you're giving a little bit of

4    a break, I guess, for July and August of '09, you could

5    have actually stuck him with 84.46 per day?

6                MR. GRANT: That's part of it, Your Honor.

7    But the other part of it is, is when the order was being

8    calculated from the start date which May whatever it was

9    2005 through the end of June 30, 2005, he would have been

10   overcharged by about $3.45 a day for 40 some days.  My

11   argument in the end would be that it's a wash, Your

12   Honor.  But in the interest of being full disclosure to

13   Your  Honor,  I  wanted  to  make  you  aware  of  this

14   discrepancy.

15               ALJ:  Okay.  So let's back up then.  The

16   rate for the 03-05 biennium, ma'am, was 64.08?

17               THE WITNESS:  That's correct.

18               ALJ:  A day.  And that went into -- or

19   that, I guess, ended on what day?

20               THE WITNESS:  June 30th, 2005.

21               ALJ:  Okay.  I see, Mr. Grant.  So your

22   argument is that, I guess, technically he should have had

23   a little bit lower rate from May 19th, '05 through June

24   30, '05?

25               MR. GRANT:  That is correct, Your Honor.

McDaniel - D          81

1   By my calculations, $3.45 a day less than was calculated.

2               ALJ:  Okay.  And that would be offset by,

3   let's see, a few days --

4               MR. GRANT:  Between July 1, 2009 through

5   August 14th, 2009, he was undercharged a little bit, if

6   you will.  Actually, the difference I think favors him a

7   bit more.

8               ALJ:  Well, since you've done -- do you

9   have the calculation for the time, I guess, July 1, '09

10  through August 14, '09?  How much per day that would be?

11              MR. GRANT:  Yeah.  Let me check just to

12  make sure I give you the correct number here by my

13  calculations.  My calculations is he was undercharged by

14  $6.68 a day, and I'm doing that right now, so I -- I

15  apologize if my numbers are off.

16              ALJ:  Okay.  Gotcha.  Okay.  Move on.

17  BY MR. GRANT:  (Continuing)

18      Q    Ms. McDaniel, is there anything else you think

19  the judge should know?

20      A    No, there isn't.

21              MR. GRANT:  Your Honor, I have no further

22  questions for Ms. McDaniel.

23              ALJ:  Okay.  Mr. Shinault, do you have any

24  questions you want to ask Ms. McDaniel?

25              THE PETITIONER:  No, I don't.

1          ALJ:   Okay.   I guess call your next

2     witness.

3          MR. GRANT:  Your Honor, before I wanted to

4     rest, I can call Mr. Hawks and have him testify as to the

5     things I was just telling you about the discrepancies on

6     both ends, the '03 through '05 biennium and the '09

7     through 2011 biennium, but if Your Honor and Mr. Shinault

8     are fine with my representations, I won't recall him.

9          ALJ:   Okay.  Mr. Shinault, is that okay

10    with you, his representations as to what Mr. Hawks would

11    testify about, just these difference on the numbers?  It

12    looks like actually it technically favors you a little

13    bit, slightly, a few dollars.

14          THE PETITIONER:  He can call --

15          ALJ:  I'm sorry?

16          THE PETITIONER:  If it's okay.  I mean --

17          ALJ:  Do you want him to be called as a

18    witness on that?

19          THE PETITIONER:  Do you think that would

20    be a good thing?

21          ALJ:  Well, it's up to you.  I mean, it's

22    not my decision really to make.  Let's do this.  Why

23    don't you just -- you're already under oath, Mr. Hawks.

24    Why don't you ask him a few questions, Mr. Grant.

25

1                    <u>DICK HAWKS</u>,

2         was thereupon recalled as a witness and having been

3    previously duly sworn to tell the truth, the whole truth

4    and nothing but the truth, testified as follows:

5

6                    <u>DIRECT EXAMINATION</u>

7    BY MR. GRANT:

8         Q    Mr. Hawks, let me just ask you briefly, you've

9    heard the testimony of Ms. McDaniel.

10        A    Yes.

11        Q    And is it your opinion that the quarter where

12   it had the calculation for May 19th, 2005 through June

13   30, 2005, should have been calculated at the $64.08 a day

14   rate?

15        A    Yes, it should have been.

16        Q    All right.  And for the period of time from

17   July 1st, 2009 through August 14, 2009, should that have

18   been calculated at the $84.46 per day rate?

19        A    Yes, it should have.

20                   MR.  GRANT:   Thank  you.    No  further

21   questions, Your Honor.

22                   THE PETITIONER:  I have a question for Mr.

23   Hawks.

24                   ALJ:  Okay.  Go ahead.

25

1                    CROSS-EXAMINATION

2    BY THE PETITIONER:

3        Q    Mr. Hawks, is it normal for a garnishing to

4    come into a DOC account and start and you guys just

5    release money like that without letting the other party

6    know?

7        A    Are you referring to the garnishment orders

8    that were --

9        Q    I'm referring to the garnishing order to the

10   4,000.  Because I didn't know nothing about that.  It was

11   tooken out of the 65,000 until now.  I didn't get no

12   notice, no papers, no nothing.

13             ALJ:    Let him answer the question, sir.

14   Do you give him a notice, an inmate a notice of those

15   garnishments?

16             THE WITNESS: Yes, we do, and actually, I

17   believe, if memory -- if I recall correctly because I'm

18   not the one that -- staff member that actually processes

19   those, the notices were sent to the institution but you

20   had already released by the time they were received.

21   BY THE PETITIONER:  (Continuing)

22       Q    And I haven't still got them yet.  My lawyer

23   haven't said nothing to me about it either.

24       A    I believe I -- there again, I'm going from

25   recollection.  I believe we may have sent them to your

1   attorney when they came back to us.  But if they didn't,

2   then they would be --

3             ALJ:  So those garnishments then would

4   have been mailed to either him or his attorney.  Do you

5   have the date on that or --

6             THE WITNESS: Well, the garnishment orders

7   were, let's see, I'm not -- I have to look at the trust

8   account statement here to see when the garnishment

9   orders.  Yeah, okay.  The garnishments were processed in

10  our trust system August 11th and when we receive

11  garnishment paperwork, there's copies of that that we

12  forward to the inmate to let them know that their account

13  has been garnished, and since he was released October

14  14th --

15            ALJ:  August 14th.

16            THE WITNESS:  I'm sorry, August 14th, by

17  the time those got to you, they were -- you were gone and

18  they were returned to us.  What I'm unsure of is if they

19  were mailed to your attorney then or if they were held

20  pending your request for us to send them to you.

21            ALJ:  Okay.  Any other questions for him,

22  Mr. Shinault?

23            THE PETITIONER:  No.

24            ALJ:  Okay.  Do you have any other

25  witnesses to present, Mr. Grant?

1          MR. GRANT:  I do not, Your Honor.  May I

2     make one legal point about the questioning that just

3     happened?

4          ALJ:  Okay.  Go ahead.

5          MR. GRANT: Your Honor, I can't cite it off

6     the top of my head here, although it's in Chapter 18.  I

7     can grab the citation if you want, but it's my

8     recollection that the requirements of Chapter 18 require

9     a garnishor, that being the person who issues the

10    garnishment, to send a copy of the writ of garnishment,

11    together with a debt calculation form, to the debtor

12    after the writ of garnishment is served upon the

13    garnishee, which in this case would have been the

14    Department of Corrections.  I can't say what happened in

15    that case, I can just say what the requirements are, and

16    assuming that happened, that would be another potential

17    avenue for Mr. Shinault to have been given notice.

18          ALJ:  Okay.  And that would be in this

19    case, that would be your office I guess, the Department

20    of Justice, wouldn't it?

21          MR. GRANT:  Maybe.  The writs, Your Honor,

22    probably were issued because -- and I would just be

23    guessing here, Your Honor, but if they're criminal

24    judgments or criminal garnishments, they may have been

25    prepared at the Judicial Department and signed at this

1   office, but I can't say that with certainty.

2                   ALJ:  Okay.

3                   THE PETITIONER:  Your Honor, is there a

4   date  when  they  released  that  paper  to  send  me

5   notification that they was garnishing some money out of

6   my account?  Is there a date to that?

7                   ALJ:   I believe that was August 11th,

8   wasn't it, Mr. Hawks?

9                   MR. HAWKS:  Yes, it was.

10                  THE PETITIONER: Okay.

11                  ALJ:  Okay.  Now, Mr. Grant, I see we've

12  not admitted Exhibits A9 through A14.

13                  MR. GRANT:  That is correct, Your Honor.

14  Those are criminal documents, but, Your Honor, I believe

15  that what I sent to Your Honor was certified copies of

16  those documents.

17                  ALJ:  Okay.  But, I mean, do you want to

18  offer them?

19                  MR. GRANT: Yeah, I'll offer them, Your

20  Honor.

21                  ALJ:  Okay.  One question I have is what

22  is the relevance of the probation revocation order, for

23  example, A13, and the report from a probation officer?

24  What's the relevance of that?

25                  MR. GRANT:  A13 was just the affidavit

Colloquy                    88

1    talking about the report, which I think is marked as --
2    well, it's part of A13.  Part of it is, Your Honor, kind
3    of  lays  out  the  history  on  the  --  of  Mr.  Shinault
4    involving methamphetamine, and if the issue is what he's
5    going to spend his money on, it would be our position
6    that  the  history  of  involvement  with  methamphetamine
7    would be relevant to determine whether he really wants
8    the money for medical needs or other needs or whether he
9    really wants it for drug use.
10                ALJ:  Well, okay.  That's interesting.  I
11   guess  I  don't  know  in  the  Department  of  Corrections
12   calculating these amounts, I guess what difference does
13   that really make whether they give the $5,000 -- some
14   people are probably going to go out and use it to buy
15   drugs and other people may pay rent.  So I guess what
16   difference does it make?
17                MR. GRANT: I agree, Your Honor, and that
18   point  it  doesn't  make  a  difference.   Where  I  think  it
19   makes a difference is if Mr. Shinault is coming here
20   saying that he has needs greater than $5,000 for the
21   three-month period and therefore more of the money should
22   be given back to him for that three-month period, then it
23   would certainly raise the question of, does he want the
24   money for medical needs or for feeding a drug habit,
25   something like that.

Colloquy          89

1          ALJ:  Okay.  Interesting.  Okay.  Mr.

2     Shinault,  do  you  have  any  objection  to  Exhibits  A9

3     through A14?

4          THE PETITIONER:  No, I don't.

5          ALJ:  Okay.  Those are admitted.  Okay.

6     Anything  further  to  present  by  way  of  evidence,  Mr.

7     Grant?

8          MR. GRANT:  No, Your Honor, and the State

9     rests at this time.

10          ALJ:  Okay.  Mr. Shinault, now we'll move

11    on to your side of the case.  Let me put you under oath

12    and I'll ask you some questions and then you'll have a

13    chance to present anything additional you think I need to

14    know about this matter.  So if you'd raise your right

15    hand.

16

17               LESTER SHINAULT,

18      was thereupon produced as a witness and having been

19    first duly sworn to tell the truth, the whole truth and

20    nothing but the truth, testified as follows:

21

22          ALJ:  Okay.  Let's see, you got released

23    on August the 14th, 2009 from prison; is that correct?

24          THE WITNESS:  Yes.

25          ALJ:  And did you remain here in the Salem

Colloquy                    90

1    area?

2                    THE WITNESS:  Yes, I have.

3                    ALJ:  Okay.  I notice on your request for

4    hearing you indicate that you have diabetes.  How long

5    have you had diabetes?

6                    THE WITNESS:  I've been having diabetes

7    for the past five years.

8                    ALJ:  Okay.  So that would include most of

9    the time you've been in prison then you've had diabetes?

10                    THE WITNESS: Yeah, most of the times.  Not

11   since 2005-2007 -- well, since 2007 I've been having

12   diabetes  all  through  2007,  yeah,  I've  been  having

13   diabetes.

14                    ALJ:  Okay.

15                    THE WITNESS:  From 2007 to 2009.  That's

16   three years.

17                    ALJ:  Okay.  And were you treated for that

18   in the corrections facility you were in?

19                    THE WITNESS:  Just recently, yeah.

20                    ALJ:    What  --  are  you  taking  any

21   medication for your diabetes?

22                    THE WITNESS:  I do.

23                    ALJ:  What do you take?

24                    THE WITNESS: I take metformin.  I used to

25   -- when I first got on it, I used to take insulin but now

Colloquy                    91

1    I'm on the pill now metformin and they give me another
2    pill which I don't know the name of it because they just
3    started me on it right there at DO -- right there at the
4    Correctional Facility that I just got released from.
5    They gave me a pill that would take my brain, my kidneys
6    and my heart, because I've been taking metformin for a
7    long period of time.
8                    ALJ:   Okay.   So you take just the one
9    medication then?
10                   THE WITNESS: I take two of them.
11                   ALJ:   Two medications.   How often do you
12   take them?
13                   THE WITNESS:   I take the one for my brain,
14   heart and kidneys once a day and I take metformin twice
15   a day.
16                   ALJ:   Approximately how much do you spend
17   a month on medications for these two medications?
18                   THE WITNESS:   Well, I haven't had any
19   chance to spend none on it because when I got released,
20   they -- there's been -- I mean, I got released, from here
21   they give you a 60-day supply and from the prison, and
22   now I'm out of that though, I'm out of that.   But I'm
23   back in jail here and this is the only time when I have
24   to --
25                   ALJ:   Okay.   I see.   Okay.   Anything else

1    you want to tell me about this case?

2                    THE WITNESS:   Okay.   About this case is

3    this money -- can I tell you where this money come from?

4                    ALJ:   Go ahead.

5                    THE WITNESS:   Okay.   Back in 2003 I got

6    out of prison and they put me on this medication called

7    Zopressa (phonetic).   Okay.   The State of Oregon

8    Behavioral Clinic in Gresham, Oregon put me on this pill

9    called Zopressa.   I took this pill for a long amount of

10   time and around 2007, I was getting very sick, so I went

11   to the hospital.   They told me I was a diabetic so they

12   put me on insulin.   So I got a lawyer and we sued a

13   company that made the Zopressa pill, which they didn't

14   analyze the pill, they just shipped it straight to Oregon

15   and gave it to a clinic, and so the clinic just handed it

16   out to us.   So basically I was used as a guinea pig.   So

17   --

18                    ALJ:   Okay.   So the long and short is, the

19   money came from you sued the drug company for some

20   product liability case?

21                    THE WITNESS: Yes.

22                    ALJ:   And got, what, 107,000 or something?

23                    THE WITNESS: That's supposed to be for my

24   medicine, my hospital bills and other, you know, like

25   insurance because, you know, diabetes is a -- you can die

Shinault - X                    93

1    from it, so I had to get -- it's for my insurance, my

2    medicine, my bills, you know, my food because I gotta eat

3    different, I gotta eat different from anybody.  I mean,

4    it can't contain no sugar.  If we get to any sugar, our

5    blood sugar go up and we get sick.  And I wanted to use

6    it for classes to learn how to deal with this disease to

7    live better, you know.

8              ALJ:   Okay.   I understand all that.

9    Anything else you want to tell me?

10             THE WITNESS: Other than that, that -- not

11   really.   It's liability money.   This money is for my

12   life.   It's for the -- to take care of my diabetes, to

13   take care of me, to keep my medication.

14             ALJ:   Okay.   Mr. Grant, do you have any

15   questions for Mr. Shinault?

16             MR. GRANT: Yes.

17

18                   CROSS-EXAMINATION

19   BY MR. GRANT:

20        Q    Mr. Shinault, the jail is taking care of your

21   medications right now?

22        A    Yes, they are.

23        Q    When are you scheduled to be released?

24        A    I haven't seen my parole officer yet and I'm

25   waiting to see him, but it's going to be real soon.

Shinault - X                    94

1        Q      By the end of the month?

2        A      No -- yeah, by the end of the month, yeah.

3        Q      And how many days have you been incarcerated at

4    the Marion County Jail total since August 14th?

5        A      Since the 10th of -- October 10th, I got out on

6    the 19th and I came -- and they re-arrested me on the

7    21st. And I've been here since. I don't have a place to

8    stay, I don't have no money to buy no place, no home, no

9    nothing, so I'm basically on the streets right now.

10        Q      When you got out of prison, you were given

11    roughly $5,000 from the Department of Corrections?

12        A      Yes, and I had an apartment at the Liberty and

13    Madrona and ran out of money and lost my apartment.

14        Q      Mr. Hawks testified that you sent a little over

15    11,000 to Kevin Carolan. What happened to that money?

16        A      That's for to obtain my lawyer to keep him

17    working on my case.

18        Q      But he's no longer working on your case,

19    correct?

20        A      Yeah, because he said that I owe him $8,000

21    now.

22                ALJ:   When you talk about the case, you

23    mean this particular case or something else?

24                THE WITNESS: Yes, sir.

25                ALJ: This case?

1                    THE WITNESS: Yeah, this case here.

2                    ALJ:  Okay.  All right.  Go ahead, next

3      question.

4      BY MR. GRANT: (Continuing)

5          Q    How much money did Mr. Carolan send to you

6      after you got released?

7          A    Well, my vehicle got impounded so he sent me

8      $2,000 and other than that, and $1,000, like $3,000 out

9      of that.

10         Q    The most recent incarceration stems from your

11     delivery of methamphetamine?

12         A    From right here, right now?

13         Q    Yes.

14         A    No.

15                   ALJ:  Do you mean in prison, Mr. Grant, or

16     in jail?

17                   MR. GRANT:  Good point, Your Honor.  Let

18     me withdraw the question and re-ask it here.

19     BY MR. GRANT:  (Continuing)

20         Q    Mr. Shinault, your most recent incarceration

21     with the Oregon Department of Corrections, was that based

22     on you being convicted for delivering methamphetamine?

23         A    No, that's based on me eluding the police in a

24     car.  I didn't have nothing -- they revoked my probation

25     because I was on probation for delivery, but then for

Shinault - X          96

1   coming to prison, I eluded the police in a car and that's

2   what got me sent to prison.

3       Q    Mr. Shinault, I want to ask you about some

4   criminal convictions really quickly.

5       A    What do that have to do with my case right

6   here?

7                 ALJ:  Are you doing this for impeachment

8   purposes or what?

9                 MR. GRANT:  I am, Your Honor.

10                ALJ:  Okay.  It's relevant for impeachment

11  purposes.  Go ahead.

12                MR. GRANT:  Thank you, Your Honor.

13  BY MR. GRANT: (Continuing)

14      Q    Mr. Shinault, you were convicted of felony

15  Escape II?

16                ALJ:  When was that?

17                MR. GRANT:  1997.

18                ALJ:  Do you remember that, Mr. Shinault?

19                THE WITNESS: Yes, I do.

20  BY MR. GRANT:  (Continuing)

21      Q    Were you convicted of felony Escape II in 1997?

22      A    Yes, I do.  Yeah.

23      Q    All right.  And also 1997 were you convicted of

24  felony Robbery II?

25      A    Yeah.

Shinault - X          97

1       Q     And 1997 you were also convicted of Escape II

2  felony?

3       A     Yes.

4             ALJ:   Wait a minute.   This is another

5  Escape, both in the same year?

6             THE WITNESS: Yeah.

7             ALJ:  Mr. Grant, there were two Escape IIs

8  in 1997?

9             MR. GRANT: Yeah, I believe so, Your Honor.

10            ALJ:   Okay.

11            MR. GRANT: I see two different conviction

12 dates.

13 BY MR. GRANT:  (Continuing)

14      Q     2003, you're convicted of felony Assault IV?

15      A     Yes.

16      Q     And 2007, you're convicted of Possession of

17 Methamphetamine, also a felony?

18      A     Yes.

19      Q     Mr. Shinault?

20      A     Yeah.

21      Q     In 2007, you were also convicted of felony

22 Possession of Methamphetamine?

23      A     Yes.

24      Q     In 2008, you were convicted of felony Attempt

25 to Elude Police?

Shinault - X          98

1      A    Yes.

2      Q    And 2008, you were also convicted of felony

3   Meth Possession?

4      A    2008?

5      Q    Excuse me, felony Delivery of Methamphetamine?

6      A    Yes.

7               MR. GRANT:  Your Honor, if I may have just

8   a moment here.

9                    (Pause)

10  BY MR. GRANT:  (Continuing)

11     Q    Mr. Shinault, have you ever been on the Oregon

12  Health Plan?

13     A    At one time, yeah.

14     Q    When was that?

15     A    That was back in 2008.

16     Q    And were you on the Oregon Health Plan up to

17  the time of your incarceration?

18     A    No.

19     Q    When you were on the Oregon Health Plan, did

20  they provide you with medications for your diabetes?

21     A    No.

22     Q    What did you use the Oregon Health Plan for?

23     A    Food stamps.

24               ALJ:  Wait a minute.  The Oregon Health

25  Plan for food stamps?  I thought that was a separate

1    program.

2                        THE WITNESS:  Huh-uh.  The Oregon Health

3    Plan -- I don't -- I haven't been on Oregon Health Plan

4    since 2007.

5                        ALJ:  Okay.  Any other questions?

6                        MR. GRANT:  No, Your Honor.  Thank you.

7                        ALJ:  Okay.  Let's see.  Mr. Grant, I'm

8    trying to kind of look here and look at these dates and

9    everything.  Now, the sentence, the most recent sentence

10   which would be 2008, October 2008, was that -- did that

11   include the Delivery of Methamphetamine, Class B felony,

12   and the felony Attempt to Elude convictions?

13                       MR. GRANT:  Let's see.  I'm looking at an

14   OJIN print here, Your Honor, and I -- what I'm looking at

15   here, the OJIN print for the Attempt to Elude, and this

16   is Marion County Case 08C-48929, shows that he was

17   convicted, the incident date was September 28, 2008, that

18   he pled guilty on 10-17-2008 and was given 90 days in

19   jail.   I don't know if they had him serve that

20   concurrently with any other sentence or not.  I can

21   probably --

22                       ALJ:  What got him in prison from October

23   23, '08 to August 14, '09?  Was that the Delivery of

24   Methamphetamine, the indictment from Marion County, that

25   alleges that on July 5th, 2008, he delivered

Colloquy          100

1    methamphetamine?

2              MR. GRANT:  My understanding, Your Honor,

3    and I don't -- I'm not saying it definitively as a

4    witness here, but my understanding is he was convicted of

5    the methamphetamine, was given probation and then

6    violated the probation.  The documents you asked me about

7    earlier, Exhibits A18 on, talk about the probation

8    violation and it's my understanding that when he actually

9    went to prison, it was for the probation violation

10   related to that possession of methamphetamine.

11             ALJ:  Well, actually, it looks like the

12   indictment was for Delivery of Meth.

13             MR. GRANT:  Excuse me, Delivery of

14   Methamphetamine.  You're right, Your Honor.  I'm looking

15   at the other charge on the Possession.

16             ALJ:  Okay.  And I don't know which is

17   more serious, Delivery or Possession.  I suspect Delivery

18   is but I don't -- and I don't know if there is a

19   difference.

20             THE PETITIONER:  Delivery is, Your Honor.

21             ALJ:  Higher up on the food chain on

22   seriousness?  Is it more serious than just Possession?

23             THE PETITIONER:  Yeah.  Possession is a

24   lower, but Delivery is higher up.

25             ALJ:  Okay.  That was the only question.

1    One thing in looking, I just noticed something.

2                    THE PETITIONER:  Can I say one thing based

3    on --

4                    ALJ:   No,  you'll  have  a  chance  in  a

5    minute, sir.  Mr. Grant, I'm looking at Exhibit A1, page

6    7.

7                    MR. GRANT:  Yes, Your Honor.

8                    ALJ:  And I just noticed something.  You

9    have the dates there, 10-23-2008 and 8-14-1009.  Do you

10   mean 2009?

11                   MR.  GRANT:  Yes,  Your  Honor,  that  is  a

12   typo.

13                   ALJ:  Okay.  I'll just make that.  That's

14   obviously,  couldn't  be  a  thousand  years  ago.   So  I'll

15   make that change.

16                   MR. GRANT:  Thank you, Your Honor.

17                   ALJ:  Okay.  All right.  Now, you were

18   going to say something, Mr. Shinault.  What was it?

19                   THE   PETITIONER:  Also,   while   being

20   incarcerated in Deer Ridge, I took a class called -- for

21   six months, it was a drug class, and it's called Phoenix,

22   and I took this class because I wanted to better my life

23   and stay clean and sober, you know, and I completed this

24   class.  I noticed Mr. Hawks or --

25                   ALJ: When did you complete the class?

Colloquy          102

1                    THE PETITIONER: I completed the class upon

2      my release.

3                    ALJ:   Well, when did you complete the

4      class?

5                    THE PETITIONER: August 14th.

6                    ALJ: Okay. It was in prison and you were

7      released and you completed it when you were released?

8                    THE PETITIONER:  It's extensive in-house

9      program, real extensive.

10                   ALJ: Okay. Well, that's fine. It's good

11     to know that. Okay. Anything further, Mr. Grant, by way

12     of rebuttal testimony?

13                   MR. GRANT:  No, Your Honor.

14                   ALJ:  Anything further by way of rebuttal

15     testimony, Mr. Shinault?

16                   THE PETITIONER:  No, Your Honor.

17                   ALJ: Okay. Let's see. Closing argument,

18     Mr. Grant.  Why don't you go ahead.

19                   MR. GRANT:  Let's start with the law here.

20     Inmates  are  liable  for  their  cost  of  care  while

21     incarcerated,  and  the  authority  for  this  is  ORS

22     179.620(2)  and  Oregon  Administrative  Rules  291-203-

23     0040(1).   Under  ORS  179.620(2),  inmates  are  charged

24     according  to  their  ability  to  pay.   ORS  179.640(1)

25     authorizes Corrections to establish rules for determining

1   an inmate's ability to pay and the Department of
2   Corrections did this, and the primary rule is OAR 291-
3   203-0050.  This provides in part that the Department of
4   Corrections will consider the inmate's assets and says
5   that Corrections may allow deductions for legal
6   obligations and the like.  So turning to the facts of the
7   case, Your Honor, the cost of care for Mr. Shinault
8   between May 19th, 2005 through February 5th, 2007, and
9   then again from October 23rd, '08 through August 14th,
10  '09, was, according to Exhibit A1, $65,353.94.  As we
11  discussed in the hearing, Your Honor, that number is
12  actually off a little bit because he should have been
13  charged a little bit lower for approximately 40 some days
14  during the 03-05 biennium, but then he also should have
15  been charged a little bit more for approximately 40 some
16  days during the 2009-2011 biennium.  At any rate, the
17  discrepancy probably doesn't matter because the
18  Department of Corrections is not asking for an order for
19  $65,000.  Instead, what they're asking for is an order
20  requiring Mr. Shinault to pay $61,352.39 because that's
21  the money that the Department of Corrections is holding
22  at this time.  Your Honor, Mr. Shinault's had $107,000
23  deposited into his inmate trust account, $21,717 was
24  deducted to pay for past due child support.  Therefore,
25  section 2 of the order correctly came up with his

Colloquy          104

1   available assets as being $85,699 and change.   The
2   Department of Corrections, in accordance with its rules,
3   allowed him three months of post-prison support.   They
4   allowed him $5,000.   They also gave him $90 for living
5   expenses while he was incarcerated.   Mr. Shinault, Your
6   Honor, I want to talk for a moment about his medical
7   expenses.   His medical expenses, he is saying he needs
8   money for Metformin and the other drug to protect his
9   brain and heart.   First thing is, Your Honor, he left
10  prison with apparently 60 days worth of the medications.
11  Second of all, Your Honor, sounds like he was already
12  during October been incarcerated for roughly two weeks,
13  and is hoping to get out by the end of the month.   It
14  sounds like the three months of his medication needs,
15  frankly also his food needs while he's incarcerated, have
16  been provided for him.   The other thing, Your Honor, is
17  that the Department of Corrections did leave him money.
18  They left him the roughly $5,000, but on top of that,
19  Your Honor, there was other money that he also had.
20  After you take $85,000 as the net after the child support
21  is pulled out, and you take off 65,000 roughly from that,
22  he's still left with $20,000, and that includes the
23  $5,000.  Of the 20, he's apparently spent all of it, and
24  some of it apparently went to a lawyer, some of it went
25  for, it sounds like, getting an automobile out of

1   impound.  We don't know where the rest of it went.  It's

2   apparently all gone, Your Honor, and unfortunately that's

3   his choice.  What we have here is somebody unfortunately

4   who has a fairly involved criminal record, has some drug

5   issues, Your Honor, is apparently -- was pulled in on a

6   parole violation because of drug paraphernalia found in

7   the residence where they were at --

8           ALJ:  You're talking about the most recent

9   October 10th?

10          MR. GRANT:  The October 21 that Mr. Hawks

11  testified about, Your Honor.

12          ALJ:  Well, what was he arrested for on

13  October the 10th?

14          MR. GRANT:  I don't know that we heard

15  testimony about that, Your Honor.

16          ALJ: I'm sure we did.  Oh, well, that's

17  fine.  Go ahead.

18          MR. GRANT:  The point is, Your Honor, is

19  that here's somebody with unfortunately what appears to

20  be a criminal record and drug issues, and it certainly

21  would be my concern, Your Honor, that he -- although he's

22  going to come in here, and he did come in and say he

23  wants the money for medication, that he would instead use

24  it for other things, such as drug usage.  We heard no

25  explanation from him about --

Colloquy          106

1          THE PETITIONER:   That --

2          ALJ:   Now, Mr. Shinault, please don't

3    interrupt him.   Go ahead.

4          MR. GRANT:   We have no testimony about

5    what his medications cost, apparently because it sounds

6    like he hasn't had to buy any yet, and what his long-term

7    costs would be.   Your Honor, it would be my position that

8    -- or the State's position that if he is saying that he

9    should get something more than the $5,000 for those three

10   months, that he should have to come in and prove that.

11   And he hasn't done it, Your Honor.   The final thing I

12   want to note about the medical needs, Your Honor, is by

13   his own testimony, it sounds like he received Oregon

14   Health Plan in the past or -- I wasn't sure if it was

15   Oregon Health Plan or food stamps, but he's received, it

16   sounds like, some public assistance in the past.   If he

17   did receive Oregon Health Plan in the past, it certainly

18   raises the question of whether they will provide for his

19   medical needs in the future.   And other than that, Your

20   Honor, Department of Corrections would ask that you issue

21   an order requiring that he pay the sum of $61,352.39 for

22   his cost of care.

23          ALJ:   Okay.   Let me see, is there anywhere

24   in the record here that it shows what his date of birth

25   is?

1          THE PETITIONER:  6-13-67.

2          ALJ:  6-13-67?

3          THE PETITIONER: Yes.

4          ALJ:  Okay.  And that's on Exhibit A13,

5    page 2.  So, let's see, some quick math here, 42 years

6    old then?

7          THE PETITIONER: Yes.  Yes, sir.

8          ALJ:  Okay.  One thing, Mr. Grant, I'm

9    kind of curious in reading these rules and so forth, the

10   rule that determines this three months and so forth of

11   expenses, it would not appear in reading this, I mean, a

12   strict reading of the rule would kind of indicate the

13   only place that anything other than what's listed there

14   would fall under miscellaneous expenses.  So I'm kind of

15   curious if you had an inmate who was, let's say, a

16   paraplegic and got some big settlement and even if they

17   did come in with, you know, some credible evidence from

18   an economist and maybe a doctor or something that said

19   they were going to need tens of thousands or hundreds of

20   thousands of dollars of care for the rest of their life,

21   would this rule even allow any consideration of that?

22         MR. GRANT:  Your Honor, that rule on its

23   face says three months.  If I may have a moment here, I

24   can maybe shed some light there.  The -- Your Honor, I

25   don't want to speak for the Department of Corrections,

1    but I would direct Your Honor's attention to ORS 179.731.

2    If the Department of Corrections -- it says in part --

3    determines that the amount -- that collection of the

4    amount payable under the other statutes would be

5    detrimental to the best interests of the person or the

6    agency, the agency may waive the collection of part or

7    all of the amounts otherwise payable.  That may serve as

8    an escape valve, if you will, in a serious case.

9    Obviously in this case, Your Honor, it would be the

10   agency's position it doesn't present that -- it's not

11   that kind of case here.

12           ALJ:  Yeah.  That statute is interesting,

13   and then I guess the process would be, do you know if

14   there's any -- have you seen any cases where someone

15   maybe requested a waiver, I guess, would be a process

16   where you'd be entitled to make a request for waiver and

17   then the Department would make a decision and then would

18   that be subject to a separate appeal, I wonder?  Do you

19   know?

20           MR. GRANT:  Well, Mr. Hawks is here.  I

21   think he would probably testify that that particular

22   issue hasn't come up.  Certainly in the context of one of

23   these proceedings, somebody could, I suppose, ask for a

24   waiver in one of these proceedings.  I hadn't really

25   thought that through though, Your Honor, so I'm just kind

Colloquy                109

1    of talking out loud and I certainly don't want to say

2    what the Department's position would be.

3                    ALJ:   No, I understand.   And I'm not

4    trying to pin anybody down, I'm just -- I'm kind of

5    curious about all of this.   Mr. Hawks, have you folks

6    ever had somebody request a waiver of the amount?

7                    MR. HAWKS:  No, we have not.

8                    ALJ:  Okay.   I'd be curious as to whether

9    there is kind of a legal process in place for that

10   because that could actually even be kind of like a

11   separate hearing.   Curious.   Okay.   Mr. Shinault, your

12   closing argument.

13                   THE PETITIONER:  Yeah.   Due to the fact of

14   my drug use back in the past, I know I made a lot of bad

15   decisions and done a lot of bad things and I've done

16   drugs and all that, sold drugs and that, you know, but

17   when I took this program on, I took this program to

18   better myself and that's what I've been trying to do.

19   I've been out there trying to make a living and from

20   leaving prison with a low amount of money, knowing I have

21   kids and I have other things that need to be tooken care

22   of like my mom's house and my sister's and brother's, you

23   know, I'm the one everybody look up on, and I try to do

24   the right things to keep myself from prison and jails and

25   it seems to just keep getting wrapped up, but my thing is

1    that this money is for my health.  If I don't have this

2    money, then it's going to -- I'm going to end up dying

3    because I don't have no money to pay for my house to put

4    a roof over my head or keeping myself out of trouble.  If

5    I have money, I wouldn't be doing the things I been

6    doing, you know, having to sell drugs and stuff like

7    that.  I wouldn't do nothing like that.  I don't want to

8    do that no more.  I'm tired, I'm 42 years old.  I got

9    kids 13 years old now that's looking at me now, so now I

10   gotta be a better example for them.  This money -- this

11   money, like I said, is for my health.  When you guys take

12   this money, then you guys are committing murder because

13   it's going to kill me, you know.  Diabetes is a disease

14   that you just don't play with.  This might sound good for

15   you guys to take my money, but it shows what kind of

16   heart you got because you trying to take from a guy that

17   won a settlement that the State helped create the disease

18   in me and you guys want to take the money from me, you

19   know.  That's poor.  That's not right.  And you want to

20   use my drug back past to make it look like I'm a bad guy,

21   you know, just so you can get my money.  Well, I'm not

22   going to use this money for drugs, this money is strictly

23   for my health, it's for my hospital bills, it's for my

24   bills that I have to live up under.  I don't have no

25   intention as going back into the drug life.  I'm done

Colloquy                    111

1   with that.

2                  ALJ: When did you decide to be done with

3   the drug life?

4                  THE PETITIONER:  I was done with that when

5   I was taking my program, when I was in --

6                  ALJ:  When you got released on August

7   14th?

8                  THE PETITIONER: Yeah.  When I was in

9   prison.

10                  ALJ:  What did you get arrested for on

11  October the 19th?

12                  THE PETITIONER:  On October the 19th?

13                  ALJ: Yeah, a few days ago.  Why are you in

14  jail now?

15                  THE PETITIONER:  Abscond.  It started off

16  with abscond and then because I didn't have no place to

17  live, I lost my home.

18                  ALJ:  Okay.  I heard something about drug

19  paraphernalia found at the place where you tried to run

20  from on --

21                  THE PETITIONER: But I didn't run nowhere,

22  sir.  What happened was, when I was right across the

23  street at my sister's house, that's where I was staying

24  there for the time being.  I walked across the street to

25  a friend of mine's house and then 10 minutes later they

Colloquy          112

1    come -- they knocking on -- the police knocking on the

2    door.  Now, I don't got nothing to do with that house

3    right there.  Whatever goes on in that house is that's

4    their business.  I don't got nothing to do with it.  And

5    when I looked at the window and seen the police there, I

6    went back there and I told them, I said, you guys have

7    got police at the door, and then I walked in, sat down

8    and put a CD in the TV and I was watching a movie, and

9    then the police says, Shinault, we know you're back

10   there, come on out.  I walked out there, put my hand on

11   the wall and then came outside, the officer said let me

12   see your tongue, Mr. Shinault, and I showed him my tongue

13   and he said he's high off marijuana.  And then he says,

14   book him, so that's how I got here.  Now, he says when we

15   get you down here to Marion County, we're going to take

16   a UA.  We gets to Marion County, nobody does a UA.  I

17   even asked for a UA and they gave me no UA.

18              ALJ:  Okay.

19              THE PETITIONER:  So I'm just waiting for

20   my parole officer to come in here to give me a sanction

21   so I can get out of here.

22              ALJ:  Okay.  Thank you, Mr. Shinault.

23   Anything, final comments, Mr. Grant?

24              MR. GRANT:  No, Your Honor.

25              ALJ:  Okay.  I'm going to go ahead and

ER 245

Colloquy                113

1   close the record.  I'll be reviewing all the evidence and

2   issuing a written decision that will be out within 45

3   days.  Thank you all.

4                  THE PETITIONER: Thank you.

5                  ALJ:  Bye.

6                  MR. GRANT:  Bye-bye.

7

8                  (Concluded)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Certificate        114

I, Robin Curl, do hereby certify that I am a court transcriber in and for the State of Oregon.

I further certify that the proceedings were digitally recorded, supplied to me, and thereafter reduced to typewriting by me, and that the foregoing is an accurate and complete transcript to the best of my ability of such digitally recorded proceedings.

IN WITNESS WHEREOF, I have hereunto set my hand in the City of Salem, County of Polk, State of Oregon, this 28th day of May, 2010.

_Robin Curl_

Robin Curl
Court Transcriber

APPEAL,IFP,PPS,PR1983,TERMINATED

# U.S. District Court
## District of Oregon (Portland (3))
## CIVIL DOCKET FOR CASE # 3:11-cv-00436-PK

Shinault v. Hawks et al
Assigned to: Magistrate Judge Paul Papak
Demand: $650,000
Case in other court: Ninth Circuit, 13-35290
Cause: 42:1983 Prisoner Civil Rights

Date Filed: 04/06/2011
Date Terminated: 03/05/2013
Jury Demand: Both
Nature of Suit: 550 Prisoner: Civil Rights
Jurisdiction: Federal Question

**Plaintiff**

**Lester R. Shinault**                 represented by  **Lester R. Shinault**
                                                       8041974
                                                       Snake River Correctional Institution
                                                       777 Stanton Blvd
                                                       Ontario, OR 97914-8335
                                                       PRO SE

V.

**Defendant**

**Dick Hawks**                         represented by  **Jacqueline Sadker Kamins**
                                                       State of Oregon
                                                       Department of Justice
                                                       1515 SW Fifth Ave., Suite 410
                                                       Portland, OR 97201
                                                       (503) 947-4700
                                                       Fax: (503) 947-4794
                                                       Email:
                                                       jacqueline.kamins@doj.state.or.us
                                                       *TERMINATED: 04/04/2012*

                                                       **Kristin A. Winges-Yanez**
                                                       Oregon Department of Justice
                                                       1515 SW Fifth Avenue
                                                       Suite 410
                                                       Portland, OR 97201
                                                       (971) 673-1880
                                                       Fax: (971) 673-5000
                                                       Email: kristin.a.winges-
                                                       yanez@doc.state.or.us
                                                       *TERMINATED: 12/06/2012*

                                                       **Loren William Collins**

State of Oregon
Department of Justice - Trial Division
1162 Court Street, NE
Salem, OR 97301-4096
(503) 947-4700
Fax: (503) 947-4791
Email: loren.collins@doj.state.or.us
*TERMINATED: 06/13/2011*

**Shannon M. Vincent**
Oregon Department of Justice
Trial Division, CLS
1162 Court Street, NE
Salem, OR 97301-0346
(503) 947-4700
Fax: (503) 947-4791
Email:
shannon.m.vincent@doj.state.or.us
*ATTORNEY TO BE NOTICED*

**Defendant**

**Tami Dohrman**                    represented by  **Jacqueline Sadker Kamins**
                                                    (See above for address)
                                                    *TERMINATED: 04/04/2012*

                                                    **Kristin A. Winges-Yanez**
                                                    (See above for address)
                                                    *TERMINATED: 12/06/2012*

                                                    **Loren William Collins**
                                                    (See above for address)
                                                    *TERMINATED: 06/13/2011*

                                                    **Shannon M. Vincent**
                                                    (See above for address)
                                                    *ATTORNEY TO BE NOTICED*

**Defendant**

**Martha McDaniel**                  represented by  **Jacqueline Sadker Kamins**
                                                    (See above for address)
                                                    *TERMINATED: 04/04/2012*

                                                    **Kristin A. Winges-Yanez**
                                                    (See above for address)
                                                    *TERMINATED: 12/06/2012*

                                                    **Loren William Collins**
                                                    (See above for address)
                                                    *TERMINATED: 06/13/2011*

**Shannon M. Vincent**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Oregon Department of Corrections**    represented by  **Loren William Collins**
**General Service Division**    (See above for address)
*TERMINATED: 06/13/2011*

| Date Filed | # | Docket Text |
|---|---|---|
| 04/06/2011 | 1 | Application for Leave to Proceed IFP. Filed by Lester R. Shinault. (gw) (Entered: 04/07/2011) |
| 04/06/2011 | 2 | Complaint. Jury Trial Requested: Yes. Filed by Lester R. Shinault against Tami Dohrman, Dick Hawks, Martha McDaniel, Oregon Department of Corrections General Service Division. (Attachment: # 1 Handwritten Complaint) (gw) (Additional attachments added on 4/11/2011: # 2 Exhibit 1a-1g, # 3 OSP mailing information) (gw). Modified on 4/11/2011 to add additional attachments received 4/11/2011 (gw). (Entered: 04/07/2011) |
| 04/06/2011 | 3 | **Notice of Case Assignment:** This case is assigned to Magistrate Judge Paul Papak. (gw) (Entered: 04/07/2011) |
| 04/06/2011 | 4 | Motion for Appointment of Counsel. Filed by Lester R. Shinault. (Attachment: # 1 second version of motion) (gw) (Entered: 04/07/2011) |
| 04/07/2011 | | Clerk's Notice of Mailing to Lester R. Shinault of Case Assignment Notice 3 . (gw) (Entered: 04/07/2011) |
| 05/09/2011 | 5 | **ORDER:** Granting Plaintiff's Application/Motion for Leave to Proceed in Forma Pauperis 1 . The Clerk of the Court is directed to send waiver of service packets to the Oregon Attorney General. The Clerk of the Court is directed to send a copy of this order to the Oregon Department of Corrections - Central Trust Unit. (Order sent to OR Dept. of Corr. on 5/10/11.) Signed on 5/9/11 by Magistrate Judge Paul Papak. (gm) (Entered: 05/10/2011) |
| 05/09/2011 | 6 | **ORDER:** Denying Plaintiff's Motion for Appointment of Counsel 4 . Signed on 5/9/11 by Magistrate Judge Paul Papak. (gm) (Entered: 05/10/2011) |
| 05/09/2011 | 7 | Notice of Lawsuit and Request for Waiver of Service of Summons: Waiver of Service is due by 6/13/2011. (Attachment: # 1 Complaint) (gm) (Entered: 05/10/2011) |
| 05/27/2011 | 8 | Motion for Reconsideration of Order on Motion for Appointment of Counsel 6 . Filed by Lester R. Shinault. (gw) (Entered: 05/27/2011) |
| 05/27/2011 | 9 | Declaration of Lester A. Shinault. Filed by Lester R. Shinault. (Related document: Motion for Reconsideration 8 .) (gw) (Entered: 05/27/2011) |
| 06/13/2011 | 10 | Waiver of Service of Summons Returned Executed Filed by Martha McDaniel, Tami Dohrman, Dick Hawks. (Kamins, Jacqueline) (Entered: 06/13/2011) |

| 06/13/2011 | 11 | Notice of Attorney Withdrawal: *Notice of Withdrawal of Loren Collins as Counsel of Record* Filed by Tami Dohrman, Dick Hawks, Martha McDaniel (Kamins, Jacqueline) (Entered: 06/13/2011) |
| 07/05/2011 | 12 | Answer to 2 Complaint, with Jury Demand *(titled as Defendants' Answer to Plaintiff's Complaint and Affirmative Defenses-Jury Demand)*. Filed by Tami Dohrman, Dick Hawks, Martha McDaniel. (Kamins, Jacqueline) (Entered: 07/05/2011) |
| 07/08/2011 | 13 | **Scheduling Order for Civil Rights Actions Filed by Incarcerated Plaintiffs**. Summary Judgment Advice Notice and Consent Form. All pretrial, discovery, and dispositive motions are due by 9/9/2011. Signed on 7/08/2011 by Deputy Clerk G. Williams. (Attachment: # 1 Consent to Jurisdiction by Magistrate form) (gw) (Entered: 07/08/2011) |
| 07/08/2011 | 14 | Clerk's Notice of Mailing to Lester R. Shinault of Prisoner Civil Rights Scheduling Order and Summary Judgment Advice Notice 13 . (gw) (Entered: 07/08/2011) |
| 08/15/2011 | 15 | Motion for Extension of Time. Filed by Lester R. Shinault. (Attachments: # 1 Statement of the Case, # 2 Request for Production of Documents, # 3 Affidavit of Mailing) (gw) (Entered: 08/25/2011) |
| 08/15/2011 | 16 | Second Motion for Appointment of Counsel. Filed by Lester R. Shinault. (Attachments: # 1 Exhibits, # 2 Certificate of Service) (gw) (Entered: 08/25/2011) |
| 08/29/2011 | 17 | Notice. Filed by Lester R. Shinault. (gw) (Entered: 08/29/2011) |
| 09/09/2011 | 18 | Motion for Extension of Time . Filed by Tami Dohrman, Dick Hawks, Martha McDaniel. (Kamins, Jacqueline) (Entered: 09/09/2011) |
| 09/09/2011 | 19 | Declaration of Jacqueline Kamins . Filed by Tami Dohrman, Dick Hawks, Martha McDaniel. (Related document(s): Motion for Extension of Time 18 .) (Kamins, Jacqueline) (Entered: 09/09/2011) |
| 09/12/2011 | 20 | Second Motion for Extension of Time, to 11/4/2011. Filed by Lester R. Shinault. (gw) (Entered: 09/13/2011) |
| 09/12/2011 | 21 | Declaration of Lester Rubin Shinault. Filed by Lester R. Shinault. (Related document: Second Motion for Extension of Time 20 .) (gw) (Entered: 09/13/2011) |
| 10/03/2011 | 22 | **ORDER** issued by Magistrate Judge Paul Papak: Denying Plaintiff's Motions 8 & 16 for the reasons set forth in the Court's prior Order 6 denying Plaintiff's motion for appointment of counsel. Granting Defendants' Motion 18 for extension of time to file their motion for summary judgment and Plaintiff's Motion 20 for extension of time to complete discovery as follows: All pretrial, discovery and dispositive motions are due by 11/8/2011. (gm) (Entered: 10/03/2011) |
| 10/04/2011 | 23 | Clerk's Notice of Mailing to Plaintiff regarding Order 22 . (gm) (Entered: 10/04/2011) |

| 10/26/2011 | 24 | Motion for Extension of Time (titled by filer "Plaintiff Motion for Extension Of Time To Production Of Documents"). Filed by Lester R. Shinault. (gw) (Entered: 10/27/2011) |
|---|---|---|
| 11/03/2011 | 25 | **ORDER** issued by Magistrate Judge Paul Papak: Granting Plaintiff's Motions for Extension of Time to Complete Discovery 15 & 24 as follows: All pretrial, discovery, and dispositive motions are due by 1/9/2012. Plaintiff's Motion for Leave to File an Amended Complaint 15 is Denied, with leave to re-file, on the basis he failed to attach a copy of the proposed amended pleading as an exhibit to his motion as required by Local Rule 15-1(d)(1). (gm) (Entered: 11/03/2011) |
| 11/03/2011 | 26 | Clerk's Notice of Mailing to Plaintiff regarding Order 25 . (gm) (Entered: 11/03/2011) |
| 11/10/2011 | 27 | Motion for Summary Judgment . Filed by Tami Dohrman, Dick Hawks, Martha McDaniel. (Kamins, Jacqueline) (Entered: 11/10/2011) |
| 11/10/2011 | 28 | Memorandum in Support *of Defendants' Motion for Summary Judgment*. Filed by Tami Dohrman, Dick Hawks, Martha McDaniel. (Related document(s): Motion for Summary Judgment 27 .) (Kamins, Jacqueline) (Entered: 11/10/2011) |
| 11/10/2011 | 29 | Declaration of Dick Hawks . Filed by Tami Dohrman, Dick Hawks, Martha McDaniel. (Related document(s): Motion for Summary Judgment 27 .) (Attachments: # 1 Attachment 1-10) (Kamins, Jacqueline) (Entered: 11/10/2011) |
| 11/10/2011 | 30 | Motion for Stay *(titled as Defendants' Motion to Stay Discovery)*. Filed by Tami Dohrman, Dick Hawks, Martha McDaniel. (Kamins, Jacqueline) (Entered: 11/10/2011) |
| 11/10/2011 | 31 | Memorandum in Support *of Defendants' Motion to Stay Discovery*. Filed by Tami Dohrman, Dick Hawks, Martha McDaniel. (Related document(s): Motion for Stay 30 .) (Kamins, Jacqueline) (Entered: 11/10/2011) |
| 11/10/2011 | 32 | **ORDER** issued by Magistrate Judge Paul Papak: Setting Defendants' Motion for Summary Judgment 27 on the under advisement calendar of 12/19/2011. Plaintiff's response to Defendants' summary judgment motion due by 11/29/2011. Defendants' reply to Plaintiff's response to summary judgment motion due by 12/16/2011. Order: Setting Defendants' Motion to Stay Discovery 30 on the under advisement calendar of 11/30/2011. Plaintiff's response to Defendants' motion to stay discovery due by 11/29/2011. (gm) (Entered: 11/14/2011) |
| 11/14/2011 | 33 | Clerk's Notice of Mailing to Plaintiff regarding Order 32 . (gm) (Entered: 11/14/2011) |
| 11/28/2011 | 34 | Motion for Extension of Time to File a Response/Reply to Motion for Summary Judgment 27 . Filed by Lester R. Shinault. (gw) (Entered: 11/29/2011) |
| 11/28/2011 | 35 | Affidavit of Lester Rubin Shinault in Support of Motion. Filed by Lester R. Shinault. (Related document: Motion for Extension of Time to File |

| | | |
|---|---|---|
| | | Response/Reply to a Motion 34 .) (Attachment: # 1 Certificate of Service) (gw) (Entered: 11/29/2011) |
| 11/30/2011 | 36 | **ORDER** issued by Magistrate Judge Paul Papak: Granting Plaintiff's Motion for Extension of Time 34 as follows: Plaintiff's response to Defendants' summary judgment motion due by 2/29/2012. Defendants' reply to Plaintiff's response to summary judgment motion due by 3/19/2012. Order: Resetting Defendants' Motion for Summary Judgment 27 from 12/19/2011 to the under advisement calendar of 3/20/2012. (gm) (Entered: 11/30/2011) |
| 11/30/2011 | 37 | Clerk's Notice of Mailing to Plaintiff regarding Order 36 . (gm) (Entered: 11/30/2011) |
| 12/14/2011 | 39 | Third Motion for Appointment of Counsel. Filed by Lester R. Shinault. (gw) (Entered: 12/15/2011) |
| 12/15/2011 | 38 | Motion for Reconsideration of Motion to Appoint Counsel 16 . Filed by Lester R. Shinault. (Attachment: # 1 Letters) (gw) (Entered: 12/15/2011) |
| 12/19/2011 | 40 | **ORDER:** Plaintiff's Motion to Stay Discovery 30 is Granted. In addition, Plaintiff's Motions 38 and 39 are Denied for the reasons set forth in the Court's prior Order 6 denying Plaintiff's Motion for Appointment of Counsel. Finally, Plaintiff is reminded that his response to Defendants' Motion for Summary Judgment is due by 2/29/2012. Signed on 12/19/11 by Magistrate Judge Paul Papak. (gm) (Entered: 12/19/2011) |
| 12/19/2011 | 41 | Clerk's Notice of Mailing to Plaintiff regarding Order 40 . (gm) (Entered: 12/19/2011) |
| 02/27/2012 | 42 | Motion for Extension of Time to File a Response/Reply to Motion for Summary Judgment 27 . Filed by Lester R. Shinault. (gw) (Entered: 02/28/2012) |
| 02/28/2012 | 43 | Second Motion for Extension of Time to File a Response/Reply to Motion for Summary Judgment 27 . Filed by Lester R. Shinault. (gw) (Entered: 02/29/2012) |
| 03/06/2012 | 44 | Response in Opposition to Motion for Summary Judgment 27 . Filed by Lester R. Shinault. (gw) (Entered: 03/06/2012) |
| 03/06/2012 | 45 | Memorandum in Support. Filed by Lester R. Shinault. (Related document: Response in Opposition to Motion 44 .) (gw) (Entered: 03/06/2012) |
| 03/08/2012 | 46 | **ORDER** issued by Magistrate Judge Paul Papak: Granting Plaintiff's Motions for Extension of Time 42 & 43 as follows: Plaintiff's response in opposition 44 and memorandum in support 45 are deemed timely filed. Defendants' reply to Plaintiff's response to summary judgment motion due by 3/26/2012. Order: Resetting Defendants' Motion for Summary Judgment 27 from 3/20/2012 to the under advisement calendar of 3/27/2012. (gm) (Entered: 03/08/2012) |
| 03/08/2012 | 47 | Clerk's Notice of Mailing to Plaintiff regarding Order 46 . (gm) (Entered: 03/08/2012) |
| 03/15/2012 | 48 | Mail Returned - Undeliverable: Order 46 sent to Lester R. Shinault returned as undeliverable. (gw) (Entered: 03/16/2012) |

| 03/21/2012 | 49 | Reply to Motion for Summary Judgment 27 . Filed by Tami Dohrman, Dick Hawks, Martha McDaniel. (Kamins, Jacqueline) (Entered: 03/21/2012) |
| 04/04/2012 | 50 | Notice of Attorney Substitution:Attorney Kristin A. Winges-Yanez is substituted as counsel of record in place of Attorney Jacqueline Sadker Kamins Filed by Martha McDaniel, Tami Dohrman, Dick Hawks (Winges-Yanez, Kristin) (Entered: 04/04/2012) |
| 04/13/2012 | 51 | **ORDER TO SHOW CAUSE**. Plaintiff shall provide the Court with a current mailing address on or before May 14, 2012. Plaintiff is advised that failure to comply with this Order will result in the dismissal of this action with prejudice. IT IS SO ORDERED. Signed on 4/13/2012 by Magistrate Judge Paul Papak. (gw) (Entered: 04/16/2012) |
| 04/16/2012 | 52 | Clerk's Notice of Mailing to Lester R. Shinault of Order to Show Cause 51 . (gw) (Entered: 04/16/2012) |
| 04/20/2012 | 53 | Mail Returned - Undeliverable: Order to Show Cause 51 sent to Lester R. Shinault returned as undeliverable. (gw) (Entered: 04/23/2012) |
| 05/03/2012 | 54 | Notice of Change of Address. Docket updated accordingly. Filed by Lester R. Shinault. (gw) (Entered: 05/03/2012) |
| 05/03/2012 | 55 | Clerk's Notice of Mailing to Lester R. Shinault at new address of Order 46 and Order to Show Cause 51 . (gw) (Entered: 05/03/2012) |
| 05/04/2012 | 56 | **ORDER** issued by Magistrate Judge Paul Papak: Resetting Defendants' Motion for Summary Judgment 27 from 3/27/2012 to the under advisement calendar of 5/7/2012. (gm) (Entered: 05/07/2012) |
| 05/07/2012 | 57 | Clerk's Notice of Mailing to Plaintiff regarding Order 56 . (gm) (Entered: 05/07/2012) |
| 05/22/2012 | 58 | Notice of Change of Address. Docket updated accordingly. Filed by Lester R. Shinault. (gw) (Entered: 05/23/2012) |
| 05/23/2012 | 59 | Clerk's Notice of Mailing to Lester R. Shinault at Marion County Jail of Order to Show Cause 51 and docket sheet containing Order 46 . (gw) (Entered: 05/23/2012) |
| 05/30/2012 | 60 | Response to Order to Show Cause. Filed by Lester R. Shinault. (eo) (Entered: 05/31/2012) |
| 06/11/2012 | 61 | **Findings & Recommendation:** Defendants' Motion for Summary Judgment 27 should be granted, and Shinault's claims in this action should be dismissed with prejudice. A final judgment should be prepared. Signed on 6/11/12 by Magistrate Judge Paul Papak. (gm) (Entered: 06/11/2012) |
| 06/11/2012 | 62 | **ORDER** issued by Magistrate Judge Paul Papak: Findings & Recommendation 61 is referred to Judge Anna J. Brown for review. Objections, if any, are due fourteen (14) days from service of the Findings and Recommendation. If no objections are filed, then the Findings and Recommendation will go under advisement on that date. If objections are filed, then a response is due fourteen (14) days after being served with a copy of the objections. When the response |

| | | is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement. (gm) (Entered: 06/11/2012) |
|---|---|---|
| 06/11/2012 | 63 | Clerk's Notice of Mailing to Plaintiff regarding Findings & Recommendation 61 and Order 62 . (gm) (Entered: 06/11/2012) |
| 06/18/2012 | 64 | Mail Returned - Undeliverable: Findings & Recommendation 62 , minute order 61 . Sent to Lester R. Shinault. Returned as undeliverable. (dmd) (Entered: 06/18/2012) |
| 07/10/2012 | 67 | Objections to Findings & Recommendation 61 , including Motion for Appointment of Counsel. Filed by Lester R. Shinault. (Attachments: # 1 Exhibits 1-3, # 2 envelope) (gw) (Entered: 07/12/2012) |
| 07/12/2012 | 65 | Order by Judge Anna J. Brown. Findings and Recommendation were issued on June 11, 2012 and a copy was mailed to Plaintiff at his last known address on June 11, 2012. On June 18, 2012, the Court received the Findings and Recommendation back as attempted-not known. Pursuant to Local Rule 83-10, a party not represented by counsel has a "continuing responsibility to notify the Clerk's Office whenever they change their mailing address or telephone number." When the Court sends mail to the last known address of an unrepresented party, the postal service returns the mail as undeliverable, and the failure to notify the Clerk of any changed address continues for sixty (60) days, then the Court may dismiss the action. Local Rule 83-12. The Plaintiff is directed to notify the Clerks Office of his change of address no later than August 20, 2012. Plaintiffs failure to notify the Clerks Office of his change of address by August 20, 2012, will result in dismissal of Plaintiffs case. (bb) (Entered: 07/12/2012) |
| 07/12/2012 | 66 | Clerk's Notice of Mailing to Lester Shinault copy of Order 65 on 7/12/2012. (bb) (Entered: 07/12/2012) |
| 07/13/2012 | 68 | Order by Judge Anna J. Brown. On 7/12/12 the Court issued an Order 65 advising Plaintiff that he had until 08/20/2012 to notify the Court of his current address. Apparently that Order and a letter from Plaintiff crossed in the mail in light of the fact that the Court received Plaintiffs letter on 7/10/12. In his letter ( 67 filed in the court record on 7/12/12), Plaintiff asks the Court not to dismiss his case, makes an additional request for appointed counsel even though the Court has denied such a request numerous times, and confirms his address is the same as reflected on the courts docket. The Court, therefore, concludes Plaintiff has satisfied the requirements of the Courts 7/12/12 Order 65 . In light of these circumstances, the Court is re-sending Plaintiff a copy of the F&R on this date that contains instructions on filing objections. Under the circumstances and considering the fact that Plaintiff appears pro se, the Court will grant Plaintiff additional time to submit objections to the Magistrate Judges Findings and Recommendation 61 issued 6/11/12. Thus, Plaintiff shall have until 8/6/12 to file any objections to the Findings and Recommendations, and Defendants may file a response to any such objections by 8/20/12. In any event, the Findings and Recommendations will be taken under advisement by this Court if no objections are filed by 8/6/12 or will be taken under advisement by this Court on 8/20/12 if objections are filed. The Court DENIES Plaintiffs |

|            |     |                                                                                                                                                                                                                                                                                   |
|------------|-----|-----------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
|            |     | request for appointed counsel on the same bases as the Magistrate Judge has previously denied such requests. (bb) (Entered: 07/13/2012)                                                                                                                                            |
| 07/13/2012 | 69  | Clerk's Notice of Mailing to Lester Shinault copy of F&R 61 and Order 68 on 7/13/2012 to Marion County Seriff's Office-Jail, 4000 Aumsville Hwy S.E., Salem, OR 97317. (bb) (Entered: 07/13/2012)                                                                                   |
| 07/17/2012 | 70  | Fourth Motion for Appointment of Counsel. Filed by Lester R. Shinault. (gw) (Entered: 07/19/2012)                                                                                                                                                                                  |
| 07/19/2012 | 71  | Fifth Motion for Appointment of Counsel. Filed by Lester R. Shinault. (gw) (Entered: 07/19/2012)                                                                                                                                                                                   |
| 07/30/2012 | 72  | **ORDER:** The Court DENIES Plaintiff's Motions 70 , 71 for Appointment of Counsel. The Court grants Plaintiff leave to file any objection to the June 11, 2012, Findings and Recommendation no later than 08/20/2012. Defendants shall file any responses to objections no later than 09/03/2012. Signed on 07/30/2012 by Judge Anna J. Brown. See attached 4 page Order Denying Motions for Appointment of Counsel. (bb) (Entered: 07/30/2012) |
| 07/30/2012 | 73  | Clerk's Notice of Mailing to Lester Shinault copy of Order 72 on 7/31/2012. (bb) (Entered: 07/30/2012)                                                                                                                                                                             |
| 07/30/2012 | 74  | Order by Judge Anna J. Brown. Due to September 3, 2012, being a holiday, Defendants shall file any responses to objections no later than September 4, 2012. (bb) (Entered: 07/30/2012)                                                                                              |
| 07/30/2012 | 75  | Clerk's Notice of Mailing to Lester Shinault copy of Order 74 on 7/31/2012. (bb) (Entered: 07/30/2012)                                                                                                                                                                             |
| 08/02/2012 | 76  | Objections to Findings & Recommendation 61 . Filed by Lester R. Shinault. (Attachment: # 1 Inmate request forms) (gw) (Entered: 08/03/2012)                                                                                                                                        |
| 08/07/2012 | 77  | Motion for Reconsideration of Order on Motion for Appointment of Counsel 72 . Filed by Lester R. Shinault. (gw) (Entered: 08/08/2012)                                                                                                                                              |
| 08/09/2012 | 78  | **ORDER by Judge Anna J. Brown.** The Court acknowledges Plaintiffs letter received August 7, 2012, which the Court construes as a Motion 77 for Reconsideration of the Courts Order issued July 30, 2012. In its Order the Court denies Plaintiffs request for appointment of counsel. In his Motion 77 Plaintiff requests the Court to reconsider its July 30, 2012, Order. Plaintiff has not made any showing that warrants a change in the Courts original analysis and decision to deny Plaintiffs request for appointment of counsel. Accordingly, the Court grants Plaintiffs Motion to the extent that the Court reconsiders Plaintiffs request for appointment of counsel. The Court ADHERES to its decision set out in the July 30, 2012, Order and DENIES Plaintiffs request for appointment of counsel for the reasons therein.The dates set out in the Courts July 30, 2012, Order remain in effect: Plaintiff may file objections to the June 11, 2012, Findings and Recommendation no later than August 20, 2012, and Defendants responses to those objections, if any, are due no later than September 4, 2012. (bb) (Entered: 08/09/2012) |
| 08/09/2012 | 79  | Clerk's Notice of Mailing to Lester R. Shinault copy of Order 78 on 08/10/2012. (bb) (Entered: 08/09/2012)                                                                                                                                                                         |

| | | |
|---|---|---|
| 08/21/2012 | 80 | Motion for Extension of Time. Filed by Lester R. Shinault. (gw) (Entered: 08/21/2012) |
| 08/23/2012 | 81 | **ORDER by Judge Anna J. Brown.** On August 9. 2012, the Court issued an Order again affirming the August 20, 2012, deadline for Pro Se Plaintiff Lester R. Shinault to file his Objections to Magistrate Judge Papak's Findings and Recommendations 61 that have been pending since they were issued on June 11, 2012. On August 21, 2012, Plaintiff made his filing 80 , which the Court construes both as his Objections to the Findings and Recommendations and a request for an extension of time "to show evidence to the court that ODOC violated my rights." The Court notes Plaintiff filed this matter in April 2011 and, other than filing repeated motions for appointment of counsel and his two substantive filings regarding the Findings and Recommendations 76 , 80 , it does not appear Plaintiff has made any substantive effort to prosecute this matter despite numerous notices from the Court regarding his obligations, including a Summary Judgment Advice Notice 14 on July 8, 2011, more than a year ago. Accordingly, given the significant length of time this proceeding has been pending and the fact the Findings and Recommendations have been pending more than 60 days, the Court, in the exercise of its discretion, concludes another extension of the time for Plaintiff to make a further filing regarding his objections is not warranted. Accordingly, the Court denies that part of Plaintiff's August 21, 2012, filing 80 seeking additional time. Although that filing was one day late and made without leave of court, the Court excuses that late filing in light of Plaintiff's Pro Se and incarcerated status. Defendants' response to Plaintiff's Objections remain due on September 4, 2012, when the Court will take the Findings and Recommendations under advisement. (bb) (Entered: 08/23/2012) |
| 08/23/2012 | 82 | Clerk's Notice of Mailing to Lester R. Shinault copy of Order 80 on 8/23/2012. (bb) (Entered: 08/23/2012) |
| 08/30/2012 | 84 | Notice. Filed by Lester R. Shinault. (gw) (Entered: 09/04/2012) |
| 08/31/2012 | 83 | Response to Objections to Findings & Recommendation. Related document(s): 76 Objections to Findings & Recommendation. Filed by Tami Dohrman, Dick Hawks, Martha McDaniel. (Winges-Yanez, Kristin) (Entered: 08/31/2012) |
| 09/06/2012 | 85 | **(STRICKEN)ORDER:** The Court ADOPTS in part Magistrate Judge Acosta's Findings and Recommendation 61 to the extent that the Court GRANTS Defendants' Motion 27 for Summary Judgment as to Plaintiff's claims for violation of the First, Sixth, and Eighth Amendments and Plaintiff's claim for conspiracy to interfere with his civil rights DISMISSES those claims with prejudice. The Court, therefore, REFERS to the Magistrate Judge for further Findings and Recommendation Plaintiff's allegation that Defendants violated Plaintiff's rights to due process under the Fourteenth Amendment. Signed on 09/06/2012 by Judge Anna J. Brown. (bb) Modified on 9/6/2012 (bb). (Entered: 09/06/2012) |
| 09/06/2012 | 86 | (STRICKEN) Clerk's Notice of Mailing to Lester R. Shinault copy of Order 85 on 9/6/2012. (bb) Modified on 9/6/2012 (bb). (Entered: 09/06/2012) |
| 09/06/2012 | 87 | |

| | | |
|---|---|---|
| | | Order for Administrative Correction of the Record pursuant to Fed. R. Civ. P. 60(a). A Clerical error has been discovered in the case record. The Clerk is directed to make the following administrative corrections to the record: The Court directs that the Clerk STRIKE dockets 85 and 86 . (bb) (Entered: 09/06/2012) |
| 09/06/2012 | 88 | Order. The Court ADOPTS in part Magistrate Judge Papak's Findings and Recommendation 61 to the extent that the Court GRANTS Defendants' Motion 27 for Summary Judgment as to Plaintiff's claims for violation of the First, Sixth, and Eighth Amendments and Plaintiff's claim for conspiracy to interfere with his civil rights DISMISSES those claims with prejudice. The Court, therefore, REFERS to the Magistrate Judge for further Findings and Recommendation Plaintiff's allegation that Defendants violated Plaintiff's rights to due process under the Fourteenth Amendment. Signed on 09/06/2012 by Judge Anna J. Brown. (bb) (Entered: 09/06/2012) |
| 09/06/2012 | 89 | Clerk's Notice of Mailing to Lester R. Shinault copy of Order 88 on 9/7/2012. (bb) (Entered: 09/06/2012) |
| 10/16/2012 | 90 | Notice of Change of Address. Docket updated accordingly. Filed by Lester R. Shinault. (gw) (Entered: 10/17/2012) |
| 12/06/2012 | 91 | Notice of Attorney Substitution:Attorney Shannon M. Vincent is substituted as counsel of record in place of Attorney Kristin A. Winges-Yanez *(titled "Notice of Substitution of Counsel")* Filed by Martha McDaniel, Tami Dohrman, Dick Hawks (Vincent, Shannon) (Entered: 12/06/2012) |
| 12/10/2012 | 92 | **Findings & Recommendation:** Defendants' Motion for Summary Judgment 27 should be granted as to Shinault's claim under 42 U.S.C. § 1983 premised on the violation of his Fourteenth Amendment due process rights. A final judgment should be prepared. Signed on 12/10/12 by Magistrate Judge Paul Papak. (gm) (Entered: 12/10/2012) |
| 12/10/2012 | 93 | **ORDER** issued by Magistrate Judge Paul Papak: Findings & Recommendation 92 is referred to Judge Anna J. Brown for review. Objections, if any, are due fourteen (14) days from service of the Findings and Recommendation. If no objections are filed, then the Findings and Recommendation will go under advisement on that date. If objections are filed, then a response is due fourteen (14) days after being served with a copy of the objections. When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement. (gm) (Entered: 12/10/2012) |
| 12/10/2012 | 94 | Clerk's Notice of Mailing to Plaintiff regarding Findings & Recommendation 27 should be granted 92 & Order 93 . (gm) (Entered: 12/10/2012) |
| 12/26/2012 | 95 | Motion for Extension of Time to File a Response to Findings & Recommendation: Motion for Summary Judgment 27 should be granted # 92 . Filed by Lester R. Shinault. (eo) Modified on 12/28/2012 to correct title of motion (bb). (Entered: 12/27/2012) |
| 12/26/2012 | 96 | Notice of Change of Address. Filed by Lester R. Shinault (eo) (Entered: 12/27/2012) |
| | | |

| 12/28/2012 | 97 | **ORDER by Judge Anna J. Brown.** Granting Plaintiff's Motion for Extension of Time to File a Response to F & R 95 . Plaintiff's response to F & R extended to 1/31/2013. (bb) (Entered: 12/28/2012) |
| 12/28/2012 | 98 | Clerk's Notice of Mailing to Lester R. Shinault regarding Order on Motion for Extension of Time to File Objection to F & R 97 . (bb) (Entered: 12/28/2012) |
| 01/22/2013 | 99 | Second Motion for Extension of Time to File an Objection to Findings & Recommendation 92 . Filed by Lester R. Shinault. (gw) (Entered: 01/25/2013) |
| 01/25/2013 | 100 | **ORDER by Judge Anna J. Brown.** The Court acknowledges receipt of Plaintiff's Second Motion 99 for Extension of Time to file Objections to the Magistrate Judge's Findings and Recommendations 92 . When the Court granted Plaintiff's first request for extension, the Court extended the deadline for Plaintiff's Objections to January 31, 2013, which was an extension of more than 30 days from the initial due date. The Court granted the extension in light of Plaintiff's pro se and incarcerated status. Plaintiff's current request, filed January 22, 2013, seeks another 30-day extension and does not provide any reason why such additional extension is necessary. The Court notes Defendants' underlying Motion 27 for Summary Judgment has been pending for more than 14 months, primarily due to many extensions of time granted to Plaintiff. It is not in the interests of justice that this matter be put off without just cause. Accordingly, the Court denies Plaintiff's Second Motion 99 for Extension of Time. In light of the fact that the current deadline, January 31, 2013, is only days away, and because Plaintiff may have assumed the request would be granted and, therefore, may not have been working on his Objections since he filed the Second Motion, the Court, on its own Motion, extends the deadline for Plaintiff's Objections to Friday, February 8, 2013. If Objections are timely filed, Defendants' response is now due 02/25/2013, when the Court will take the Findings and Recommendations under advisement.The Court directs the Clerk to attempt to expedite delivery of notice of this Order to Plaintiff. (bb) (Entered: 01/25/2013) |
| 01/25/2013 | 101 | Clerk's Notice of Mailing to Lester R. Shinault copy of Order (#100) on 1/25/2013. (bb) (Entered: 01/25/2013) |
| 02/08/2013 | 102 | Third Motion for Extension of Time to File an Objection to Findings & Recommendation 92 . Filed by Lester R. Shinault. (gw) (Entered: 02/11/2013) |
| 02/12/2013 | 103 | **ORDER:** The Court has received Plaintiff's Third Motion 102 for Extension of Time to file objections to the pending Findings and Recommendations 92 . Although this Motion asserts there is good cause to an extension due to Plaintiff's pro se and incarcerated status, Plaintiff does not provide any support for the notion that he is unable to articulate to this Court why he believes the Magistrate Judge's Findings and Recommendations are wrong in any way. It's clear from Plaintiff's pro se filings in this matter that he has an adequate understanding of the issues and is able to express himself well. Indeed, if Plaintiff had simply written out his views regarding the Findings and Recommendations instead of writing out another pro forma motion for extension, the matter would have progressed by now. The Court does not see any justification to put off any further its review of the Findings and Recommendations. Accordingly, the Court denies Plaintiff's Third Motion for |

| | | Extension. The Court intends to take this matter under advisement on February 22, 2013. If Plaintiff files any objections before that date, the Court will consider them even though they will be technically late and, in that event, the Court grants Defendants until March 6, 2013, to file any response. The Court will not accept any further Motions for Extension from Plaintiff. The Clerk is directed to attempt to expedite delivery to Plaintiff of this Order. (bb) (Entered: 02/12/2013) |
|---|---|---|
| 02/12/2013 | 104 | Clerk's Notice of Mailing to Lester R. Shinault copy of Order #103 on 2/13/2013. (bb) (Entered: 02/12/2013) |
| 03/05/2013 | 105 | **ORDER:** The Court ADOPTS Magistrate Judge Papak's Findings and Recommendation 92 . Accordingly, the Court GRANTS Defendants' Motion 27 for Summary Judgment as to Plaintiff's remaining claim for violation of Plaintiff's right to due process under the Fourteenth Amendment and DISMISSES this matter with prejudice. Signed on 03/05/2013 by Judge Anna J. Brown. (bb) (Entered: 03/05/2013) |
| 03/05/2013 | 106 | Judgment. Signed on 03/05/2013 by Judge Anna J. Brown. (bb) (Entered: 03/06/2013) |
| 03/06/2013 | 107 | Clerk's Notice of Mailing to Lester R. Shinault copy of Order (#105) and Judgment (#106) on 3/6/2013. (bb) (Entered: 03/06/2013) |
| 03/13/2013 | 108 | Notice of Change of Address. Filed by Lester R. Shinault. (gw) (Entered: 03/14/2013) |
| 04/08/2013 | 109 | Notice of Appeal to the 9th Circuit from Order 105 and Judgment 106 . No filing fee collected. Filed by Lester R. Shinault. (Attachment: # 1 Order 105 , Judgment 106 ) (gw) (Entered: 04/09/2013) |
| 04/08/2013 | 110 | Motion for Appointment of Counsel. Filed by Lester R. Shinault. (gw) (Entered: 04/09/2013) |
| 04/18/2013 | | USCA Case Number and Notice confirming Docketing Record on Appeal re Notice of Appeal 109 . **Case Appealed to Ninth Circuit Case Number 13-35290** assigned. (cp) (Entered: 04/18/2013) |
| 05/10/2013 | 111 | Order of USCA for the 9th Circuit, **USCA # 13-35290**, re Notice of Appeal 109 . The appeal is dismissed. (cp) (Entered: 05/24/2013) |
| 07/03/2013 | 112 | Order from USCA for the 9th Circuit, re Notice of Appeal 109 .Appellants July 1, 2013 motion is construed in part as a motion to reinstate. So construed, the motion is granted and this appeal is reinstated. Within 21 days after the filing date of this order, appellant shall comply with this courts April 11, 2013 order by completing and filing the authorization form, which directs the prison officials at appellants institution to assess, collect, and forward to the court the $455 filing and docketing fees for this appeal on a monthly basis whenever funds exist in appellants trust fund account. The Clerk shall re-serve a copy of the April 11, 2013 order on appellant. Failure timely to comply with this order will result in the Clerk dismissing the appeal for failure to prosecute. (sm) (Entered: 07/03/2013) |
| 07/18/2013 | 113 | |

| | | Order and Prisoner Authorization Form from USCA for the 9th Circuit USCA # 13-35290 re Notice of Appeal 109 . (sm) (Entered: 07/18/2013) |
|---|---|---|
| 07/18/2013 | 114 | **ORDER** issued by Magistrate Judge Paul Papak: As this case is dismissed, Plaintiff's Motion for Appointment of Counsel 110 is Denied as Moot. (gm) (Entered: 07/18/2013) |
| 07/18/2013 | 115 | Clerk's Notice of Mailing to Plaintiff regarding Order 114 . (gm) (Entered: 07/18/2013) |
| 12/23/2013 | | Partial Filing Fee in amount of $35.43 collected; Receipt No. 55313 issued. (ljc) (Entered: 01/07/2014) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 04/01/2014 15:28:54 | | | |
| **PACER Login:** | om0021 | **Client Code:** | 17219/3001059-00036 |
| **Description:** | Docket Report | **Search Criteria:** | 3:11-cv-00436-PK Start date: 1/1/1970 End date: 4/1/2014 |
| **Billable Pages:** | 11 | **Cost:** | 1.10 |

| 9th Circuit Case Number(s) | 13-35290 |
|---|---|

**NOTE:** To secure your input, you should print the filled-in form to PDF (File > Print > *PDF Printer/Creator*).

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## CERTIFICATE OF SERVICE
### When All Case Participants are Registered for the Appellate CM/ECF System

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on (date) | May 30, 2014 | .

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Signature (use "s/" format) | /s/ Anna-Rose Mathieson |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## CERTIFICATE OF SERVICE
### When <u>Not</u> All Case Participants are Registered for the Appellate CM/ECF System

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on (date) | | .

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

I further certify that some of the participants in the case are not registered CM/ECF users. I have mailed the foregoing document by First-Class Mail, postage prepaid, or have dispatched it to a third party commercial carrier for delivery within 3 calendar days to the following non-CM/ECF participants:

Signature (use "s/" format) |